UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| **DR. WILLIAM KYROS, M.D.,**<br>*Plaintiff*, | :<br>:<br>: |
| v. | :      Case No. _____<br>: |
| **STATE OF RHODE ISLAND**, by and through its Treasurer, James A. Diossa in his official capacity; **RHODE ISLAND DEPARTMENT OF HEALTH**, by and through its Interim Director Utpala Bandy, MD, MPH, in her official capacity; **DAVID R. GIFFORD, M.D., MPG**, individually and in his capacity as the former Director of Health of the Rhode Island Department of Health, **ROBERT S. CRAUSMAN, M.D.**, individually and in his official capacity as the former Chief Administrative Officer of the Rhode Island Board of Medical Licensure and Discipline; **JAMES V. MCDONALD, MD, MPH**, individually and in his official capacity as Medical Director and as the Chief Administrative Officer of the Board of Medical Licensure and Discipline; **NICOLE ALEXANDER-SCOTT, MD, MPH**, individually and in her official capacity as the former, Director of Health of the Rhode Island Department of Health,<br>*Defendants*. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

## **PLAINTIFF'S COMPLAINT**

### *Parties*

1. Dr. William Kyros, M.D. ("Plaintiff"), is an individual residing in Sanibel, Florida.

2. The State of Rhode Island (the "State") is a state in the United States of America, and James A. Diossa is the current Rhode Island General Treasurer.

3. The Rhode Island Department of Health ("RIDOH") is an agency of the State of Rhode Island, with its enabling legislation set forth in R.I. Gen. Laws § 23-1-1 *et seq.*, and Dr. Utpala Bandy, M.D., MPH is the current Interim Director of RIDOH.

4. Upon information and belief, Dr. David R. Gifford, M.D., MPG ("Dr. Gifford") is an individual residing in West Hartford, Connecticut.

5. Upon information and belief, Dr. Robert S. Crausman, M.D. ("Dr. Crausman") is an individual residing in Rehoboth, Massachusetts.

6. Upon information and belief, Dr. James V. McDonald, M.D., MPH ("Dr. McDonald") is an individual residing in Latham, New York.

7. Upon information and belief, Dr. Nicole Alexander-Scott, M.D., MPH ("Dr. Alexander-Scott") is an individual residing in Bridgeport, New York.

8. The State, RIDOH, Dr. Gifford, Dr. Crausman, Dr. McDonald, and Dr. Alexander-Scott are referred to as "the Defendants" in this Complaint when discussed collectively.

### *Jurisdiction*

9. This Court has original jurisdiction over this civil action pursuant to 28 U.S.C. § 1331 and under 42 U.S.C. §§ 12132-12133.

10. This Court has general personal jurisdiction over the State and RIDOH, and it has specific personal jurisdiction over the individual Defendants residing outside of the State of Rhode Island, because the conduct complained of in this action was engaged in by those individual Defendants while they were working in the State of Rhode Island.

11. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) and/or (3), because the events giving rise to Plaintiff's claims occurred in this judicial district and Defendants are generally subject to personal jurisdiction in the State of Rhode Island.

*Facts*

12. On August 14, 2009, Plaintiff and the Board of Medical Licensure and Discipline (the "Board" or "BMLD"), a division of RIDOH, entered into an "Agreement to Cease Practice" ("the Agreement"), with Dr. David R. Gifford, M.D., MPG, the former Director of Health ("Dr. Gifford"), signing the Agreement on behalf of the Board. *See* **Exhibit A** (Agreement). The Agreement to Cease Practice acts as a Consent Order and binding contract between RIDOH and Plaintiff. *See id*.; *see also* 216-RICR-10-05-4.15 ("Every agreement shall contain, in addition to an appropriate order, an admission of all jurisdictional facts and express waivers of further procedural steps before the AHO and of the right to appeal and shall also state that such agreement is enforceable as an order of the Department in accordance with procedures prescribed by law.").

13. In pertinent part, Plaintiff "agree[d] to cease practicing any branch of medicine." *Id*. In addition, the Agreement provided that Plaintiff "agree[d] to go for an evaluation at the Santé Center for Healing, Argyle, [Texas][,]" that "[t]he evaluation report must be sent directly to the Board of Medical Licensure and Discipline[,]" and that "*[t]he Board will make a determination on final sanctions after it reviews and considers the evaluation report from Santé Center for Healing*." *Id.* (emphasis added).

14. Plaintiff attended the Santé Center for Healing in Argyle, Texas, as required by the "Agreement to Cease Practice," from August 17, 2009 to August 20, 2009. *See generally* **Exhibit B** (Santé Center Assessment).

15. On August 27, 2009, Plaintiff's former counsel, Michael G. Sarli, Esq. ("Attorney Sarli"), sent a letter to Bruce McIntyre, who was at that time the BMLD's legal counsel, requesting guidance as to how to proceed in the wake of the Santé Center for Healing's report and

3

recommendations therein. *See* **Exhibit C** (Letter from Attorney Sarli, dated August 27, 2009). Attorney Sarli wrote:

> I trust that you have had the opportunity to review the preliminary recommendations of the Santé Center for Healing insofar as they concern Dr. Kyros. In that connection, Dr. Kyros wants to do everything he reasonably can to return to the practice of medicine in his specialty. In that connection, he has asked me to advise the Department of Health that he is willing to undergo the recommendations made by the Santé Center and would like to begin immediately. He has asked me to inquire as to whether or not there are any psychotherapists that the Department would want him to establish a relationship with and whether or not there are any specific designated licensed professionals the Department would want him to have present during encounters with patients of the opposite sex. He is also perfectly willing to attend the recommended continuing education courses.

*Id.*

16. After receiving no response to his August 27, 2009 letter, Attorney Sarli sent a second letter, this time to Dr. Robert S. Crausman, M.D. ("Dr. Crausman"), at that time the Chief Administrative Officer of the BMLD, on September 30, 2009. *See* **Exhibit D** (Letter from Attorney Sarli, dated September 30, 2009). In the second letter, Attorney Sarli wrote:

> I am assuming that you have received your copy of the Santé Center for Healing's report on Dr. Kyros. In that connection, Dr. Kyros is eager to address any and all concerns that have been raised. In that connection, and as you know from my earlier letter, he is willing to accept the Department's recommendation or any particular therapist.

*Id.*

17. After receiving no response from the BMLD with respect to either letter, Plaintiff, at the recommendation of Attorney Sarli, began treatment with Edward M. Brown, M.D. ("Dr. Brown") starting in October of 2009. *See* **Exhibit E** (Deposition of Dr. Kyros, conducted on January 31, 2018 (Kyros. Dep.)), at 123:1-18. After treating with Dr. Brown, Dr.

4

Brown wrote that he saw Plaintiff once every two weeks starting in October 2009. *See* **Exhibit F** (Letter from Dr. Brown, dated August 2, 2010). Dr. Brown noted that "[s]ince Dr. Kyros has had eighteen years practicing without complaint, it seems that there are some practice settings, less challenging than the one where his recent difficulties arose, where he should be able to practice successfully." *Id.*

18. Plaintiff also saw Gene Jacobs, D.O. ("Dr. Jacobs") for treatment for three and a half years after he entered the Agreement to Cease Practice. *See* Kyros Dep. at 135:9-14; 136:17-137:1. Dr. Jacobs noted "[a]fter working with Dr. Kyros these past 3.5 years I saw no evidence of any characterological traits or patterns consistent with or evidencing a propensity or likelihood of Dr. Kyros exhibiting boundary issues." *See* **Exhibit G** (Letter from Dr. Jacobs, dated May 13, 2013).

19. On June 10, 2013, almost four (4) years after requesting, but not receiving, guidance from the BMLD, Attorney Sarli wrote to the BMLD Chief Administrative Officer James V. McDonald M.D., MPH ("Dr. McDonald"), stating:

> Toward that end, Dr. Kyros has been under the treatment of Dr. Jacobs and I am enclosing a copy of his note of May 13, 2013 which summarizes Dr. Kyros' current condition and the insight Dr. Jacobs has insofar as the boundary issue is concerned.
>
> Given his progress and his compliance with all requests of the Department of Health, he has asked me to inquire on his behalf as to whether or not we can arrange an appointment to discuss his future.

**Exhibit H** (Letter from Attorney Sarli, dated June 10, 2013).

20. At no time between August 14, 2009 and the June 10, 2013 letter did Plaintiff receive any response from the Board with respect to his completion of the Santé Center treatment pursuant to the Agreement.

5

21. Plaintiff was also evaluated by a Forensic Psychiatrist, Daniel S. Harrop, M.D. ("Dr. Harrop"), in August 2013, as requested by Dr. Herbert Rakatansky, the Chairman of the Physician's Health Committee. *See* **Exhibit I** (Letter from Dr. Harrop, dated August 19, 2013). This evaluation specifically addressed Plaintiff's "fitness for duty," or work readiness as a physician. *Id.* Dr. Harrop noted that after conducting extensive examinations that Plaintiff's mental status was entirely within normal limits. *Id.* Dr. Harrop noted that Plaintiff had never had any other legal problems: no arrests, no civil judgments, and no malpractice suits. *Id.* Dr. Harrop found no evidence of psychiatric disorder and concluded Plaintiff was "fit-for-duty," and should have his license returned unrestricted and be able to resume his practice. *Id.*

22. Thereafter, the Physicians Health Committee ("PHC") reviewed Dr. Harrop's evaluation and stated the psychiatric symptoms that led to Plaintiff seeking treatment (the trauma and depression resulting from the fear of losing his livelihood and reputation permanently) had abated. *See* **Exhibit J** (Letter from Dr. Rakatansky, dated September 9, 2013). The PHC noted Dr. Jacob's and Dr. Harrop's findings that Plaintiff was no longer impaired medically or psychologically and concluded that "we have no reason to doubt this conclusion." *Id.*

23. On December 4, 2013, Dr. McDonald and Attorney Thomas J. Corrigan, Jr., the BMLD's legal counsel at that time, sent a letter to Plaintiff claiming that the Investigating Committee of the BMLD "ha[d] made a finding of 'Unprofessional Conduct' on your part relating to your role" in the case at hand. *See* **Exhibit K** (Investigating Committee Finding of Unprofessional Conduct).

24. In January 2014, a meeting took place between Plaintiff and Dr. McDonald, among others. Plaintiff described the meeting as:

6

> a discussion of where we go from here, whether to go to a hearing or to accept a consent that I was uncomfortable accepting, which would have required supervision and probation, and I did not feel I needed that . . . so there was no agreement at that meeting.

*See* Kyros. Dep. at 159:10-17.

25. As of early 2014, Plaintiff could no longer afford his legal costs of Attorney Sarli, and after a time engaged the services of Ronald J. Resmini, Esq. ("Attorney Resmini"). *See id.* at 160:21-24.

26. In a prior proceeding, Plaintiff testified that upon his engagement of Attorney Resmini's services, Attorney Resmini "requested documents. It took four months to get my file from the Board to Mr. Resmini." *See id.* at 160:25-161:2.

27. Plaintiff also testified that from 2014 to 2015, Attorney Resmini, Plaintiff, Dr. McDonald, and several BMLD attorneys met occasionally "to discuss potential consents to put the matter to rest. As time went along, Dr. McDonald requested an update from one of the previous physicians, and I got an update from Dr. Harrop in November of 2015." *See id.* at 163:9-17.

28. Plaintiff continued receiving an updated medical license on an annual basis after the Agreement was signed, until June 30, 2014, after which the Board stopped sending Plaintiff updated licenses. The Board did not offer a hearing on its decision to unilaterally revoke Plaintiff's license in 2014. While Plaintiff continued receiving his medical license every year from 2009 to 2014, he could not benefit from the use of his license due to the Agreement and the Board's failure to take final action on sanctions under such.

29. On November 5, 2015, Dr. Harrop wrote a letter to Dr. McDonald. *See* **Exhibit L** (Letter from Dr. Harrop, dated November 5, 2015). In his letter, Dr. Harrop wrote:

> As such, my opinion remains much as it did in August 2013: After an extensive review of the psychiatric records, the complaints as forwarded, and recognizing at the current time that [Dr. Kyros] has no psychiatric diagnosis, having fully recovered from post-traumatic stress disorder and major depressive disorder, and that he is not in any other way impaired medically or psychiatrically, I find that he would be "fit for duty" to have his medical license returned unrestricted at the present time to be able to resume his medical practice.

*Id.*

30. Plaintiff testified that, after the November 5 letter from Dr. Harrop, "I believe there were just the ongoing back-and-forth of consent proposals, Mr. Resmini to the Board, and back-and-forth, I mean, they would happen every six to eight weeks." *See* Kyros Dep. at 165:24-166:2.

31. Plaintiff further testified that he found himself unable to agree to the proposed consent decrees "[b]ecause of the ongoing requests that I participate in supervision, probation, and I believe it came to me having to reapply for licensure, and I had had my license since the late 1980s. There was just no agreement." *See* Kyros. Dep. at 166:8-12.

32. On September 8, 2016, Plaintiff notified the Board that he had retained new counsel. *See* **Exhibit M** (Letter from Michael A. Kelly, Esq., dated September 8, 2016). The letter suggested a new proposed Consent Order, which would allow Plaintiff to practice his chosen profession without restriction after seven years of not practicing. *Id.*

33. On October 13, 2016, Plaintiff's counsel, Michael A. Kelly, Esq. ("Attorney Kelly") sent a follow up letter to Dr. McDonald. *See* **Exhibit N** (Letter from Attorney Kelly, dated October 13, 2016). Attorney Kelly's letter indicated that his office had received no response to his September 8, 2016 letter, and assumed that the BMLD accepted the proposed Consent Order making it effective and enforceable. *Id.*

34. Dr. McDonald and the BMLD responded to the October 13, 2016 letter on November 11, 2016, stating that the September 8, 2016 letter "did not evidence the requisite insight for the Board to seriously consider this request." *See* **Exhibit O** (Letter from Attorney Kelly, dated November 17, 2016).

35. In a letter from Lauren Lasso, the Administrative Officer for the BMLD, Plaintiff was notified that "[a] letter and Reinstatement Application was sent to Dr. Kyros. In order for the Committee to further consider Dr. Kyros' request for reinstatement of licensure, we need a completed application and the required supporting documents." *See* **Exhibit P** (Letter from Lauren Lasso, dated February 2, 2017).

36. On March 23, 2017, Plaintiff, through his attorneys, filed a Reinstatement Application and paid the required fees. *See* **Exhibit Q** (Letter from Jackson C. Parmenter, Esq. ("Attorney Parmenter"), dated March 23, 2017).

37. Six days later, Angela Phengsavatdy of the BMLD, wrote back saying that Plaintiff had submitted an incomplete fee and application. *See* **Exhibit R** (Letter from Angela Phengsavatdy, dated March 29, 2017).

38. Two weeks later, Plaintiff submitted the requested documents to complete his application. *See* **Exhibit S** (Letter from Attorney Parmenter, dated April 13, 2017). Supplemental information was provided on April 25, 2017. *See* **Exhibit T** (Letter from Attorney Parmenter, dated April 25, 2017).

39. The BMLD Licensure Committee met on August 3, 2017 to consider Plaintiff's application, but "[g]iven the complexity of your application from the previous adverse action of August 14th, 2009, the committee tabled the matter that day and considered this

matter again on September 7th, 2017." *See* **Exhibit U** (Letter from Dr. McDonald, dated September 11, 2017).

40. Dr. McDonald wrote a letter on September 11, 2017, which stated "[a]t the September 7th Licensing Committee meeting, the committee voted to have you attend the Santé Center for a re-evaluation since so much time has elapsed since the original evaluation. The committee also requires you to attend the Center for Personalized Education for Physicians (CPEP) to assess your clinical competency to practice psychiatry." *Id.* "Once both of these evaluations are completed, the committee will reassess your application for a license as a physician." *Id.*

41. Plaintiff, though counsel, timely demanded "a formal hearing relative to the Board of Medical Licensure and Discipline Committee's . . . decision dated September 11, 2017." *See* **Exhibit V** (Letter from Attorney Parmenter, dated September 18, 2017).

42. Dr. McDonald confirmed that Plaintiff's demand for a formal hearing had been received on September 21, 2017. *See* **Exhibit W** (Letter from Dr. McDonald, dated September 26, 2017). He further noted:

> At present your application for a physician license has not been approved or denied. If you are not willing to attend the Santé Cente[r] and CPEP as the Committee requested, you can communicate that to the committee at that time.

*Id.*

43. In a letter dated October 3, 2017, Plaintiff, through counsel, stated:

> Moreover, please be advised that in no way did our letter state that Dr. Kyros was unwilling to attend the Santé Center and CPEP as requested by the Committee. Rather, we feel that neither the Santé Center nor the CPEP is necessary for the reasons outlined in our September 18, 2017 correspondence. Accordingly, Dr. Kyros is requesting a formal hearing to determine whether attending the Santé Center or the CPEP is even necessary given that he has already

10

> gone through for treatment, or if his license to practice should be immediately reinstated without conditions or restrictions. If after a formal hearing, a decision is issued requiring Dr. Kyros to attend the Santé Center and CPEP, we will evaluate Dr. Kyros' options at that time.

*See* **Exhibit X** (Letter from Attorney Parmenter, dated October 3, 2017).

44. In an October 10, 2017 letter, the BMLD Licensure Committee notified Plaintiff of its decision to "recommended denial" of his application for license reinstatement. *See* **Exhibit Y** (Letter from Dr. McDonald, dated October 10, 2017).

45. Plaintiff requested a formal hearing again two days later. *See* **Exhibit Z** (Letter from Attorney Parmenter, October 12, 2017).

46. On November 3, 2017, a Specification of Charges was sent to Plaintiff, via his attorney, accusing him of violating R.I. Gen. Laws § 5-37-5.1(24). Notice of his hearing date was also provided. *See* **Exhibit AA** (Notice of Hearing). The Notice stated:

> Pursuant to the provisions for a hearing in Rhode Island General Laws §§ 5-37-5.3 and 5.4 (1956) as amended, you are hereby given notice that the Rhode Island Board of Medical Licensure and Discipline will hold a hearing to receive and act upon evidence that you may have violated certain laws and regulations as set forth in the previously delivered Specification of the Charges. The hearing will be conducted on the question of whether your license as a physician in Rhode Island should be revoked, suspended and/or otherwise disciplined.

*Id.*

47. The hearing was held in three parts, taking place on December 7, 2017, January 31, 2018, and May 17, 2018. *See generally* Kyros Dep.

48. On November 14, 2018, the Board issued a decision (the "Board Decision") requiring that Plaintiff, in order to be re-licensed, attend CPEP only, not Santé Center. *See* **Exhibit AB** (Board Decision). The BMLD ordered:

> Pursuant to the Agreement, the Committee found that in order to be re-licensed, the Respondent shall ensure competency by satisfactorily completing the fitness for duty and clinical competency assessment at CPEP and by following all recommendations from CPEP. The Respondent shall keep the Board informed of his progress at CPEP on an ongoing basis. Additionally, the Respondent shall satisfy all statutory requirements for licensing (e.g. CME's, application, fees).

*Id.* at 9. The Board Decision included a footnote that reads as follows:

> Note that this is not the Reentry to Clinical Program at CPEP. Those seeking to reenter practice after discipline are directed to CPEP's clinical competence assessment program. Along with clinical competency, the Respondent shall complete the fitness for duty evaluation. The method for completing these programs is determined by CPEP.

*Id.*

49. The Board did not require that Plaintiff attend the Santé Center, although the treatment ordered by the BMLD at CPEP would have cost roughly $28,000.

50. Plaintiff timely appealed the Board Decision to the Rhode Island Superior Court. *See* **Exhibit AC** (Administrative Appeal).

51. In a December 13, 2019 written decision by Rhode Island Superior Court Associate Justice Jeffrey A. Lanphear, the trial justice granted the appeal and reversed the Board Decision. *See* **Exhibit AD** (Trial Court Decision).

52. The trial justice found that "the Board relie[d] solely on Dr. Kyros' nine-year gap in practicing medicine—a gap that the Board is largely responsible for—to justify requiring clinical competency courses." *Id.* at 8.

53. The trial justice held that the Board's decision was arbitrary and capricious, and explained that "[t]he Board arbitrarily believes this gap speaks for itself" but that the record was "devoid of nearly any evidence that Dr. Kyros is not clinically competent." *Id.*

54. Further, the trial justice relayed his concerns "about the extensive license deprivation" created by the Board "where Dr. Kyros was unable to understand and fulfill what [the Board] wanted for over nine years." *Id.* at 9.

55. The trial justice further explained that Plaintiff never actually surrendered his license, but that he only agreed to temporarily cease practice. *Id.*

56. The trial justice held that Plaintiff "was only forced to apply for relicensure to get the Board to come to a conclusion when it repeatedly remained silent regarding Dr. Kyros's efforts to return to practice." *Id.*

57. Importantly, as the trial justice acknowledged, there was never a finding of unprofessional conduct by the Board. *Id.* at 11.

58. The trial justice did not decide any constitutional issues, and he reversed the Board decision without a remand, noting that it would be unjust for Plaintiff to have to suffer more delay in returning to practice. *Id.* at 12.

59. The Rhode Island Department of Health then appealed the Trial Court Decision to the Rhode Island Supreme Court, and they filed an emergency order to stay the decision of the trial justice to reverse and vacate without a remand. The Rhode Island Supreme Court granted the emergency order, leaving Plaintiff unable to resume practicing medicine.

60. In a decision released on June 30, 2021 (the "Rhode Island Supreme Court Decision"), the Rhode Island Supreme Court affirmed the Trial Court Decision and held that the trial justice properly reversed the Board Decision for being unsupported by the evidence. *See* **Exhibit AE** (Rhode Island Supreme Court Decision); *see also Kyros v. Rhode Island Department of Health*, 253 A.3d 879, 886-87 (R.I. 2021) ("The Board failed to make a

single finding that Dr. Kyros was, in fact, not clinically competent, and wholly overlooked the substantial evidence in the record that plaintiff was fit for clinical practice.").

61. The Rhode Island Supreme Court wrote that "[p]arties who are subject to administrative proceedings have the right to an expeditious agency decision and judicial decision[,]" and based on these grounds, affirmed, the trial justice's decision to reverse the Board without a remand. *Id.* at 887.

62. The Court also explained, "Doctor Kyros voluntarily ceased practicing medicine for more than nine years. It is striking that defendants would now claim that this matter should be further delayed in order to afford them an opportunity to attempt to correct the deficiency of the Board's decision which did not comply with the specification of charges. Allowing defendants to continue to stonewall Dr. Kyros' return to the practice of medicine will not further the interests of justice." *Id.*

63. While Plaintiff now has the use of his license back, he was deprived the use of that license for more than nine years because of the Board's failure to finally determine the status of Plaintiff's license following the Agreement.

64. Between August 14, 2009 and November 14, 2018, the Board did not make a final determination on Plaintiff's sanctions or provide a path for Plaintiff to return to practice.

65. Plaintiff's right to practice medicine remained in flux until the Rhode Island Supreme Court Decision was handed down on June 30, 2021.

66. The Board violated Plaintiff's constitutional due process rights under the United States Constitution, and it discriminated against Plaintiff based upon a disability in violation of the Americans with Disabilities Act.

67. As a result of the Board's actions and/or inactions, Plaintiff has been damaged, including, but not limited to lost income for the nine-plus year period that he was unable to practice.

## Count I

### § 1983 – Procedural Due Process – Fourteenth Amendment of the United States Constitution

68. Plaintiff repeats and reavers the allegations set forth in Paragraphs 1 through 67 of the Complaint as if they were each set forth separately herein.

69. At all relevant times, Plaintiff had a protected property interest in his medical license.

70. The Defendants, acting under the color of state law, deprived Plaintiff of his medical license without constitutionally adequate process.

71. The deprivation of Plaintiff's medical license was significant, and Plaintiff was deprived of his ability to earn income pursuant to his license.

72. Defendants continuously violated Plaintiff's procedural due process rights from August 14, 2009 to December 7, 2017, and at no time from at least August 14, 2009 to December 7, 2017, did Defendants afford Plaintiff an opportunity to be heard on the deprivation of his license at a meaningful time or in a meaningful manner.

73. Under this particular situation, procedural due process required Defendants to make a final determination on the status of Plaintiff's medical license shortly after the Agreement was entered on August 14, 2009.

74. Instead, Defendants waited over nine years before they issued a final decision on the status of Plaintiff's license.

75. Plaintiff's de facto license suspension was supposed to be temporary under the Agreement, but due to Defendants' inaction, Plaintiff was unable to resume practicing medicine until

he obtained a final decision in his favor on his administrative appeal from the Rhode Island Supreme Court on June 30, 2021.

76. Defendants' inaction on Plaintiff's license status was equivalent to a final deprivation of his license rather than a temporary cease of practice under the Agreement.

77. The Board never made a finding of unprofessional conduct.

78. Any proceedings that took place in front of the Board lacked adequate procedural safeguards.

79. Each of the individual Defendants, from an objective standpoint, should have known that their conduct was unlawful, and Plaintiff's constitutional right not to be deprived of his medical license without procedural due process was clearly established at the time of the violation.

80. Any reasonable public official for RIDOH would have understood that the failure to take action on Plaintiff's medical license contravened his procedural due process rights.

81. Plaintiff has been injured as a result of the Defendants actions and/or inactions.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter an order as follows:

a. That the Defendants are jointly and severally liable to Plaintiff for violating his rights under § 1983 and the Fourteenth Amendment of the United States Constitution;

b. An award to Plaintiff of damages in an amount to make Plaintiff whole for Defendants' constitutional violations;

c. An award to Plaintiff of any and all attorneys' fees, costs, and other expenses incurred by Plaintiff; and

d. Any other relief that the Court deems fair, equitable, and just.

## Count II

*§ 1983 – Substantive Due Process - Fourteenth Amendment of the United States Constitution*

82. Plaintiff repeats and reavers the allegations set forth in Paragraphs 1 through 81 of the Complaint as if they were each set forth separately herein.

83. The Defendants aforementioned actions and/or inactions violated Plaintiff's substantive due process rights under the United States Constitution.

84. Defendants unlawfully deprived Plaintiff of his medical license, in which he had a protected property interest.

85. Defendants actions and/or inactions were so egregious as to shock the conscious.

86. Defendants abused their government power when they refused to take action on Plaintiff's license.

87. The nine-year gap relied upon by Defendants to continue depriving Plaintiff of his license in November of 2018 did not have a rational connection to Plaintiff's fitness or capacity to practice medicine.

88. Both the Rhode Island Superior Court and Rhode Island Supreme Court held that Defendants' actions and/or inactions were arbitrary and capricious.

89. Plaintiff has been injured as a result of Defendants' actions and/or inactions.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter an order as follows:

a. That the Defendants are jointly and severally liable to Plaintiff for violating his rights under § 1983 and the Fourteenth Amendment of the United States Constitution;

b. An award to Plaintiff of damages in an amount to make Plaintiff whole for Defendants' constitutional violations;

    c. An award to Plaintiff of any and all attorneys' fees, costs, and other expenses incurred by Plaintiff; and

    d. Any other relief that the Court deems fair, equitable, and just.

## Count III

### *Americans with Disabilities Act – 42 U.S.C. §§ 12132-12133*

90. Plaintiff repeats and reavers the allegations set forth in Paragraphs 1 through 89 of the Complaint as if they were each set forth separately herein.

91. At all relevant times, Plaintiff was a qualified individual with a disability.

92. At Plaintiff's initial evaluation at the Santa Centré, he was diagnosed with depression, anxiety, and obsessive-compulsive disorder ("OCD").

93. By reason of this disability, Defendants excluded Plaintiff from the benefits of the services, programs, or activities of the State and/or the Rhode Island Department of Health as a provider of medical licenses.

94. Defendants subjected Plaintiff to discrimination by reason of his disability.

95. Defendants continuously discriminated against Plaintiff based upon his disability when they refused his repeated requests to return to practice and continued treating and regarding him as disabled, despite the fact that Defendants had received multiple letters from Plaintiff's treating physicians informing Defendants that Plaintiff was no longer disabled and was fit to resume practice.

96. Plaintiff has suffered damages as a result of Defendants' violations of the Americans with Disabilities Act.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter an order as follows:

a. That the Defendants are jointly and severally liable to Plaintiff for violating his rights under the Americans with Disabilities Act;

b. An award to Plaintiff of damages in an amount to make Plaintiff whole for Defendants' violations of the Americans with Disabilities Act;

c. An award to Plaintiff of any and all attorneys' fees, costs, and other expenses incurred by Plaintiff; and

d. Any other relief that the Court deems fair, equitable, and just.

## Jury Demand

Plaintiff demands a trial by jury on all claims in this Complaint so triable.

Respectfully submitted,

**DR. WILLIAM KYROS, M.D.**

*By and through his attorneys,*

*/s/ Jackson C. Parmenter*
Jackson C. Parmenter, Esq. (#8396)
Michael D. Resnick, Esq. (#9028)
**KELLY, SOUZA & PARMENTER, PC**
128 Dorrance Street, Suite 300
Providence, RI 02903
Tel. (401) 490-7334
*jparmenter@ksplawpc.com*

Dated: February 21, 2024