# **EXHIBIT A**

:d in Providence/Bristol County Superior Court
omitted: 1/18/2019 10:48 AM
velope: 1881090
viewer: Alexa G.

Prt #3

STATE OF RHODE ISLAND
DEPARTMENT OF HEALTH
BOARD OF MEDICAL LICENSURE AND
DISCIPLINE

08-250
09-252

IN THE MATTER OF WILLIAM P. KYROS, M.D.
License Number MD 6880

## AGREEMENT TO CEASE PRACTICE

The Board of Medical Licensure and Discipline (hereinafter referred to as the "Board") received notice that the Respondent engaged in unprofessional conduct by engaging in serious professional boundary violations with patients. An Investigating Committee of the Board convened and considered the facts and circumstances surrounding the allegations and has found probable cause for discipline. The Investigating Committee's Findings of fact and conclusions of law are set forth below.

## FINDINGS OF FACTS AND CONCLUSIONS OF LAW

1.  Respondent is a physician licensed to practice in Rhode Island since June 1986. He is a 1980 graduate of St. Georges University School of Medicine in Grenada and is Board Certified in General Psychiatry. The Department of Health received information concerning three boundary violations with women who were his patients.

2.  The boundary violations date back to the early 1990s and more recently this year. The Board learned of this information while investigating a complaint that occurred in April of 2009.

d in Providence/Bristol County Superior Court
omitted: 1/18/2019 10:48 AM
velope: 1881090
viewer: Alexa G.

3.   The Board learned also that the Respondent was working as an employee in a mental health practice that lacked proper licensure and organizational structure.

4.   When the president of the mental health practice learned of information concerning two boundary violations, he did not refer them to the Board. He undertook measures such as tape recording patient sessions without their consent in order to protect the patients and the practice.

5.   The Board finds that this practice violated the Confidentiality of Health Care Information and Communications act, the state mental health law and the Federal Health Insurance Portability and Accountability Act (HIPAA).

6.   The complaints to the Board implicate the provisions of R.I.G.L.5-37-5.1 (30) for sexual contact between a doctor and a patient.

**The parties agree as follows:**

(a)  The Respondent is a physician licensed and doing business under the laws of the State of Rhode Island, allopathic license number MD 06880;

(b)  Respondent admits to the jurisdiction of the Board and hereby agrees to remain under the jurisdiction of the Board;

(c)  Respondent hereby acknowledges and waives:

(1)  The right to appear personally or by counsel or both before the Board;

(2)  The right to produce witnesses and evidence in his behalf at a

d in Providence/Bristol County Superior Court
bmitted: 1/18/2019 10:48 AM
velope: 1881090
viewer: Alexa G.

hearing;

(3) The right to cross-examine witnesses;

(4) The right to have subpoenas issued by the Board;

(5) The right to further procedural steps except for those specifically contained herein;

(6) Any and all rights of appeal of this Consent Order;

(7) Any objection to the fact that this Consent Order will be presented to the Board for consideration and review;

(8) Any objection to the fact that it will be necessary for the Board to become acquainted with all evidence pertaining to this matter in order to review adequately this Consent Order;

(9) Any objection to the fact that potential bias against the Respondent may occur as a result of the presentation of this Consent Order. The signing of this Consent Order is for settlement purposes only.

(10) Failure to comply with this Consent Order, when signed and accepted, shall subject the Respondent to further disciplinary action.

## ORDER

Respondent agrees to cease practicing any branch of medicine. The Respondent agrees to go for an evaluation at the Sante Center for Healing; Argyle, TX. The evaluation report must be sent directly to the Board of Medical Licensure and Discipline. The Board will make a determination on final sanctions after it reviews and considers the evaluation report from Sante Center for Healing.

ed in Providence/Bristol County Superior Court
bmitted: 1/18/2019 10:48 AM
velope: 1881090
viewer: Alexa G.

William P. Kyros, M.D.

Ratified by the Board of Medical Licensure and Discipline at a meeting held on _____, 2009.

David R. Gifford, M.D., MPH
Director of Health

# EXHIBIT B

RIDOH Exhibit # 4



**Santé**
CENTER FOR HEALING

PROFESSIONALS ASSESSMENT PROGRAM

ASSESSMENT OF

WILLIAM KYROS, MD

ASSESSMENT NO.  A151

AUGUST 17, 2009 – AUGUST 20, 2009

C O N F I D E N T I A L

SANTÉ CENTER FOR HEALING
PROFFESSIONAL ASSESSMENT PROGRAM
DR. WILLIAM KYROS (A152)

## CONTENTS

| SECTION | PAGE NUMBER |
|---|---|

| WAIVER OF CONFIDENTIALITY | 3 |
| CAUTION IN THE USE OF THIS REPORT | 3 |
| COLLATERAL INFORMATION | 4 |
| NURSING ASSESSMENT | 6 |
| PSYCHIATRIC ASSESSMENT | 12 |
| PSYCHOLOGICAL TESTING | 20 |
| POLYGRAPH #1 | 37 |
| POLYGRAPH #2 | 43 |
| BIOPSYCHOSOCIAL ASSESSMENT | 46 |
| SPIRITUALITY ASSESSSMENT | 50 |
| PRELIMINARY RECOMMENDATIONS | 52 |

**CONFIDENTIAL**          2

This information has been released to you from records whose confidentiality is protected by Federal
Regulations (42CFR,Part 2) which prohibits you from making any further disclosure without the specific
written consent of the person to whom it pertains or as otherwise permitted by such regulations.

SANTÉ CENTER FOR HEALING
PROFFESIONAL ASSESSMENT PROGRAM
DR. WILLIAM KYROS (A152)

The assessment team consisted of James Montgomery, MD, Attending Psychiatrist;
William Swenson, LPC, LCDC; Rick Gordon, LCSW; Linda Trowbridge, RN, CARN;
Ron Arrington, LCDC;. Michael Chimarys, Polygrapher, Robert Hardin, Polygrapher and
Charles Haskovec. Ph.D., Forensic and Testing Psychologist.

## WAIVER OF CONFIDENTIALITY

The doctor provided us with a written authorization permitting us to disclose to you the
results of this assessment.   This preliminary summary was prepared with his full
knowledge and informed consent that information provided in clinical interviews,
performance on psychological tests, disclosures on self-evaluation questions and
questionnaires, written assignments and additional information obtained from collateral
sources would be used in the creation of this and subsequent reports and completion of
component individual professional evaluations.  He was informed of the assessment
team's defined duty to inform and duty to report certain information if obtained in
accordance with state and federal laws.  Further disclosure of this report or any other
medical information is not permitted under the terms of this authorization without his
expressed written consent.

## CAUTION IN THE USE OF THIS REPORT

The results of this assessment were based upon the information provided by the
individual and collateral sources.  We have not attempted to assure the accuracy of
collateral information obtained or provided. He was given the opportunity to provide the
assessment team with any collateral information felt to be relevant and helpful in order
for our team to conduct an objective assessment. Concerned parties and in particular the
referring party were provided with the same opportunity.

The diagnostic consultations, opinions and recommendations contained herein are based
upon this database, and are stated with a reasonable degree of medical and clinical
certainty unless otherwise indicated.  Additional information not disclosed to us by him
or provided by collateral sources could significantly alter the assessment results.  The
assessment team reserves the right to amend its options and conclusions in such
situations.  Natural limitations in the assessment process and our state of knowledge are
acknowledged and, therefore, we cannot validate fully nor predict accurately all future
behaviors and actions of this person.

CONFIDENTIAL                                  3

This information has been released to you from records whose confidentiality is protected by Federal
Regulations (42CFR,Part 2) which prohibits you from making any further disclosure without the specific
written consent of the person to whom it pertains or as otherwise permitted by such regulations.

SANTÉ CENTER FOR HEALING
PROFFESSIONAL ASSESSMENT PROGRAM
DR. WILLIAM KYROS (A152)

## COLLATERAL INFORMATION
### By Ron Arrington, L.C.D.C.

The information in this report was derived from the following sources: clinical interview with Dr. Kyros, collateral phone interviews with Peter Podenworny, Detective, Cranston, R.I. Police Department, Ed Brown, M.D. past psychiatrist for Dr. Kyros, Elizabeth Aloisio, Clinical Director, Quality Behavioral Health (QBH), Gene Jacobs, M.D., colleague QBH, Robert Arruda Owner and Director, QBH, Mark O'Brian, M.D. Medical Director Behavior Medicine Clinic, Ethan Kisch, M.D. Medical Director QBH, David Stoll. M.D. past Chairman Medical Staff executive Committee, Landmark Medical Center. Proper releases of information was obtained for each party interviewed.

Written and verbal reports from polygraphists Michael Chimarys and Robert Hardin were obtained. The full reports of both Mr. Chimarys and Mr. Hardin are included elsewhere in this report in there entirety.

For the past approximate 2 years Dr. Kyros has worked 35 hours per week, over 3 days per week, for Quality Behavioral Health. He will typically conduct three psychiatric evaluations and thirty-six medication management sessions per day. He does not practice psychotherapy sessions as a part of this practice, and I think it important to note, has never practiced psychotherapy. The clientele of the clinic are described as very challenging, dual diagnosed, severally or chronically mentally ill, many with personality disorders and generally characterized as a population that might misinterpret the intentions of another or be easily prone to complain over real or imagined wrongs. The two most recent complaints were from this clientele base at QBH.

It is significant to note while Dr. Kyros and his colleagues appear to suggest these complaints were a result of the particular patient population he treated, other psychiatrist at QBH, in the same setting , treating the same population have had no complaints of sexual misconduct or inappropriateness.

The collateral data from employers and coworkers uniformly paint a picture of a committed psychiatrist, who consistently receives high praises for his care and concern of patients. He is thought of only in terms of praise from peers, "kindly, humble, good boundaries, takes his time, soft spoken, very gentlemanly, respectful, loved by administrative staff, impeccable demeanor, being accused of this unthinkable", etc. There was more than one comment made regarding his lack of tolerance for off colored humor and his refusal to encourage or reinforce this behavior on the part of others.

CONFIDENTIAL                    4

This information has been released to you from records whose confidentiality is protected by Federal Regulations (42CFR,Part 2) which prohibits you from making any further disclosure without the specific written consent of the person to whom it pertains or as otherwise permitted by such regulations.

SANTÉ CENTER FOR HEALING
PROFFESSIONAL ASSESSMENT PROGRAM
DR. WILLIAM KYROS (A152)

There were several features of Dr. Kyros history that stood out in this interview. We discussed these in terms of a Bell curve and the fact that Dr. Kyros was leaning toward the extremes in significant areas related to this assessment:

1. Dr. Kyros has not been in a significant relationship since his divorce approximately 12 years ago. He reports being comfortable not being in a relationship as his work life keeps him busy and fulfilled.

2. He has no sexual outlet, including masturbation which he has not engaged in since high school. He stated, "I am not driven nor motivated by sex and I am aware of the dangers of STD's". He reported that when he has a sexual thought he simple distracts himself by thinking of all he has to do.

3. He does not have a social life to speak of and is also comfortable with this.

4. On his first polygraph Dr. Kyros was observed altering his breathing and contacting major muscle groups, this was perceived by the administrator of the polygraph to be a deliberate and intentional way to alter the outcome of the polygraph, as a result he failed this polygraph. On his second polygraph, with a different tester the same evasive measures were not noted and he showed a deception on each relevant question. In the 12 years we have been doing these assessments we have never encountered this scenario.

5. Dr. Kyros has had 4 allegations of some type of sexual inappropriateness, either verbal or physical, three patient reported and one reportedly witnessed by 4 staff members. As previously mentioned this is not occurring with colleagues treating the same patient population.

6. Dr. Kyros took no measures of his own accord following the second and third allegations to safe guard himself against future allegations or seek to understand why this was recurring in his practice.

These six factors would seem to lend themselves to a belief that without significant intervention a fifth incident is highly likely.

This information has been released to you from records whose confidentiality is protected by Federal Regulations (42CFR,Part 2) which prohibits you from making any further disclosure without the specific written consent of the person to whom it pertains or as otherwise permitted by such regulations.

SANTÉ CENTER FOR HEALING
PROFFESSIONAL ASSESSMENT PROGRAM
DR. WILLIAM KYROS (A152)

## NURSING ASSESSMENT
### By Linda Trowbridge, R.N., C.A.R.N.

## PSYCHOSOCIAL INFORMATION:

Patient Name: Kyros, William, MD    Address: 7 Bedford St., Barrington, RI, 02806

Phone number: 401-286-4766    Birthdate: 1-1-1954    Age: 55

Marital Status: divorced

Referral: Robert Krausman, MD, RI Department of Health

## CHIEF COMPLAINT:

*Precipitating Event:*
Dr. Kyros reports he is here for "boundary issues".

## HISTORY OF PRESENT ILLNESS:

*Presenting Problem:*
Dr. Kyros reports that the event of concern that precipitated his assessment was when he met with a patient on 4-20-09 for a routine medication check and the following Monday, he got a call from the police department. They reported this female patient had made a complaint that he had made sexual advances to her. The client also called the Board of Health to report his behavior. From there, the Board of Health encouraged him to get an assessment done. Dr. Kyros states he was fully cooperative with the police department until they requested he complete a polygraph. At that point, he felt he needed legal representation before proceeding and also called the owner of the clinic where he was working to report the issue.

Dr. Kyros states that this client is a cocaine addict/alcoholic who is on welfare. She overdosed in February of 2008, was hospitalized at Butler Hospital, and then referred to his clinic for follow up. He had seen her twice previously. She was on Seroquel, Celexa, and Lamotrigine at the time of the visit and he had increased her Seroquel to 100 mgs tid for complaint of anxiety. This client was also in therapy and was reported to be doing well. He reports that the topics of the visit included her participation in 12 step meetings and how things were going at home. This questioning lead to her disclosure of sexual concerns with her boyfriend. She additionally made the comment that she may "jump someone's bones" in her 12 step meetings. He reports he encouraged them to seek counseling together to deal with the issue. He denies inappropriate touch or verbal interchange with this client.

CONFIDENTIAL                                6

This information has been released to you from records whose confidentiality is protected by Federal Regulations (42CFR,Part 2) which prohibits you from making any further disclosure without the specific written consent of the person to whom it pertains or as otherwise permitted by such regulations.

SANTÉ CENTER FOR HEALING
PROFFESIONAL ASSESSMENT PROGRAM
DR. WILLIAM KYROS (A152)

The second event in question occurred in September of 2008. He reports this event was investigated and he has been exonerated. Dr. Kyros reports that he began seeing this client in July of 2008. She had a history of depression and anxiety and had been treated at Butler Hospital in 2004 and placed on meds but came back in 2008 on no meds. He began Zoloft and Klonopin and began to see her every 2 weeks along referring her to therapy. Her depression initially improved and then she reported she thought she was pregnant and was more depressed. She was not pregnant and she continued in therapy. She had also been seeing her pcp for lab work and felt like some of the lab work had been missed on her last apt. He saw her for her appointment and then while waiting for her therapy appointment, talked to him about ordering some lab tests. After her appointment, she came back to his office where he reports he wrote the orders and she left, exiting the alternative route in the office. This client later called her therapist and reported that Dr. Kyros had made inappropriate comments to her. Her boyfriend called the Board of Health as well to report his actions and they fully investigated the incident and dismissed it. He did report that the Department of Health sent a letter stating his behavior was unprofessional.

Dr. Kyros reports the initial incident that occurred during the course of his practice that is related to his current predicament occurred in 1991 where he was reported by 4 staff members of a state hospital for sexually inappropriate behavior. He reports that he was seeing a client who was very confused and in a psychiatric hospital. She began to disrobe and, as he went to help her get dressed, the staff members witnessed this. He does report that they came to the door but he asked them to wait in an effort to afford the client privacy. This complaint was dismissed as well. He also adds that one of the staff members who complained used his services when her daughter needed a psychiatrist and another staff member who complained had asked him for money about this time.

One further incident occurred in 1999. Again, he had seen a client while she was in the state hospital and was following up with her for medication management. After one of her appointments, she called her therapist to report that Dr. Kyros had been aroused during one of their sessions and hugged her. Her ex-husband also called the medical board to report his behavior. However, this client stated later that she had been having erotic dreams and she was not sure that the event really happened and felt like may have been in her head. As the client went on record with this report, no further action was taken by the board.

Dr. Kyros does state has had one other complaint from a parent of a child for whom he prescribed Wellbutrin but nothing came of this complaint.

Dr. Kyros had voluntarily stepped out of practice prior to coming for this assessment. He states he has practiced medicine for 20 years and after the incident in 1991, he went to counseling to address any issues of transference and counter transference. He feels he has made changes in his practice to prevent these types of incidents and has never been guilty

CONFIDENTIAL                                    7

This information has been released to you from records whose confidentiality is protected by Federal Regulations (42CFR,Part 2) which prohibits you from making any further disclosure without the specific written consent of the person to whom it pertains or as otherwise permitted by such regulations.

SANTÉ CENTER FOR HEALING
PROFFESSIONAL ASSESSMENT PROGRAM
DR. WILLIAM KYROS (A152)

of the charges. Since the latest incident, the office has been equipped with cameras to record his sessions. He describes a practice of clientele who are sicker and states he sees a high volume of clients daily. He had been in a partnership with Alex Scognelli, MD until 2003 and then in a private practice until March of this year. He now works in a clinic with 4-5 other doctors, 12 therapists and 5-6 secretaries and states he enjoys the work. He also works with Dr. Mark O'Brien part time and has for 15 years worked with mentally challenged individuals. He denies having any relational issues with any other co-workers.

*Current Stressors:*
Dr. Kyros reports that the possible legal and occupational consequences that he faces currently have increased his general level of anxiety. As well, he admits to some dysphoria with appetite and sleep changes. He has recently relocated after selling his house to be in an apartment closer to work. He is very concerned about these charges and his practice has added cameras to monitor his interaction with clients.

*Previous Treatment/Past Psychotropic Medications:*
Dr. Kyros states he underwent counseling following the initial allegation in 1991 for approximately 5-6 months. He has never been hospitalized for psychiatric or chemical dependency concerns. He does state that he has been taking Klonopin 0.25 mgs ½ half tab prn for occasional insomnia.

*Infection Control:*
Dr. Kyros denies history of tuberculosis, hepatitis A, B, or C. He states he took the Hepatitis B vaccination in the 90's and his last tetanus toxoid injection was greater than ten years ago. He states his last TB test was last year and he does not get the flu shot. He has not had a pneumonia injection in the past, denies exposure to SARS.

*Current Medications:*
Dr. Kyros reports taking the following medications upon initial evaluation:
Klonopin 0.25 mgs ½ tab prn insomnia, Dr. Mark O'Brien is his prescribing physician.
Prinivil 40 mgs daily
Prevastatin 20 mgs each morning
ASA 81 mgs daily
Vitamins, fish oil, and a B complex daily
He had used Prednisone drops to his eye tid for a recent retinal detachment.

## REVIEW OF SYSTEMS:

*Behavior:*
Dr. Kyros denies problems at work until recent complaints, not enrolled in school. He has not noted deterioration in dress, hygiene, or ADLs. Denies obsessive, manic, impulsive,

This information has been released to you from records whose confidentiality is protected by Federal Regulations (42CFR,Part 2) which prohibits you from making any further disclosure without the specific written consent of the person to whom it pertains or as otherwise permitted by such regulations.

SANTÉ CENTER FOR HEALING
PROFFESSIONAL ASSESSMENT PROGRAM
DR. WILLIAM KYROS (A152)

aggressive, self-mutilative behavior and denies running away as a child, sexually acting out or purging. Denies being assaultive or isolative.
He sold his house two years ago and currently lives in an apartment near his job.

*Psychiatric Symptoms:*
Dr. Kyros endorses feelings of depression, anxiety, and some fear about his future. He admits to fleeting suicidal thoughts in 1991 when first confronted with incident but has had none since that time.

*Sleep Habits:*
Dr. Kyros admits to difficulty with initial and mid awakening, denies nightmares-generally gets approximately 7-8 hours of sleep at night with medications, 3-4 without.

*Appetite/Eating Habits:*
Dr. Kyros reports eating 3 meals/per day and admits to a 4-5 pound weight gain since charges were made. His usual pattern is to eat a light breakfast, moderate lunch and a small supper. He has been overeating at lunch lately. Dr. Kyros exercises regularly.

*Alcohol/Drug/Process Use:*
Dr. Kyros states he does not drink alcohol regularly, perhaps drinking only 2 drinks per year. He admits that in high school and college, he did drink more often with his friends but did not drink to intoxication. He also experimented with cocaine and marijuana in college but has not done so recently.

*Sexual Orientation:*
Dr. Kyros denies sexually compulsive behavior. States he is heterosexual but not currently active. Denies use of pornography or prostitutes, does not visit adult clubs.

*Other Addictive Behavior:*
Dr. Kyros denies gambling, gaming, or other compulsive behavior.

*History of Abuse:*
Dr. Kyros denies history of physical, sexual, or emotional abuse.

*Religious Preference:*
Dr. Kyros states he was raised Greek Orthodox but is not currently attending services. However, he does state he has a "deep faith" and he has experienced numerous religions.

*Strengths and Weaknesses:*
Dr. Kyros states his strengths include the following: I am a good person, loyal friend, honest, diligent, hard working, and am a good brother and son. He identified the following weaknesses: naiveté, too giving, too helpful at times, work too many hours.

CONFIDENTIAL                           9

This information has been released to you from records whose confidentiality is protected by Federal Regulations (42CFR,Part 2) which prohibits you from making any further disclosure without the specific written consent of the person to whom it pertains or as otherwise permitted by such regulations.

SANTÉ CENTER FOR HEALING
PROFFESSIONAL ASSESSMENT PROGRAM
DR. WILLIAM KYROS (A152)

*Legal Issues:*
Dr. Kyros denies current legal issues although he is not sure what the police have determined about the latest incident.

*Family History:*
Dr. Kyros states his mother is deceased, having had a stroke 12 years ago. His father is alive at 84 years of age—he is in good health. He is a mechanical engineer who completed Penn State and MIT for his education. He has two brothers, one is an endodontist and the younger brother works in the real estate business. He does report that 3 of his maternal cousins have had problems with alcohol and drugs. He denies other psychiatric disorders or medical diseases in the family of origin.

Dr. Kyros was married x1 for 10 years although they were separated for 3 years. They divorced in 1997 but still have an amicable relationship. He has no children and is not currently in a significant relationship. He reports that he recently lost a dear pet- a large ✓ bunny and has no pets currently.

*Occupational Issues:*
Dr. Kyros reports he is a board certified psychiatrist. He is working part time for a clinic and part time with the mentally challenged persons. He is being investigated currently by the Board of Medicine for above cited incidents. He denies other restrictions to his practice and enjoys his work greatly.

*Physical Information:*
**Pain:**
Dr. Kyros denies issues with acute or chronic pain.
**Eyes:**
Dr. Kyros is presbyoptic and wears bifocals. He denies any redness, swelling, drainage or dryness or visual disturbances.
**Ears:**
States some hearing decline with age but without corrective devices. No redness, drainage, swelling or pain.
**Skin:**
Denies rashes, itching, eczema, psoriasis, tattoos, or piercings.
**Nose/Throat:**
States he has environmental allergies occasionally, no current pain, soreness, drainage, or dysphagia.
**Cardiovascular:**
Dr. Kyros admits to hypertension elevated cholesterol. He has some premature ventricular contractions that he reports are normal. No chest pain or discomfort, no vascular impairment with extremities. No history of AAA, or valvular irregularities.
**Respiratory:**
No cough, wheezing, shortness of breath, asthma, or other respiratory complaints.

CONFIDENTIAL                    10

This information has been released to you from records whose confidentiality is protected by Federal Regulations (42CFR,Part 2) which prohibits you from making any further disclosure without the specific written consent of the person to whom it pertains or as otherwise permitted by such regulations.

SANTÉ CENTER FOR HEALING
PROFFESSIONAL ASSESSMENT PROGRAM
DR. WILLIAM KYROS (A152)

**GI:**
No nausea, vomiting, diarrhea, indigestion or GERD symptoms. BMs reported to be regular.
**GU:**
Nocturia x1 per night reported, no polyuria, burning, pain, or other urinary symptoms.
**Reproductive:**
Denies reproductive issues, no hernias, and no reported sexually transmitted illness.
**Endocrine:**
No thyroid abnormalities, no diabetes, or hormonal issues.
**Allergies: NKDA**
**Musculo-skeletal:**
No neck pain, back pain, limitations in activities, no disabilities reported
**Neuro:**
No seizures, tremors, numbness, tingling, loss of consciousness, or blackouts
**Mental Status/Suicide Risk/Violence Assessment:**
Dr. Kyros is dressed neatly and appropriately, his appearance is relaxed and he is cooperative, appears his stated age. He is alert and oriented x4, mood is anxious and affect is congruent. Speech is coherent, no evidence of thought disorder, hallucinations or delusions. Thought processes are goal directed and spontaneous. His judgment is intact. Memory intact, able to recall 7 numbers forward and 5 numbers backwards and perform serial seven subtractions with ease. Able to give abstract interpretation of proverbs. Admits to suicidal ideation in the past, none since 1991. Denies homicidal ideation currently or in the past.

Dr. Kyros does report that he spends time at his mother's grave on his parent's anniversary, August 27th. He was robbed in April of this year and lost his laptop computer. Denies any gang association, stalking behavior, and physical aggression at work or other violence.

This information has been released to you from records whose confidentiality is protected by Federal Regulations (42CFR,Part 2) which prohibits you from making any further disclosure without the specific written consent of the person to whom it pertains or as otherwise permitted by such regulations.

SANTÉ CENTER FOR HEALING
PROFFESSIONAL ASSESSMENT PROGRAM
DR. WILLIAM KYROS (A152)

## PSYCHIATRIC ASSESSMENT SUMMARY
### By Jes Montgomery, MD

### HISTORY OF PRESENT ILLNESS:

This is a 55-year-old Caucasian psychiatrist who was referred by the Rhode Island State Board of Medical Examiners for an evaluation after a complaint was filed with an accusation of violating patient boundaries. Dr. Kyros states that the patient visit in question began on April 20th, which he believes was a Friday morning. He states it was a routine 10 to 15-minute psychopharmacology visit, which was the third appointment for this patient. He recalls that the patient had a difficult past with alcohol and cocaine dependence and depression. She had been hospitalized at Butler Hospital in February 2009, one of the training units for Brown University. At the time of her hospitalization, she had overdosed on alcohol and a combination of pills. He recalls that the patient was also in individual therapy with one of the therapists in the organization for which he works and she was to start Alcoholics Anonymous after her first visit. On the first visit, she reported that she was not taking her Seroquel 50 mg., which was scheduled as a PRN. She was, however, taking Cymbalta, Neurontin and Lamotrigine along with possibly taking Buspirone. He noted that she had a decrease in focus and concentration, variable appetite and sleep, anhedonia and isolation. His recommendation was to increase the Seroquel to 100 mg t.i.d. and not take it PRN. On the second visit, she appeared to be improved and described herself as feeling better with a decrease in depression, describing herself as feeling calm and demonstrating full range of affect. She had a decrease in headaches and gastrointestinal symptoms and had been attending AA. She reported that her individual therapy was going well. He made no changes in her medication at that visit. Her third visit was on April 20, 2009. He recalled this visit in significant detail. He states that, as was his routine, both he and the patient sat down. He began the interview by asking something along the line of "how are you feeling?" He describes her as replying that she was improving. He asked her about side effects, which she stated she had none; about sleep and appetite, which were stabilizing. He remembers that she reported she was socializing more and going to AA. He then asked her how things were at home to which she replied "not good." She related this to having "no intimacy." He asked if there was a problem and she shrugged. On further investigation, he asked about physical problems with her significant other, whom he interpreted as a husband, though he is a long time boyfriend. She reported that she had not talked with him about it, but felt that "he was possibly pretty sick." He says that she reported that she is the only female in AA and "the guys are starting to look pretty good and I am about ready to jump somebody's bones." He asked if she had talked to her spouse and she just shrugged. He asked further if she had talked to their primary care physician and suggested that she ·might want to explore this before doing something she might regret. He reports that the conversation returned to the routine topics of the visit and she asked about when she

This information has been released to you from records whose confidentiality is protected by Federal Regulations (42CFR,Part 2) which prohibits you from making any further disclosure without the specific written consent of the person to whom it pertains or as otherwise permitted by such regulations.

SANTÉ CENTER FOR HEALING
PROFFESSIONAL ASSESSMENT PROGRAM
DR. WILLIAM KYROS (A152)

returned to see him. At this point, he closed the chart and they both stood up to exit. He reached for the door, opened it and walked down the 8-10 feet hall to the door, which went into the waiting area. He reports that this door is very heavy and he frequently opens it for clients. He says that he opened the door, allowed her out and called for the next patient. Subsequent to this, he finished his day without incident. On the following Monday received a call from the police. They told him that a complaint had been filed and they wanted him to report to the police station for an interview. He spoke with the detectives who reported that there are allegations by this patient that he had touched her and was verbally inappropriate with her. He says that he had approximately a half hour interview and was asked to sign a form to continue discussing the case. He states that the third detective entered the room at some point and asked about performing a polygraph. Initially, Dr. Kyros agreed to polygraph, but states that the detective started to say different things such as "we do not believe you and we think you are not telling the truth." He says that the person who was to perform the polygraph came in and got harsh and "yelled" a statement like "why don't you admit you did it?" At that point, he asked if he could take the polygraph on another day and left. He left and spoke with the owner of his agency. In addition, he contacted his attorney the next morning. Subsequently, he met with the Board of Health after several weeks and they told him that they felt that this was evidence of unprofessional conduct, recommending that he have the current assessment.

He states that part of the reason for referring him for the assessment was that he had a prior history of complaints of which the Board was aware. The first was what he describes as "a bizarre incident at an inpatient facility "in September 2008." He states that he was seeing a patient with depression and anxiety. The patient had begun to see him in July 2008 and had been treated at Butler Hospital in 2004. She had a 2-year-old son who was ill. She reported abnormal sleep pattern and variable appetite, anhedonia and isolation. According to the history she gave, she had been on an antidepressant in the past, but was not on any antidepressant on the first visit. She had not tolerated Paxil, but Zoloft at 150 mg had helped in the past along with Klonopin. He restarted Zoloft and titrated to 150 mg and began Klonopin 0.5 mg t.i.d. She was seen in follow up and reported being markedly better with improved affect and what she described as a pleasant mood. She was more sociable and had resumed her hobby of crocheting again. She reported that things at home were fair except that she was continuing to worry about her child. Her sleep and appetite were improved. She was seen 2 weeks later and thought she was pregnant, reporting a slight increase in her anxiety and depression. He instructed her that if she was not pregnant, that she was to increase the Zoloft to 200 mg and, if she was pregnant, to see him in 2 weeks. When she returned in 2 weeks, her pregnancy was negative and she was feeling better. At that point, he decreased the Zoloft to 150 mg. Her next visit was on September 11, 2008 and was a morning visit. He describes it as a routine psychopharmacological visit and says things were going good. She had no depression and minimal anxiety. Her primary care physician had checked thyroid functions and had started her on thyroxine and vitamin B12. She was concerned about

CONFIDENTIAL                                        13

This information has been released to you from records whose confidentiality is protected by Federal Regulations (42CFR Part 2) which prohibits you from making any further disclosure without the specific written consent of the person to whom it pertains or as otherwise permitted by such regulations.

SANTÉ CENTER FOR HEALING
PROFFESSIONAL ASSESSMENT PROGRAM
DR. WILLIAM KYROS (A152)

the labs because she felt they were incomplete. He agreed to recheck them. At that point, they exited the office and made a follow-up appointment. He recalls that he was scheduled with back-to-back appointments through most of the day until 8:30 or 8:45 at night. Physically, he describes the office is being split having doubled the size of the office. One side of the office has a coffee room and the other side has medical records and the receptionist area where messages are held. He recalls that at about 19:00 hours he went to the other side of the office to check messages. The same patient he had seen in the morning was there to see her therapist. Her laboratory had been faxed from her primary care physician and only a thyroid-stimulating hormone was done. He saw her in the waiting room and told her that he could write up the lab slip for the remaining tests while she was seeing her therapist. He told her "have her bring you over and I will write up the lab requests. He suggested that the therapist bring her through the back hall rather than coming through the waiting room. He made this suggestion to avoid alarming other waiting patients by giving the impression that he was taking somebody out of order. The individual therapist escorted her over to his office as requested for the lab request. He agreed to order the tests and invited her into his office to do so. He says that he spent approximately 1 to 1-1/2 minutes with her, gave her the prescription with the lab orders and opened the door of his office to let her out into the hall. He sent her out the backdoor, which leads directly to the parking lot, again to avoid sending her into the waiting room with the appearance of having taken somebody out of order. At that point, he went on to his next patient. The next day, the administrator of the organization called him in and told him that the patient had called her individual therapist that night very upset and reporting that he made sexually inappropriate comments in both the morning and the evening visits. In addition, he found out that she had disclosed new issues with her boyfriend to the therapist at the end of the session and felt vulnerable. When he heard this report, he said it was "news to him." He reports that her husband called the Department of Health. They performed an investigation, which he reports "scrutinized everybody and no wrong doing was found."

In 1998, he also had a complaint related to what he describes as a hospitalist incident stating that it is also "fairly bizarre." He says that he was on the hospital staff until 1997 and, while he helped a lot in many areas, he had issues with virtually every staff member. In 1999, he went into private practice outside the hospital. He had a patient with bipolar disorder with psychotic symptoms, including religious delusions. He reports that he kept her out of the hospital for 3 years with medication and therapy with an individual therapist also in his office. This patient had been in and out of the State Hospital for years and had a long history of sexual abuse as a child. In the visit in question, she was seen for a routine psychopharmacology visit and no change in her medication was made. After the visit, she went to her religious group and told the people that she thought her psychiatrist was aroused and wanted to hug. She did not accuse him of doing so, but simply expressed this. At this point, she called the individual therapist and made comments like "... but it is all in my head" and later said "nothing happened." However, her ex-husband called the Medical Society. A psychiatrist in the Medical Society office

CONFIDENTIAL                    14

This information has been released to you from records whose confidentiality is protected by Federal Regulations (42CFR,Part 2) which prohibits you from making any further disclosure without the specific written consent of the person to whom it pertains or as otherwise permitted by such regulations.

SANTÉ CENTER FOR HEALING
PROFFESSIONAL ASSESSMENT PROGRAM
DR. WILLIAM KYROS (A152)

had treated her when she was in the State Hospital and was very ill. He reported that it was not unusual for such patients to make allegations. This did not go to the Department of Health for an investigation. At that point, he transferred her to another psychiatrist and another therapist, but she continued to call and leave messages for him for over 3 years. He has most of these messages on tape for his record.

In 1991, he was investigated for an incident, which happened in the hospital where he was seeing a patient for chronic schizophrenia. A rather detailed complaint was filed by 4 members of the hospital stating that Dr. Kyros had been in the exam room with patient who was partially disrobed and that he had his hands on her buttocks. The report alleges that he had refused help from the staff in intervening. The complaint stated that the encounter progressed for approximately 20 minutes. Dr. Kyros states that the patient had disrobed as a part of her delusional behavior and he was trying to help her get dressed. He denies the behavior described in the incident. After the incident, Dr. Kyros states that the patient had no further difficulty and she did not endorse the complaint. This complaint led to an evaluation at Golden Valley Health Center in December 1991. The report is reviewed and it contains extensive details, which will not be repeated here. Concern is raised by the members of the Sante Assessment Team that no collateral information was obtained or reported in their Assessment from the 4 complainants and, in our opinion, the time discrepancies are not addressed in the evaluation. Their recommendation was that Dr. Kyros receive supervision and follow-up, which he did. He states that he learned a great deal about transference and management of the same and feels that the outcome of this was positive. He still maintains that there was no inappropriate behavior during that event and that it was a delusional patient and angry staff. He gives a report that two of the complainants were involved in a sexual affair and a third was involved with another staff member who potentially had a grudge with Dr. Kyros.

In review of his overall history, Dr. Kyros says that he graduated from Hobart College in upstate New York, which was a college of 1500 students. He says that he played football and as a very small person describes others saying that football "gave me the beating I deserved." He applied for medical school at 3 medical schools including Boston University and Tufts, but was not accepted. He moved from Massachusetts and, subsequently, began medical school in Guadalajara, Mexico later moving to Granada to complete medical school so he could do his clinical rotations in Brockton Hospital, which is a Boston University Hospital. He finished prior to time to start residency and had time to work in Wellesley, Massachusetts in a psychiatric hospital. He liked psychiatry and had the opportunity to make morning rounds with psychiatrists. Therefore, he accepted a residency in East Holland Hospital, which was a large metropolitan hospital. He completed a General Psychiatry Residency and a Child and Adolescent fellowship. He moved to Rhode Island in July 1989. The majority of his practice has been psychopharmacology with minimal supportive psychotherapy. He states that he asked every patient about their home, their job, their family and overall lifestyle other than just

This information has been released to you from records whose confidentiality is protected by Federal Regulations (42CFR,Part 2) which prohibits you from making any further disclosure without the specific written consent of the person to whom it pertains or as otherwise permitted by such regulations.

SANTÉ CENTER FOR HEALING
PROFFESSIONAL ASSESSMENT PROGRAM
DR. WILLIAM KYROS (A152)

questions related to medication. When he worked for Quality Behavioral Health, he worked with about half adults and half children and adolescents. He has always worked with the "sicker" population and has been in private practice for the last 15 years. His private practice has been approximately 60% adults with approximately 10% geropsychiatry. He had a partner for approximately 7 years and has been in solo practice for approximately 6-1/2 years working with a secretary and 2 other employees. Approximately 18 months ago, he started working with 2 other full time psychiatrist in Quality Behavioral Health for whom he works now. He had been working throughout his career with mentally retarded and developmentally delayed children, adolescents and adults and has had numerous satellite opportunities within this population. In March of 2008, Dr. Mark O'Brien who was one of the psychiatrists with whom he worked retired for health reasons. At that point, he took over his duties and began to phase out of his private practice.

He reports that in these years of working in the hospital, he was careful to try to stay out of politics. He admits that he may have been considered somewhat distant because he was not truly a "staff doctor" because he was doing work with family services and substance abuse and the numerous other satellite opportunities he had. He feels that he tried to be "a nice guy" being both empathic and sympathetic with the touch of realism. He bases this on his history of being raised to be polite and be considerate to everybody.

## PAST PSYCHIATRIC HISTORY:

He has not been hospitalized, though he was considered admitted for his four-day evaluation at Golden Valley Health Center. He was involved in marriage counseling for approximately 6 months during his first year of therapy and saw a therapist subsequent to his Golden Valley evaluation.

## FAMILY HISTORY:

He is the oldest of 3 siblings, all males. He describes a good relationship with all of the siblings and a positive relationship with his family. He says that his father always worked hard and his mother was a "beautiful person." He has had to financially assist his parents late in life. He describes no major family disruptions or discard other than having to work hard throughout their life. He was married relatively briefly and is divorced. They have no children. He says that the marriage just never worked out.

## MENTAL STATUS EXAM:

This is a well-developed, small-statured adult male who presents in no acute distress, though very controlled in his responses. His affect is very controlled or somewhat constricted so it is difficult to read at times. He does display some range of affect, which

CONFIDENTIAL                          16

This information has been released to you from records whose confidentiality is protected by Federal Regulations (42CFR,Part 2) which prohibits you from making any further disclosure without the specific written consent of the person to whom it pertains or as otherwise permitted by such regulations.

SANTÉ CENTER FOR HEALING
PROFESSIONAL ASSESSMENT PROGRAM
DR. WILLIAM KYROS (A152)

appears to be congruent with his expressed affect. His mood is somewhat anxious and he admits to being worried. His speech is soft and relatively controlled with a very regular rate and syntax. He is soft spoken and shows somewhat limited fluctuations in his tone of voice. Thought processes are logical and goal directed though the amount of detail he provides is very precise and shows a significant emphasis on being accurate. He shows no evidence of delusion. His thought content indicates no evidence of suicidal or homicidal ideation, no evidence of hallucinations or response to internal stimuli and no formal thought disorder. His cognitive abilities are intact. He is able to recall recent and remote information easily and accurately without difficulty. His recall of the events of the current day is intact. His ability to process questions is accurate and shows no gross evidence of cognitive distortion. His abstractive ability is intact and complex, though very guarded in his approach to the abstractions.

### IMPRESSION:

| | | |
|---|---|---|
| *Axis I* | Acute adjustment disorder with Anxious Features | |
| | Rule out Depressive Disorder NOS. | |
| *Axis II* | Diagnosis deferred at this time. | |
| *Axis III* | No major medical illnesses, basically healthy middle-aged male. | |
| *Axis IV* | Moderately severe. | |
| *Axis V* | Current | 45 |
| | Highest in the last year | 56 |

### PSYCHODYNAMIC FORMULATION:

Dr. Kyros presents with unclear predisposing factors for his current situation. He comes from a family that is not particularly clear in its medical or psychological predisposition or about which he gives minimal information. There is not a history of addictive disorder as he reports. His collaborative information falls into 2 very distinct categories: Those who feel he is not at all due the scrutiny under which he is placed and feel he is a very clearly upstanding, forthright and good psychiatrist who would only do the best for his patients versus those who have significant concern for his behavior. Note is made that the vast majority fall into the first category. He does; however, have in his history significant evidence, which points to possible perpetuating factors. His relationship history indicates a very limited number of relationships, an assertion that he is asexual and may indicate difficulty with significant attachment and long-term relationships. His work has always been with an extremely difficult population, which may be totally altruistic or maybe selective in a protective fashion to avoid a population which would be more attachment-focused and demanding in more personal emotional arenas. Note is

CONFIDENTIAL                    17

This information has been released to you from records whose confidentiality is protected by Federal Regulations (42CFR, Part 2) which prohibits you from making any further disclosure without the specific written consent of the person to whom it pertains or as otherwise permitted by such regulations.

SANTÉ CENTER FOR HEALING
PROFFESSIONAL ASSESSMENT PROGRAM
DR. WILLIAM KYROS (A152)

also made of his difficulties in his early medical career, indicating either difficulty with performance or difficulty integrating into medical training. There is no clear evidence in his malpractice history or his reviews that he has clinical difficulty within his practice of pharmacology or basic psychiatry. His most significant perpetuate to his current situation is his difficulty with identifying any factors within himself that may lead to situations that place him in the role of recipient of four distinct complaints. The polygraphs contributed two important pieces of data. The first was interpreted to be a deliberate attempt to mask or invalidate the test in general. The second, despite significant processing regarding the importance of the test and the results of the first test, indicated deception. While the polygraph is not a clear "hard science" item of data for purposes of this assessment, the combination of the two variable performances implies a significant internal difficulty with the current situation. This combined with the subjective history simply raises further questions that do not have clear answers. In short, the polygraph neither confirms, nor disproves any hypothesis regarding Dr. Kyros's current situation. Dr. Kyros further response to the situation will fully determine his situation. This presents a very difficult situation because it narrows the curve of possibilities to a very limited set of options. If indeed the complaints, the polygraph, and the concerns of the assessment team are the "outliers" then Dr. Kyros is the outstanding psychiatrist and person as he has been reported in most of his collateral information. If this is the reality, then to impede his ability to provide care would be a significant loss to his patients and a clientele, which already has a limited number of service providers. With very little grey in between, the other option is that the complaints are validated and within the veil of this kindly, generous service provider is a very destructive, potentially predatory person, the potential harm to the public at large could be extensive. The extreme difficulty lies in the very limited number of choices, the limited data with which to make that decision, and the extremely small amount of grey area in between the two options. While strict observation and control over patient contact may limit the potential harm to the public this does not answer the internal questions and dilemma that it a definite need exists for him to resolve these questions and to have a sense that he understands the current situation, sees his contributing factors and the need to resolve his issues. In addition, both Dr. Kyros and the Public Health Department need to have a clear sense that he understands how to avoid similar situations, find a sense of satisfaction within his own personal life, and step out of the stoic, limited, presumed asexual, and isolated personal life within which he lives. The very negative interpretations of this situation are resolving these observable and measurable indicators. The prognosis for treatment will depend on Dr. Kyros' willingness to enter into an explorative psychotherapeutic process that will examine precisely what he contributes to these situations, how he can empathically understand the process and need to change and his willingness to make changes that he has clearly seen no call for in the past. This will require a complex and

CONFIDENTIAL                    18

This information has been released to you from records whose confidentiality is protected by Federal Regulations (42CFR,Part 2) which prohibits you from making any further disclosure without the specific written consent of the person to whom it pertains or as otherwise permitted by such regulations.

SANTÉ CENTER FOR HEALING
PROFFESSIONAL ASSESSMENT PROGRAM
DR. WILLIAM KYROS (A152)

trusting relationship with a therapist well-versed in psycho dynamically oriented psychotherapy as well as the practice of psychiatry in the chronically, persistently mentally ill, such as Dr. Kyros treats. In addition, he will have to overcome resistances to engage in interpersonal interactions, the likes of which he appears to have avoided in many ways in his life. Finally, this therapeutic process will require that he explore his sexuality and come to an understanding and attitude of choice, rather than using suppression, repression and denial to relegate it to the unconscious realm, where it is at risk of being acted upon or perceived non-verbally or behaviorally. His overall prognosis is improved by his proven capacity to learn and his history of a willingness that has been attributed to altruistic motives. These may be positive defenses, as well as having contributed to his current situation.

This information has been released to you from records whose confidentiality is protected by Federal Regulations (42CFR,Part 2) which prohibits you from making any further disclosure without the specific written consent of the person to whom it pertains or as otherwise permitted by such regulations.

SANTÉ CENTER FOR HEALING
PROFFESSIONAL ASSESSMENT PROGRAM
DR. WILLIAM KYROS (A152)

### PSYCHOLOGICAL REPORT
#### By Charles Haskovec, Ph.D.
#### Psychiatric Consultants of Ft. Worth, P.A.

**EVALUATION BATTERY:**
- CLINICAL INTERVIEW
- SHIPLEY-2
- RORSCHACH
- MILLON CLINICAL MULTIAXIAL INVENTORY – II (MCMI-II)
- PERSONALITY ASESSMENT INVENTORY (PAI)
- MULTIPHASIC SEX INVENTORY (MSI)

**HISTORY OF THE PRESENTING PROBLEM:**

The patient came to Sante after being accused of violating a sexual boundary with a patient. The patient has had other allegations of violating sexual boundaries with patients. All of the other three allegations were found to be without merit.

**PSYCHOSOCIAL HISTORY:**

The patient is the eldest of three children. He is a psychiatrist. He and his only wife were married for 10 years before they divorced. The patient lives alone.

**MEDICAL HISTORY:**

The patient reports that he suffers from hypertension, hypercholesterolemia, and anxiety.

**OBSERVATIONS DURING TESTING:**

This is a 55-year-old Caucasian male who was clean and appropriately dressed. He spoke English spontaneously with good articulation. Gross and fine motor movements were good. Hearing and vision were adequate to negotiate tasks we presented to him during the course of this evaluation. He was cooperative and acquiescent with us throughout the evaluation. He appeared anxious, which is expected based on the nature of the allegations.

Before he worked on the paper-and-pencil tests (PAI, MCMI-II, and MSI-I) we reminded the patient that the tests have built in scales for detecting a person's attempt to distort test results.

*Orientation:* The patient was oriented to person, place, and time.

*Mood:* Dysphoric

CONFIDENTIAL                    20

This information has been released to you from records whose confidentiality is protected by Federal Regulations (42CFR,Part 2) which prohibits you from making any further disclosure without the specific written consent of the person to whom it pertains or as otherwise permitted by such regulations.

SANTÉ CENTER FOR HEALING
PROFFESSIONAL ASSESSMENT PROGRAM
DR. WILLIAM KYROS (A152)

*Affect:* Restricted in range

*Suicidal Ideation:* The patient denied suicidal ideation.

*Homicidal Ideation:* The patient denied homicidal ideation.

*Hallucinations:* The patient denied auditory, visual and olfactory hallucinations.

*Delusions:* None apparent

*Substance Use:* The patient will have a total of three drinks during the course of a year. He denied abuse of prescription or street drugs. He does not use tobacco.

## COGNITIVE ABILITY (INTELLIGENCE)

Intelligence was assessed by the Shipley-2, which measures vocabulary and abstraction skills.

On the Vocabulary section, the patient appears to be functioning at least in the Above Average levels for general cognitive abilities. This score is achieved by only the top 15 percent of the population.

Good verbal skills are demonstrated, and good abilities are documented in terms of language development, the understanding of verbal concepts, and a highly developed general fund of information. A high level of word knowledge which has been obtained both through academic training and life-experiences is apparent. This person should be able to demonstrate good communication skills.

The patient obtained a score in the Well Above Average range (Upper 10 percent of the general population) on the Abstraction section of the Shipley-2 suggesting Well Above Average levels of ability to think in terms of general principles, solve logical problems, and generalize among situations.

## COMPOSITE:

The patient's composite score on the Shipley-2 is in the Well Above Average range (SS = 124; %ile = 95).

*Attention:* The patient was able to repeat eight digits forward and five backward.

On both Trails A and Trails B, he obtained a time score that is in the "Perfectly Normal" range. He made no errors on either of these tasks.

CONFIDENTIAL                                           21

This information has been released to you from records whose confidentiality is protected by Federal Regulations (42CFR,Part 2) which prohibits you from making any further disclosure without the specific written consent of the person to whom it pertains or as otherwise permitted by such regulations.

SANTÉ CENTER FOR HEALING
PROFFESSIONAL ASSESSMENT PROGRAM
DR. WILLIAM KYROS (A152)

Both focused and divided attention appears to be within normal limits.

*Language:* On a verbal fluency task, the patient was asked to name as many four legged animals as possible in 60 seconds. He could name 25. This score is within normal limits. In clinical interview, there was no evidence aphasia or other language problems.

*Memory:* The patient was oriented to person, place, and time.

The patient was asked to recall four unrelated words after five minutes and after ten minutes. He required prompting on all four words at the five-minute trial and on one of the four words at the ten-minute trial. With prompting, his score at five minutes is within normal limits. At ten minutes, his score is within normal limits without prompting. Subtle difficulties with memory may be due to anxiety.

## RORSCHACH

### TEST VALIDITY:

The patient provided 25 associations to Rorschach Inkblots.
There is a valid basis for interpretive inference. His restricted handling of affect may lower the reliability with which the test can assess emotional control.

### QUICK-SCAN:

The following hypotheses are listed solely to provide an initial orientation to some of the data in this record. A full analysis of the data is required to confirm or reject their validity. No summary or synopsis is intended.

There is a serious deficit of interpersonal resources to handle social stress. His psychological controls and functioning are either decompensate from chronic stress, or are not maturely developed. He has an inflated sense of self-worth. Many psychological operations are used to protect and defend the ego. Problems with interpersonal relationships or cognition are evident. There may be problems involving interpersonal closeness.

### SITUATIONAL STRESS:

His awareness of stress from current external situations is about as much as most people's. There is little evidence that current problems and demands are bothering him emotionally. The stress makes him much more aware of environmental complexities than is usual, potentially leading to disorganization.

CONFIDENTIAL                                    22

This information has been released to you from records whose confidentiality is protected by Federal Regulations (42CFR,Part 2) which prohibits you from making any further disclosure without the specific written consent of the person to whom it pertains or as otherwise permitted by such regulations.

SANTÉ CENTER FOR HEALING
PROFFESSIONAL ASSESSMENT PROGRAM
DR. WILLIAM KYROS (A152)

He may deny or externalize feelings of stress by use of a narcissistic overcompensation for a prideful ego unwilling to confess such vulnerability.

Due to his tendency to overextend ego resources to attain his goals, potential failure experiences are likely to induce stress and feelings of inadequacy.

## AFFECTIVE FUNCTIONING:

*Suicide Potential:* Not in evidence in this Rorschach protocol.

*Endogenous Depression:* Although the Depression Index is not significantly elevated, there are indications of depressive features, which are likely to be situational based. Dysphoric ideation is likely. His underlying attitudes, expectations, and views of life and self may be pessimistic, negative, and self-defeating. The person feels helpless and hopeless, has flat affect, and may feel unmotivated. His excessive focus on negative aspects of himself is likely to generate depressive guilt and painful, unremitting rumination.

*Reactive Depression:* Not in evidence in this Rorschach protocol.

*Bipolar characteristics:* Not in evidence in this Rorschach protocol.

*Coping Style:* The presence of an introversive, extroversive or ambient coping style cannot be validly determined from the sparse data in this record.

*Emotional Receptivity:* Emotional interchanges with others appear to be blocked, probably due to fears of becoming overwhelmed by feelings or handling them poorly. He shows average willingness or ability to respond to or be affected by complex or intense emotions. This moderate level of sensitivity to feelings is an ongoing trait for him.

## CONTROLS:

*Emotional Constraint:* Little evidence is seen that the patient is internalizing feelings. However, he appears to be experiencing very little affect to suppress. He may be using other methods of emotional control, which are excessive.

*Emotional Control:* Defensive concealment of dyscontrol is possible. His control of affect is hampered.

The current level of stress far exceeds the patient's coping resources available for directing and controlling affect. He is emotionally fragile and very vulnerable to affective disruption from even small degrees of stress. Impulsive acting-out is very likely unless demands can be reduced or ego strengthened.

CONFIDENTIAL                    23

This information has been released to you from records whose confidentiality is protected by Federal Regulations (42CFR,Part 2) which prohibits you from making any further disclosure without the specific written consent of the person to whom it pertains or as otherwise permitted by such regulations.

SANTÉ CENTER FOR HEALING
PROFFESSIONAL ASSESSMENT PROGRAM
DR. WILLIAM KYROS (A152)

Because the person is dealing with affect in a very restricted way, statements about emotional control may be inaccurate. Evidence from the test is too sparse to make reliable estimates.

His strong concern about being proper and conventional provides an additional measure of emotional control. There is little evidence that he is trying to inhibit his feelings.

The patient's unmet internal needs, wishes, and impulses tend to intrude on his thoughts. His awareness of physiological or psychological urges and the controls they demand may disrupt sleep, concentration, and task orientation. Internal pressures and impulses combined with his lack of resources for expressive or ideational control create strong vulnerability to disruption. Avoidant or defenses that are more primitive may be called upon. His problems with emotional control suggest a potential for affective volatility driven by needs. The intense crisis situation overwhelms his ideational resources. His ability to cognitively delay or postpone behavior is insufficient to handle drives and impulses from unmet internal needs. The needs may press for quick gratification and propel impulsive or primitive behavior under stress. If he has had treatment, relapse is a danger.

*Ego Strength:* Ordinarily, unburdened by any current stressors, he has insufficient psychological resources available to cope with ordinary stress. His substantial vulnerability often leads to ideational confusion, poor judgment, inappropriate behavior, or poor impulse control with only minor additional demands. Adequate functioning occurs only when situations present routine, predictable, and simple demands.

## IDEATIONAL FUNCTIONING:

*Perceptual Monitoring (Information Processing):* The patient spends about as much time and energy as most people gathering and integrating information about situations before acting.

His style of dealing with reality and problems is to focus primarily on the simple and concrete. This is an immature attempt to avoid recognizing or experiencing problems with emotions or interactions.

He often attends to cues about what is socially correct or conventional. This may stem from a need for approval.

*Motivation (Information Processing):* The person is willing to take in complex information about the environment to the same degree as most. Goals do not appear to be overextended. He strives less than most to set and attain goals.

CONFIDENTIAL                    24

This information has been released to you from records whose confidentiality is protected by Federal Regulations (42CFR,Part 2) which prohibits you from making any further disclosure without the specific written consent of the person to whom it pertains or as otherwise permitted by such regulations.

SANTÉ CENTER FOR HEALING
PROFFESSIONAL ASSESSMENT PROGRAM
DR. WILLIAM KYROS (A152)

*Reality Testing and Conventionality (Cognitive Mediation):* He shows no significant problems with distortion of reality, perceiving the environment as accurately as do most people.

He is individualistic and tends to disregard social demands and expectations more than others do, possibly due to value differences or conflicts. He is very concerned about being correct and conventional. His commitment to what is socially appropriate may aid control efforts but may inhibit personal expressiveness. He sees things from an unconventional, idiosyncratic perspective.

*Thinking Problems (Ideation):* There is no evidence of impairment or limitation in thinking as applied to problem solving and effectiveness in demanding life situations.

The patient's ideas, impulses, or needs are impacting his thinking to a greater extent than average. The agitation can direct his attention to dealing with the stressors but also can be distracting and disturbing. Internal needs are especially intrusive. Although they may evoke positive action, the chronic stimulation is likely to become distracting and intrusive. Concentration and attention often are disrupted.

His ideas, beliefs, and values are extremely rigid and fixed. His thinking is narrow and very resistant to change. Consequently, his range of available coping behaviors is restricted.

There is no evidence of cognitive problems that would adversely affect judgment or conceptualization.

## SELF-PERCEPTION:

*Self-Esteem:* He is strongly self-involved and places considerable value on himself to compensate for a basically weak ego that needs constant bolstering. Feelings of entitlement and a wish for automatic recognition and admiration by others are probable and very influential in most dealings with the world. If he can manage to be recognized as very special, development of backup defenses and psychopathology can be prevented. Failure and negative feedback can breed disdain or angry reprisal.

There are indications that he may realize his assumption of great personal worth is vulnerable to deflation or is untenable. This self-preoccupation can precipitate either positive change or heightened moodiness and defensiveness.

His sense of self is fixed, rigid, and routinized. This makes him much less able to cope with challenges in daily life, which require flexibility.

CONFIDENTIAL                          25

This information has been released to you from records whose confidentiality is protected by Federal Regulations (42CFR, Part 2) which prohibits you from making any further disclosure without the specific written consent of the person to whom it pertains or as otherwise permitted by such regulations.

SANTÉ CENTER FOR HEALING
PROFFESSIONAL ASSESSMENT PROGRAM
DR. WILLIAM KYROS (A152)

*Introspection:* He is being unusually introspective. A re-evaluation of self may be attendant to critical life events, unresolved problems, or impending depression. Uncovering psychotherapy precipitates this degree of introspection prior to resolution of issues. He probably is conflicted by discrepancies between over glorified and negative perceptions of himself. If he feels distress, he may further overcompensate for perceived "weaknesses" with more self-aggrandizement. His introspection is very likely to be painful and distressing and to precipitate guilty rumination and depression. Continued focus on defects and faults may escalate and he may minimize or lose sight of his more positive attributes. He is apt to feel badly about his failures and lack of achievement in light of the limited resources he has available.

His tendency to externalize negative aspects of himself limits how insightful he can be. His rigid values and attitudes limit his potential for understanding himself and, consequently, for changing. He may not apply insight in the hope that others will solve his problems.

## INTERPERSONAL PERCEPTION:

*Suspiciousness:* He does not appear to be extremely suspicious.

*Defensiveness:* There is some oppositionality present. This may be a problem if he lacks appropriate opportunities and social skills for asserting disagreement and autonomy.

Emotional over control may be employed to defend against affective confrontation. His basic defense of over glorifying himself serves to protect him against ego-deflation. He is likely to deny, rationalize, and externalize blame, while elevating himself beyond fault.

*Interpersonal Relationships:* His relationships may be immature and fantasy-laden. Rather than engaging people for who they are, his interactions may be more of an attempt to materialize his own wishes, needs, or projections.

His self-centeredness, self-aggrandizement, and interpersonal shallowness may put people off. Threatening confrontations are strongly resisted but flattery or submission will succeed. His self-absorption breeds distorted views of others. Because others are important in terms of his need for appreciation, superficial relationships are the rule. Negative or confrontive interactions typically are handled by rationalization, blame, or denial. He has difficulty making compromises in interpersonal interactions.

He has some ambivalence or turmoil about interacting with others. Aggressive tendencies may be present.

**CONFIDENTIAL**                                    26

This information has been released to you from records whose confidentiality is protected by Federal Regulations (42CFR,Part 2) which prohibits you from making any further disclosure without the specific written consent of the person to whom it pertains or as otherwise permitted by such regulations.

SANTÉ CENTER FOR HEALING
PROFFESSIONAL ASSESSMENT PROGRAM
DR. WILLIAM KYROS (A152)

Rather than passively reacting to events, he has a stylistic inclination to actively initiate behavior. In addition, he tends not to listen well to others and to take action even though gathering more preliminary information might be helpful.

Generally, he is less socially skilled than others are and consequently has problems coping, especially interpersonally. This results in dissatisfaction and sometimes depression. He may not expect nor experience comfort or nurturance from interpersonal closeness in ways that others do. He is conservative about intimacy and sharing personal space. He tends to see reciprocal interactions with others as important and beneficial to him.

His relationships may be "clingy", immature, or dependent. This may relate to a wish for others to handle responsibilities he sees as beyond his capabilities.

## TREATMENT CONSIDERATIONS:

*The following issues may become therapy concerns or may affect the course of treatment:*

dysphoric ideation
fragile self-esteem
guilt
painful introspection
impulsivity
somatization
externalizing
crisis situation
excess stress
risk of relapse
low motivation
intrusive urges
social nonconformity
self-absorption
rigid independence

Cognitive techniques can be used to counter depressive and self-destructive thinking and attitudes.

Prompt therapeutic intervention is needed to help him manage his stress.

If his atypical views of reality contribute to social or interpersonal problems, feedback from the therapist and others may help him establish more consensual grounds for communication and perception. He may not listen well nor try to integrate the therapist's

CONFIDENTIAL                    27

This information has been released to you from records whose confidentiality is protected by Federal Regulations (42CFR,Part 2) which prohibits you from making any further disclosure without the specific written consent of the person to whom it pertains or as otherwise permitted by such regulations.

SANTÉ CENTER FOR HEALING
PROFFESSIONAL ASSESSMENT PROGRAM
DR. WILLIAM KYROS (A152)

ideas that stress understanding. In a stressful situation, he is likely to act without thinking about his goals in therapy. Due to his tendency to think in rigid ways, shifting his focus to consider alternate understandings and multiple perspectives will require preparation, planning, and time.

Encouraging self-examination may lead to his dwelling too much on his negative features. A focus on his more positive features and on the world around him is needed. He is likely to painfully dwell on his more negative features, losing sight of his strengths. However, a result of his self-questioning can be to reconstitute an inflated and ungrounded self-esteem. The current lapse may offer an opportunity for mature ego development growth. The therapist may not be able to rely on much self-initiated application of insights, but more directive or behavioral techniques may be welcomed.

Therapy needs to address effective ways for him to cope with his unmet needs and impulses. Rapid stress reduction is needed to help him handle pressures from unmet internal needs. Verbal ventilation and/or need fulfillment should provide some relief from the urges.

Treatment should rapidly and substantially reduce stress, provide support, and aim toward building coping skills. Frequent contact and increased structure are appropriate for the crisis situation.

At this time, structure, predictability, support, and assistance are needed when new or difficult problems arise. Additional and more effective coping skills should be developed to combat his sense of helplessness. In psychotherapy, he will find it difficult or "unnecessary" to take responsibility for change, feeling that things should be better without his having to do much. Simply letting him, talk about himself will reconstitute possible narcissistic injury, at which time he may feel no need to continue treatment. A commitment to long-term reconstructive therapy is needed to nurture genuine self-worth. Very supportive and constructive confrontation is required for him to learn to live without his props. To avoid frustration, psychotherapy goals should be set to what is readily achievable. However, stronger motivation should be established and reinforced to ensure persistence of effort.

Therapeutic change will be difficult because he is very prone to rationalize, blame, and avoid responsibility, believing that success should come magically without his having to do much. Early termination is likely unless ego is carefully supported. As a protection against negative views of himself, he may deny any need to change, tending to project blame for problems onto others. Resistance to psychotherapy is likely to result from his self-centered involvement and a denial or externalization of his need to change.

This information has been released to you from records whose confidentiality is protected by Federal Regulations (42CFR,Part 2) which prohibits you from making any further disclosure without the specific written consent of the person to whom it pertains or as otherwise permitted by such regulations.

SANTÉ CENTER FOR HEALING
PROFFESSIONAL ASSESSMENT PROGRAM
DR. WILLIAM KYROS (A152)

In initial therapy sessions, he will have difficulty trusting and making close contact. Persistence is needed to break through his distancing and detachment. The therapist-patient relationship should be consistent and largely nurturant.

## MCMI-II

### TEST VALIDITY:

The patient displayed a moderate tendency to present himself in a positive light. The obtained score is in a range considered to be within normal limits for patients who are under scrutiny for some reason.

### PERSONALITY PATTERNS

The behavior of this man is typified by his need to be seen by others in a favorable light and by his rigid and tense compliance to social convention. His overt submission to the wishes and values of those in authority overlies his insecurity and fear of humiliation. Despite some discontents, he is self-effacing, noncompetitive, and unassertive. He sacrifices his desires to gain the approval and respect of others. On the surface, he invariably exhibits a strong sense of duty to obey and follow others. He also tries to appear unpresuming, considerate, and cooperative--a person devoid of self-will and personal desire. Although feeling quite inadequate and unsure of himself, he often goes out of his way to maintain a mature appearance, posturing capability and confidence in his attributes. Any form of condemnation or implied disapproval creates considerable tension for him. To avoid humiliation or disparagement, he assumes a public posture of being respectful, even ingratiating and self-denying, especially with persons in a position of authority.

The overt propriety and unassertiveness of this man, especially in his relationships with those having prestige or status, hide negative feelings that periodically break through his front of respect and restraint. Fear of exposing these resentments as well as his desire to maintain emotional control lead him to an over organized life of rigid and disciplined self-control. Assertion and independent thought would endanger the approval he desperately seeks. Given his life experiences, he does not trust others to provide the recognition and security he needs. Hence, his tension and his tendency to be careful not to transgress what is proper and acceptable.

Despite his efforts to appear cooperative, capable, and conscientious, he is often indecisive, tends to procrastinate, and is easily upset by deviations from his daily routine. His denial of contrary feelings limits the extent to which this report can disclose his current life difficulties. He strongly desires to appear in a good light and tries to give a perfectionistic view of himself. Toward this end, he adheres to social conventions and is disinclined to admit social shortcomings. Of particular significance is his dread of

CONFIDENTIAL                    29

This information has been released to you from records whose confidentiality is protected by Federal Regulations (42CFR,Part 2) which prohibits you from making any further disclosure without the specific written consent of the person to whom it pertains or as otherwise permitted by such regulations.

SANTÉ CENTER FOR HEALING
PROFFESSIONAL ASSESSMENT PROGRAM
DR. WILLIAM KYROS (A152)

making mistakes or taking risks lest they prove humiliating, end in failure, or provoke disapproval and punishment.

Rarely does he relax the guarded defensiveness that he conceals behind his posture of respectability, conformity and social propriety. He avoids introspection and is guided by an unrelenting internal conscience that counters his hostile impulses and thoughts. As a consequence of constraining his feelings and submerging his intense ambivalence, he is likely to exhibit a history of bodily complaints and functional symptoms.

## CLINICAL SYNDROMES

The patient is suffering from moderate levels of anxiety. The anxiety appears to be situationally based. He is reacting to stress-producing experiences with a range of vague physiological symptoms, which reflect his underlying anxieties and depression. With the personality characteristics described above, he is likely to turn anger inward.

## NOTEWORTHY RESPONSES:

The following statements were answered "TRUE" by the patient.

### Health Preoccupation

I can't seem to sleep, and wake up just as tired as
when I went to bed.
In recent weeks, I feel worn out for no special reason.

### Self-Destructive Potential

I feel terribly depressed and sad much of the time
now.

## TREATMENT CONSIDERATIONS:

Because of his strong need to be liked and his fear of humiliation, this patient may view therapy as a threat to his overly perfectionistic and fastidious view of himself. Although tense and worried, he lacks insight and is inclined to resist probing and deny psychological insights. His defensiveness should be honored, and probing interpretations should proceed slowly. Once trust and confidence have developed in the relationship, the therapist may begin to bring the patient's repressed anger into the open. Given his insecurity, his fear of humiliation, and his reluctance to expose more than he can tolerate, actions that directly confront the patient may invite emotional complications. He may voice intellectual insights, especially if he is well educated, but given his respectful, if not ingratiating manner, this is often a camouflage to placate the therapist. The patient's

CONFIDENTIAL                    30

This information has been released to you from records whose confidentiality is protected by Federal Regulations (42CFR,Part 2) which prohibits you from making any further disclosure without the specific written consent of the person to whom it pertains or as otherwise permitted by such regulations.

SANTÉ CENTER FOR HEALING
PROFFESSIONAL ASSESSMENT PROGRAM
DR. WILLIAM KYROS (A152)

defenses are so well constructed that insight-based changes are likely to be temporary at best. Though giving lip service to treatment goals, he will not readily relinquish his defensive controls.

Unfortunately, he not only observes real deficits in his competence but also deprecates what virtues and talents he may possess. This is done to prevent others from expecting him to assume responsibilities he would rather avoid. Successful as a shield against discomfort and in protecting his dependency needs, these actions are carried out at the cost of demeaning his own self-respect.

Methods of cognitive behavioral treatment designed to focus on dysfunctional self-statements may prove useful in countering his self-demeaning judgments as well as in providing structure to what he may perceive as an ambiguous, elusive, and potentially threatening therapeutic relationship.

An auspicious beginning to therapy may create the misleading impression that future progress will be rapid. The patient may seek a protective relationship with the authority and status of his therapist, and may resist efforts to guide his assumption of independence and autonomy. Helping him relinquish his conforming and dependency habits will prove a slow and arduous process. Efforts in assisting him to building an image of true independence and self-esteem must proceed one-step at a time through a program geared toward strengthening his attributes and dislodging his habit of leaning on others.

Supportive therapy is likely to be the best initial vehicle for treating this patient. Several psychopharmacologic agents may prove beneficial in alleviating periods of marked anxiety, but the level of dosage should not cause the patient to feel significant decrements in efficiency and alertness. Also useful are behavior modification techniques designed to desensitize discomforting or anxiety-provoking situations. As noted previously, cognitive reorientation methods geared to developing insight should be applied gradually and discreetly; however, these approaches may be limited in their accomplishments, since the patient may grasp his problems only at an abstract or intellectual level. Reworking the foundations of his life-style may require long-term procedures, although short-term supportive and cognitive methods are likely to be helpful in restabilizing him.

## OMITTED OR DOUBLE MARKED ITEMS:

The patient omitted or double marked the following items, making them unusable for scoring.

Under no circumstances do I ever let myself be tricked by people who say they need help.

CONFIDENTIAL                                    31

This information has been released to you from records whose confidentiality is protected by Federal Regulations (42CFR,Part 2) which prohibits you from making any further disclosure without the specific written consent of the person to whom it pertains or as otherwise permitted by such regulations.

SANTÉ CENTER FOR HEALING
PROFFESIONAL ASSESSMENT PROGRAM
DR. WILLIAM KYROS (A152)

## PAI

### TEST VALIDITY:

For this protocol, the number of uncompleted items is within acceptable limits. His scores suggest that he did attend appropriately to item content and responded in a consistent fashion to similar items.

His pattern of responses suggests that he tends to portray himself as being relatively free of common shortcomings to which most individuals will admit, and he appears somewhat reluctant to recognize minor faults in himself. Given this apparent tendency to repress undesirable characteristics, the interpretive hypotheses in this report should be reviewed with caution. Although there is no evidence to suggest an effort to intentionally distort the profile, the results may underrepresent the extent and degree of any significant findings in certain areas due to the client's tendency to avoid negative or unpleasant aspects of himself. This level of defensiveness is considered normal for persons who have been accused of serious misbehaviors. In and of itself, this score does not provide any evidence of guilt or innocence of the alleged inappropriate behaviors.

Despite the level of defensiveness noted above, there are some areas where the client described problems of greater intensity than is typical of defensive respondents. These areas could indicate problems that merit further inquiry. These areas include: physical signs of depression.
There is no evidence to suggest that the respondent was motivated to portray himself in a more negative or pathological light than the clinical picture would warrant.

### CLINICAL FEATURES:

The PAI clinical profile reveals no elevations that should be considered to indicate the presence of clinical psychopathology.

The PAI clinical profile is entirely within normal limits. There are no indications of significant psychopathology in the areas that are tapped by the individual clinical scales.

### SELF-CONCEPT:

The self-concept of the patient appears to involve a generally stable and positive self-evaluation. He is normally a confident and optimistic person who approaches life with a clear sense of purpose and distinct convictions. He describes being reasonably self-satisfied, with a well-articulated sense of who he is and what his goals are.

This information has been released to you from records whose confidentiality is protected by Federal Regulations (42CFR, Part 2) which prohibits you from making any further disclosure without the specific written consent of the person to whom it pertains or as otherwise permitted by such regulations.

SANTÉ CENTER FOR HEALING
PROFFESSIONAL ASSESSMENT PROGRAM
DR. WILLIAM KYROS (A152)

## INTERPERSONAL AND SOCIAL ENVIRONMENT:

His interpersonal style seems best characterized as warm, friendly, and sympathetic. He particularly values harmonious relationships and derives much of his satisfaction from these relationships. Because of the premium placed upon harmony, he is likely to be uncomfortable with interpersonal confrontation or conflict, and he will tend to shun controversy. He is probably quick to forgive others and will readily give others a second chance.

He reports having a level of stress comparable to that of normal adults, with the demands of the environment buffered by a large number of individuals to whom he can turn for support when needed.

## TREATMENT CONSIDERATIONS:

He is not reporting distress from thoughts of self-harm.

He describes himself as a very meek and unassertive person who has difficulty standing up for himself, even when assertiveness is warranted. Thus, he may have some difficulty in the appropriate expression of anger.

His interest in and motivation for treatment is somewhat below average in comparison to adults who are not being seen in a therapeutic setting. Furthermore, his level of treatment motivation is substantially lower than is typical of individuals being seen in treatment settings. His responses suggest that he is satisfied with himself as he is, that he is not experiencing marked distress, and that, as a result, he sees little need for changes in his behavior.

He may not be experiencing sufficient distress to feel that treatment is warranted.

He may be somewhat defensive and reluctant to discuss personal problems, and as such, he may be at-risk for early termination.

### *Critical Item Endorsement*
A total of 27 PAI items reflecting serious pathology have very low endorsement rates in normal samples. These items have been termed critical items. A significant item with a score of "SLIGHTLY TRUE" is listed below.

Potential Malingering

Sometimes my vision is only in black and white.

CONFIDENTIAL                    33

This information has been released to you from records whose confidentiality is protected by Federal Regulations (42CFR,Part 2) which prohibits you from making any further disclosure without the specific written consent of the person to whom it pertains or as otherwise permitted by such regulations.

SANTÉ CENTER FOR HEALING
PROFFESSIONAL ASSESSMENT PROGRAM
DR. WILLIAM KYROS (A152)

## SUMMARY

This is a 55-year-old male who is suffering from reactive anxiety and depression associated with accusations of a violation of sexual boundary issues. Psychometrics suggest dependent and obsessive-compulsive personality traits.

Tests do not indicate any evidence of any serious antisocial tendencies. There is some indication of a degree of self-absorption, some difficulties with control of impulses. Defense mechanisms include rationalization, projection, denial, and above all intellectualization. With strong dependency needs, his difficulties in interpersonal relationships leave him without the emotional support he needs.

Our evaluation does not provide a clear indication that the patient did or did not violate sexual boundaries. The patient is a psychiatrist and so he is probably familiar with the tests that we administered. There are indications of moderate levels of attempts to present himself in a positive light. Both those who are guilty and those who are innocent obtain such scores, though many who are guilty have higher scores than he obtained. Certainly, there are red flags here. But there are also indications that the patient is simply not as socially adept as he needs to be.

At best, he has poor judgment or does not recognize potentially risky situations or does not think to take precautions in risky situations (E.g., he could audio tape or video record the sessions he has with patients; he could see patients with his door open; he could have a window put in the door to his office; he could have a nurse in his office with him when he sees women patients; or he could refuse to see certain individuals.) One example involved a woman who accused him of violating sexual boundaries. Prior to this incident, he had been treating the woman's daughter for a bipolar illness. When the woman retracted her allegations, he asked her if he should continue to see her daughter. The woman told him to continue because he was doing a wonderful job with her (the daughter). He continued to treat the daughter.

IMPRESSIONS:

AXIS I:       Depressive Disorder NOS (311.)
              Anxiety Disorder NOS (300.0)

AXIS II:      Obsessive-compulsive and Dependent Personality
                 (301.9)

AXIS III:     By history:    Hypertension
                                Hypercholesterolemia

CONFIDENTIAL                      34

This information has been released to you from records whose confidentiality is protected by Federal Regulations (42CFR,Part 2) which prohibits you from making any further disclosure without the specific written consent of the person to whom it pertains or as otherwise permitted by such regulations.

SANTÉ CENTER FOR HEALING
PROFFESSIONAL ASSESSMENT PROGRAM
DR. WILLIAM KYROS (A152)

AXIS IV:     Severe

AXIS V:      55

RECOMMENDATIONS:

1.    The results of the MSI will be forwarded to you as soon as we receive them.  This
      test has to be sent to its publisher for scoring.

## ADDENDUM TO
## PSYCHOLOGICAL REPORT

TEST:  MULTIPHASIC SEX INVENTORY

TEST VALIDITY:

The patient omitted no items.  On the reliability indices, his scores are within normal
limits.  Validity scales suggest that he was highly defensive and presented himself in an
overly favorable light.

GENERAL SEXUALITY TEST RESULTS:

He has highly accurate knowledge about sexual anatomy and physiology.  He describes
himself as heterosexual and presents himself as having basic libido urges and drives, non-
impaired erectile functioning and adequate sexual performance.  However, he attempts to
present himself as "asexual" and as having limited sexual interest in adult females.  He
does not report sexual interests or behaviors involving female apparel,
bondage/discipline, inflicting sexual humiliation or pain on others, sexual masochism or
any other fetishes.

SEX DEVIANCE ASSESSMENT:

The results from the Exhibitionism Scale show that:

      a.    he does not report ever having sexual thoughts or
            fantasies involving exposing himself;
      b.    he denies ever having sought out or positioned
            himself to expose to someone;
      c.    he does not acknowledge ever having exposed himself.

This information has been released to you from records whose confidentiality is protected by Federal
Regulations (42CFR,Part 2) which prohibits you from making any further disclosure without the specific
written consent of the person to whom it pertains or as otherwise permitted by such regulations.

SANTÉ CENTER FOR HEALING
PROFFESSIONAL ASSESSMENT PROGRAM
DR. WILLIAM KYROS (A152)

He denies ever having acted out sexually harassing behavior.

He does not acknowledge culpability to any sexual offense or sexual misconduct assessed
by the MSI II.

**SUMMARY:**

The main finding from the testing results is that the patient produced a highly guarded
and defensive, non-disclosing profile.

This information has been released to you from records whose confidentiality is protected by Federal
Regulations (42CFR,Part 2) which prohibits you from making any further disclosure without the specific
written consent of the person to whom it pertains or as otherwise permitted by such regulations.

SANTÉ CENTER FOR HEALING
PROFFESSIONAL ASSESSMENT PROGRAM
DR. WILLIAM KYROS (A152)

### POLYGRAPH ASSESSMENT 1
By Michael Chimarys, M.S., M.S., J.D.

**PURPOSE OF EXAM:    SEXUAL BOUNDARY INFRACTIONS**
**RESULTS OF EXAM:     NO OPINION**

## 1. SYNOPSIS:

On August 18, 2009, Dr. William Peter Kyros, M.D. was administered a Specific Issue Polygraph Examination as requested to determine if he had sexual contact with any present or former patient for his sexual or psychosocial gratification; was intentionally dishonest or withheld information about any of the complaints filed against him; consulted with an attorney, obtained written information or talked to former patients of assessment centers to prepare for his visit; or, misrepresented or withheld information from his Sante Center Treatment Team.

Dr. Kyros Said he entered the Sante Center on August 17, 2009, to participate in a ninety-six hour evaluation and assessment program for doctor/patient boundary issue violations.

After Dr. Kyros' polygraph examination was completed his recorded polygraph tests were evaluated and determined to reflect physiological responses consistent with attempted deception to the relevant questions by the execution and use of "Counter-Measures." Dr. Kyros' polygraph examination was evaluated NO OPINION.

Before Dr. Kyros departed the testing site, he was informed about the results of his polygraph examination and that he did not pass his polygraph examination.

Dr. Kyros' polygraph examination was conducted according to the guidelines promulgated by the State of Texas Polygraph Examiners Board.

Dr. Kyros' polygraph examination was reviewed and evaluated NO OPINION.

## 2. PREDICATION:

On August 17, 2009, Dr. Kyros entered the Sante Center for evaluation and assessment for doctor/patient boundary issue violations. As part of Dr. Kyros' treatment program he was administered a Clinical Polygraph Examination to determine if he had sexual contact with any present or former patient for his sexual or psychosocial gratification; was intentionally dishonest or withheld information about any of the complaints filed against him; had consulted with an attorney, obtained written information or talked to former patients of assessment centers to prepare for his visit; or, misrepresented and withheld information from his Sante Center Treatment Team.

CONFIDENTIAL                              37

This information has been released to you from records whose confidentiality is protected by Federal Regulations (42CFR,Part 2) which prohibits you from making any further disclosure without the specific written consent of the person to whom it pertains or as otherwise permitted by such regulations.

SANTÉ CENTER FOR HEALING
PROFFESSIONAL ASSESSMENT PROGRAM
DR. WILLIAM KYROS (A152)

### 3. PRE-TEST INTERVIEW:

Prior to initiating his pre-test interview, Dr. Kyros was instructed to read and initial documents informing him a polygraph examination in Texas is a voluntary procedure, that the Sante Center and his treatment staff would be provided a copy of this report. Dr. Kyros was also instructed to read all documents, identify his medical conditions and list all medications. Dr. Kyros completed a medical waiver and polygraph examination release before his polygraph examination. Dr. Kyros read the required documents and verbally indicated that he understood the legal and medical requirements and that he was willing to proceed with his interview and complete the polygraph examination process. After Dr. Kyros read and signed the required medical and polygraph examination release documents his Pre-test Interview started at 10:45 a.m. on August 18, 2009.

Dr. Kyros was on time for his appointment, he was cooperative, alert and well oriented as to time, place and his surroundings. Dr. Kyros responded to questions clearly and answered them intelligently.

### A. PERSONAL INFORMATION:

Dr. Kyros identified himself with Florida Driver's License K620-935-54-001-0. Dr. Kyros said he was married to Susan KOEN, age 52, from 1984 until 1997, they do not have any children. Dr. Kyros is a 55-year-old white male who was born on January 1, 1954 in Long Branch, New Jersey. Dr. Kyros is 5' 7" tall; he weighs 156 pounds and has brown hair and hazel eyes. When asked about any identifying scars, marks or tattoos, Dr. Kyros said he did not have any. Dr. Kyros said his mother is deceased and his father lives in Cape Cod. Dr. Kyros identified his two brothers as Theodore and Stephen.

Dr. Kyros said he graduated from high school in 1971, and then graduated from Hobart College in 1975 with a B.S. degree in Biology. Dr. Kyros then went to medical school in Juarez, Mexico for two years and then transferred to medical school at St. George University, under the Granada Island medical system in the United States; he graduated with his M.D. in 1981. Dr. Kyros has never served in the U.S. Armed Forces. When asked about his work history Dr. Kyros said he worked one year at the Metropolitan Hospital of New York for his Internship; then two years in general psychiatry, followed by two years of a fellowship in psychiatry.

Dr. Kyros did not reveal any life stresses, recent events or other conditions that might have precluded or influenced the outcome of his polygraph examination.

### B. PRIOR ARRESTS:

Dr. Kyros denied that he has ever been arrest or convicted for any prior misdemeanor or felony offense.

CONFIDENTIAL                    38

This information has been released to you from records whose confidentiality is protected by Federal Regulations (42CFR,Part 2) which prohibits you from making any further disclosure without the specific written consent of the person to whom it pertains or as otherwise permitted by such regulations.

SANTÉ CENTER FOR HEALING
PROFFESSIONAL ASSESSMENT PROGRAM
DR. WILLIAM KYROS (A152)

## 4. STATEMENT OF EVENTS LEADING TO ENTERING SANTE:

Dr. Kyros said he entered the Sante Center because of complaints that were made against him by former female patients and a former male assistant.

In 1991, a former male worker, who was a male stripper, asked Dr. Kyros to loan him $3,000.00 to buy a house. This worker reportedly said he saw Dr. Kyros having sex with a female patient. A female patient also accused Dr. Kyros of sexually abusing her.

In February 1999, a 33-year-old W/F patient made a complaint against Dr. Kyros; she also reported sexual dreams about Dr. Kyros.

In September 2008, a 38-year-old W/F patient accused Dr. Kyros of making sexual statement to her.

On April 20, 2009, a 55-year-old W/F patient whom Dr. Kyros said he has seen three times for patient visits came in for a routine 15-minute visit for the renewal of her medications. Dr. Kyros said she filed a complaint against him.

Dr. Kyros denied any sexual contact with any female patients.

## 5. SEXUAL HISTORY:

Dr. Kyros was interviewed to obtain a brief sexual history and information concerning his background. The information Dr. Kyros provided is reflected below.

When questioned about his childhood and possible physical abuse and/or sexual assault by anyone, Dr. Kyros said denied he had been abused either sexually or physically as a child. Dr. Kyros said he started to masturbate at the age of 13; Dr. Kyros said the most he ever masturbated in one day was one time. Dr. Kyros said the last time he masturbated was while in high school

Dr. Kyros said his first sexual relationship and experience with another person was at the age of 15, with a 15-year-old female, they dated for four months and engaged in sexual intercourse weekly. Dr. Kyros identified himself as a heterosexual male.

### A. SEXUALLY ORIENTED BUSINESSES:

Dr. Kyros was questioned about his sexual activities prior to entering the Sante Center. Dr. Kyros denied he frequented sexually oriented businesses, adult book and video stores, sex shops, topless clubs, sex shows, peep shows, massage parlors, lingerie modeling studios, gay bars, bathhouses or escort services.

CONFIDENTIAL                    39

This information has been released to you from records whose confidentiality is protected by Federal Regulations (42CFR,Part 2) which prohibits you from making any further disclosure without the specific written consent of the person to whom it pertains or as otherwise permitted by such regulations.

SANTÉ CENTER FOR HEALING
PROFFESSIONAL ASSESSMENT PROGRAM
DR. WILLIAM KYROS (A152)

### B. SEX CRIMES:

Dr. Kyros was questioned about and denied his involvement in sex crimes before entering the Sante Center by performing a sex act in public, indecent exposure, public masturbation, paid to perform a sex act, sex with prostitutes, viewing or possession of child pornography; use of force, use of threats of any kind or bribery to make anyone do something sexual with him; having sex with an unconscious, incapacitated or sleeping individual; incest; beastiality; or engaging in a sex act with a minor.

### C. DEVIANT SEXUAL BEHAVIOR:

Dr. Kyros was questioned about and denied his involvement in the following deviant sexual activities before he entered the Sante Center, telephone sex, writing sexually explicit letters, making sexually obscene telephone calls, calling 1-800/900 sex telephone services, involvement in cybersex, engaging in sex acts with individuals he had known for less that 24 hours, adultery, sex with more than one person at the same time, participation in group masturbation, voyeurism, fetishisms, homosexual acts, frottage, cross-dressing, sadomasochistic activities, use of sex toys or contacting anyone on the Internet for a sexual purpose.

### D. PORNOGRAPHY:

Dr. Kyros was questioned about his purchase, possession and use of adult and child pornographic pictures, videos, movies, books and magazines before he entered the Sante Center. Dr. Kyros said when he was a teenage a friend of his showed him a copy of "Playboy" when they were in high school.

### 6. DRUG AND ALCOHOL USAGE HISTORY:

Dr. Kyros said he started drinking at the age of 15; he drank once a month with a friend. Dr. Kyros said he was never intoxicated, and had his last drink three months ago. Dr. Kyros said he usually only had one drink an evening.

Dr. Kyros denied that he had purchased, obtained or used any drug to take sexual advantage of another individual.

### 7. EXAM ADMINISTRATION:

The following relevant questions were formulated for Dr. Kyros' polygraph examination based on the information obtained during the course of his interview and from questions and information suggested by Dr. Montgomery.

CONFIDENTIAL                    40

This information has been released to you from records whose confidentiality is protected by Federal Regulations (42CFR,Part 2) which prohibits you from making any further disclosure without the specific written consent of the person to whom it pertains or as otherwise permitted by such regulations.

SANTÉ CENTER FOR HEALING
PROFFESSIONAL ASSESSMENT PROGRAM
DR. WILLIAM KYROS (A152)

All of the polygraph examination questions reflected below were reviewed with Dr. Kyros before his polygraph examination. Dr. Kyros' verbal responses to the reviewed relevant questions are indicated infra:

| Relevant Question #1: | Have you ever had sexual contact with any present of former patients for your sexual or Psychosocial gratification? |

Response:                   NO.

| Relevant Question #2: | Have you intentionally been dishonest or withheld information about any complaints filed against you in 1991, 1998, 1999 or this year? |

Response:                   NO.

| Relevant Question #3: | Other than what you told me about, have you prepared for your Sante Assessment Program in advance by consulting with an attorney, obtaining written information or talking to former patients of assessment centers? |

Response:                   NO.

| Relevant Question #4: | Have you misrepresented or withheld any information from your Sante Center Treatment Team members? |

Response:                   NO.

**NOTE:** "Other than what you told me about," was added to Relevant Question #3 after Dr. Kyros revealed he did consult with his attorney to help him decide if he should come to the Sante Center.

## 8. EXAMINER'S ANALYSIS:

The AFMGQT four relevant question format was used for Dr. Kyros' polygraph examination. Dr. Kyros' polygraph examination was reviewed and a final evaluation was that of **NO OPINION**. This evaluation was made because Dr. Kyros attempted to use "COUNTER-MEASURES" to alter the outcome of his polygraph examination.

CONFIDENTIAL                    41

This information has been released to you from records whose confidentiality is protected by Federal Regulations (42CFR,Part 2) which prohibits you from making any further disclosure without the specific written consent of the person to whom it pertains or as otherwise permitted by such regulations.

SANTÉ CENTER FOR HEALING
PROFFESIONAL ASSESSMENT PROGRAM
DR. WILLIAM KYROS (A152)

Dr. Kyros altered his respiration to effect his upper and lower pneumograph tracings by taking long slow deep breaths during the majority of the Relevant Questions; and, short rapid breaths during the majority of the Comparison Questions.

By GOOGLING "How to beat a polygraph examination," several websites are listed.

An evaluation of **NO DECEPTION INDICATED** or **DECEPTION INDICATED** could not be made because of the erratic patterns on Dr. Kyros polygraph charts. Dr. Kyros' polygraph examination was evaluated **NO OPINION**.

## 9. POST-TEST:

Following the completion of Dr. Kyros' polygraph examination, his polygraph recordings were reviewed. Before Dr. Kyros departed the testing site, he was informed that he did not pass his polygraph examination.

Dr. Kyros was given an opportunity to explain his erratic responses; he made no excuses or offered an opinion as to why he did not pass his polygraph examination.

Before, during and after his polygraph examination, Dr. Kyros was observed to be well oriented and responded appropriately to his environment, personal interactions and questions. Dr. Kyros did not appear to be upset with his conviction, probation, treatment conditions or his requirement to undergo polygraph testing. After being informed of his polygraph examination results, Dr. Kyros did not appear unduly upset or agitated. At no time did Dr. Kyros express thoughts of injuring himself, discuss ideas about taking his life, or say that he had a plan to commit suicide. The polygraph examiner did not develop an impression that Dr. Kyros should have been evaluated or monitored for suicide prevention.

I certify the polygraph examination administered above meets recognized criteria of quality control standards and was conducted in accordance with the guidelines promulgated by the Texas Joint Polygraph Committee on Offender Testing (JPCOT), and the regulations of the State of Texas Polygraph Examiners Board.

Michael Chimarys, M.S., J.D.
Texas Polygraph Examiner
License #977

Retired Naval Criminal Investigative Service (NCIS) Special Agent & Polygraph Examiner
Former Instructor Department of Defense Polygraph Institute
Texas Licensed Polygraph Examiner, Past President Texas Association of Polygraph Examiners
Member American Polygraph Association & American Association of Police Polygraphists
Office Address:    103 South Woodrow Lane, #5, Denton, Texas          Telephone: 817-909-3411

CONFIDENTIAL                                   42

This information has been released to you from records whose confidentiality is protected by Federal Regulations (42CFR,Part 2) which prohibits you from making any further disclosure without the specific written consent of the person to whom it pertains or as otherwise permitted by such regulations.

SANTÉ CENTER FOR HEALING
PROFFESSIONAL ASSESSMENT PROGRAM
DR. WILLIAM KYROS (A152)

**POLYGRAPH ASSESSMENT 2**
By Robert J. Hardin

## CASE DETAILS:

I have been informed that there have been 4 patient complaints against Dr. Kyros of sexually inappropriate behavior.  I was also informed that Dr. Kyros submitted to a polygraph examination previously concerning this same issue. The examiner reported that Dr. Kyros used counter measures during the examination to distort the results.

## PRE-TEST INTERVIEW WITH DR. WILLIAM KYROS:

Dr. Kyros stated that the 4 complaints were all resulting from seeing patients in 1991, 1999, September 2008 and April 2009. Concerning the case in 1991, he explained that 4 witnesses said that he was sexually inappropriate with a patient. He said the witnesses were lying and went into detail about their potential motive for lying. He remembered exact detail concerning the witnesses and the patient. However when I asked what the actual allegation was he said touching the patient inappropriately and did not recall if he was accused of touching her breasts or vagina because he never saw the report. He recalled that the patient did pull her pants down to show him a scar on her stomach and he said no, no don't do that and helped her pull her pants back up.

Concerning the case in 1999, he said that he was in private practice. He saw this patient in his normal time slot, 15 to 20 minutes. The next week she called her counselor and said I think Dr. Kyros was aroused and wanted a hug. Later the patient recanted the story and said it did not happen it was all in her head.

September 2008, concerned a very depressed woman that he saw every two weeks. On September 11, 2008, he saw her and she said she was feeling great, her meds were working and she was very thankful to him. He saw her 10 or 15 minutes, she complained that her primary care doctor did not order tests that she thought she had needed. Therefore, he suggested that she find out exactly what test were conducted and if more were needed, he would order them. Later that evening at approximately 7:15, the patient appeared and she had been talking to her counselor. When she saw him, she said her primary care doctor had only ordered one test. He said that he invited her into his office, she was there approximately 90 seconds and he wrote her prescriptions for some additional examinations. He told her she should go out the side door to avoid the people in the waiting room. The next morning his supervisor called him in and told him that there was a complaint of sexual inappropriateness with a female patient that had been there the previous day. Dr. Kyros had remembered in exact detail everything that had occurred with this patient. However, when I asked him what the actual allegations were, he said she said something about me saying I wanted to spread my sperm around and oh

This information has been released to you from records whose confidentiality is protected by Federal Regulations (42CFR,Part 2) which prohibits you from making any further disclosure without the specific written consent of the person to whom it pertains or as otherwise permitted by such regulations.

SANTÉ CENTER FOR HEALING
PROFFESSIONAL ASSESSMENT PROGRAM
DR. WILLIAM KYROS (A152)

yes, she said I had an erection and that I blocked her way when she tried to depart the building. He further stated that she accused him of making sexual statements to her but he did not recall what those statements were. He said that he has been completely cleared of all of these allegations.

Concerning the last allegation, it was in April 2009, he said this woman is a cocaine addict, an alcoholic and has attempted suicide. The first time he saw her she explained that she had not been taking all of her medications and did not feel well. He increased her dose up to 300mg of Secroul and she started attending AA meetings. The second visit he recalls that she said she felt better, said the AA meetings were going well and her therapy was going well, it was her routine 15 or 20 minute session. Then an appointment was made for April 2009. On that appointment she came in at 10 or 10:30am, everything was okay except she complained that there were some intimacy problems at home. He asked her if she had talked to her husband about this problem and she shrugged her shoulders, and then said that he wasn't interested in sex. She explained that she was getting ready to jump someone and that she had been looking at the guys in her AA meetings. At this time he suggested that she get her husband to either go to counseling or be checked by his medical doctor, perhaps he needed Viagra. She then set up another appointment with him for May 2009. Dr. Kyros was extremely detailed in explaining activities during that visit and repeated that there was a lot of people around.

The following Monday, the police called him and asked him to come in for an interview. They explained to him that he had been accused of being sexually inappropriate. He said the police talked to him for quite sometime and then asked him if he would take a polygraph examination. He agreed to the test. The examiner came in, raised his voice, and said that he should sign a confession. At this time, he felt very scared and unsure of what was going on, so he asked them to delay the examination until the next day. He then was advised by a co-worker to talk to an attorney and he did. I asked him what the allegations were concerning this patient and he said he wasn't sure what all she said but she accused him of making sexual comments, and touching her inappropriately. I asked if he recalled where she said that he had touched her, he said her breasts and buttocks. I asked what else he remembered about her allegations, and he said oh, also she said I took out my penis and exposed myself to her. However, he could not recall any of the sexual comments that he allegedly made to her.

The test was structured and administered relevant questions asked on the examination were as follows:

1.    Have you ever had sexual contact with any patient or former patient for your own sexual gratification?

      Answer: NO

CONFIDENTIAL                    44

This information has been released to you from records whose confidentiality is protected by Federal Regulations (42CFR,Part 2) which prohibits you from making any further disclosure without the specific written consent of the person to whom it pertains or as otherwise permitted by such regulations.

SANTÉ CENTER FOR HEALING
PROFESSIONAL ASSESSMENT PROGRAM
DR. WILLIAM KYROS (A152)

    2.    **Have you been dishonest with me about any of the four patient complaints we have discussed?**

        Answer: NO

    3.    **Have you deliberately misrepresented or withheld any information from your Sante Center Treatment team?**

        Answer: NO

## RESULTS:

Evaluations of the polygrams indicate deceptive responses. Based on the polygrams it is the opinion of this examiner that Dr. Kyros has not answered the above relevant questions truthfully.

## POST-TEST INTERVIEW:

I explained the results of the test to Dr. Kyros. He asked if I was saying that he was lying about everything. I explained to him that was not what I was saying, what I was saying was that he was deceptive on the three above relevant questions.

## SPECIAL NOTATION:

It is very unusual for an individual to remember in explicit detail every single factor leading up to a case, but only have a vague memory of the specific elements of the case (actual allegations from the patients).

CONFIDENTIAL              45

This information has been released to you from records whose confidentiality is protected by Federal Regulations (42CFR,Part 2) which prohibits you from making any further disclosure without the specific written consent of the person to whom it pertains or as otherwise permitted by such regulations.

SANTÉ CENTER FOR HEALING
PROFFESSIONAL ASSESSMENT PROGRAM
DR. WILLIAM KYROS (A152)

## BIOPSYCHOSOCIAL ASSESSMENT
### By Bill Swenson, L.P.C., L.C.D.C.

### PRESENTING PROBLEM LEADING TO ADMISSION:

He reports that he was referred by the Department of Health of RI for an evaluation after a complaint by a patient who he had seen three times who reported that he touched her sexually. He stated that the patient was chemically dependent, bipolar and that she had been hospitalized for these issues recently and referred to him for aftercare.

### PROBLEM STATEMENT:

The Department of Health of RI referred me for an evaluation after a complaint by a patient who I had seen three times who reported that I touched her sexually.

### TREATMENT HISTORY:

He met with Ed Brown, MD and psychiatrist for 5 to 6 months after the first accusation of sexual impropriety that occurred in 1991. In the late 1980's he engaged in marital therapy with his wife for 2 years due to problems in their marriage.

### CHEMICAL/BEHAVIORAL USE:

He reports that he is essentially a "teetotaler" and that he drinks about three drinks a year. He reports that alcohol makes him feel tired and that he doesn't like the taste of alcohol. He reports that in high school and college he drank no more than one weekend a month and that he typically had only one or two drinks. He reports that he experimented with cannabis in high school and college and that he used perhaps a dozen times. He reports that he used cocaine once in college.

He denied any other compulsive behaviors including gambling, shopping, eating, exercising, or sexually acting out.

### CURRENT EMOTIONAL FUNCTIONING:

He reported and appeared somewhat anxious due to the requirement for the assessment.

### CHANGES IN CLIENT:

He reports that he has gained about 5 pounds in the past 4 months due to the stress and anxiety of the complaint and the need for this evaluation. He also noted variable sleep and appetite problems.

CONFIDENTIAL                    46

This information has been released to you from records whose confidentiality is protected by Federal Regulations (42CFR,Part 2) which prohibits you from making any further disclosure without the specific written consent of the person to whom it pertains or as otherwise permitted by such regulations.

SANTÉ CENTER FOR HEALING
PROFFESSIONAL ASSESSMENT PROGRAM
DR. WILLIAM KYROS (A152)

He reports that he has had periods of despondence, dysphoria, frustration and anger in the past few months, again related to the complaint and the need for this assessment.
He denies changes in his thinking.
He denies changes in his spirituality. He reports that he is a spiritual, moral, ethical empathic and sympathetic person and that he likes himself. He describes himself and a decent, good person who enjoys helping people.

## SOCIAL HISTORY:

He reports that he is of Greek origin; both parents are of Greek origin.

### Religion/Spirituality
He was raised Greek Orthodox and reports that he is no longer active in religious activities but that he is a spiritual person with beliefs in the basic values of the Christian and other religions. He believes in the "golden rule."

### Educational/Vocational Training
He reports that he graduated from West Springfield HS in West Springfield, MA. He received a BS in Biology from Hobart College and went to Universidad de Cuidad Juarez for 2.5 years before transferring to Georges University School of Medicine in Grenada where he went to Brockton Hospital a teaching hospital associated with Boston University. He completed his internship, residency and fellowship at Metropolitan Hospital Center at Harlem in NYC.

### Employment History: (Including Military)
Past Employment History
Dr Kyros has worked at a number of facilities and health care businesses in the state of Rhode Island from 1994 through the present. He has also been in private practice both with others and solo. He has not been in the military. He has worked with adolescents and adults including geriatric patients.

### Current Employment Status
Currently he is employed by Quality Behavioral Health in Warwick, RI. He also works for Behavioral Medicine Clinic with the mentally retarded for the State of Rhode Island. No current licensure restrictions reported.

### Legal History and Current Legal Status
Denies

### Current Living Situation
He reports that he lives alone in an apartment.

CONFIDENTIAL                    47

This information has been released to you from records whose confidentiality is protected by Federal Regulations (42CFR,Part 2) which prohibits you from making any further disclosure without the specific written consent of the person to whom it pertains or as otherwise permitted by such regulations.

SANTÉ CENTER FOR HEALING
PROFFESSIONAL ASSESSMENT PROGRAM
DR. WILLIAM KYROS (A152)

*Sources of Social Support*
He reports that his brothers and father are supportive and that he has supportive friends some of whom go back to the third grade with whom he is still in contact.

## RELATIONSHIP HISTORY:

He reports only one significant relationship with his former wife with whom he is still in contact and on friendly terms per his report. He noted that soon after they were married they started having problems and began to see a marital therapist. They were married for about 10 years and per report divorced amicably. He noted that she wanted children but he was not willing to have children because of the difficulty they had in getting along with each other. He noted no significant events other than their episodes of marital therapy.

## FAMILY HISTORY:

*Parents and Siblings*
He is the oldest of three male siblings; Dr Kyros is 55 and his brothers are 54 and 53.

*Who lived in your home?*
He reports that his family growing up consisted of his parents and 2 brothers. He described his father as loving, kind, supportive, honest, and moral and a good father. He states that his father was a graduated of MIT in mechanical engineering and that he was close to his father. His father instilled pride in being a good person and honoring the family name and other family members by being a good person and not getting into trouble. His mother was loving, sensitive, sweet, helpful and supportive. She was a college graduate and worked outside the home in the family bakery and then as a bookkeeper. Dr. Kyros is the oldest sibling in the family and his next brother, Ted was more intellectual and introverted. They were close growing up and Ted became an endodontist. The youngest brother, Stephen, was more outgoing and went to business school at Boston College and went in to real estate and owns several businesses. He was also close to this brother.

*Childhood Experience*
He reports that when his parents were struggling financially when he was a child he remembers feeling sad. Also, when his maternal grandmother died he was sad in part because she was his mother's last living parent and because he was close to her. He noted that he was sad when he was not accepted into medical school and had to go to medical school in Mexico (although he enjoyed that time in his life per his report).

*Abuse/Trauma History*
Emotional
Denies

CONFIDENTIAL                    48

This information has been released to you from records whose confidentiality is protected by Federal Regulations (42CFR,Part 2) which prohibits you from making any further disclosure without the specific written consent of the person to whom it pertains or as otherwise permitted by such regulations.

SANTÉ CENTER FOR HEALING
PROFFESSIONAL ASSESSMENT PROGRAM
DR. WILLIAM KYROS (A152)


Physical
Denies

Spiritual/Religious
Denies

Sexual
Denies

Family of Origin
There is a history of substance abuse/dependency on his mother's side of the family;
several of his cousins have a history of substance abuse.

## SUICIDE RISK:

Denies suicidal ideation in family members
He reports that in 1991 he had brief episode of suicidal ideation but no intent or plan and
none since and none current.
Denies risk of suicide

## STRENGTHS AND WEAKNESSES:

"Kind, good, empathetic, helpful, try to be the best that I can be, a trusted friend."
"I give too much of my time in work situations."

This information has been released to you from records whose confidentiality is protected by Federal
Regulations (42CFR,Part 2) which prohibits you from making any further disclosure without the specific
written consent of the person to whom it pertains or as otherwise permitted by such regulations.

SANTÉ CENTER FOR HEALING
PROFFESSIONAL ASSESSMENT PROGRAM
DR. WILLIAM KYROS (A152)

## SPIRITUALITY ASSESSMENT
### By Rick Gordon, L.C.S.W.

### FINDINGS:

Mr. Kyros was not available for a face-to-face interview due to scheduling conflicts. However, he did complete a set of written questions related to his spiritual beliefs. Below are the answers to those questions.

He reported his definition of spirituality as "a conceptualization incorporating many themes and meanings formulated by one's own thoughts, opinions and life experiences which help guide in trying to understand the world and life".

In his childhood Mr. Kyros reported that his parents were a great influence spiritually. He reported they stressed being honest and truthful, that integrity and character were important and that behaviors reflect on the whole family. He reported he attended Sunday school, and vacation Bible school each summer.

In his adolescence he reported a continuation of moral and spiritual guidance from his parents but less frequent attendance at church.

In his adulthood he reported a integrating spiritual thoughts and events in his life and how they increased his understanding and acceptance of his abilities and limitations.

A segment of this assessment was designed to gain insight as to how an individual has come to development some connection with themselves through self-care, truth, mindfulness and the experiences of the emotional pain of the human condition. Mr. Kyros was asked to provide ways in which he does and does not practice self-care. He stated "takes his medications regularly, works less hours and spends quality time with family and friends". He reported in the past he worked too many hours for many decades and was overly available to the needs of others.

He was then asked to provide examples in which he did and did not tell the truth to himself and others. His response was as follows: "I tell myself to work fewer hours, find balance in my life with diet exercise and relaxation". He stated he does not tell himself the truth when he continues to over work so he can do more philanthropically. He also reported he did not tell his friends and family about "this difficult time he is going through professionally".

When asked to provide ways in which he does or does not practice mindfulness Mr. Kyros reported he is aware of his reactions and feelings when he is mindful. He reported

CONFIDENTIAL                    50

This information has been released to you from records whose confidentiality is protected by Federal Regulations (42CFR,Part 2) which prohibits you from making any further disclosure without the specific written consent of the person to whom it pertains or as otherwise permitted by such regulations.

SANTÉ CENTER FOR HEALING
PROFFESSIONAL ASSESSMENT PROGRAM
DR. WILLIAM KYROS (A152)

he is attentive to himself, his clothing, his car, recycling, and scheduling efficiently as part of mindfulness. He reports he does not practice mindfulness when he is too trusting of others.

Mr. Kyros was asked to give some ways in which he does or does not allow himself to experience emotional pain of the human condition. He stated "I am very empathic and sympathetic person who tempers there emotions with reality". He also reported when someone who is suffering a severe debilitating illness passes away he see that as a blessing.

He was asked to give some examples of ways in which he was and was not open to learning. He reported he has always been open to learning. He reads medical journals, consults with colleagues and finds ways to increase his information base. He reports he does not like computer games or things that bore him.

Mr. Kyros reported that he experiences oneness rather than separation as "being self-focused regarding a specific idea, situation or event". He reported that separation involves extracting himself from a larger scenario.

He was asked how he shares his time, talent and money. He responded by stating he shares time with friends and family, talent with other medical professionals and money to help family and donates to causes.

When asked to give ways he participates in the spiritual community he reported, "when people ask for thoughts on issues I give my sincere opinion based on my integration of spiritual concepts and life events".

Mr. Kyros was asked how his history is not his destiny by stating, "My destiny will continue to be shaped by what happened to shape my history including my morals, values and spirituality. However, my destiny does not have to be a continuation of my history. Other endeavors may present themselves and define my destiny".

## CONCLUSION:

Mr. Kyros currently is not involved in a church, and does not consider himself a religious person; he does have a belief in spiritual principles. He utilizes his gifts for the benefit of others but acknowledges that his work interferes with his connection to self and others. He seems to understand the difference between religion and spirituality. He does appear to take some comfort in his relationship with God, but struggles with self-acceptance and connecting with his authentic self.

Testing results and collateral information were not available at the time of this writing.

This information has been released to you from records whose confidentiality is protected by Federal Regulations (42CFR,Part 2) which prohibits you from making any further disclosure without the specific written consent of the person to whom it pertains or as otherwise permitted by such regulations.

SANTÉ CENTER FOR HEALING
PROFFESSIONAL ASSESSMENT PROGRAM
DR. WILLIAM KYROS (A152)

## PRELIMINARY RECOMMENDATIONS REPORT

### CONCERNS:

In the course of the Assessment of Dr. Kyros, numerous concerns have come to the forefront. These center around widely separated dichotomies that can be viewed as reasonably factual, yet the lack of congruence between the opposing aspects of these sets of information confounds the current situation. Examples are as follows:

1. **DR. KYROS AND HIS PRACTICE**

   a. Dr. Kyros has a long history of practice with this current population. His colleagues report that he has seen thousands of patients over the years and has demonstrated positive rapport, quality care and consistent productivity with a difficult patient population. Yet, four separate complaints regarding similar, though different, situations have arisen.

   b. Dr. Kyros works in a high volume, high intensity setting where the likelihood of random complaints is relatively reasonable. Yet, none of the other practitioners in his current reference group have received similar complaints.

   c. Despite being a part of the complaint in 1991, one staff member continued to view Dr. Kyros as a competent and trustworthy enough psychiatrist to continue as her daughter's psychiatrist by his report.

   d. Dr. Kyros is described as being intolerant of and unresponsive to sexual humor, off-color remarks and levity in professional settings, appearing to have impeccable and very rigid standards.

2. **DR. KYROS' PREVIOUS COMPLAINTS**

   a. In the 1991 complaint, Dr. Kyros gives a plausible explanation for the setting in which the event occurred and how it could be misconstrued on visual, political and personal conflict perspectives. This was endorsed by the Assessment Team at Golden Valley. However, despite admitting that he knew terminating the encounter when the patient disrobed was the appropriate intervention, Dr. Kyros did not accept the intervention of a staff member knocking on the door.

   b. We find that the Golden Valley Assessment focused heavily on the lack of staff intervention. In addition, information regarding collateral contact with the reporting staff or other staff was not available in the Golden Valley report. However, no mention is made of Dr. Kyros' lack of response to the intervention that was made nor of his failure to extricate himself from the situation in less than the reported length of time in which the observations were made.

CONFIDENTIAL                    52

This information has been released to you from records whose confidentiality is protected by Federal Regulations (42CFR,Part 2) which prohibits you from making any further disclosure without the specific written consent of the person to whom it pertains or as otherwise permitted by such regulations.

SANTÉ CENTER FOR HEALING
PROFFESSIONAL ASSESSMENT PROGRAM
DR. WILLIAM KYROS (A152)

    c. The hospital letter, returning Dr. Kyros to practice states that he may return to practice, yet declares that his "professional ethics were without a doubt compromised and reprehensible" without clear documentation of the basis of this statement. At this late date, the details become irrelevant, but the incongruous statement stands.

    d. On one hand, much allusion is made during the interview and by the collateral informants regarding the unreliability of the psychiatric patients' capacity to accurately report events, yet accepting the recanting of their accusations has been rather reflex.

    e. One component glaringly absent from the recommendations from Golden Valley and Dr. Kyros' practice has been an ongoing review of specific patient charts and situations that would have allowed for identification of patients that would be at risk of developing erotic transferential issues and for making such complaints, thus assuming that no part of his behavior led to these complaints, especially after the second complaint in 1999.

## 3. DR. KYROS' PERSONALITY STYLE AND PERSONAL LIFE

    a. In an Assessment such as this, the overlap between personal and professional lives becomes a significant consideration. The qualities that allow for the kind of structure, definition and restrictions that are essential for working with the chronic, persistently mentally ill can also be deleterious in allowing for rigidity and inflexibility. When matched with a personal lifestyle that is described as asexual, void of significant interpersonal, intimate relationships and constricted, our opinion is that the risk of these needs being projected onto patients increases greatly.

## 4. COMPONENTS OF THE ASSESSMENT

    a. One significant issue that arose repeatedly during the Assessment was Dr. Kyros' detailed awareness of his interviews with patients, the events that led to the complaints and the subsequent situations that arose. Yet, his awareness of the specific allegations against him was very limited. Our experience is that one who is accused, especially if he feels that accusation is wrong, tends to gain a detailed knowledge of the allegations in order to prepare a defense.

    b. While the polygraph is a limited tool, it provides both a detailed interview and an objective assessment of response to a questioning situation. The initial polygraph indicated what appeared to be a deliberate attempt to deceive the polygraph as a test. However, the second polygraph, which was deemed valid and cooperative, yielded a fully deceptive response.

This information has been released to you from records whose confidentiality is protected by Federal Regulations (42CFR,Part 2) which prohibits you from making any further disclosure without the specific written consent of the person to whom it pertains or as otherwise permitted by such regulations.

SANTÉ CENTER FOR HEALING
PROFFESSIONAL ASSESSMENT PROGRAM
DR. WILLIAM KYROS (A152)

## PRELIMINARY RECOMMENDATIONS:

The following are the preliminary recommendations and are based only on verbal reports of the members of the assessment team. They are presented in the interest of the efficient use of time. They may be modified pending final collateral information, complete review of written reports from the members of the assessment team, and other information that may be obtained prior to the completion of the formal report.

1) The issue of skill and competence in the practice of medicine is beyond the scope of this assessment and will not be addressed here. This is deferred to the Rhode Island State Board of Medical Licensure and Discipline and Department of Health.

2) The preponderance of evidence supports a concern that Dr. Kyros has not been fully truthful OR is in denial about his own actions or contributions to the situations that led to his past and current complaints. Until this is resolved, the Assessment Team feels that Dr. Kyros should not return to the unrestricted practice of medicine through direct psychiatric patient care.

3) We do not feel that the underlying issues in this situation are readily amenable to short-term interventions and require exploration in supervision, psychodynamically oriented psychotherapeutic supervision, personal therapy and monitored practice. In addition, a "Non-deceptive" Polygraph would be one indicator of satisfactory progress with regard to these issues.

4) The ultimate resolution of these issues requires patient contact to allow for supervision. Therefore, when the Rhode Island Licensing Agencies feel that the therapists or supervisors have deemed these issues adequately addressed, Dr. Kyros will necessarily return to Supervised Practice. Supervised Practice may be defined as follows:

   a) Practice with a designated, licensed professional present during any encounter with a member of the opposite sex

   b) Weekly supervision of a minimum of two patient sessions to review psychodynamic issues and insights, as well as overall internal experience of psychiatric practice.

   c) Ongoing psychodynamically oriented psychotherapy to explore relationship issues, sense of self and internal goals.

5) The Assessment Team recommends that Dr. Kyros successfully complete the following continuing education courses:

   a) The Maintaining Proper Boundaries Course through UTSouthwestern Medical Center, Vanderbilt, or an equivalent accredited course.

CONFIDENTIAL                    54

This information has been released to you from records whose confidentiality is protected by Federal Regulations (42CFR,Part 2) which prohibits you from making any further disclosure without the specific written consent of the person to whom it pertains or as otherwise permitted by such regulations.

# EXHIBIT C

One Turks Head Place, Suite 900
Providence, Rhode Island 02903
Telephone 401-274-6644
Fax 401-331-9304

Michael G. Sarli*
James P. Marusak*
Michael R. De Luca*
Dennis T. Grieco II*

Matthew D. Rocheleau*
Per C. Vaage*
Michael P. Quinn, Jr.*
Chrisanne E. Wyrzykowski*

Thomas D. Gidley, Retired

* Also admitted in Massachusetts

## Gidley, Sarli & Marusak, LLP
### ATTORNEYS AT LAW

August 27, 2009

Bruce McIntyre
RI Board of Medical Licensure and Discipline
Three Capitol Hill - Room 205
Providence, RI 02908-5097

     Re:   File No. C09-252, C08-520

Dear Bruce:

    I trust that you have had the opportunity to review the preliminary recommendations of the Sante Center for Healing insofar as they concern Dr. Kyros. In that connection, Dr. Kyros wants to do everything he reasonably can to return to the practice of medicine in his specialty. In that connection, he has asked me to advise the Department of Health that he is willing to undergo the recommendations made by the Sante Center and would like to begin immediately. He has asked me to inquire as to whether or not there are any psychotherapists that the Department would want him to establish a relationship with and whether or not there are any specific designated licensed professionals the Department would want him to have present during encounters with patients of the opposite sex. He is also perfectly willing to attend the recommended continuing education courses.

    I would appreciate it if you would consult with Dr. Crausman and get back to me concerning this matter as Dr. Kyros is very anxious to pursue these recommendations.

                  Sincerely,

                  Michael G. Sarli

MGS/cma

cc:   William P. Kyros, M.D.

# EXHIBIT D

Michael G. Sarli*
James P. Marusak*
Michael R. De Luca*
Dennis T. Grieco II*

Matthew D. Rochelesu*
Per C. Vaage*
Michael P. Quinn, Jr.*
Chrisanne E. Wyrzykowski*

Thomas D. Gidley, Retired

* Also admitted in Massachusetts

One Turks Head Place, Suite 900
Providence, Rhode Island 02903
Telephone 401-274-6644
Fax 401-331-9304

# Gidley, Sarli & Marusak, LLP
### ATTORNEYS AT LAW

September 30, 2009

Robert S. Crausman, MD MMS
Chief Administrative Officer
RI Board of Medical Licensure and Discipline
Associate Professor of Medicine, Brown Medical School
The Cannon Building, Suite 205
Three Capitol Hill
Providence, Rhode Island  02908

> Re:   Joanne Cabral, D/O/B: 01/15/54
>        File No.  C09-252

Dear Dr. Crausman:

I am assuming that you have received your copy of the Sante´ Center For Healing's report on Dr. Kyros.  In that connection, Dr. Kyros is eager to address any and all concerns that have been raised.  In that connection, and as you know from my earlier letter, he is willing to accept the Department's recommendation or any particular therapist.

At your earliest convenience, I would appreciate it if you could give me a call, so we can discuss what steps we can take from here.  I look forward to hearing from you.

Sincerely,

Michael G. Sarli

MGS/dtc

cc:  William P. Kyros, M.D.

# EXHIBIT E

Hearing

William Kyros, M.D. - Vol. II
January 31, 2018

Page 120

1   will not be addressed here. This is deferred to
2   the Rhode Island State Board of Medical Licensure
3   and Discipline and Department of Health."
4   Q.  So they weren't concerned or addressing your skill
5   and competence?
6   A.  No.
7   Q.  With respect to point number two.
8   A.  "The preponderance of the evidence supports a
9   concern that Dr. Kyros has not been fully truthful
10  or is in denial about his own actions or
11  contributions to the situations that led to his
12  past and current complaints. Until this is
13  resolved, the assessment team feels that Dr. Kyros
14  should not return to the unrestricted practice of
15  medicine through direct psychiatric patient care."
16  Q.  So the Sante Center recommended that there be at
17  least some resolution relative to whether or not
18  you had been fully truthful or in denial about your
19  actions; fair to say?
20  A.  Fair to say.
21  Q.  Let's go to number three.
22  A.  "We do not feel the underlying issues in this
23  situation are readily amenable to short-term
24  interventions and require exploration in
25  supervision, psychodynamically oriented

Page 121

1   psychotherapeutic supervision, personal therapy and
2   monitored practice. In addition, a nondeceptive
3   polygraph would be one indicator of satisfactory
4   progress with regard to these issues."
5   Q.  What does this recommendation mean to you, that you
6   should do what?
7   A.  That I should engage with psychodynamic and
8   psychotherapeutic treatment, personal therapy.
9   That's what it said to me.
10  Q.  Okay. With resect to number four, what did that
11  recommendation simply require?
12  A.  "The ultimate resolution of these issues
13  requires patient contact to allow for supervision.
14  Therefore, when the Rhode Island licensing agencies
15  feel that the therapists or supervisors have deemed
16  these issues adequately addressed, Dr. Kyros will
17  necessarily return to supervised practice.
18  Supervised practice may be defined as follows," and
19  they give A, B, and C.
20      "Practice with a designated, licensed
21  professional present during any encounter with a
22  member of the opposite sex. B) Weekly supervision
23  of a minimum of two patient sessions to review
24  psychodynamic issues and insights, as well as
25  overall internal experience of psychiatric

Page 122

1   practice. C) Ongoing psychodynamically oriented
2   psychotherapy to explore relationship issues, sense
3   of self, and internal goals."
4   Q.  Lastly, the Sante Center recommended that you take
5   a continuing education course; correct?
6   A.  Correct.
7   Q.  That is Maintaining Proper Boundaries course
8   through UT Southwestern Medical Center?
9   A.  Or an equivalent accredited course.
10  Q.  Or an equivalent accredited course. With that
11  said, let's go back to the Exhibit -- let's go to
12  Exhibit 5. Exhibit 5 is an evaluation performed by
13  Dr. Edward Brown dated August 2nd, 2010. This, do
14  you know whether or not this document was sent to
15  you, Dr. Kyros?
16      (EXAMINATION OF DOCUMENT)
17  A.  Yes, I have a copy.
18  Q.  Are you familiar with this document?
19  A.  I am.
20  Q.  You recognize this document?
21  A.  I do.
22      MR. PARMENTER: I move to admit Exhibit 5
23  full.
24      THE HEARING OFFICER: Any objection?
25      DR. DOWLING: Who was Dr. Brown?

Page 123

1       THE WITNESS: Dr. Ed Brown is a
2   practicing psychiatrist that I was referred to and
3   went to in 1991, 1992, following the first matter
4   that happened at Landmark Medical Center, which I
5   described to you. I went there as a recommendation
6   from the Physicians Health Committee, and I gained
7   a great deal from my work with Dr. Brown.
8       DR. DOWLING: Do you still see him?
9       THE WITNESS: No. I saw him for a year
10  and a half, from November of 2009 through the
11  spring of 2011. I went to him per discussion with
12  Michael Sarli. Since there was no guidance from
13  the Board at all, we came to the conclusion that I
14  should start, and that was the logical place for me
15  to begin. He was, apparently, acknowledged and
16  well respected by the Board. I had a very good
17  interaction with him in the early '90s, and I
18  contacted him, and began with him.
19      THE HEARING OFFICER: So you don't have
20  an objection?
21      MR. MORRIS: No, I object because it's
22  not signed.
23      MR. PARMENTER: I don't believe we have a
24  signed copy, actually.
25  Q.  But, Dr. Kyros, do you recognize this to be the

Hearing

William Kyros, M.D. - Vol. II
January 31, 2018

**Page 132**

1 A. Yes.
2 Q. Do you recognize this document -- it's a document
3 that was drafted by Dr. Gene Jacobs, dated
4 5/13/2013?
5 A. Yes, I do.
6 Q. Did you receive a copy of this from Dr. Jacobs?
7 A. I did.
8 Q. When did you receive a copy of that?
9 A. Shortly after it was written, through the
10 mail, May of 2013.
11 Q. Do you know if this summary that was provided by
12 Dr. Jacobs was ever provided to the Department of
13 Health?
14 A. Yes, it was.
15 Q. Do you know how it was provided?
16 A. I believe it was mailed.
17    MR. PARMENTER: I believe it is signed,
18 actually.
19    MR. MORRIS: So I would object to the
20 answer.
21    MR. PARMENTER: That's fine. I move to
22 admit Exhibit 6 as full. It actually is signed by
23 Dr. Gene Jacobs.
24    MR. MORRIS: I would object. It's got a
25 mark on it; I don't know what that is.

**Page 133**

1    MR. PARMENTER: It's a doctor's
2 signature.
3    MR. MORRIS: I am objecting to it. We
4 may be able to figure out this came here, but the
5 content of it being used as a way to establish
6 something is a problem because it's hearsay.
7    MR. PARMENTER: We will figure out if
8 it's in the file.
9    MR. MORRIS: Whether it's in the file or
10 not doesn't matter. It's actually what is being
11 said and used as evidence. It's hearsay.
12    THE HEARING OFFICER: I will mark it as
13 ID.
14    EXHIBIT 6 FOR THE RESPONDENT MARKED FOR
15 IDENTIFICATION
16    THE HEARING OFFICER: Mr. Morris is going
17 to check with the licensing file. I mean,
18 essentially, Dr. Kyros is saying, I have reports
19 from doctors?
20    MR. PARMENTER: Yes, that were provided
21 to the Department, which satisfied the Sante Center
22 recommendations. It's going to be undisputed that
23 the Department has these documents.
24    MR. MORRIS: That's an argument.
25    THE HEARING OFFICER: Mr. Morris might be

**Page 134**

1 arguing, that's all very well and good, but the
2 Department doesn't think they satisfy.
3    MR. PARMENTER: Of course they don't; I
4 appreciate that. But my point is that they were
5 provided. Our argument, obviously, is that these
6 reports do satisfy Sante. I understand there is
7 going to be a contrary position put forth. I
8 wouldn't be that naive.
9    MR. MORRIS: Just to make your point very
10 strongly, if all of these reports were provided to
11 the Board, and they said no license, then they
12 didn't satisfy the Sante report.
13    MR. PARMENTER: That's what we'll
14 determine today.
15    MR. MORRIS: The Board gets to decide
16 that, not you.
17    MR. PARMENTER: Mr. Morris, there is no
18 reason to get confrontational here. There is no
19 reason to do that.
20    THE HEARING OFFICER: Mr. Morris,
21 confrontational?
22    MR. PARMENTER: He does. It's
23 interesting. All this is being put forth -- well,
24 it's interesting. All of this is being put forth
25 to show. We all know I'm not trying to make a

**Page 135**

1 decision for the Board.
2    THE HEARING OFFICER: It will be for our
3 hearing panel to decide.
4    MR. PARMENTER: Back to the Exhibit.
5 Q. Dr. Kyros, you do, again, recognize this Exhibit;
6 correct?
7    (EXAMINATION OF DOCUMENT)
8 A. I do.
9 Q. You treated with Dr. Jacobs for how long?
10 A. Three-and-a-half years.
11 Q. So that's from when to when, approximately --
12 A. Within a few days of beginning with
13 Dr. Brown, I also began with Dr. Jacobs, and it was
14 in November of 2009.
15 Q. Okay. Do you understand why or have an
16 understanding as to why this report was drafted by
17 Dr. Jacobs?
18 A. Yes.
19 Q. Why is that?
20 A. Because it was the -- this was written in May
21 of 2013.
22 Q. What was going on in May of 2013?
23 A. A considerable amount of time had passed,
24 four years had passed. I had completed my work
25 with Dr. Brown, he had said we had covered all of

Hearing

William Kyros, M.D. - Vol. II
January 31, 2018

Page 136

1  the pertinent topics that would address the Sante
2  Center. I continued with Dr. Jacobs because I felt
3  it was necessary for me at the time just to --
4  continue with my treatment with him, and there was
5  no resolution to this matter. I was still not
6  practicing. My attorney, Mike Sarli, suggested
7  enough time had passed, and we should revisit this
8  with the Board, and he asked for a report from
9  Dr. Jacobs.
10 Q.  You understand that your attorney provided this, or
11 at least it's your understanding that your attorney
12 provided this report to the Board?
13 A.  Yes.
14 Q.  Take us through how you believe this report
15 satisfies the recommendations contained in the
16 Sante Center report.
17     DR. DOWLING: Can I interrupt? Tell us
18 who Dr. Jacobs is.
19     THE WITNESS: Dr. Jacobs is a
20 psychiatrist.
21     DR. DOWLING: He is a psychiatrist, also?
22     THE WITNESS: Correct; two psychiatrists.
23 I was doing psychodynamically oriented psycho-
24 therapeutic therapy with both of them. I was doing
25 personal therapy with both of them as was warranted

Page 137

1  or indicated by the Sante Center.
2  Q.  So, Dr. Kyros, take us through, starting with
3  number one, again, number one of the Sante Center
4  report wasn't specifically addressed, but take us
5  through whether this report by Dr. Jacobs addresses
6  your skill and competence to return to practice.
7  A.  I think it addresses several issues.
8  Q.  Let's start with number one, skill and competence.
9  A.  Skill and competence was never really an
10 issue throughout this time frame, but at the top of
11 page 2 of the two-page report, Dr. Jacobs endorses
12 what Dr. Brown had written in that he had said at
13 the very end, "There are no symptoms or complaints,
14 he is on no psychiatric medication, mini mental
15 status exam is within normal limits. I see no
16 reason as to why Dr. Kyros cannot restart clinical
17 practice." I guess that addresses clinical
18 practice. But more importantly, number two, the
19 second issue --
20 Q.  What is the second issue?
21 A.  The second issue is the preponderance of the
22 evidence supporting a concern that Dr. Kyros has
23 not been fully truthful or is in denial about his
24 own actions or contributions that led to his past
25 and present complaints.

Page 138

1     DR. DOWLING: Do you think there is any
2  merit in that, Dr. Kyros?
3     THE WITNESS: As I said last time, I
4  don't think there is any evidence, let alone a
5  preponderance of evidence. I think the patients
6  were very ill people. I think they were motivated
7  by secondary issues in their lives. One was caught
8  by her husband, the other was trying to squeeze
9  some moneys out of me. I don't think there is any
10 evidence at all, let alone a preponderance.
11     Dr. Jacobs, in his report addressing the
12 Sante Center's concern of my truthfulness or
13 denial, he said that he -- mini mental status has
14 been consistently normal over multiple tests, 30
15 out of 30, so stopped taking this test at some
16 point, January 24, 2012. Then he goes on to say,
17 "After working with Dr. Kyros for the past
18 three-and-a-half years, I saw no evidence of any
19 characterological traits or patterns consistent
20 with or evidencing a propensity or likelihood of
21 Dr. Kyros exhibiting boundary issues. In fact, I
22 can summarize by a summary already noted in the
23 chart, to which I fully agree, by Dr. Edward M.
24 Brown, in a letter to Herbert Rakatansky, M.D.,
25 Chairman of the Physicians Health Committee written

Page 139

1  on August 2nd, 2010."
2  Q.  So he is parroting what Dr. Brown already said,
3  which is the Exhibit we already went over?
4  A.  Yes. "I can say that over the month of
5  talking to him, Dr. Kyros" -- this is from
6  Dr. Brown -- "I have had no reason to doubt his
7  sincerity or truthfulness. Certain populations of
8  patients do contain a greater percentage of
9  patients who are more likely yo misinterpret a
10 doctor's intentions. He may have avoided
11 accusations or wrongdoing for 18 years because he
12 was practicing among less risky patients. It is at
13 least consistent with the opinions of his
14 colleagues that he is a kind, well-meaning
15 physician, that he might have failed to notice a
16 patient interpreting his kindness as an
17 inappropriate interest. It may have been the case
18 that the pleasure he got from helping other people
19 was read by some as inappropriate interest. By the
20 same token, the value he places in being a helping
21 professional makes it seem unlikely that he would
22 have behaved in an openly sexual manner toward his
23 patients. The Sante Center report recommended that
24 he take one of the numerous available courses on
25 boundaries to help him to learn to recognize and

**Page 156**

1  patients.
2  Q.  You weren't allowed to see patients, because of
3  why?
4  A.  Because of the agreement that we signed in
5  2009 to cease practice, and the Board not allowing
6  me to return to practice, to see patients to be
7  supervised.
8  Q.  Sure. But notwithstanding that, however, it is
9  true that you did have reports from at least one
10  doctor that indicated that you should be able to
11  return to unsupervised practice at this time;
12  correct?
13  A.  Both Dr. Jacobs and Dr. Harrop at this time
14  said there is no need. They said, "Unrestricted
15  practice." They did not mention supervision or any
16  kind of probation being warranted.
17  Q.  Okay. So after this correspondence, September 9,
18  2013, sent to Dr. McDonald, did you receive any
19  response from the Board regarding Dr. Rakatansky's
20  correspondence to them?
21  A.  I don't recall receiving any correspondence.
22  I know we were setting up a Board meeting to review
23  this matter.
24  Q.  Okay.
25  A.  There it is (Indicating).

**Page 157**

1  Q.  So Exhibit 10. Exhibit 10 is a letter from Linda
2  Julien, that's to you, dated October 9, 2013, and
3  this is a letter which is to set up the meeting or
4  interview which you just described?
5  A.  Correct.
6      MR. PARMENTER: I move to admit Exhibit
7  10 as full.
8      MR. MORRIS: No objection.
9      THE HEARING OFFICER: 10 is in.
10  EXHIBIT 10 FOR THE RESPONDENT MARKED AS FULL
11  Q.  Did you attend that meeting, October 10, 2013?
12  A.  This was, I believe, a correspondence. No,
13  it was for an appointment to meet with the Board of
14  Medical Licensure and Discipline on October 30 of
15  2013. Unfortunately, my attorney had a commitment
16  out of town, and we had to reschedule, and it was
17  rescheduled for December.
18  Q.  Did you attend that interview or meeting in
19  December?
20  A.  Yes.
21  Q.  What happened at that meeting?
22  A.  That would be, I believe, Number 11.
23  Q.  Well, what happened during the meeting; do you
24  recall?
25  A.  Well, we reviewed the events, much as we have

**Page 158**

1  done here in our first encounter in December and
2  here today. All of these reports were presented
3  and reviewed as evidence of my being able to return
4  to practice in an unrestricted way, and the Board
5  was to make their decision.
6  Q.  Did the Board, ultimately, make a decision relative
7  to you after that meeting?
8  A.  Yes.
9  Q.  Let's go to Exhibit 11. This is a correspondence
10  from Dr. McDonald and Attorney Corrigan to you
11  dated December 4.
12      MR. PARMENTER: We will move to introduce
13  this as full.
14      THE HEARING OFFICER: Any objection?
15      MR. MORRIS: No.
16      THE HEARING OFFICER: 11 is in.
17      MR. PARMENTER: Thank you.
18  EXHIBIT 11 FOR THE RESPONDENT MARKED AS FULL
19  Q.  This is the Exhibit, Dr. Kyros, where there was a
20  finding about unprofessional conduct regarding you;
21  correct?
22  A.  Correct.
23  Q.  What happened after you received this finding of
24  unprofessional conduct in December of 2013?
25  A.  The correspondence that we are referring to

**Page 159**

1  indicated I was entitled to a formal hearing, and
2  it would have to be within 60 days of the above
3  date, which was December the 4th. My attorney,
4  Michael Sarli, requested a meeting with the
5  Board -- with Dr. McDonald, and the attorney for
6  the Board was there, I believe, again, it was
7  Mr. Corrigan, and the four of us met in early
8  January of 2014.
9  Q.  What happened at that meeting?
10  A.  Essentially, it was a discussion of where we
11  go from here, whether to go to a hearing or to
12  accept a consent that I was uncomfortable
13  accepting, which would have required supervision
14  and probation, and I did not feel I needed that. I
15  do not feel my evaluations warranted me to be under
16  that or to accept that, and so there was no
17  agreement at that meeting.
18  Q.  Okay. Subsequent to that meeting, what happened
19  next?
20  A.  I discussed the matter with Mr. Sarli, my
21  attorney, and wanted to go to a hearing; but due to
22  finances, I couldn't afford to engage Mr. Sarli's
23  services for here.
24  Q.  Let's go to Exhibit 12. Exhibit 12 is a
25  correspondence from Dr. Daniel Harrop to Dr. James

Hearing                                                          William Kyros, M.D. - Vol. II
                                                                           January 31, 2018

**Page 160**

1  McDonald, regarding you. It's dated November 5,
2  2015, and it seems to be signed by Dr. Daniel
3  Harrop; do you recognize this document?
4    (EXAMINATION OF DOCUMENT)
5  A.  I do.
6  Q.  Did you receive a copy of this document?
7  A.  I did.
8  Q.  Who did you receive it from?
9  A.  I believe, Dr. Harrop.
10   MR. PARMENTER: Move to admit Exhibit 12
11 as full.
12   MR. MORRIS: No objection.
13   THE HEARING OFFICER: So that's admitted.
14 EXHIBIT 12 FOR THE RESPONDENT MARKED AS FULL
15 Q.  Dr. Kyros, note that this letter is dated
16 November 5, 2015, so that's a good deal of time
17 after early 2014 when you were having your meeting
18 with the Board. Can you take me through a bit of
19 what transpired between early 2014 and now
20 November 5, 2015?
21 A.  Yes. In early 2014, after not being able to
22 financially continue with Mr. Sarli, my new
23 attorney -- I engaged in services with Mr. Ronald
24 Resmini. He took over my case with the Board, and
25 that was in January of 2013. He requested

**Page 161**

1  documents. It took four months to get my file from
2  the Board to Mr. Resmini. Mr. Resmini reviewed the
3  documents, and we wanted to depose one of the
4  accusers in a deposition. That took an inordinate
5  amount of time, and was finally scheduled for
6  February 26 of, I believe of 2015. It took over a
7  year to schedule a deposition on a patient.
8    THE HEARING OFFICER: I'm sorry; was this
9  in the context of a hearing before the Board?
10   THE WITNESS: I believe it was leading to
11 a hearing, yes.
12   MR. PARMENTER: Apparently, I wasn't
13 involved.
14   MR. MORRIS: To my understanding, this
15 was just something that your attorney wanted to do.
16 It had nothing to do with the Board hearing.
17   THE WITNESS: I'm sorry. My
18 understanding, it was going to lead to a hearing.
19   THE HEARING OFFICER: Just for the
20 record, I am always the Hearing Officer for the
21 Medical Board --
22   MR. MORRIS: There was no hearing
23 involved.
24   THE WITNESS: No hearing ever took place.
25   THE HEARING OFFICER: I am just a little

**Page 162**

1  confused how you can depose someone out of thin air
2  if there is not a hearing. It is probably not
3  relevant to the hearing panel, so ...
4    MR. MORRIS: I mean, this is an ongoing
5  issue, what is being said about other people, what
6  they are saying, and I assume that the Hearing
7  Officer and the panel will take into account what
8  it is that's being said, as to the truthfulness,
9  because if Attorney Resmini said we are going to
10 depose somebody, it doesn't make really any sense,
11 but he may have said that. We don't know. But
12 that's just Dr. Kyros saying that.
13   THE HEARING OFFICER: I just wanted to
14 clarify that, based on what Dr. Kyros has said,
15 that he had chosen not to have a hearing in 2013
16 after meeting with Dr. McDonald because you
17 couldn't afford to contest the findings against him
18 in 2013; right? That was the testimony?
19   THE WITNESS: That was my reason for not
20 pursuing it then, in 2013.
21 Q.  So, Dr. Kyros, going back to Exhibit 12 again, and
22 we are in November 5, 2015. Now, what was the
23 reason for, justification that this report was
24 drafted by Dr. Harrop?
25 A.  Much time had passed, some two years from the

**Page 163**

1  reports from 2013.
2  Q.  Was this requested by the Department?
3  A.  Dr. McDonald.
4  Q.  Dr. McDonald?
5  A.  Right.
6    THE HEARING OFFICER: The 2015 one?
7    MR. MORRIS: I will object. Dr. McDonald
8  can testify if he requested it or not.
9  A.  We met again. We had several meetings
10 through 2014 and 2015, myself, Mr. Resmini,
11 Mr. Corrigan, and I believe it was -- there were a
12 change of several attorneys during that period of
13 time. There was a female attorney in there for
14 about a year. I forget her name. We had several
15 meetings with Dr. McDonald, the attorney for the
16 Board, Mr. Resmini, and myself, to discuss
17 potential consents to put the matter to rest. As
18 time went along, Dr. McDonald requested an update
19 from one of my previous physicians, and I got an
20 update from Dr. Harrop in November of 2015.
21 Q.  Dr. Harrop's opinion, to your knowledge, didn't
22 change whatsoever from his prior conclusions that
23 were made back in his prior report?
24   MR. MORRIS: It's a full Exhibit; it
25 speaks for itself.

Hearing

William Kyros, M.D. - Vol. II
January 31, 2018

**Page 164**

1    THE HEARING OFFICER: He can say, and the
2  hearing panel can certainly read it and make that
3  decision.
4  A.  Right. Dr. Harrop, in reviewing me again in
5  late October, early November -- it's dated
6  November 15 (sic) of 2015, performed a complete
7  mental status examination. Once again, this was
8  entirely within normal limits. There was no
9  evidence of psychosis. He had good future
10  orientation. He goes on to say and conclude, "As
11  such, my opinion remains much as it did in August
12  of 2013. After an extensive review of the
13  psychiatric records, the complaints forwarded, and
14  recognizing at the current time that he has no
15  psychiatric diagnoses, having fully recovered from
16  posttraumatic stress disorder and major depressive
17  disorder, he is not in any other ways impaired
18  medically or psychiatrically, I find he would be
19  fit for duty, to have his medical license returned
20  unrestricted at the present time to be able to
21  resume his medical practice."
22    MR. MORRIS: Just for the record, I
23  believe he testified November 15, but it is
24  November 5.
25    THE WITNESS: I'm sorry. Did I say 15?

**Page 165**

1    MR. MORRIS: Just for the record. I know
2  he meant 5th.
3    MR. GREEN: Can I ask a question? If
4  it's not appropriate, tell me. I keep hearing PTSD
5  and depressive disorder, were those resultant from
6  not being able to practice medicine, or did those
7  exist prior to?
8    THE WITNESS: I never had a problem with
9  depression in my life.
10    MR. GREEN: This is as a result of --
11    THE WITNESS: -- this whole matter.
12    MR. GREEN: -- this whole matter. I just
13  wanted to understand.
14    MR. PARMENTER: All right.
15  Q.  Let's go to Exhibit 13. This is a correspondence
16  from Attorney Michael Kelly to Dr. McDonald, dated
17  September 8, 2016 -- or let's back up. Strike
18  that. My apologies. Dr. Kyros, as you testified
19  previously, this was submitted to Dr. McDonald, as
20  it states on this Exhibit 12?
21  A.  Yes.
22  Q.  Did you receive any sort of response after this was
23  submitted to Dr. McDonald, to your knowledge?
24  A.  I believe there were just the ongoing
25  back-and-forth of consent proposals, Mr. Resmini to

**Page 166**

1  the Board, and back-and-forth, I mean, they would
2  happen every six to eight weeks.
3  Q.  You weren't, ultimately, able to agree on a form of
4  consent order?
5  A.  That's correct.
6  Q.  Why weren't you able to agree on a form of consent
7  order?
8  A.  Because of the ongoing requests that I
9  participate in supervision, probation, and I
10  believe it came to me having to reapply for
11  licensure, and I had had my license since the late
12  1980s. There was just not agreement.
13  Q.  Okay. Let's go to Exhibit 13. Again, this is a
14  correspondence from my office, from Attorney
15  Michael Kelly to Dr. McDonald, dated September 8,
16  2016.
17    MR. PARMENTER: We will introduce this as
18  a full Exhibit.
19    THE HEARING OFFICER: Any objection?
20    MR. MORRIS: Talking about the letter?
21    MR. PARMENTER: Yes, the letter and
22  attachment with it.
23    MR. MORRIS: And the consent order?
24    MR. PARMENTER: Yes.
25    MR. MORRIS: No objection.

**Page 167**

1    THE HEARING OFFICER: Admitted.
2    EXHIBIT 13 FOR THE RESPONDENT MARKED AS FULL
3  Q.  Dr. Kyros, you understand this correspondence was
4  sent on behalf of you by your attorney to the
5  Department, attached with it is a form of proposed
6  consent order?
7  A.  Uh-huh.
8  Q.  Going to Exhibit 14, which is, again, a letter from
9  Attorney Kelly to Dr. McDonald, dated October 13,
10  2016.
11    MR. PARMENTER: I move to introduce this
12  Exhibit as full.
13    THE HEARING OFFICER: Any objection?
14    MR. MORRIS: No objection.
15    THE HEARING OFFICER: 14 is admitted.
16    EXHIBIT 14 FOR THE RESPONDENT MARKED AS FULL
17  Q.  Dr. Kyros, to your knowledge, did the Department
18  ever respond to the letter that's been marked as
19  Exhibit 13?
20  A.  I am unaware of any response.
21  Q.  The letter that's been marked as Exhibit 14 states,
22  "This correspondence is a follow-up to our letter
23  dated September 8, 2016. To date, we have yet to
24  hear from you regarding our proposed consent
25  order." Is that fair to say; did I read that

**Page 311**

1    THE WITNESS: So when the Board gets a
2    case where a physician's competency is in question,
3    a physician is sent to CPEP. The Board has done
4    that many times over the years. One of the reasons
5    why people go is just an absence from the practice
6    of medicine, that's something that's occurred.
7    People are absent from the practice of medicine for
8    a host of reasons.
9        Just a recent case, someone was absent for 20
10   years just raising a family. There was no
11   disciplinary case, but someone said, gee, I haven't
12   practiced in 20 years, how do I go back getting my
13   license reinstated, or getting a license? What we
14   said was if you need to establish competency, go to
15   CPEP, that's is a great way to do it. I have seen
16   a couple of pediatricians actually do that over the
17   years, just to assure the Board that they are
18   competent. That's one example of.
19       Generally, when there is a big gap in people
20   practicing medicine, that's one reason why the
21   Board will say to someone who wants to practice,
22   say, hey, look, are you going to do this or not?
23       MR. GREEN: I have a question. Point of
24   clarity for myself, Dr. Brown, Dr. Jacobs, and
25   Dr. Harrop, how did you come to go to those

**Page 312**

1    physicians?
2        DR. KYROS: I can answer that. Dr. Brown
3    had worked with the Board on cases of this nature
4    in the past, and since the only time, apparently,
5    we have gotten any feedback from any discipline of
6    the Board was within the last one year, and we are
7    approaching nine years. We got no initial feedback
8    in spite of our letters in August and September of
9    2009 --
10       MR. GREEN: I can truncate the question
11   and answer. What I am trying to determine is did
12   you come to those physicians of your own choosing,
13   or were you referred to those physicians
14   specifically by the Board?
15       DR. KYROS: No, the Board made no
16   recommendations --
17       MR. GREEN: That's all I wanted to know.
18       DR. KYROS: I discussed with my attorney,
19   I knew Dr. Brown was connected with the Board, and
20   did these cases, so I elected to seek out
21   Dr. Brown.
22       MR. GREEN: I just wanted clarity on
23   that.
24       MR. MORRIS: Just can be clear, the
25   doctors that wrote letters that had been submitted

**Page 313**

1    on your behalf were doctors that you sought out
2    with your attorney to provide the Board with some
3    information?
4        DR. KYROS: My attorney knew that
5    Dr. Brown had worked with the Board in the past,
6    seemed like a logical thing since we were walking
7    through this in the dark without any feedback from
8    the Board. And mind you, the Board members looked
9    at these evaluations, and then come to the
10   determination, and Dr. McDonald, as well, that I
11   have bad character, and that I'm not good enough at
12   that point to go back into medical practice.
13       Dr. Brown treated me for over a year and a
14   half, weekly, sometimes more than one time per
15   week, and he had no qualms about my character, he
16   had no qualms about my returning to practice, as he
17   said in the last paragraph of his report.
18   Dr. Jacobs treated me for three-and-a-half years,
19   intensive psychotherapy, I believe item number
20   three, as did Dr. Brown, for over a year and a
21   half. Now, psychodynamically oriented
22   psychotherapy supervision, that's what it is.
23   That's what it is. After three-and-a-half years of
24   working with Dr. Jacobs, he concluded, he agreed
25   with everything Dr. Brown had said about my ability

**Page 314**

1    to go back and treat patients and be successful in
2    a clinical setting. Dr. Jacobs agreed with him.
3        MR. PARMENTER: Dr. Kyros, just back up.
4    Hold on.
5        DR. KYROS: Let's look at Dr. Harrop's
6    credentials, the forensic. One of our meetings,
7    Dr. McDonald, you suggested I go to have an
8    evaluation or see Dr. Rakatansky, and I did; and
9    Dr. Rakatansky wanted me to have a forensic
10   evaluation, psychiatrically. Decided on Dr. Harrop
11   because he was impeccably qualified to do this.
12   There was no question about his credentials, his
13   history with the State, it's overwhelming in the
14   work he has done. He did an exhaustive review of
15   me, and came to the determination I should have my
16   license returned unrestricted, and I was in no way
17   a menace to the practice, and I was no way
18   clinically deficient. Rakatansky, Dr. Rakatansky
19   saw these reports and endorsed them back to you.
20   This was in September, October of 2013.
21       Then when I was present for our Board meeting
22   in November of 2013, the Board still found me
23   professionally -- what is the phrase? With no
24   feedback, they hadn't been involved, and had not
25   recommended anything to me in terms of direction

# EXHIBIT F

Michael G. Sarli*
James P. Marusak*
Michael R. De Luca*

Matthew D. Rocheleau*
Per C. Vaage*
Michael P. Quinn, Jr.*
Andrea L. Merolla-Simister*

One Turks Head Place, Suite 900
Providence, Rhode Island 02903
Telephone 401-274-6644
Fax 401-331-9304

Thomas D. Gidley, Retired

* Also admitted in Massachusetts

**Gidley, Sarli & Marusak, LLP**
ATTORNEYS AT LAW

September 20, 2010

**PERSONAL AND CONFIDENTIAL**

William P. Kyros, M.D.
7 Bradford Street, #2
Barrington, RI  02806

Re:     Joanne Cabral
        File No.  C09-252

Dear Dr. Kyros:

Please find enclosed the letter from the Medical Society to Bruce McIntyre.  The next step is for the Department of Health to contact us.  I will keep you advised.

Sincerely,

Michael G. Sarli

MGS/dtc
Enclosure

**Edward M. Brown M.D.**
**480 Hope St.**
**Providence R.I. 02906**
**401-351-5915**

Herbert Rakatansky  M.D.                    August 2, 2010
Chairman,
Physicians Health Committee
Rhode Island Medical Society
225 Promenade St. Suite 500
Providence, R.I.  02908-5739

Re: William Kyros

Dear Dr. Rakatansky,

   I write at Dr. Kyros' request to outline the impressions I have gleaned from my work with him since he consulted me in October 2009. At that time he told me that he was greatly distressed because  he was at risk of losing his medical license after having been falsely accused sexually molesting female patients on four separate occasions. He sought out my services because I had worked with him following the first of these accusations in 1990. He said that he came to see me in an effort  to do everything he could to keep his license. He was quite anxious and depressed. I gave him a diagnosis of Adjustment Disorder as it seemed that his symptoms were directly related to the threat of losing his license. He said that he had tried several antidepressants before consulting me and that they had not been helpful. He was having difficulty sleeping and had a loss of appetite. I prescribed Klonopin to help with his anxiety and sleep difficulties. He used these for a while and did not request refills.

He expressed fear of returning to clinical practice because of concerns that he might be falsely accused again. He described himself as feeling that he did not want "to return to the lion's den." Over time his mood improved and his anxiety moderated. Thinking of ways to use his medical license to earn a living without having to return to clinical practice seemed to be helpful in alleviating his distress. Talking with his 86 year-old father and his two brothers about his difficulties as well as moving out of Rhode Island to live with his father also helped ease his mind. He continues to see me every other week and we have recently been talking about he might adjust if he loses his license.

Dr. Kyros has been accused of misconduct on four occasions. He denies wrongdoing in all of these instances. In the three most recent incidents he describes why the allegations might have been made in terms of the patients' psychopathology and psycho-social circumstances. In each of these cases he insists that he did nothing to warrant the accusations made. In the 1990 incident, however, he acknowledges that his actions may have contributed to others accusing him. In this case, when nurses appeared at the door of an examining room after a woman had disrobed, he sent the nurses away rather than encouraging them to help him with the situation.

It is clear that he failed to appreciate and respond to the serious nature of this boundary violation. Instead, I believe, his over-investment in his role as a helpful doctor led him to try to spare the woman embarrassment by helping her dress. It is not surprising that the nurses thought something was amiss. In retelling the story, however, Dr.Kyros emphasizes that he was exonerated because the patient did not accuse him of wrongdoing. Dr. Kyros acknowledges that he was naive at the time. He states that he thought a lot about his naiveté and in the years following this incident took CME courses about boundaries. He is proud that there were no other complaints against him for eighteen years

In the three more recent incidents Dr. Kyros denies wrongdoing and says that he cannot see how his actions could have credibly been interpreted as inappropriate. Of the 1998 incident Dr. Kyros says that the patient accused him of "looking aroused" and "looking as though he wanted a hug." In this instance, as he presents it, there is nothing for him to deny, as he was not accused of <u>doing</u> anything. In the 2008 incident Dr. Kyros says that the patient accused him of "looking aroused" and "saying that (he) was aroused." In this instance he denies saying anything about his state of mind to the patient. In regard to the 2009 incident Dr. Kyros told me that the patient alleges that while he was writing out a lab slip for the patient in a busy clinic, he "touched her butt," "fondled her breasts" and "showed her

his penis." In this case he not only denies the accusation, but insists that it would have been physically impossible for him to have done all the things she said that he did in a busy clinic. He also points out that she did not complain to anyone in the clinic and he adds that he believes that she made another appointment before leaving.

Not having any evidence with regard to these incidents I am not able to make a judgment as to facts. The Santé Center report states that "the preponderance of evidence supports a concern that Dr. Kyros has not been fully truthful OR is in denial about his own actions or contributions to the situations that led to his past and current complaints.' I can say that over the months of talking to him I have had no reason to doubt his sincerity or truthfulness.

The question of "denial" is more difficult to address. Dr. Kyros acknowledges that he was "naive" in the 1990 incident. Whether he lacks sufficient wariness to recognize and deal appropriately with patients who are prone to misinterpret a doctor's kindly manner is a possibility. Certain populations of patients do contain a greater percentage of patients who are more likely to misinterpret a doctor's intentions. He may have avoided accusations of wrongdoing for eighteen years because he was practicing among less risky patients. It is at least consistent with the opinions of his colleagues that he is a kind and well meaning physician that he might have failed to notice patients interpreting his kindness as an inappropriate interest. This, of course, assumes that, as he insists, he did not do anything inappropriate.

The Santé report notes that Dr. Kyros' colleagues also worked in a difficult practice environment, but were not subject to accusations of inappropriate behavior. The Santé report also notes that at one point Dr. Kyros offered to continue treating the child of a patient after she withdrew an accusation. Such an action, while not "inappropriate." does suggests the lack of wariness that I think should be considered a factor leading Dr. Kyros but not his colleagues to receive these accusations.

He and I discussed this lack of wariness. The impression that I get from his discussion of his  background is that his role in his family was that of a caretaker, who felt responsible for his younger brothers. I see him as a physician who is, perhaps, over-invested in this role. The satisfaction that he has gotten from being a caretaker probably led him adopt workaholic habits. It is hard to say whether this contributed to the break-up of his marriage, which he says was characterized by much fighting. It does seem likely that following  his divorce he threw himself into work as a more certain source of gratification than marriage. It may have been the case that

the pleasure that he got from helping other people was read by some as inappropriate interest. By the same token, the value he places in being a helping professional makes it seem unlikely that he would have behaved in an openly sexual manner towards his patients.

While Dr. Kyros states that he is not interested in returning to clinical practice, it is certainly possible that with his license restored that he might change his mind. The Santé Center report recommended that he take one of the numerous available courses on "boundaries" to help him to learn to recognize and deal appropriately with situations that could lead to misunderstandings. I think that this is a good idea and I have discussed this with Dr. Kyros. He is willing to take such a course. Since Dr. Kyros has had eighteen years practicing without complaint, it seems that there are some practice settings, less challenging than the one where his recent difficulties arose, where he should be able to practice successfully. We have discussed this as well. Some counselling about his choices and supervision of his practice would also be helpful. As he very much wants to avoid further accusations, I think that if he returns to practice, he would follow such suggestions.

Sincerely,

# **EXHIBIT G**

Gene Jacobs D.O.

209 Massapoag Ave.

North Easton MA

02356

781 254 6179

5/13/13


Summery   RE: DR. William Kyros

Dr. Kyros had been suffering from Major depression and PTSD diagnosed 11/18/09 from trauma induced by being accused of misconduct in an office setting.  Symptoms included depression, anxiety, social isolation, lack of sleep, decreased appetite, panic attacks, cognitive disturbance, lethargy,  nightmares, flashbacks, avoidance, hyper vigilance. GAF 40 at the time, Beck anxiety  39 scored severe and beck depression 40 scored sever , and cpi 1.3 ave  = very weak  all on 9/20/11. Since that time Dr. Kyros has shown steady improvement. Multiple Medication trials were tried settling on klonopin .5mg bid  as the only medication tolerated. Over the 4 year period symptoms have slowly resolved to where Beck scales have markedly improved with last done 5/13/13 Beck anxiety currently 11.5 = very low, Beck Depression scale 10 considered normal. CPI  ave 4 = no problems.   Medication had been weaned since July 2012 and he has been on no medications for the last 4 months.  Currently all symptoms have resolved to where "I feel back to being alive."   Sleep, appetite, motivation, socialization, have all returned to baseline as seen on the CPI.  Current GAF score of 95 = no symptoms . Dr Kyros has now a positive outlook on life and his career. All flashbacks, nightmares,  avoidance have resolved and have not currently been present for the last four months.

MMSE has been consistently normal over multiple tests 30/30 so stopped taking this test as of 1/24/12.

After working with Dr. Kyros these past 3.5 years I saw no evidence of any characterological traits or patterns consistent with or evidencing a propensity or likelihood of Dr. Kyros  exhibiting boundary issues. In fact  I can summarize by a summery already noted in the chart, to which I fully agree, by Dr.  Edward M. Brown, M.D.   In a letter to Herbert Rakatansky, M.D., Chairman, Physicians Health Committee written on August 2, 2010:

"I can say that over the months of talking to him (Dr. Kyros)  I have had no reason to doubt his sincerity or truthfulness......Certain populations of patients do contain a greater percentage of patients who are more likely to misinterpret a doctor's intentions.  He may have avoided accusations of wrongdoing for eighteen years because he was practicing among less risky patients.  It is at least consistent with the opinions of his colleagues that he is a kind and well meaning physician that he might have failed to notice patients interpreting his kindness as an inappropriate interest.... it may have been the case that the pleasure that he got from helping

other people was read by some as inappropriate interest. By the same token, the value he places in being a helping professional makes it seem unlikely that he would have behaved in an openly sexual manner towards his patients....The Sante Center report recommended that he take one of the numerous available courses on " boundaries" to help him to learn to recognize and deal appropriately with situations that could lead to misunderstandings."

To this end He did; In September, 2010 Dr. Kyros completed a CME course at Case Western Reserve University School of Medicine on Intensive Course in Medical Ethics, Boundaries & Professionalism per recommendation of the Sante Center.

Given Dr. Kyros currently is on no medication x 4 months has no current psychiatric symptoms or complaints and has tested within normal limits on beck scales of anxiety/ depression and scored a CPI within normal range he is discharged as of 5/13/13 as there is no further need for psychiatric follow up.

Given there is no symptoms or complaints, he is on no psychiatric medication, MMSE is within normal limits I see no reason as to why Dr. Kyros cannot restart clinical practice.

Gene Jacobs D.O.

# EXHIBIT H

Michael G. Sarli*
James P. Marusak*
Michael R. De Luca*

Per C. Vaage*
Andrea L. Merolla-Simister*
Stephen J. Sypole*

Thomas D. Gidley, Retired

* Also admitted in Massachusetts

One Turks Head Place, Suite 900
Providence, Rhode Island 02903
Telephone 401-274-6644
Fax 401-331-9304

**Gidley, Sarli & Marusak, LLP**
ATTORNEYS AT LAW

June 10, 2013

James V. McDonald, M.D., MPH
Chief Administrative Officer
Department of Health
Board of Medical Licensure and Discipline
Three Capitol Hill
Providence, RI 02908

    Re:  *William Kyros, M.D.*

Dear Dr. McDonald:

    The events that concerned Dr. Kyros precede your arrival at the Department of Health.  I am assuming there is a file regarding this which contains all the pertinent data.  However, if there is anything you need, please don't hesitate to call.

    In brief, Dr. Kyros is a psychiatrist who in 2009 was accused of inappropriate sexual contact with a patient.  As I am sure your file will reflect, the Department of Health became concerned because there were two groupings of these incidents.  At the time Dr. Kyros was working with a very ill subset of the psychiatric population and the stress he was experiencing was considerable.

    As a consequence of the accusation and in conjunction with the Department's concerns, Dr. Kyros agreed not to practice medicine while this matter was investigated.  Dr. Kyros also availed himself of the services of the Physicians Health Committee.

    Toward that end, Dr. Kyros has been under the treatment of Dr. Jacobs and I am enclosing a copy of his note of May 13, 2013 which summarizes Dr. Kyros' current condition and the insight Dr. Jacobs has insofar as the boundary issue is concerned.

    Given his progress and his compliance with all requests of the Department of Health, he has asked me to inquire on his behalf as to whether or not we can arrange an appointment to discuss his future.

    I look forward to hearing from you.

                            Sincerely,

                            Michael G. Sarli

MGS/dtc
Enclosure
cc:    William Kyros, M.D.

# EXHIBIT I

**HUMAN SERVICES CONSULTANTS, LTD.**
277 WATERMAN STREET
PROVIDENCE, R.I. 02906

RONALD MARK STEWART, M.D.
MEDICAL DIRECTOR

(401) 331-7778
(401) 331-7777
FAX (401) 781-8344

August 19, 2013

Herbert Rakatansky, M.D.
Chairman
Physicians Health Committee
Rhode Island Medical Society
225 Promenade Street STE 500
Providence, R.I. 02908

RE: William Kyros, M.D. (dob 1/1/54)

Dear Doctor Rakatansky:

I was requested to perform a forensic evaluation for "fitness for duty," that is, for work readiness, on the physician, William Kyros, M.D. It is my understanding that this report will be used to determine whether or not his license should be returned unrestricted at the present time.

The request was made for me to conduct this examination based on my experience in return -to-work and fitness-for-duty examinations. Besides being a Board Certified psychiatrist(in both general psychiatry and geriatric psychiatry), I am certified by the American Board of Forensic Examiners, as well as having certifications in group psychotherapy and other techniques, I am licensed in Rhode Island, Massachusetts, Connecticut, Maryland, Arkansas, Florida, Tennessee, Nevada, and Arizona. I have been the psychiatric consultant to the Workers Compensation Court here in Rhode Island for nearly 20 years, since the initial Medical Advisory Board was constituted, appointed first by Chief Judge Arrigan, and later Chief Judge Healey to that body, and have been qualified to testify not only before the Workers Compensation Court but also the Superior Court here in Rhode Island. Until my recent decision to work only part-time, I also had faculty appointments on the medical schools at both Brown University and Harvard University.

I had been initially involved in Doctor Kyros' case several years ago as a third consulting psychiatrist(with Doctors Brown and Jacobs) with my work focusing on his

Herbert Rakatansky, M.D.        - 2 -              August 19, 2013

obtaining disability compensations secondary to his ongoing psychiatric treatment. Doctor Kyros has had a long and complicated course over the last four years. He was accused by a patient of making a sexual advance. The Department of Health received three complaints from women concerning professional boundry issues. There was actually one other accusation in the distant past that also came to light that had never reached the Department of Health. None of these accusations have ever been proven. Nevertheless, Doctor Kyros had agreed during the course of the evaluation and investigation to suspend his practice of medicine. Doctor Kyros began to see Doctor Brown at the request of the Licensing Board with treatment focusing on the accusations and any possible psychiatric disorders that might cause ongoing boundry violations with patients. He also began to see Doctor Jacobs when it became apparent that he fulfilled criteria for Post Traumatic Stress Disorder(the trauma being the most recent accusation which led him to fear losing his livelihood and reputation permanently), and this was further complicated over time with a Major Depressive Disorder. Doctor Kyros also received an evaluation at the SANTE Center, which issued an equivocal report basically stating that they felt that he needed to take further education in boundry violations but did not find actual sexual deviancy. This was also the opinion of Doctor Brown after more than a year of treatment, DOctor Brown eventually discharging Doctor Kyros for that particular problem. Nevertheless, Doctor Kyros did continue to see Doctor Jacobs for ongoing treatment of Post Traumatic Stress Disorder and Major Depressive Disorder. This treatment was somewhat protracted because Doctor Kyros perferred not to use any medications for treatment of these problems, which is unusual but not unheard of, and dealt with it solely through psychotherapy. I have reviewed records from the SANTE Center, Doctor Brown and Doctor Jacobs. OVer the course of almost four years he was in treatment, all the symptoms of Post Traumatic Stress Disorder and Major Depressive Disorder have now cleared, and several months ago Doctor Kyros was discharged by Doctor Jacobs.

I do note that the only charges of unprofessional conduct which were found as having fact were: (1) He voice recorded patients without their signed consent after the last accusation of boundry violation(apparently they had a consult from a local college professor who urged this to protect himself without getting any legal advice on the matter), and (2) That he was working for a group called

Herbert Rakatansky, M.D.        - 3 -                August 19, 2013

"Quality Behavioral Health" that was not professionally
licensed.  Doctor Kyros essentially admits that these were
both violations; he was ignorant of the necessity to get
consent for voice recording and was ignorant of the legal
requirements for licensing, and did not grieve these findings
of unprofessional conduct.

Doctor Kyros acknowledges he has not until now pursued
vigorously having his license returned to full status because
he has been ill.  While under treatment for PTSD and Major
Depressive Disorder, he admits that he was in a "dark place"
and considered giving up medicine completely. He experimented
with financial services.  He moved out of state to alternate
living with either his brother or his father.  He has not
practiced as a physician at all since his agreement with
the Medical Licensing Board.

Having now recovered psychiatrically, he is seeking
restoration of his license.  He has a number of plans of
what he would like to do with this in the future, but nothing
has been settled.  He would like the opportunity to resume
seeing children and their parents again(he is Board Certified
in Child Psychiatry as well as Adult Psychiatry) but doubts,
by preference, he would ever return to seeing adults again
given the trauma he has experienced over the last number of
years.

I conducted an extensive mental status examination which
was entirely within normal limits.  There are no significant
findings at all at this time.  In summary, he was alert,
oriented, pleasant, and cooperative. He told a clear and
coherent story.  His affect was of full range.  He denied
wanting to harm himself, others, or property.  Memory and
intelligence were intact.  Speech and dress were appropriate
to the emotional content.  He had good future orientation.
There were no obvious neurological difficulties.

As an aside, he is on medications for high cholesterol
and high blood pressure, both of which are well controlled.
He has no side-effects from these.  He has never had any
other legal problems: no arrests, no civil judgments, no
malpractice suits.

In summary, Doctor Kyros is an unfortunate gentleman who
suffered from Post Traumatic Stress Disorder, envisioning
the end of his career and reputation, after having been
accused of a sexual boundry violation by a patient.  This
was further complicated by a Major Depressive Disorder with
melancholia but without psychosis.  Records from Doctor Brown
and Doctor Jacobs confirm these diagnoses, but the records

Herbert Rakatansky, M.D.     - 4 -                    August 19, 2013

from Doctor Jacobs, consistent over the last three years, also confirm that both disorders have now resolved through the use of intensive psychotherapy. Doctor Jacobs finds no evidence of psychiatric disorder at the present time, and neither do I based on my mental status examination and review of current functioning and history.

Having practice as a psychiatrist now for thirty years in a variety of settings, I am, of course, particularly knowledgeable about the pressures and strains of the profession. It is difficult to know what to make of four accusations of sexual boundry violations over the course of Doctor Kyros' 25-year career, none of which were proven, and none of which even resulted in civil accusations through malpractice suits. I admit it would be glib he was "unfortunate." However, that is one possibility. There is no evidence from any area where he has worked that he has ever suffered from any type of substance abuse difficulty and no evidence that he was suffering from any type of psychiatric disorder while in active practice. While he has been psychiatrically ill for a number of years, luckily all were cleared through good treatment,he never saw patients during the time he was ill. All psychiatrists are subject to sexual advances from patients. We deal with a group of patients who are emotionally ill. I myself have been propositioned by patients on any number of occasions, both male and female,and all psychiatrists are trained to prepare themselves for this, in that any good psychiatrist needs to display warmth and empathy towards ill patients who may be severely emotionally deprived in their personal lives, but we need to know how to stop the advance on a moment's notice. As you may know, this is the whole experience with transference and counter-transference in psychiatry in being trained to use the emotional attachments that patients develop for their benefit and not for your own. IN the four incidents that I have reviewed it appeared that Doctor Kyros was taken by surprise with the accusations afterwards and did not have any inclination that the patients would be making accusations against him(in fact, in one case it wasn't even a patient but an attendant who thought there was some inappropriate language between doctor and patient). Doctor Kyros has taken the course at Western Reserve and is now more fully aware that advances by patients need to be handled there in the office when they occur and placed in a proper prospective so that a patient does not get the wrong idea about what is transpiring. A patient who makes such an advance and then feels slighted by the psychiatrist because it has not been handled appropriately are often the ones who will bitterly complain later on.In all these cases, as you know, they were one-time brief incidents that never were carried through to a second incident, and so this leads me firmly to believe that Doctor Kyros initiated nothing and was truly an innocent party in what occurred.

Herbert Rakatansky, M.D.    - 5 -                August 19, 2013

As such, after review of extensive psychiatric records, the complaints as forwarded, and recognizing that at the current time he has no psychiatric diagnosis, having fully recovered from Post Traumatic Stress Disorder and Major Depressive Disorder and that he is not otherwise impaired in any way medically or psychologically, I find that he would be "fit for duty" to have his license returned unrestricted at the present time to be able to resume his practice.

If you have further questions on this matter, please feel free to contact me.

Sincerely,


Daniel S. Harrop, M.D.

cc  James V. McDonald, M.D.
    Michael Sarli, Esq.

# EXHIBIT J



RHODE ISLAND MEDICAL SOCIETY

September 9, 2013

James McDonald, MD
Chief Administrative Officer
Rhode Island Board of Medical Licensure & Discipline
3 Capitol Hill
Providence, RI  02908

RE:    William Kyros, MD

Dear Dr. McDonald:

Dr. Kyros contacted us after meeting with you and the Board's attorney to inquire about having his license reinstated. In seeking a letter of support from the Physician Health Program (PHP), Dr. Kyros provided us with copies of supporting documents from the psychiatrist who has been treating him for the past three and one half years for post-traumatic stress disorder and major depression. We reviewed these documents prior to meeting with Dr. Kyros on August 1, 2013.

At the August 1st meeting, we reviewed our policy regarding issues related to boundary violations with Dr. Kyros. We explained to Dr. Kyros that our comments are limited to his current status vis a vis the two primary psychiatric diagnoses which have prevented him from working for several years.

Dr. Kyros chose to contact a psychiatrist, Dr. Daniel Harrop, to provide a forensic psychiatric evaluation. It is our understanding that a copy of Dr. Harrop's letter has been forwarded to you. We reviewed Dr. Harrop's evaluation of Dr. Kyros that states that the psychiatric symptoms leading Dr. Kyros to seek treatment have abated. Both Dr. Jacobs and Dr. Harrop have concluded that Dr. Kyros is no longer impaired medically or psychologically and we have no reason to doubt this conclusion.

Please feel free to contact us should you require further information.

Sincerely,

Herbert Rakatansky, MD
Chairperson, Physician Health Committee

Kathleen Boyd, MSW, LICSW
Director
Physician Health Program

cc:    William Kyros, MD
       Michael G. Saril, Esq.

# **<u>EXHIBIT K</u>**



Department of Health

Three Capitol Hill
Providence, RI 02908-5097

TTY: 711

www.health.ri.gov

December 4, 2013

WILLIAM PETER KYROS, MD
15A RIVERVIEW AVENUE
MASHPEE MA  02649

In The Matter Of:     Our File No.: C08-250 & C09-252

Dear Dr. KYROS:

The investigating Committee of the Board of Medical Licensure and Discipline ("BMLD") has made a finding of "Unprofessional Conduct" on your part relating to your role in the above-noted matter.

As to this finding, you are entitled to a formal hearing, which is a trial-like administrative procedure in which evidence will be presented to a BMLD hearing panel. You have the right to bring an attorney, and a stenographic record of the proceedings will be kept.

Prior to any formal hearing, you may elect to have an informal hearing within 60 days of the date above to discuss potential resolution of this complaint with myself and the BMLD attorney.   You may bring an attorney to this informal hearing. Please call, or have your attorney call, BMLD counsel Thomas Corrigan at his number below.  If we do not hear from you within 60 days, a notice of the formal hearing date and a specification of charges will be mailed to your address above.

Thank you for your anticipated cooperation in this matter.

Sincerely,

James V. McDonald MD, MPH
Chief Administrative Officer
Board of Medical Licensure & Discipline
James.mcdonald@health.ri.gov
(401) 222-1016

Thomas J. Corrigan Jr.
Board Counsel
Board of Medical Licensure & Discipline
Thomas.corrigan@health.ri.gov
(401) 222-7755

# EXHIBIT L

**HUMAN SERVICES CONSULTANTS, LTD.**
277 WATERMAN STREET
PROVIDENCE, R.I. 02906

RONALD MARK STEWART, M.D.
MEDICAL DIRECTOR

(401) 331-7778
(401) 331-7777
FAX (401) 751-6244

November 5, 2015

James V. McDonald, M.D.MPH
Chief Administrative Officer
Board of MEdical Licensure and
Discipline
Board Certified Pediatrics and
Preventive Medicine
3 Capitol Hill
Providence, Rhode Island 02908

Dear Doctor McDonald:

RE: William Kyros, M.D. dob 1/1/54

        This letter is being sent to you as an update on the
condition of Doctor Kyros. It is my understanding that
the Board of Medical Licensure is considering reinstating
his medical license at this time.

        As you know, I last reported on Doctor Kyros in August
of 2013. At that time he had recovered from major depressive
disorder and post traumatic stress disorder. The psychiatrists
who had treated him for these difficulties had discharged him
from care. I performed a complete mental status examination
at that time which was entirely within normal limits and found
no evidence of any difficulties that would prevent him from
practicing medicine without restrictions. Again, please refer
to my letter of August 19, 2013 addressed to Herbert Rakatansky,
M.D., Chairman of the Physicians Health Committee.

        Over the course of the last two years, Doctor Kyros has
stayed medically stable. He is not practicing medicine at
all at this time. He spends his days looking after his health,
exercising, taking care of his 90-year-old father, or reading,
preferring to read medical or financial or historical articles.
He has kept up on his continuing medical education credits.
Weekly he helps his brother restore a 1729 house and barn out-
side of Boston. He particularly enjoys this family time with
his brother and father. His physical health has been good, and
his only medications at the moment are a statin for lipid
problems and lisinopril for high blood pressure difficulties,
both of which he has been on for many years without any change.
He has relied on family financial support and some savings that
he had to get through financially. However, this has been
tight, the family financial support cannot continue forever,
and he would like to resume medical practice at this time.

James V. McDonald, M.D. MPH      - 2 -            November 5, 2015

I performed a complete mental status examination on November 4, 2015 in follow-up. Once again, this was entirely within normal limits. Doctor Kyros was alert, oriented, pleasant, and cooperative. He told a clear and coherent story. His affect was of full range. There was no evidence of psychosis. HE had good future orientation. He maintains an active and regular physical schedule on a daily basis. He maintains good family relationships. His physical health is reported insignificant. He does not describe any evidence of melancholia, he can point out a number of areas where he enjoys himself. He reports he has had no difficulties with the law. He does not use alcohol nor illicit substances.

We did review the difficulties that led to his license suspension some years ago. He notes he has not needed any further psychotherapy or psychiatric medications in the last two years and shows no evidence of post traumatic stress disorder at this time.

As such, my opinion remains much as it did in August of 2013: After an extensive review of the psychiatric records, the complaints as forwarded, and recognizing at the current time that he has no psychiatric diagnosis, having fully recovered from post traumatic stress disorder and major depressive disorder, and that he is not in any other way impaired medically or psychiatrically, I find that he would be "fit for duty" to have his medical license returned unrestricted at the present time to be able to resume his medical practice.

If you have any further questions on this matter, please feel free to contact me.

Sincerely,

Daniel S. Harrop, M.D.
Psychiatric Consultant,
Medical Advisory Board,
Workers' Compensation Court

# EXHIBIT M



Attorneys and Counselors at Law

September 8, 2016

**VIA FIRST CLASS MAIL:**

James McDonald, MD
Board of Medical Licensure and Discipline
Department of Health
3 Capitol Hill
Providence, RI 02908

MICHAEL A. KELLY*
JOHN O. MANCINI*+

THOMAS P. CARTER *
JOSEPH P. PEMANTELL JR.
JOELLE C. ROCHA *
NICHOLAS J. GOODIER*
JACKSON C. PARMENTER*
NICOLE J. MARTUCCI
MICHAEL L. MINEAU
ERIN A. HOCKENSMITH * *

* also admitted in Massachusetts
+ also admitted in Connecticut
** also admitted in Virginia (inactive),
Maryland, Massachusetts and
District of Columbia

*RE: File Number C08-250 and C09-252*

Dear Mr. McDonald and the Members of the Board:

Please be advised that this office has recently been retained by William P. Kyros, M.D. ("Dr. Kyros") in connection with the above referenced file numbers. We understand that there have been discussions with the Board of Medical Licensure and Discipline ("Board") relative to Dr. Kyros' license being reinstated so that he may return to his chosen profession. We also understand that a proposed consent order was proposed by the Board which granted Dr. Kyros an unrestricted license to practice with certain conditions. This correspondence is to present the Board with edits to that proposed Consent Order for review. Dr. Kyros, as you can imagine takes issue with some of the findings of fact and conclusions of laws set forth in the Board's original consent order. We believe this new consent order remedies those concerns and presents an accurate recitation of the factual findings and conclusions of law.

Please advise as to whether the enclosed Consent Order is acceptable. At this point in time Dr. Kyros is eager to get back to practicing his chosen profession as a physician. I look forward to hearing from you.

Sincerely,

Michael A. Kelly

Enclosure

m \kyros, william\harrasment\correspondence\drafts\2016 09 08 ltr kelly and parmenter to doh re consent order.docx

128 Dorrance Street • Suite 300 • Providence • Rhode Island 02903
Tel: 401-490-7334 • Fax: 401-490-7874
www.kellymancini.com

STATE OF RHODE ISLAND & PROVIDENCE PLANTATIONS
WILLIAM KYROS, MD
C08-250 & C09-252

STATE OF RHODE ISLAND
DEPARTMENT OF HEALTH
BOARD OF MEDICAL LICENSURE AND
DISCIPLINE

IN THE MATTER OF:
WILLIAM KYROS M.D.
License Number MD; MD06880
Controlled Substances Registration Number CMD06880
BMLD Case Numbers C08-250 & C09-252

## CONSENT ORDER

William Kyros, M.D. (hereafter Respondent) entered into an agreement to cease practice with the Rhode Island Board of Medical Licensure & Discipline (Board) on August 14, 2009. The agreement to cease practice was made after the Board reported accusations that alleged Respondent had engaged in unprofessional conduct by engaging in serious professional boundary violations with patients. The Investigating Committee of the Board convened and considered the facts and circumstances surrounding the allegations and allegedly found probable cause for discipline, in their independent assessment. The Investigative Committee's findings of fact and conclusions of law are set forth below as well as the results of the myriad assessments ordered by the Board, that were considered relevant to this matter. The information obtained through these assessments did NOT validate the Investigative Committee's initial findings; the charges were NOT confirmed by a preponderance of the evidence.

Page 1

**STATE OF RHODE ISLAND & PROVIDENCE PLANTATIONS**
**WILLIAM KYROS, MD**
**C08-250 & C09-252**

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

1. Respondent is a physician licensed to practice medicine in Rhode Island since June of 1986. He is a 1980 graduate of St. Georges University School of Medicine in Grenada and was Board Certified in Psychiatry at the time of these complaints.

2. An accusation of a boundary violation occurred in the early 90's; the Respondent was subsequently cleared of any wrongdoing with no sanction or other action on his license. Moreover, within the year, the Respondent was appointed Acting Medical Director and later Acting Chief of Psychiatry at the same facility, and he remained on staff until 1999 without any further accusations.

   Current accusations have been, and continue to be, vigorously denied by Respondent.

3. The Board erroneously asserted that Respondent was working as an employee of a mental health practice that lacked proper licensure and organizational structure. These allegations were later retracted by the Board and said mental health practice has continued to operate without interruption as a fully licensed medical facility to the current day.

4. The Board allegedly found violations against the president of the above-referenced mental health practice for violations of the Confidentiality of Health Care Information and Communications act, the state mental health law and the Federal Health Insurance Portability and Accountability Act (HIPAA).

**STATE OF RHODE ISLAND & PROVIDENCE PLANTATIONS**
**WILLIAM KYROS, MD**
**C08-250 & C09-252**

5. These determinations are not dispositive of the present case, as they do not pertain to the Respondent, but rather to the president of said practice. In fact, for Respondent to comment on these allegations would constitute further violations of the president's rights to due process and equal protections.

6. The complaints to the Board alleged violations of R.I.G.L. 5-37-5.1(30) for sexual contact between a doctor and a patient.

7. Upon demand of the Board, Respondent attended the Santé Center for Healing in August of 2009. Despite a lengthy assessment, the Santé Center did not reach a definitive conclusion. Without conclusive results and with a lack of categorical evidence, the Santé Center nonetheless recommended a course in professional boundaries, lengthy lengthy psychotherapeutic supervision, personal therapy and monitored practice.

8. Respondent successfully completed the Intensive Course in Medical Ethics, Boundaries & Professionalism September 2-3, 2010 at Case Western Reserve University.

9. As a component of the Board's demands, Respondent undertook care from a Board Certified Psychiatrist in 2009 after this complaint. He was treated for trauma symptoms engendered by the personal stress caused to Respondent by these complaints. Respondent remained in treatment with this psychiatrist for 4 (four) years due to the stress created by the allegations and the Board's actions. In 2013, the

**STATE OF RHODE ISLAND & PROVIDENCE PLANTATIONS**
**WILLIAM KYROS, MD**
**C08-250 & C09-252**

treating psychiatrist reported, "After working with Dr. Kyros these past 3.5 years, I saw no evidence of any characterological traits or patterns consistent with or evidencing a propensity or likelihood of Dr. Kyros exhibiting boundary issues." Moreover, it was - and is - the opinion of the treating psychiatrist that Respondent was able to resume clinical practice; moreover there was no mention of the need for probation or supervision of clinical practice.

10. Respondent was evaluated by an additional psychiatrist from October 2009 through late 2010. This psychiatrist admitted to being influenced by the reservations as expressed in the Santé Center evaluation, in which there was no conclusive determination but Respondent's truthfulness was called into question as an explanation for the Center's equivocation. Nonetheless, the psychiatrist averred, "I can say that over the months of talking to him, I have had no reason to doubt his sincerity or truthfulness."

11. Respondent was evaluated by a Forensic Psychiatrist in August of 2013 specifically addressing "fitness for duty" or work readiness as a physician. It was the opinion of the Forensic Psychiatrist in 2013 that "...this lead me firmly to believe that Doctor Kyros initiated nothing and was truly an innocent party in what occurred." The Forensic Psychiatrist further reported, "I find that (Respondent) would be 'fit for duty' to have his license returned unrestricted at the present time to be able to resume his

STATE OF RHODE ISLAND & PROVIDENCE PLANTATIONS
WILLIAM KYROS, MD
C08-250 & C09-252

practice." This recommendation obviously does not endorse probation or supervision of clinical practice.

12. Despite multiple previous clearances, the Board requested further update and Respondent was again evaluated by the same Forensic Psychiatrist in November 2015. Again, the evaluating psychiatrist confirmed that Respondent was fit to practice, and there were no recommendations of probation or clinical supervision.

13. Respondent was also evaluated by the Physicians Health Program in 2010 and 2013. Although the Physicians Health Program (PHP) as a matter of policy does not make recommendations on reentry when physicians have been referred for possible boundary violations, the PHP has reviewed the documentation and recommendations from treating and evaluating behavioral health care providers and has no reason to believe Respondent is impaired medically or psychologically. Once again, there is no indication of the need for probation or supervision of clinical practice.

14. Respondent has provided evidence of meeting the requirement for Continuing Medical Education for the time period of 2010-present. His medical license was maintained throughout the timeframe of the complaints and investigative process, including routine renewals in both 2010 and 2012. Without precipitant or explanation, the Board changed Respondent's license status in April 2013.

15. Respondent acknowledges that complaints were made to the Board. However, despite compliance with extensive mandated psychiatric evaluations and treatment,

## STATE OF RHODE ISLAND & PROVIDENCE PLANTATIONS
## WILLIAM KYROS, MD
### C08-250 & C09-252

none of the demanded evaluations have supported or confirmed the allegations of boundary violations.. The Investigative Committee solely alleges the receipt of information that indicates probable cause for discipline; the Respondent however did not receive any reports of the Investigative Committee. The lack of findings from any of the Board's requisite assessments fails wholly to prove the allegations with a preponderance of the evidence.

16. The Board acknowledges Respondent's genuine efforts to address their concerns and recognizes that 6 (six) years have passed since these events have allegedly occurred. Respondent would have been eligible for reinstatement after 5 years had the license been revoked. Respondent's license was NOT revoked and the allegations were not proven with a preponderance of the evidence.

### BASED ON THE FOREGOING, THE PARTIES AGREE AS FOLLOWS:

1. Respondent shall be granted an unrestricted license without the necessity of a reinstatement application or any other process.

2. With a full, unrestricted license, Respondent will be bound by the the laws of the State of RI that apply to all physicians and will continue to hold himself to the highest of professional ethical values.

3. Respondent will practice independently, without supervision or probation, as the ethics and canons of psychiatry require in psychiatric clinical care. Moreover,

**STATE OF RHODE ISLAND & PROVIDENCE PLANTATIONS**
**WILLIAM KYROS, MD**
**C08-250 & C09-252**

neither probation nor clinical supervision were recommended by the any of the three psychiatric independent evaluations.

4. Respondent shall review the Prescription Monitoring Program prior to prescribing a controlled substance to any patient.

5. There will be no notation on Respondent's medical license regarding the unfounded allegations of this Consent Decree. Respondent will not be responsible for any administrative fees; the expenses of the Board of Medical Licensure and Discipline are covered by physician licensure fees and RI taxpayers' dollars. Respondent maintains all rights afforded to physicians practicing in the State of RI, and the terms of this Consent decree shal not limit his rights in any way.


Signed this ____ day of January 2016.


_____
William Kyros M.D.,

Ratified by the Board of Medical Licensure and Discipline on the ____ day of January 2016.


_____
Nicole Alexander-Scott, M.D., M.P.H.

Page 7

STATE OF RHODE ISLAND & PROVIDENCE PLANTATIONS
WILLIAM KYROS, MD
C08-250 & C09-252

Director of Health
Rhode Island Department of Health

# EXHIBIT N



KELLY & MANCINI PC
ATTORNEYS AT LAW

Attorneys and Counselors at Law

October 13, 2016

MICHAEL A. KELLY*
JOHN O. MANCINI*+

**VIA FIRST CLASS MAIL AND E-MAIL:**

James McDonald, MD
Board of Medical Licensure and Discipline
Department of Health
3 Capitol Hill
Providence, RI 02908
*James.McDonald@health.ri.gov*

THOMAS P. CARTER *
JOSEPH P. PEMANTELL, JR.
JOELLE C. ROCHA *
NICHOLAS J. GOODIER*
JACKSON C. PARMENTER*
NICOLE J. MARTUCCI
MICHAEL L. MINEAU
ERIN A. HOCKENSMITH **

*RE: File Number C08-250 and C09-252*

\* also admitted in Massachusetts
+ also admitted in Connecticut

\*\* also admitted in Virginia (inactive),
Maryland, Massachusetts, and
District of Columbia

Dear Mr. McDonald and the Members of the Board:

This correspondence is a follow up to our letter dated September 8, 2016. To date, we have yet to hear from you regarding our Proposed Consent Order contained in said correspondence, and attached hereto as <u>Exhibit A</u>. As you know, William P. Kyros, M.D. ("Dr. Kyros") still does not have his license to practice medicine in the State of Rhode Island. Moreover, Dr. Kyros will continue to be prevented from practicing medicine in the State of Rhode Island unless, and until, such time as the Consent Order is negotiated and executed with the Department of Health ("Department"). As we noted in our previous correspondence, Dr. Kyros is eager to get back to practicing his chosen profession. Accordingly, we respectfully request that the Department and the Board of Medical Licensure and Discipline respond to our letter dated September 8, 2016, as well as the Proposed Consent Order attached thereto.

Please respond to this correspondence as well as the Proposed Consent Order attached hereto as <u>Exhibit A</u>, as soon as possible. We sincerely appreciate your prompt attention to this matter, as Dr. Kyros is continuing to suffer from the inability to practice his chosen profession and make a living.

Sincerely,

Michael A. Kelly

Enclosure

m:\kyros, william\harrasment\correspondence\drafts\2016.10.13 ltr kelly to doh re follow up on proposed consent order.docx

# Exhibit A

STATE OF RHODE ISLAND & PROVIDENCE PLANTATIONS
WILLIAM KYROS, MD
C08-250 & C09-252

**STATE OF RHODE ISLAND**
**DEPARTMENT OF HEALTH**
**BOARD OF MEDICAL LICENSURE AND**
**DISCIPLINE**

**IN THE MATTER OF:**
**WILLIAM KYROS M.D.**
**License Number MD; MD06880**
**Controlled Substances Registration Number CMD06880**
**BMLD Case Numbers C08-250 & C09-252**

## CONSENT ORDER

William Kyros, M.D. (hereafter Respondent) entered into an agreement to cease practice with the Rhode Island Board of Medical Licensure & Discipline (Board) on August 14, 2009. The agreement to cease practice was made after the Board reported accusations that alleged Respondent had engaged in unprofessional conduct by engaging in serious professional boundary violations with patients. The Investigating Committee of the Board convened and considered the facts and circumstances surrounding the allegations and allegedly found probable cause for discipline, in their independent assessment. The Investigative Committee's findings of fact and conclusions of law are set forth below as well as the results of the myriad assessments ordered by the Board, that were considered relevant to this matter. The information obtained through these assessments did NOT validate the Investigative Committee's initial findings; the charges were NOT confirmed by a preponderance of the evidence.

**STATE OF RHODE ISLAND & PROVIDENCE PLANTATIONS**
**WILLIAM KYROS, MD**
**C08-250 & C09-252**

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

1. Respondent is a physician licensed to practice medicine in Rhode Island since June of 1986. He is a 1980 graduate of St. Georges University School of Medicine in Grenada and was Board Certified in Psychiatry at the time of these complaints.

2. An accusation of a boundary violation occurred in the early 90's; the Respondent was subsequently cleared of any wrongdoing with no sanction or other action on his license. Moreover, within the year, the Respondent was appointed Acting Medical Director and later Acting Chief of Psychiatry at the same facility, and he remained on staff until 1999 without any further accusations.

    Current accusations have been, and continue to be, vigorously denied by Respondent.

3. The Board erroneously asserted that Respondent was working as an employee of a mental health practice that lacked proper licensure and organizational structure. These allegations were later retracted by the Board and said mental health practice has continued to operate without interruption as a fully licensed medical facility to the current day.

4. The Board allegedly found violations against the president of the above-referenced mental health practice for violations of the Confidentiality of Health Care Information and Communications act, the state mental health law and the Federal Health Insurance Portability and Accountability Act (HIPAA).

**STATE OF RHODE ISLAND & PROVIDENCE PLANTATIONS**
**WILLIAM KYROS, MD**
**C08-250 & C09-252**

5. These determinations are not dispositive of the present case, as they do not pertain to the Respondent, but rather to the president of said practice. In fact, for Respondent to comment on these allegations would constitute further violations of the president's rights to due process and equal protections.

6. The complaints to the Board alleged violations of R.I.G.L 5-37-5.1(30) for sexual contact between a doctor and a patient.

7. Upon demand of the Board, Respondent attended the Santé Center for Healing in August of 2009. Despite a lengthy assessment, the Santé Center did not reach a definitive conclusion. Without conclusive results and with a lack of categorical evidence, the Santé Center nonetheless recommended a course in professional boundaries, lengthy lengthy psychotherapeutic supervision, personal therapy and monitored practice.

8. Respondent successfully completed the Intensive Course in Medical Ethics, Boundaries & Professionalism September 2-3, 2010 at Case Western Reserve University.

9. As a component of the Board's demands, Respondent undertook care from a Board Certified Psychiatrist in 2009 after this complaint. He was treated for trauma symptoms engendered by the personal stress caused to Respondent by these complaints. Respondent remained in treatment with this psychiatrist for 4 (four) years due to the stress created by the allegations and the Board's actions. In 2013, the

STATE OF RHODE ISLAND & PROVIDENCE PLANTATIONS
WILLIAM KYROS, MD
C08-250 & C09-252

treating psychiatrist reported, "After working with Dr. Kyros these past 3.5 years, I saw no evidence of any characterological traits or patterns consistent with or evidencing a propensity or likelihood of Dr. Kyros exhibiting boundary issues." Moreover, it was - and is - the opinion of the treating psychiatrist that Respondent was able to resume clinical practice; moreover there was no mention of the need for probation or supervision of clinical practice.

10. Respondent was evaluated by an additional psychiatrist from October 2009 through late 2010. This psychiatrist admitted to being influenced by the reservations as expressed in the Santé Center evaluation, in which there was no conclusive determination but Respondent's truthfulness was called into question as an explanation for the Center's equivocation. Nonetheless, the psychiatrist averred, "I can say that over the months of talking to him, I have had no reason to doubt his sincerity or truthfulness."

11. Respondent was evaluated by a Forensic Psychiatrist in August of 2013 specifically addressing "fitness for duty" or work readiness as a physician. It was the opinion of the Forensic Psychiatrist in 2013 that "...this lead me firmly to believe that Doctor Kyros initiated nothing and was truly an innocent party in what occurred." The Forensic Psychiatrist further reported, "I find that (Respondent) would be 'fit for duty' to have his license returned unrestricted at the present time to be able to resume his

STATE OF RHODE ISLAND & PROVIDENCE PLANTATIONS
WILLIAM KYROS, MD
C08-250 & C09-252

practice." This recommendation obviously does not endorse probation or supervision of clinical practice.

12. Despite multiple previous clearances, the Board requested further update and Respondent was again evaluated by the same Forensic Psychiatrist in November 2015. Again, the evaluating psychiatrist confirmed that Respondent was fit to practice, and there were no recommendations of probation or clinical supervision.

13. Respondent was also evaluated by the Physicians Health Program in 2010 and 2013. Although the Physicians Health Program (PHP) as a matter of policy does not make recommendations on reentry when physicians have been referred for possible boundary violations, the PHP has reviewed the documentation and recommendations from treating and evaluating behavioral health care providers and has no reason to believe Respondent is impaired medically or psychologically. Once again, there is no indication of the need for probation or supervision of clinical practice.

14. Respondent has provided evidence of meeting the requirement for Continuing Medical Education for the time period of 2010-present. His medical license was maintained throughout the timeframe of the complaints and investigative process, including routine renewals in both 2010 and 2012. Without precipitant or explanation, the Board changed Respondent's license status in April 2013.

15. Respondent acknowledges that complaints were made to the Board. However, despite compliance with extensive mandated psychiatric evaluations and treatment,

**STATE OF RHODE ISLAND & PROVIDENCE PLANTATIONS**
**WILLIAM KYROS, MD**
**C08-250 & C09-252**

none of the demanded evaluations have supported or confirmed the allegations of boundary violations.. The Investigative Committee solely alleges the receipt of information that indicates probable cause for discipline; the Respondent however did not receive any reports of the Investigative Committee. The lack of findings from any of the Board's requisite assessments fails wholly to prove the allegations with a preponderance of the evidence.

16. The Board acknowledges Respondent's genuine efforts to address their concerns and recognizes that 6 (six) years have passed since these events have allegedly occurred. Respondent would have been eligible for reinstatement after 5 years had the license been revoked. Respondent's license was NOT revoked and the allegations were not proven with a preponderance of the evidence.

**BASED ON THE FOREGOING, THE PARTIES AGREE AS FOLLOWS:**

1. Respondent shall be granted an unrestricted license without the necessity of a reinstatement application or any other process.

2. With a full, unrestricted license, Respondent will be bound by the the laws of the State of RI that apply to all physicians and will continue to hold himself to the highest of professional ethical values.

3. Respondent will practice independently, without supervision or probation, as the ethics and canons of psychiatry require in psychiatric clinical care. Moreover,

**STATE OF RHODE ISLAND & PROVIDENCE PLANTATIONS**
**WILLIAM KYROS, MD**
**C08-250 & C09-252**

neither probation nor clinical supervision were recommended by the any of the three psychiatric independent evaluations.

4. Respondent shall review the Prescription Monitoring Program prior to prescribing a controlled substance to any patient.

5. There will be no notation on Respondent's medical license regarding the unfounded allegations of this Consent Decree. Respondent will not be responsible for any administrative fees; the expenses of the Board of Medical Licensure and Discipline are covered by physician licensure fees and RI taxpayers' dollars. Respondent maintains all rights afforded to physicians practicing in the State of RI, and the terms of this Consent decree shal not limit his rights in any way.

Signed this ____ day of January 2016.

William Kyros M.D.,

Ratified by the Board of Medical Licensure and Discipline on the ____ day of January 2016.

Nicole Alexander-Scott, M.D., M.P.H.

Page 7

**STATE OF RHODE ISLAND & PROVIDENCE PLANTATIONS**
**WILLIAM KYROS, MD**
**C08-250 & C09-252**

Director of Health
Rhode Island Department of Health

# EXHIBIT O



**KELLY & MANCINI PC**
**ATTORNEYS AT LAW**

*Attorneys and Counselors at Law*

November 17, 2016

*Via Email and First Class Mail*

James McDonald, M.D.
Board of Medical Licensure & Discipline
Department of Health
Three Capitol Hill
Providence, RI 02908

**RE: *Dr. William Kyros - File #: C08-250 & C09-252***

Dear Dr. McDonald and Members of the Board:

Reference is made to your letter of November 11, 2016. I am confused as to your position that the letter "did not evidence the requisite insight for the Board to seriously consider this request." The substance of the Proposed Consent Order attached to that letter made it abundantly clear that Dr. Kyros should be permitted to return to practice – a determination that the Board of Medical Licensure and Discipline had seemingly agreed with based upon the prior proposed consent order. *See* Exhibit A, attached hereto, for a copy of the Board's previously proposed Consent Order; *see also* Exhibit B, attached hereto, for the newly proposed Consent Order proposed in our October 13, 2016 correspondence. Notwithstanding the factual specificity contained within the Proposed Consent Order itself, this correspondence will outline those relevant facts which demonstrate that Dr. Kyros should be permitted to immediately return to practice under the proposed restrictions. I trust that the content of this correspondence will provide the Board with the requisite insight to consider our newly proposed Consent Order. *See* Exhibit B, attached hereto.

Seven years herein passed since the alleged incidents that occurred prior to August of 2009 at which time William P. Kyros, M.D. entered into an agreement to cease practice with the Board of Medical Licensure. As I am sure you can appreciate, much trepidation has transpired over these years to properly address these isolated alleged incidences that have tarnished an otherwise successful professional career over the past twenty five years.

Upon that agreement to cease the practice of medicine, several steps were taken to professionally evaluate Dr. Kyros as well enhance and maintain his academic credentials with the anticipation that he would be returning to his chosen profession which is not only been his passion and commitment to assist those who could benefit by his guidance but equally satisfying to him as an individual by the enhancement of his self-worth.

During this time of reflection and self-evaluation, Dr. Kyros has attended the Sante Center for Healing working extensively with two (2) psychiatrists over these years who concluded that he was fully able to return to the practice of medicine. Additionally, he completed

a continuing education course in medical ethics; boundaries and professionalism; and underwent a forensic psychiatric evaluation which again concluded that he was able to return to practice. Furthermore, he was evaluated by the Physicians Health Committee on two (2) occasions who endorsed the conclusions and findings of the psychiatric evaluations and heretofore are mentioned. He has maintained his clinical knowledge and has continued to complete all CME credit requirements in accordance with RI Regulations during this time.

I will now proceed to summarize in relative simplicity the processes and reviews which Dr. William Kyros has addressed since August of 2009. At the Sante Center for Healing, Argyle Texas with Dr. Kyros, in August of 2009, submitted himself for an evaluation through the recommendation of the Board and has fully complied with each of those recommendations. The Sante Center's concern regarding Dr. Kyros as to whether or not he had been truthful or was in denial is addressed Dr. Edward Brown's summary dated August 2, 2010 for the season (attached hereto as <u>Exhibit C</u>) which provided an in-depth psychodynamically oriented psychotherapy and personal therapy program. Dr. Brown stated that he had no reason to doubt Dr. Kyros' sincerity or truthfulness. Dr. Brown further cited the value of Dr. Kyros place in being a helping professional made it unlikely he would have behaved in an openly sexual manner toward his patients. <u>DR. KRYOS RATHER THAN ADDRESSING THE ACCURACY OF THOSE ACCUSATIONS HAS UNDERGONE A FULL EVALUATION BY PROFESSIONALS IN A SELF-EVALUATION OF HIMSELF AND HAS RECEIVED THE APPROPRIATE TESTING, REVIEW, CONSULTATION, AND EVALUATIONS TO PROCEED FORWARD IN HIS PROFESSIONAL OBJECTIVES AND SURROUND HIMSELF WITH ASSISTANCE TO COMPLETELY NEGATE ANY POTENTIAL ADVERSE COMPLAINTS OR INUENDOS IN THE FUTURE.</u>

Dr. Brown, who worked with Dr. Kyros every other week for 1 ½ years stated he would be able to return to practice successfully. *See* <u>Exhibit C</u>, attached hereto.

Dr. Gene Jacob's evaluation, dated May 13, 2013 (attached hereto as <u>Exhibit D</u>) agreed with Dr. Brown's findings and further added after working with Dr. Kyros for 3 ½ years that he saw no evidence of any characterological traits or patterns consistent with evidencing a propensity or likelihood that Dr. Kyros had exhibited any boundary issues and further saw no reason why he could not restart clinical practice.

In furthering his education, Dr. Kyros successfully completed a 20.5 credit category 1 CME course entitled: Intensive Course in Medical Ethics, Boundaries and Professionalism at Case Western Reserve University School of Medicine in Cleveland, Ohio in September of 2010.

Of significance, Dr. Daniel Harrop, a doctor in extensive forensic psychiatric evaluation for "fitness for duty," that is, for work readiness, evaluated Dr. Kyros in August of 2013 per recommendation of the Physicians Health Committee. *See* <u>Exhibit E</u>, attached hereto. Dr. Harrop stated that it was his understanding that his report would be used to determine whether or not Dr. Kyros' license should be returned unrestricted at that time. The request was made to Dr. Harrop based on his extensive experience and his return-to-work and fitness-for-duty examinations. Dr. Harrop noted (page 3) that he conducted extensive mental status examination

which was entirely within normal limits and that there were no significant findings at that time. He noted that Dr. Kyros had never had any other legal problems: no arrests, no civil judgments, and no malpractice suits.

Dr. Harrop found no evidence of psychiatric disorder (page 4) and concluded Dr. Kryos was "fit-for-duty" to have his license returned unrestricted at the present to be able to resume his practice.

The Physicians Health Committee reviewed Dr. Harrop's evaluation and stated the psychiatric symptoms that lead to Dr. Kryos seeking treatment (due to the trauma and depression has led him fear losing his livelihood and reputation permanently) have abated. *See* Exhibit F, attached hereto. The Physicians Health Committee further stated that both Dr. Jacob's and Dr. Harrop have concluded that Dr. Kyros is no longer impaired medically or psychologically and that "we have no reason to doubt this conclusion." *Id.*

Then again, in November of 2015, Dr. Harrop issued another letter, reaffirming his previous evaluation, and indicating that Dr. Kyros was "fit for duty to have his medical license returned unrestricted…" *See* Exhibit G, attached hereto.

As you can imagine, these past several years have been traumatic to say the least. Notwithstanding the clinical evaluation cited herein which indicate that Dr. Kyros should be permitted to return to practice on an unrestricted basis, Dr. Kyros will voluntarily make available an assistant transcriber with him during consultations with patients to ensure that there is absolutely no doubt that his actions are professional. It is his belief and desire that this will allow Dr. Kyros, during his final years of practice, to restore his reputation as a consummate professional who has assisted and improved the lives of many throughout the years of his commitment to serve those in need. With that said, Dr. Kyros respectfully requests that this Board approve the proposed Consent Order attached hereto as Exhibit B. Moreover, Dr. Kyros respectfully requests a meeting with the Board to further demonstrate his fitness to return to practice. In the event the Board is not inclined to approve the Consent Order as proposed, we will of course welcome the Board's input on what it believes to be an acceptable form of order. Should you have any questions or wish to discuss the details of the proposed Consent Order in further detail, please do not hesitate to contact me at our office.

Respectfully,

Michael A. Kelly, Esq.

Jackson C. Parmenter, Esq.

Enclosures (see attached)

3

# EXHIBIT P



Department of Health

Three Capitol Hill
Providence, RI 02908-5097

TTY: 711

www.health.ri.gov

February 2, 2017

Michael Kelly, Esq.
Kelly & Mancini, PC
# 300
128 Dorrance Street
Providence, RI 02903

Dear Mr. Kelly:

A letter and Reinstatement Application was sent to Dr. Kyros. In order for the Committee to further consider Dr. Kyros' request for reinstatement of licensure, we need a completed application and the required supporting documents.

Sincerely,

Lauren Lasso
Administrative Officer
RI Board of Medical Licensure and Discipline
Room 205
Three Capitol Hill
Providence RI 02908

# EXHIBIT Q



**KELLY & MANCINI PC**
**ATTORNEYS AT LAW**

*Attorneys and Counselors at Law*

March 23, 2017

**VIA FIRST-CLASS MAIL**
Board of Medical Licensure & Discipline
Department of Health
Three Capitol Hill
Providence, RI 02908

    **Re:** *Dr. William Kyros - File #: C08-250 & C09-252*

Dear Members of the Board:

   Enclosed herein please find Dr. William Kyros' Reinstatement Application and a check in the amount of $170.00 for the fee associated with same. Also enclosed herein, please find a copy of Dr. Kyros' Controlled Substance Registration Certificate and a check in the amount of $200.00 for the registration fee.

   Should you have any questions, please do not hesitate to contact our office.

Sincerely,

Jackson C. Parmenter

Enclosures

cc:  Steven Morris, Esq. (via e-mail)
   James McDonald (via e-mail)

128 Dorrance Street • Suite 300 • Providence • Rhode Island 02903
Tel: 401-490-7334 • Fax: 401-490-7874
www.kellymancini.com



# Medical License - Controlled Substance and Physician Profile



 **Reinstatement**
(Lapsed to Active Status)

*William P. Kyros, M.D.*
**Applicant Name**

*MD06880*
**License Number**

Rules and Regulations governing the Practice of Medicine can be obtained at the following web site:
http://www.health.ri.gov/hsr/bmld/regulations.php

Rules and General Laws pertaining to the Practice of Medicine can be obtained at the following web site:

Medical Licensure                http://www.rilin.state.us/statutes/title5/5-37/index.htm

Controlled Substance Act        http://rilin.state.ri.us/statutes/title21/21/index.htm

I have read and understand the Rhode Island General Laws and Regulations that pertain directly to the practice of medicine and board related activities.

Specifically, Rhode Island Board of Medical Licensure and Discipline (Chapter 5-37), the uniformed Controlled Substance Act (21-28), Rules and Regulations pertaining to the licensure and discipline of physicians (R5-37-MD/DO).

*William P. Kyros, M.D.*
**Signature**

3|23|2017
**Date**

## INSTRUCTIONS

- Please answer all questions. Do not leave blanks. Incomplete forms will be returned to you and your license/permit will not be renewed. Please use a ballpoint pen.

- Reinstatement of a Lapsed License is at the discretion of the Department of Health and subject to Query Reports from applicable data banks.

- Please send <u>one</u> check/money order and make it payable to "General Treasurer, State of Rhode Island". Do not send cash.

- Please forward the form, fee and the additional required documentation to the Department of Health, Board of Medical Licensure and Discipline, Room 205, Three Capitol Hill, Providence, RI 02908-5097.

- If you have any questions concerning this application, call Lauren Lasso at the Board of Medical Licensure and Discipline at (401) 222-3855.

- Licensure application materials are public records as mandated by Rhode Island law and may be made available to the public, unless otherwise prohibited by State or Federal law.

- Special Notice about Malpractice Information: Pursuant to RIGL 5-37-9.2, the RI Board of Medical Licensure and Discipline must collect data regarding your medical malpractice history. You are required to report to the Board all actual settlement or jury verdict payout amounts within the past 10 years. The Board will <u>not</u> make actual settlement or verdict payout amounts available to the public. The Board must report the fact that a payment was made and how it compares with other payments made in your specialty. For each incident that you report, you must include documentation that verifies the date, place reason and disposition of the matter.

| Reinstatement Requirements: | You must submit the following:<br>1. Chronology of Professional Activities during Lapsed Status (accounting for each month)<br><br>2. Listing of Continuing Medical Education for the Preceding three (3) years<br><br>3. Submit a "self-query" of the National Practitioner Data Bank (NPDB). The application is a Practitioner Request for Information Disclosure, which can be obtained by calling the NPDB, or downloading it from the NPDB web site.<br><br>    Phone Number for NPDB Information:   1-800-767-6732<br>    NPDB web site:             www.npdb-hipdb.hrsa.gov<br><br>You must mail this completed form directly to the NPDB. When you receive a response, send the Board the ORGINIAL.<br><br>4. License Fees:<br>    Active License Fee: $1090.00<br><br>    Lapsed Fee      $ 170.00<br><br>    Controlled Substance Registration (If Applicable)  $200.00 |
|---|---|
| Controlled Substance Registration | If you are reinstating your RI Controlled Substance Registration you must ADD an additional $200.00 to the license fee. For your information, in order to prescribe, administer and dispense Controlled Substances in this State, you are required to hold three items: (1) an active RI practice license (2) an active RI CSR and (3) an active Federal Drug Enforcement Administration (DEA) Permit. If you need to renew your DEA Permit or obtain one for the first time, call the DEA office in Boston at (617) 557-2100. If you are denied a DEA Permit, your RI CSR will be voided. If you need to apply for a RI CSR for the first time, please contact Lauren Lasso at (401) 222-3855. If your transferring from another state, you need to contact DEA to transfer to Rhode Island<br><br>Are you reinstating your RI Controlled Substance Registration (CSR)?  ☒Yes  ☐No<br>If "YES", provide Federal DEA #: BK 13.5 1270    Please attach copy of DEA Certificate<br><br>NOTE:  IN ORDER FOR YOU TO BE ISSUED THE RI CSR – YOU MUST HAVE A RI BUSINESS ADDRESS |

KYROS, WILLIAM P MD
7 BRADFORD ST #2
BARRINGTON, RI  02806-0000-000

---

| DEA REGISTRATION NUMBER | THIS REGISTRATION EXPIRES | FEE PAID |
|---|---|---|
| BK1351270 | 12-31-2011 | FEE PAID |

| SCHEDULES | BUSINESS ACTIVITY | ISSUE DATE |
|---|---|---|
| 2,2N, 3,3N,4,5, | PRACTITIONER | 02-11-2009 |

KYROS, WILLIAM P MD
181 CENTERVILLE RD
WARWICK, RI  02886-0000

**CONTROLLED SUBSTANCE REGISTRATION CERTIFICATE**
UNITED STATES DEPARTMENT OF JUSTICE
DRUG ENFORCEMENT ADMINISTRATION
WASHINGTON D.C. 20537

Sections 304 and 1008 (21 USC 824 and 958) of the Controlled Substances Act of 1970, as amended, provide that the Attorney General may revoke or suspend a registration to manufacture, distribute, dispense, import or export a controlled substance.

THIS CERTIFICATE IS NOT TRANSFERABLE ON CHANGE OF OWNERSHIP, CONTROL, LOCATION, OR BUSINESS ACTIVITY, AND IT IS NOT VALID AFTER THE EXPIRATION DATE.

---

**CONTROLLED SUBSTANCE REGISTRATION CERTIFICATE**
UNITED STATES DEPARTMENT OF JUSTICE
DRUG ENFORCEMENT ADMINISTRATION
WASHINGTON D.C. 20537

| DEA REGISTRATION NUMBER | THIS REGISTRATION EXPIRES | FEE PAID |
|---|---|---|
| BK1351270 2,2N, | 12-31-2011 | FEE PAID |

| SCHEDULES | BUSINESS ACTIVITY | ISSUE DATE |
|---|---|---|
| 2,2N, 3,3N,4,5, | PRACTITIONER | 02-11-2009 |

KYROS, WILLIAM P MD
181 CENTERVILLE RD
WARWICK, RI  02886-0000

Sections 304 and 1008 (21 USC 824 and 958) of the Controlled Substances Act of 1970, as amended, provide that the Attorney General may revoke or suspend a registration to manufacture, distribute, dispense, import or export a controlled substance.

Form DEA-223 (4/07)

THIS CERTIFICATE IS NOT TRANSFERABLE ON CHANGE OF OWNERSHIP, CONTROL, LOCATION, OR BUSINESS ACTIVITY, AND IT IS NOT VALID AFTER THE EXPIRATION DATE.

**State of Rhode Island and Providence Plantations**
**Department of Health**
**Board of Medical Licensure and Discipline**

| | |
|---|---|
| **Name:**<br><br>This is the name that will be printed on your License and reported to those that inquire about your License.<br><br>Do not use nicknames, etc. | Name: _William_  _Peter_  _KYROS_<br>       First        Middle        Last |
| **Social Security Number:** | _031 - 42 - 7825_ |
| **Gender:** | ☒ Male    ☐ Female |
| **Date and Place of Birth:** | Date _01_ , _01_ , _1954_  Place _Long Branch_ , _NJ_<br>                                      City        State |
| **Residence Information:**<br><br>It is your responsibility to keep the Department apprised of all address and phone number changes.<br><br>(Not published on the HEALTH web site). | Address _5285 Umbrella Pool Road_<br>City _Sanibel,_           State _FL_<br>Zip Code _33957_<br>Phone: _401-286-4766_<br>Fax: __<br>Email Address: _wpkmd26@cox.net_ |
| **Mailing Address**<br>**Business/Employment Information:**<br><br>Please provide the employment information related to this license. Include Name of Business/Employer (ie. Memorial Hospital)<br><br>(Published on the HEALTH web site). | Address _15 A Riverview Avenue_<br>City _Mashpee,_           State _MA_<br>Zip Code _02649_<br>Phone: __<br>Fax: __<br>Email Address: __ |
| **Preferred Mailing Address:**<br><br>Please check ONE | ☐ Residence Address<br>☒ **Mailing Address**<br>   Business/Employment Address         For HEALTH and Public Mailings |
| **Specialty and Board Certification:**<br><br>(Use attached ABMS or AOA Code List) | Code of Primary Specialty in discipline currently practicing. _P_<br>Date of Certification: _03_ , _2004_ | Code of Secondary Specialty: _CAP_<br>Date of Certification: _∅_ , __ |

| Active Practice Information: | Are you engaged in Active practice in Rhode Island? ☐ Yes ☒ No<br><br>Total Years of Active Practice (all states) since Medical School: 🔳🔳 |
|---|---|

## Disciplinary Actions

| Board Disciplinary Actions:<br><br>(H) | Have you had any final disciplinary actions by licensing boards in other states within the most recent ten (10) years?<br><br>☐ Yes (documentation is attached)  .  ☒ No |
|---|---|
| Hospital Discipline:<br><br>(I) | Have your hospital privileges in any state ever been revoked or restricted for reasons related to competence or quality of patient care and taken by the hospital's governing body or any other official of the hospital after procedural due process has been afforded?  Also, did you resign from or were you denied renewal of medical staff privileges or were they restricted at a hospital during the course of an investigation?  Only cases within the most recent ten (10) years shall be reported.<br><br>☐ Yes (documentation is attached)  ☒ No |
| Criminal Convictions:<br><br>(J) | Have you had any criminal convictions for felonies in any state within the most recent ten (10) years?  For the purpose of this section, you are deemed to have been convicted of a crime if you pled guilty or were found or adjudged guilty by a court of competent jurisdiction or if you had entered a plea of nolo contendere in any state.<br><br>☐ Yes  (documentation is attached)  ☒ No |

| Malpractice Information:<br><br>• See Special Notice on Instruction Page<br><br>(K) | Were any of the following actions taken against you in any state within the past ten (10) years?<br><br>1.  Medical Malpractice Judgments in which payment was awarded to a complaining party<br>2.  Medical Malpractice Arbitration Awards in which payment was made to a complaining party<br>3.  Settlement of Malpractice Claims in which payment was awarded to a complaining party<br><br>☐ Yes (if "Yes", complete below)  ☒ No |
|---|---|

| | Amount Paid | Date of Payment |
|---|---|---|
| Monetary Award #1 | _____ | _____ |
| Monetary Award #2 | _____ | _____ |
| Monetary Award #3 | _____ | _____ |
| Monetary Award #4 | _____ | _____ |
| Monetary Award #5 | | |

| Medical School Faculty Appointments Within the Past Ten (10) Years: | ⊖ _____<br>_____<br>_____<br>_____<br>Do you have Graduate Medical Education Responsibility? ☐ Yes ☒ No |
|---|---|
| Other State License(s):<br>Please answer the question and list state(s), if applicable. | Have you ever held, or do you currently hold, a license in another state? (Y/N) ☒ Yes ☐ No<br>State: 🔳N🔳Y  🔳N🔳J  🔳🔳  🔳🔳  🔳🔳  🔳🔳  🔳🔳 |
| Current Hospital Privileges in RI:<br><br>If yes, check all that apply. | Do you have hospital privileges in Rhode Island? (Y/N)  ☐ Yes ☒ No |

| | | |
|---|---|---|
| ☐ Bradley Hospital | ☐ Butler Hospital | ☐ Eleanor Slater Hospital |
| ☐ Kent County Hospital | ☐ Landmark Medical Center | ☐ Memorial Hospital of RI |
| ☐ Miriam Hospital | ☐ Newport Hospital | ☐ Rhode Island Hospital/Hasbro |
| ☐ Roger Williams Hospital | ☐ St. Joseph Hospital | ☐ South County Hospital |
| ☐ Westerly Hospital | ☐ Women & Infants Hospital | |

| Postgraduate Training:

Please list the Hospital Name, Location and Number of Years of Training | *Metropolitan Hospital*                    *New York, NY* |
|---|---|

Hospital Name                                            City, State

_____
Hospital Name                                            City, State

_____
Hospital Name                                            City, State

Total Number of Years of Training   [05] (Five)

---

**Translation Services:**

Identify any translation services that may be available at your primary practice location.

☐ Language Services Provided By Hospital    ☐ Services Provided by Private Contractor    ☒ None

☐ Language(s) Spoken by Physician and/or Staff:
_____

---

**(Optional)**

**Practice Information**

On average, number of hours worked per week (all activities):   [ ][ ][ ]

Allocate hours, as appropriate (total should equal the number provided above)

[ ][ ]  Patient Care

[ ][ ]  Teaching/Medical Education

[ ][ ]  Research

[ ][ ]  Administration

[ ][ ]  Other (please describe)_____

Percentage of Time Spent in Primary Care:   [ ][ ]

Allocation of Time Spent in Patient Care Activities Across the Following Settings (total should equal 100%)

[ ][ ][ ]  Office-Based

[ ][ ][ ]  Hospital-Based

[ ][ ][ ]  Other Outpatient Setting (eg, surgi-center, diagnostic center)

On average, number of hours per week available for office-based patient appointments:   [ ][ ]

On average, number of patients seen per day:   [ ][ ]

In office-based settings, on average, number of minutes spent with each patient:   [ ][ ]

Do you accept new patients?  (Y/N)    ☐ Yes    ☐ No

Are you accepting Medicare patients?  (Y/N)    ☐ Yes    ☐ No

Are you accepting Medicaid patients?  (Y/N)    ☐ Yes    ☐ No

---

**(Optional)**

**Physician Honors & Peer-Reviewed Publications -- Limit to 5**

*Please Do Not Submit CV*

Please list any information regarding publications in peer-reviewed medical literature or professional or community service awards within the most recent (10) years.

| Awards, Honors | Publications |
|---|---|
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |

| (Optional) | Please list any Professional and Community Service Awards: |
|---|---|
| **Professional and Community Service Awards – Limit to 5**<br><br>*Please Do Not Submit CV* | |

| Affidavit of Applicant:<br><br>Read, sign and date this Affidavit. | **AFFIDAVIT AND SIGNATURE**<br><br>I have read carefully the questions in the foregoing application and have answered them completely, without reservations of any kind, and I declare under penalty of perjury that my answers and all statements made by me herein are true and correct. Should I furnish any false information in this application, I hereby agree that such act shall constitute cause for denial, suspension or revocation of my License in the State of Rhode Island.<br><br>I understand that this is a continuing application and that I have an affirmative duty to inform the Rhode Island Department of Health of any change in the answers to these questions after this application and this Affidavit is signed.<br><br>*William P. Kyro, MD*        3\|23\|2017<br>Signature of Applicant          Date of Signature |



# Rhode Island Department of Health
## 3 Capitol Hill, Providence RI, 02908-5097
## MANDATORY ADDENDUM TO LICENSE APPLICATION
### Tax Payer Status Affidavit / Identity Verification

All persons applying or renewing any license, registration, permit or other authority (herein after called "licensee") to conduct a business or occupation in the state of Rhode Island are required to file all applicable tax returns and pay all taxes owed to the state prior to receiving a license as mandated by state law (RIGL 5-76) except as noted below.

In order to verify that the state is not owed taxes, licensees are required to provide their Social Security Number, or Federal Tax Identification Number (for businesses) as appropriate. These numbers will be transmitted to the Division of Taxation to verify tax status prior to the issuance of a license.

---

## Licensee Declaration

☒ I hereby declare, under penalty of perjury, that I have filed all required state tax returns and have paid all taxes owed.

☐ I have entered a written installment agreement to pay delinquent taxes that is satisfactory to the Tax Administrator.

☐ I am currently pursuing administrative review of taxes owed to the state.

☐ I am in federal bankruptcy. (Case # _____)

☐ I am in state receivership. (Case # _____)

☐ I have been discharged from Bankruptcy.
(Case # _____)

_Allopathic  Physician  (MD)_
Type of Professional/Business License for which you are applying

_William P. Kyros, M.D_
Full Name (Please Print or Type)

_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_
Social Security Number (or FEIN for Business)

_William P. Kyros, MD._
Signature

_401-286-4766_
Phone Number (including area code if not 401)

_3 | 23 | 2017_
Date

_____
Name of Business (If Applicable)

*This form must be completed, signed and attached to your license application for processing.*

RHODE ISLAND UNIFORM CONTROLLED
SUBSTANCES ACT REGISTRATION (CSR)

☐ NEW APPLICATION
☐ CHANGE OF OWNERSHIP
☐ CHANGE OF LOCATION

** FOR OFFICE USE ONLY **

RECEIPT #

ID#

ISSUE DATE

LICENSE #

1) PLEASE TYPE OR PRINT IN UPPERCASE
2) DO NOT SEND CASH - MAIL CHECK OR MONEY ORDER, PAYABLE TO: RI GENERAL TREASURER
3) PRACTITIONER FEE - $200.00 - FACILITY FEE $100.00
4) RETURN ENTIRE APPLICATION TO:     RI BOARD OF PHARMACY
                                      ROOM 105
                                      3 CAPITOL HILL
                                      PROVIDENCE, RI 02908-5097

REGISTRANT NAME AND BUSINESS LOCATION ONLY:

FULL NAME  William Peter Kyros

BUSINESS ADDRESS  15A Riverview Ave, Mashpee, MA 02649

TELEPHONE NUMBER  401-286-4766     CURRENT STATE LICENSE OR CERTIFICATION NUMBER  MD06880

E-MAIL ADDRESS - (THIS WILL BE USED FOR REGISTRATION TO THE RHODE ISLAND PRESCRIPTION MONITORING PROGRAM)

Complete the following information to apply for a registration to prescribe, dispense, store or ship controlled substances in or into the State of Rhode Island. A CSR is not required if there will be no controlled substances prescriptions prescribed, dispensed, stored or shipped in or into this state. The CSR is renewed at the same time as the professional or facility license is renewed. NOTE: Please read important information on the next page.

REGISTRATION CLASSIFICATION:
BUSINESS ACTIVITY (CHECK ONE ONLY):

A.☐ COMMUNITY PHARMACY   B.☒ PRACTITIONER   C.☐ MANUFACTURER/DISTRIBUTOR   D.☐ RESEARCHER
E.☐ MEDICAL INSTITUTION/CLINIC   F.☐ TEACHING INSTITUTION   G.☐ NTP PROGRAM   H.☐ ANALYTICAL LAB

DRUG SCHEDULE - Check all that apply (Non-practitioners only)

1.☐ SCHEDULE I
    *Attach Protocol*   2.☐ SCHEDULE II   3.☐ SCHEDULE III   4.☐ SCHEDULE IV   5.☐ SCHEDULE V

DRUG ENFORCEMENT ADMINISTRATION (DEA) REGISTRATION
Provide DEA number if one has been issued, or check "pending" if an application is being made for the DEA Registration. A copy of the DEA Registration must be provided to the BOARD within 90 days of its issuance by the DEA.

DEA NUMBER                                    ☒ PENDING

ALL APPLICANTS MUST ANSWER THE FOLLOWING:

A    Has the applicant been convicted of, or entered a plea of nolo contendere to a violation of any state or federal law relating to manufacturing, distributing, possessing, prescribing, administering or dispensing of drugs presently defined as controlled substances under Chapter 21-28, General Laws of Rhode Island?   ☐ Yes  ☒ No

B    Has the registration application or registration of the applicant, corporation, firm, partner, or officer of the applicant been surrendered, revoked, suspended or denied under any law of the United States or of any state relating to drugs presently defined as controlled substances under Chapter 21-28 of the General Laws of Rhode Island, or is such action pending?   ☐ Yes  ☒ No

IF "A" OR "B" IS ANSWERED IN THE AFFIRMATIVE, ATTACH LETTER SETTING FORTH CIRCUMSTANCES

William P. Kyros, MD

DATE         SIGNATURE OR APPLICANT OR AUTHORIZED INDIVIDUAL                OFFICIAL TITLE

PLEASE KEEP FOR YOUR RECORDS:

### IMPORTANT INFORMATION

Licensed drug facilities and licensed practitioners with prescriptive privileges cannot dispense, possess, store or ship controlled substances in or into the State of Rhode Island without a valid drug facility or professional license, Rhode Island Controlled Substances Registration (CSR), and a federal Drug Enforcement Administration (DEA) Registration. Practitioners may only dispense, possess, and store controlled substances within their particular "scope of practice". "Controlled Substances", for purposes of this application, means a prescription drug in Schedules II through V, pursuant to the Rhode Island Uniform Controlled Substances Act, and 21 CFR 1300 of the Federal Code of Regulations. Schedule I drugs are used by researchers, and require the submission of a protocol.

Without a Rhode Island CSR and federal DEA Registration, licensed drug facilities and practitioners with prescriptive privileges may dispense or possess non=controlled prescription medications under its facility or professional license. A CSR will not be granted to an applicant whose BOARD licensure application is "pending" in this state.

A Rhode Island Controlled Substances Registration must be obtained prior to applying for the DEA Registration. Federal regulations require that applicants comply with individual state requirements prior to issuance of a DEA Registration. Once the CSR is issued, applicants must apply to the US Drug Enforcement Administration for a federal registration using that agency's DEA Form 224 (New application for Retail Pharmacy, Hospital/Clinic, Practitioner, Teaching Institution, or Mid-Level Practitioner). Applicants may apply online for the DEA Registration at the following web site:

www.deadiversion.usdoj.gov/drugreg/reg_apps/index.html

or by contacting the Drug Enforcement Administration at the following location:

Registration Unit
US Drug Enforcement Administration
JFK Federal Building
15 New Sudbury Street
Boston, MA 02203-0131
1-888-272-5174

Call the Drug Enforcement Administration to check on the status of a pending DEA Registration. *A copy of the DEA Registration must be provided to the BOARD within 60 days of its issuance by the DEA.*

---

**PLEASE NOTE:** Prescriptions in Schedules III, IV, and V cannot be written for more than one hundred (100) dosage units. A "dosage unit" is defined as a single capsule, tablet or suppository, or not more than one (1) teaspoon or an oral liquid. Prescriptions in Schedule II may be written for up to a 30-day supply, with a maximum of two hundred fifty (250) dosage units, as determined by the prescriber's directions for us of the medication.

The Rhode Island Uniform Controlled Substances Act can be accessed at the following website:

http://www.rilin.state.ri.us/Statutes/Title21/21-28/index.htm

---

### *** Rhode Island Prescription Monitoring Program - (RIPMP) ***

The RIPMP is a database that allows you to view patient's prescription history prior to your writing a prescription for them.

Once your RI Controlled Substances Registration is issued we will email a user id and temporary password to the email address that you provided on the CSR form. RI Law requires that all prescribers of controlled substances be registered with the RIPMP. It is important to make sure your email address is current with the Department.

It is the Department's expectation that you utilize this valuable tool that not only protects you as a prescriber but more importantly protects your patients.

Please visit our website for more information about the program and expectations.

http://www.health.ri.gov/programs/prescriptionmonitoring/

# EXHIBIT R



Department of Health

Three Capitol Hill
Providence, RI 02908-5097

TTY: 711
www.health.ri.gov

March 29, 2017

Suite 300
128 Dorrance Street
Providence RI 02903

    **RE: *Dr Willian Kyros – File #: C08-250 & C09-252***

Dear Dr Kyros:

The Board of Medical Licensure and Discipline received your Reinstatement application on March 27, 2017. We are returning your application due to the following: **incomplete fee and application.**

Your medical license is currently inactive. You do not need to pay a lapsed fee. The Reactivation fee includes the full medical license fee ($1090), and controlled substance registration fee ($200.00 - if applicable).

In addition to the above fees, please submit the required supplemental documents. You must provide a chronology of professional activities during lapsed status (2014 to present), list of Continuing Medical Education for the preceding 3 years, and a self-query from the National Practitioner Data Bank (NPDB).

    Should you have any questions, please do not hesitate to contact our Board.

Best Regards,

Angela Phengsavatdy
RI Board of Medical Licensure and Discipline
P (401) 222-3855 • F (401) 222-2158

# EXHIBIT S



**KELLY & MANCINI PC**
**ATTORNEYS AT LAW**

Attorneys and Counselors at Law

April 13, 2017

**VIA FIRST-CLASS MAIL**
Board of Medical Licensure & Discipline
Department of Health
Three Capitol Hill
Providence, RI 02908

　　　　　Re:　　*Dr. William Kyros - File #: C08-250 & C09-252*

Dear Members of the Board:

　　　　　Enclosed herein please find a copy of the following:

- Dr. William Kyros' Reinstatement Application;
- Check No. 1419 in the amount of $1,090.00;
- Continuing Medical Education Listing and Certificates of Completion. (Note that this also constitutes the requested Chronology of all Dr. Kyros' professional activities over the last three (3) years.);
- Self-Query from the NPDB;
- Controlled Substance Registration Certificate; and
- Check No. 1407 in the amount of $200.00.

　　　　　Should you have any questions, please do not hesitate to contact our office.

Sincerely,

Jackson C. Parmenter

Enclosures

cc:　　Steven Morris, Esq. (via e-mail)
　　　　James McDonald (via e-mail)

## RI Department of Health

# Medical License - Controlled Substance and Physician Profile



☒ **Reinstatement**
(Lapsed to Active Status)

_William P. Kyros, m.D._
**Applicant Name**

_MD06880_
**License Number**

Rules and Regulations governing the Practice of Medicine can be obtained at the following web site:
http://www.health.ri.gov/hsr/bmld/regulations.php

Rules and General Laws pertaining to the Practice of Medicine can be obtained at the following web site:

Medical Licensure          http://www.rilin.state.us/statutes/title5/5-37/index.htm

Controlled Substance Act   http://rilin.state.ri.us/statutes/title21/21/index.htm

**I have read and understand the Rhode Island General Laws and Regulations that pertain directly to the practice of medicine and board related activities.**

Specifically, Rhode Island Board of Medical Licensure and Discipline (Chapter 5-37), the uniformed Controlled Substance Act (21-28), Rules and Regulations pertaining to the licensure and discipline of physicians (R5-37-MD/DO).

_William P. Kyros, mD._
**Signature**                                          
                                                        **Date**

## INSTRUCTIONS

- Please answer all questions.  Do not leave blanks.  Incomplete forms will be returned to you and your license/permit will not be renewed.  Please use a ballpoint pen.

- Reinstatement of a Lapsed License is at the discretion of the Department of Health and subject to Query Reports from applicable data banks.

- Please send one check/money order and make it payable to "General Treasurer, State of Rhode Island".  Do not send cash.

- Please forward the form, fee and the additional required documentation to the Department of Health, Board of Medical Licensure and Discipline, Room 205, Three Capitol Hill, Providence, RI  02908-5097.

- If you have any questions concerning this application, call Lauren Lasso at the Board of Medical Licensure and Discipline at  (401) 222-3855.

- Licensure application materials are public records as mandated by Rhode Island law and may be made available to the public, unless otherwise prohibited by State or Federal law.

- **Special Notice about Malpractice Information:**  Pursuant to RIGL 5-37-9.2, the RI Board of Medical Licensure and Discipline must collect data regarding your medical malpractice history.  You are required to report to the Board all actual settlement or jury verdict payout amounts within the past 10 years.  The Board will not make actual settlement or verdict payout amounts available to the public.  The Board must report the fact that a payment was made and how it compares with other payments made in your specialty.  For each incident that you report, you must include documentation that verifies the date, place reason and disposition of the matter.

| | |
|---|---|
| **Reinstatement Requirements:** | **You must submit the following:**<br>1. Chronology of Professional Activities during Lapsed Status (accounting for each month)<br><br>2. Listing of Continuing Medical Education for the Preceding three (3) years<br><br>3. Submit a "self-query" of the National Practitioner Data Bank (NPDB). The application is a Practitioner Request for Information Disclosure, which can be obtained by calling the NPDB, or downloading it from the NPDB web site.<br><br>   Phone Number for NPDB Information:   1-800-767-6732<br>   NPDB web site:                                   www.npdb-hipdb.hrsa.gov<br><br>You must mail this completed form directly to the NPDB. When you receive a response, send the Board the ORIGINAL.<br><br>4. License Fees:<br>   **Active License Fee: $1090.00**<br><br>   **Lapsed Fee          $ 170.00**<br><br>   **Controlled Substance Registration (If Applicable)   $200.00** |
| **Controlled Substance Registration** | If you are reinstating your RI Controlled Substance Registration you must ADD an additional $200.00 to the license fee.  For your information, in order to prescribe, administer and dispense Controlled Substances in this State, you are required to hold three items: (1) an active RI practice license (2) an active RI CSR and (3) an active Federal Drug Enforcement Administration (DEA) Permit.  If you need to renew your DEA Permit or obtain one for the first time, call the DEA office in Boston at (617) 557-2100.  If you are denied a DEA Permit, your RI CSR will be voided.  If you need to apply for a RI CSR for the first time, please contact Lauren Lasso at (401) 222-3855.  If your transferring from another state, you need to contact DEA to transfer to Rhode Island<br><br>Are you reinstating your RI Controlled Substance Registration (CSR)?   ☐Yes      ☐No<br>If "YES", provide Federal DEA #:_____   Please attach copy of DEA Certificate<br><br>**NOTE:  IN ORDER FOR YOU TO BE ISSUED THE RI CSR – YOU MUST HAVE A RI BUSINESS ADDRESS** |

**State of Rhode Island and Providence Plantations**
**Department of Health**
**Board of Medical Licensure and Discipline**

| | |
|---|---|
| **Name:**<br><br>This is the name that will be printed on your License and reported to those that inquire about your License.<br><br>Do not use nicknames, etc. | Name: William    Peter    KYROS<br>First          Middle          Last |
| **Social Security Number:** | 031 — 42 — 7825 |
| **Gender:** | ☒ Male    ☐ Female |
| **Date and Place of Birth:** | Date 01 , 01 , 1954   Place Long Branch,   NJ<br>City          State |
| **Residence Information:**<br><br>It is your responsibility to keep the Department apprised of all address and phone number changes.<br><br>(Not published on the HEALTH web site). | Address 5285  Umbrella  Pool  Road<br>City Sanibel,              State FL<br>Zip Code 33957<br>Phone: 401-286-4766<br>Fax: ~<br>Email Address: wpkmd26@cox.net |
| **Mailing Address**<br>**Business/Employment Information:**<br><br>Please provide the employment information related to this license. Include Name of Business/Employer (ie. Memorial Hospital)<br><br>(Published on the HEALTH web site). | Address 15 A Riverview  Avenue<br>City Mashpee,              State MA<br>Zip Code 02649<br>Phone:<br>Fax:<br>Email Address: |
| **Preferred Mailing Address:**<br><br>Please check ONE | ☐ Residence Address<br>☒ Mailing Address<br>Business/Employment Address          For HEALTH and Public Mailings |
| **Specialty and Board Certification:**<br><br>(Use attached ABMS or AOA Code List) | Code of Primary Specialty in discipline currently practicing: P       Code of Secondary Specialty: CAP<br>Date of Certification: 03 , 2004       ~~Date of Certification:~~ |

| **Active Practice Information:** | Are you engaged in Active practice in Rhode Island?  ☐ Yes  ☒ No |
|---|---|
| | Total Years of Active Practice (all states) since Medical School  ☐ a☐ 0 |

## Disciplinary Actions

| **Board Disciplinary Actions:** (H) | Have you had any final disciplinary actions by licensing boards in other states within the most recent ten (10) years?  ☐ Yes (documentation is attached)  ☒ No |
|---|---|
| **Hospital Discipline:** (I) | Have your hospital privileges in any state ever been revoked or restricted for reasons related to competence or quality of patient care and taken by the hospital's governing body or any other official of the hospital after procedural due process has been afforded?  Also, did you resign from or were you denied renewal of medical staff privileges or were they restricted at a hospital during the course of an investigation?  Only cases within the most recent ten (10) years shall be reported.  ☐ Yes (documentation is attached)  ☒ No |
| **Criminal Convictions:** (J) | Have you had any criminal convictions for felonies in any state within the most recent ten (10) years?  For the purpose of this section, you are deemed to have been convicted of a crime if you pled guilty or were found or adjudged guilty by a court of competent jurisdiction or if you had entered a plea of nolo contendere in any state.  ☐ Yes (documentation is attached)  ☒ No |
| **Malpractice Information:** • See Special Notice on Instruction Page (K) | Were any of the following actions taken against you in any state within the past ten (10) years?  1. Medical Malpractice Judgments in which payment was awarded to a complaining party  2. Medical Malpractice Arbitration Awards in which payment was made to a complaining party  3. Settlement of Malpractice Claims in which payment was awarded to a complaining party  ☐ Yes (if "Yes", complete below)  ☒ No |

|  | Amount Paid | Date of Payment |
|---|---|---|
| Monetary Award #1 | _____ | _____ |
| Monetary Award #2 | _____ | _____ |
| Monetary Award #3 | _____ | _____ |
| Monetary Award #4 | _____ | _____ |
| Monetary Award #5 | _____ | _____ |

| **Medical School Faculty Appointments Within the Past Ten (10) Years:** | Ø _____  _____  _____  Do you have Graduate Medical Education Responsibility?  ☐ Yes  ☒ No |
|---|---|
| **Other State Licenses(s):** Please answer the question and list state(s), if applicable. | Have you ever held, or do you currently hold, a license in another state? (Y/N)  ☒ Yes  ☐ No  State: N Y  N J  ☐☐ ☐☐ ☐☐ ☐☐ ☐☐ |
| **Current Hospital Privileges in RI:** If yes, check all that apply. | Do you have hospital privileges in Rhode Island? (Y/N)  ☐ Yes  ☒ No  ☐ Bradley Hospital  ☐ Butler Hospital  ☐ Eleanor Slater Hospital  ☐ Kent County Hospital  ☐ Landmark Medical Center  ☐ Memorial Hospital of RI  ☐ Miriam Hospital  ☐ Newport Hospital  ☐ Rhode Island Hospital/Hasbro  ☐ Roger Williams Hospital  ☐ St. Joseph Hospital  ☐ South County Hospital  ☐ Westerly Hospital  ☐ Women & Infants Hospital |

| **Postgraduate Training:** | Metropolitan Hospital |  | New York, NY |
|---|---|---|---|
| Please list the Hospital Name, Location and Number of Years of Training | Hospital Name | | City, State |
| | Hospital Name | | City, State |
| | Hospital Name | | City, State |

Total Number of Years of Training  ☒ (Five)

---

**Translation Services:**

Identify any translation services that may be available at your primary practice location.

☐ Language Services Provided By Hospital   ☐ Services Provided by Private Contractor   ☒ None

☐ Language(s) Spoken by Physician and/or Staff: _____

---

**(Optional)**

**Practice Information**

On average, number of hours worked per week (all activities): ☐☐ ☐☐

Allocate hours, as appropriate (total should equal the number provided above)

☐☐ Patient Care

☐☐ Teaching/Medical Education

☐☐ Research

☐☐ Administration

☐☐ Other (please describe) _____

Percentage of Time Spent in Primary Care: ☐☐

Allocation of Time Spent in Patient Care Activities Across the Following Settings (total should equal 100%)

☐☐☐ Office-Based

☐☐☐ Hospital-Based

☐☐☐ Other Outpatient Setting (eg, surgi-center, diagnostic center)

On average, number of hours per week available for office-based patient appointments: ☐☐

On average, number of patients seen per day: ☐☐

In office-based settings, on average, number of minutes spent with each patient: ☐☐

Do you accept new patients?  (Y/N)   ☐ Yes   ☐ No

Are you accepting Medicare patients?  (Y/N)   ☐ Yes   ☐ No

Are you accepting Medicaid patients?  (Y/N)   ☐ Yes   ☐ No

---

**(Optional)**

**Physician Honors & Peer-Reviewed Publications - Limit to 5**

**Please Do Not Submit CV**

Please list any information regarding publications in peer-reviewed medical literature or professional or community service awards within the most recent (10) years.

| Awards, Honors | Publications |
|---|---|
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |

| (Optional) | Please list any Professional and Community Service Awards: |
|---|---|
| **Professional and Community Service Awards – Limit to 5**<br><br>*Please Do Not Submit CV* | _____<br>_____<br>_____<br>_____<br>_____ |

| **Affidavit of Applicant:**<br><br>Read, sign and date this Affidavit. | **AFFIDAVIT AND SIGNATURE**<br><br>I have read carefully the questions in the foregoing application and have answered them completely, without reservations of any kind, and I declare under penalty of perjury that my answers and all statements made by me herein are true and correct.  Should I furnish any false information in this application, I hereby agree that such act shall constitute cause for denial, suspension or revocation of my License in the State of Rhode Island.<br><br>I understand that this is a continuing application and that I have an affirmative duty to inform the Rhode Island Department of Health of any change in the answers to these questions after this application and this Affidavit is signed.<br><br>*William P. Kyros, MD*<br>———————————————     ———————————————<br>**Signature of Applicant**          **Date of Signature** |
|  |  |



**Rhode Island Department of Health**

**3 Capitol Hill, Providence RI, 02908-5097**

**MANDATORY ADDENDUM TO LICENSE APPLICATION**

**Tax Payer Status Affidavit / Identity Verification**

All persons applying or renewing any license, registration, permit or other authority (herein after called "licensee") to conduct a business or occupation in the state of Rhode Island are required to file all applicable tax returns and pay all taxes owed to the state prior to receiving a license as mandated by state law (RIGL 5-76) except as noted below.

In order to verify that the state is not owed taxes, licensees are required to provide their Social Security Number, or Federal Tax Identification Number (for businesses) as appropriate. These numbers will be transmitted to the Division of Taxation to verify tax status prior to the issuance of a license.

---

### Licensee Declaration

☒ I hereby declare, under penalty of perjury, that I have filed all required state tax returns and have paid all taxes owed.

☐ I have entered a written installment agreement to pay delinquent taxes that is satisfactory to the Tax Administrator.

☐ I am currently pursuing administrative review of taxes owed to the state.

☐ I am in federal bankruptcy. (Case # _____ )

☐ I am in state receivership. (Case # _____ )

☐ I have been discharged from Bankruptcy.
(Case # _____ )

_Allopathic  Physician  (MD)_
Type of Professional/Business License for which you are applying

_William P. Kyros, M.D_
Full Name (Please Print or Type)

_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_
Social Security Number (or FEIN for Business)

_William P. Kyros, MD._
Signature

_401-286-4766_
Phone Number (including area code if not 401)

_____
Date

_____
Name of Business (If Applicable)

*This form must be completed, signed and attached to your license application for processing.*



**RHODE ISLAND UNIFORM CONTROLLED SUBSTANCES ACT REGISTRATION (CSR)**

☐ NEW APPLICATION

☐ CHANGE OF OWNERSHIP

☐ CHANGE OF LOCATION

```
** FOR OFFICE USE ONLY **
RECEIPT # _____
ID# _____
ISSUE DATE _____
LICENSE # _____
```

| | |
|---|---|
| 1) | PLEASE TYPE OR PRINT IN UPPERCASE |
| 2) | DO NOT SEND CASH - MAIL CHECK OR MONEY ORDER, PAYABLE TO: RI GENERAL TREASURER |
| 3) | PRACTITIONER FEE - $200.00 - FACILITY FEE $100.00 |
| 4) | RETURN ENTIRE APPLICATION TO:   RI BOARD OF PHARMACY |
| | ROOM 103 |
| | 3 CAPITOL HILL |
| | PROVIDENCE, RI 02908-5097 |

**REGISTRANT NAME AND BUSINESS LOCATION ONLY:**

FULL NAME

BUSINESS ADDRESS

TELEPHONE NUMBER                           CURRENT STATE LICENSE OR CERTIFICATION NUMBER

E-MAIL ADDRESS - (THIS WILL BE USED FOR REGISTRATION TO THE RHODE ISLAND PRESCRIPTION MONITORING PROGRAM)

Complete the following information to apply for a registration to prescribe, dispense, store or ship controlled substances in or into the State of Rhode Island. A CSR is not required if there will be no controlled substances prescriptions prescribed, dispensed, stored or shipped in or into this state. The CSR is renewed at the same time as the professional or facility license is renewed.
NOTE: Please read important information on the next page.

**REGISTRATION CLASSIFICATION:**
**BUSINESS ACTIVITY (CHECK ONE ONLY):**

A.☐ COMMUNITY PHARMACY    B.☒ PRACTITIONER    C.☐ MANUFACTURER/DISTRIBUTOR    D.☐ RESEARCHER

E.☐ MEDICAL INSTITUTION/CLINIC    F.☐ TEACHING INSTITUTION    G.☐ NTP PROGRAM    H.☐ ANALYTICAL LAB

**DRUG SCHEDULE - Check all that apply (Non-practitioners only)**

1.☐ SCHEDULE I *Attach Protocol*    2.☐ SCHEDULE II    3.☐ SCHEDULE III    4.☐ SCHEDULE IV    5.☐ SCHEDULE V

**DRUG ENFORCEMENT ADMINISTRATION (DEA) REGISTRATION**

Provide DEA number if one has been issued, or check "pending" if an application is being made for the DEA Registration. A copy of the DEA Registration must be provided to the BOARD within 60 days of its issuance by the DEA.

☒ PENDING

DEA NUMBER

**ALL APPLICANTS MUST ANSWER THE FOLLOWING:**

A    Has the applicant been convicted of, or entered a plea of nolo contendere to a violation of any state or federal law relating to manufacturing, distributing, possessing, prescribing, administering or dispensing of drugs presently defined as controlled substances under Chapter 21-28, General Laws of Rhode Island?   ☐ Yes   ☒ No

B.    Has the registration application or registration of the applicant, corporation, firm, partner, or officer of the applicant been surrendered, revoked, suspended or denied under any law of the United States or of any state relating to drugs presently defined as controlled substances under Chapter 21-28 of the General Laws of Rhode Island, or is such action pending?   ☐ Yes   ☒ No

IF "A" OR "B" IS ANSWERED IN THE AFFIRMATIVE, ATTACH LETTER SETTING FORTH CIRCUMSTANCES

*William P. Kyroo, MD*

DATE                SIGNATURE OR APPLICANT OR AUTHORIZED INDIVIDUAL                OFFICIAL TITLE

PLEASE KEEP FOR YOUR RECORDS:

<u>IMPORTANT INFORMATION</u>

Licensed drug facilities and licensed practitioners with prescriptive privileges cannot dispense, possess, store or ship controlled substances in or into the State of Rhode Island without a valid drug facility or professional license, Rhode Island Controlled Substances Registration (CSR), and a federal Drug Enforcement Administration (DEA) Registration. Practitioners may only dispense, possess, and store controlled substances within their particular "scope of practice". "Controlled Substances", for purposes of this application, means a prescription drug in Schedules II through V, pursuant to the Rhode Island Uniform Controlled Substances Act, and 21 CFR 1300 of the Federal Code of Regulations. Schedule I drugs are used by researchers, and require the submission of a protocol.

Without a Rhode Island CSR and federal DEA Registration, licensed drug facilities and practitioners with prescriptive privileges may dispense or possess non-controlled prescription medications under its facility or professional license. A CSR will not be granted to an applicant whose BOARD licensure application is "pending" in this state.

A Rhode Island Controlled Substances Registration must be obtained prior to applying for the DEA Registration. Federal regulations require that applicants comply with individual state requirements prior to issuance of a DEA Registration. Once the CSR is issued, applicants must apply to the US Drug Enforcement Administration for a federal registration using that agency's DEA Form 224 (New application for Retail Pharmacy, Hospital/Clinic, Practitioner, Teaching Institution, or Mid-Level Practitioner). Applicants may apply online for the DEA Registration at the following web site:

<u>www.deadiversion.usdoj.gov/drugreg/reg_apps/index.html</u>

or by contacting the Drug Enforcement Administration at the following location:

Registration Unit
US Drug Enforcement Administration
JFK Federal Building
15 New Sudbury Street
Boston, MA 02203-0131
1-888-272-5174

Call the Drug Enforcement Administration to check on the status of a pending DEA Registration. *A copy of the DEA Registration must be provided to the BOARD within 60 days of its issuance by the DEA.*

---

**PLEASE NOTE:** Prescriptions in Schedules III, IV, and V cannot be written for more than one hundred (100) dosage units. A "dosage unit" is defined as a single capsule, tablet or suppository, or not more than one (1) teaspoon or an oral liquid. Prescriptions in Schedule II may be written for up to a 30-day supply, with a maximum of two hundred fifty (250) dosage units, as determined by the prescriber's directions for us of the medication.

The Rhode Island Uniform Controlled Substances Act can be accessed at the following website:

<u>http://www.rilin.state.ri.us/Statutes/Title21/21-28/index.htm</u>

---

### *** Rhode Island Prescription Monitoring Program - (RIPMP) ***

The RIPMP is a database that allows you to view patient's prescription history prior to your writing a prescription for them.

Once your RI Controlled Substances Registration is issued we will email a user id and temporary password to the email address that you provided on the CSR form. RI Law requires that all prescribers of controlled substances be registered with the RIPMP. It is important to make sure your email address is current with the Department.

It is the Department's expectation that you utilize this valuable tool that not only protects you as a prescriber but more importantly protects your patients.

Please visit our website for more information about the program and expectations.

<u>http://www.health.ri.gov/programs/prescriptionmonitoring/</u>

**William P. Kyros, M.D. (MD06880) Continuing Medical Education Credits (2013-Present)**

| Date | Title | Credits Received | Certificate of Completion? |
|---|---|---|---|
| February 7, 2013 | Infection Control | 5 | Yes |
| April 5, 2014 | Type 2 Diabetes | 5 | Yes |
| April 5, 2014 | Pressure Ulcers | 10 | Yes |
| April 5, 2014 | Chronic Pain | 15 | Yes |
| May 5, 2014 | Palliative Care | 15 | Yes |
| March 27, 2015 | Hypertension | 5 | Yes |
| March 27, 2015 | Cancer Screening | 10 | Yes |
| March 27, 2015 | Prescription Opioids | 15 | Yes |
| November 19, 2015 | Medical Marijuana | 5 | Yes |
| November 19, 2015 | Ischemic Stroke | 10 | Yes |
| November 19, 2015 | PTSD | 15 | Yes |
| March 7, 2016 | Medical Ethics | 5 | Yes |
| April 6, 2017 | Burnout in Physicians | 5 | Yes |
| April 6, 2017 | Parkinson's Disease | 10 | Yes |
| April 6, 2017 | Low Back Pain | 15 | Yes |
| | | | |
| | | Total: 145 | |
| | | | |
| | | | |



# Certificate
## of Completion

NetCE certifies that
William P. Kyros  MD06880
has participated in the enduring material titled
#47171 Medical Ethics for Physicians
on March 7, 2016
and is awarded 5

*AMA PRA Category 1 Credit(s)™.*

Freda S. O'Brien
Director of Academic Affairs

Erin K. Meinyer
Executive Director

NetCE is accredited by the Accreditation Council for Continuing Medical Education to provide continuing medical education for physicians.

Florida CE Broker Provider #50-2405, Board of Medicine.

This activity is designed to comply with the requirements of California Assembly Bill 1195, Cultural and Linguistic Competency.



**NetCE**
Continuing Education

PO BOX 997571   SACRAMENTO, CALIFORNIA 95899-7571   1-800-232-4CEU



# *Certificate of Completion*

NetCE certifies that
William P. Kyros  MD06880
has participated in the enduring material titled
#95170 Medical Marijuana and Other Cannabinoids
on November 19, 2015
and is awarded 5
AMA PRA Category 1 Credit(s)™.

*Freda S. O'Brien*
Freda S. O'Brien
Director of Academic Affairs

*Erin K. Meinyer*
Erin K. Meinyer
Executive Director

NetCE is accredited by the Accreditation Council for Continuing Medical Education to provide continuing medical education for physicians.

Florida CE Broker Provider #50-2405, Board of Medicine.

This activity is designed to comply with the requirements of California Assembly Bill 1195, Cultural and Linguistic Competency.



# NetCE
Continuing Education

PO BOX 997571    SACRAMENTO, CALIFORNIA 95899-7571    1-800-232-4CEU



# Certificate of Completion

NetCE certifies that

William P. Kyros  MD06880

has participated in the enduring material titled

#90281 Ischemic Stroke

on November 19, 2015

and is awarded 10

AMA PRA Category 1 Credit(s)™.

*Freda S. O'Brien*
**Freda S. O'Brien**
**Director of Academic Affairs**

*Erin K. Meinyer*
**Erin K. Meinyer**
**Executive Director**

NetCE is accredited by the Accreditation Council for Continuing Medical Education to provide continuing medical education for physicians.

Florida CE Broker Provider #50-2405, Board of Medicine.

This activity is designed to comply with the requirements of California Assembly Bill 1195, Cultural and Linguistic Competency.



**NetCE**
Continuing Education

PO BOX 997571    SACRAMENTO, CALIFORNIA 95899-7571    1-800-232-4CEU



# *Certificate*
# *of Completion*

NetCE certifies that

William P. Kyros  MD06880

has participated in the enduring material titled

#96010 Post-Traumatic Stress Disorder

on November 19, 2015

and is awarded 15

## AMA PRA Category 1 Credit(s)™.

*Freda S. O'Brien*
**Freda S. O'Brien**
Director of Academic Affairs

*Erin K. Meinyer*
**Erin K. Meinyer**
Executive Director

NetCE is accredited by the Accreditation Council for Continuing Medical Education to provide continuing medical education for physicians.

Florida CE Broker Provider #50-2405, Board of Medicine.

This activity is designed to comply with the requirements of California Assembly Bill 1195, Cultural and Linguistic Competency.



**NetCE**
Continuing Education

PO BOX 997571   SACRAMENTO, CALIFORNIA 95899-7571   1-800-232-4CEU

# *Certificate of Completion*

NetCE certifies that
William P. Kyros  MD06880
has participated in the enduring material titled
#94220 Hypertension: Strategies to Improve
Outcomes
on March 27, 2015
and is awarded 5
AMA PRA Category 1 Credit(s)™.

*Freda S. O'Brien*
**Freda S. O'Brien**
Director of Academic Affairs

*Erin K. Meinyer*
**Erin K. Meinyer**
Executive Director

NetCE is accredited by the Accreditation Council for Continuing Medical Education to provide continuing medical education for physicians.

Florida CE Broker Provider #50-2405, Board of Medicine.

This activity is designed to comply with the requirements of California Assembly Bill 1195, Cultural and Linguistic Competency.

**NetCE**
Continuing Education

PO BOX 997571    SACRAMENTO, CALIFORNIA 95899-7571    1-800-232-4CEU



# *Certificate of Completion*

NetCE certifies that

William P. Kyros  MD06880

has participated in the enduring material titled

#91990 Cancer Screening

on March 27, 2015

and is awarded 10

AMA PRA Category 1 Credit(s)™.

*Freda S. O'Brien*
Freda S. O'Brien
Director of Academic Affairs

*Erin K. Meinyer*
Erin K. Meinyer
Executive Director

NetCE is accredited by the Accreditation Council for Continuing Medical Education to provide continuing medical education for physicians.

Florida CE Broker Provider #50-2405, Board of Medicine.

This activity is designed to comply with the requirements of California Assembly Bill 1195, Cultural and Linguistic Competency.



**NetCE**
Continuing Education

PO BOX 997571   SACRAMENTO, CALIFORNIA 95899-7571   1-800-232-4CEU

# Certificate of Completion

NetCE certifies that
William P. Kyros  MD06880
has participated in the enduring material titled
#91410 Prescription Opioids: Risk Management and
Strategies for Safe Use
on March 27, 2015
and is awarded 15
AMA PRA Category 1 Credit(s)™.

*Freda S. O'Brien*
**Freda S. O'Brien**
**Director of Academic Affairs**

*Erin K. Meinyer*
**Erin K. Meinyer**
**Executive Director**

NetCE is accredited by the Accreditation Council for Continuing Medical Education to provide continuing medical education for physicians.

Florida CE Broker Provider #50-2405, Board of Medicine.

This activity is designed to comply with the requirements of California Assembly Bill 1195, Cultural and Linguistic Competency.



**NetCE**
Continuing Education

PO BOX 997571   SACRAMENTO, CALIFORNIA 95899-7571   1-800-232-4CEU



# Certificate
## of Completion

NetCE certifies that

William P. Kyros  MD06880

has participated in the enduring material titled

#9738 Palliative Care and Pain Management at the
End of Life

on May 5, 2014

and is awarded 15

AMA PRA Category 1 Credit(s)™.

*Freda S. O'Brien*
**Freda S. O'Brien**
*Director of Academic Affairs*

*Erin K. Meinyer*
**Erin K. Meinyer**
*Executive Director*

CME Resource is accredited by the Accreditation Council for Continuing Medical Education to provide continuing medical education for physicians.

Florida CE Broker Provider #50-2405, Board of Medicine.

This activity is designed to comply with the requirements of California Assembly Bill 1195, Cultural and Linguistic Competency.



NetCE
Continuing Education

PO BOX 997571   SACRAMENTO, CALIFORNIA 95899-7571   1-800-232-4CEU

# *Certificate of Completion*

CME Resource certifies that
William P. Kyros  MD06880
has participated in the enduring material titled
#4452 Type 2 Diabetes: Treatment Strategies for
Optimal Care
on April 5, 2014
and is awarded 5
AMA PRA Category 1 Credit(s)™.

*Freda S. O'Brien*
Freda S. O'Brien
Director of Academic Affairs

*Erin K. Meinyer*
Erin K. Meinyer
Executive Director

CME Resource is accredited by the Accreditation Council for Continuing Medical Education to provide continuing medical education for physicians.

Florida CE Broker Provider #50-2405, Board of Medicine.

This activity is designed to comply with the requirements of California Assembly Bill 1195, Cultural and Linguistic Competency.

**CME RESOURCE**
Continuing Medical Education
PO BOX 997571   SACRAMENTO, CALIFORNIA 95899-7571   1-800-232-4CEU



# *Certificate*
# *of Completion*

CME Resource certifies that
William P. Kyros  MD06880
has participated in the enduring material titled
#4885 Pressure Ulcers: Pathogenesis and
Management
on April 5, 2014
and is awarded 10
AMA PRA Category 1 Credit(s)™.

*Freda S. O'Brien*

**Freda S. O'Brien**
**Director of Academic Affairs**

*Erin K. Meinyer*

**Erin K. Meinyer**
**Executive Director**

CME Resource is accredited by the Accreditation Council for Continuing Medical Education to provide continuing medical education for physicians.

Florida CE Broker Provider #50-2405, Board of Medicine.

This activity is designed to comply with the requirements of California Assembly Bill 1195, Cultural and Linguistic Competency.



**CME**
**RESOURCE**
Continuing Medical Education
PO BOX 997571   SACRAMENTO, CALIFORNIA 95899-7571   1-800-232-4CEU

# Certificate
# of Completion

CME Resource certifies that
William P. Kyros  MD06880
has participated in the enduring material titled
#98700 Chronic Pain Syndromes: Current
Concepts and Treatment Strategies
on April 5, 2014
and is awarded 15
AMA PRA Category 1 Credit(s)™.

*Freda S. O'Brien*
**Freda S. O'Brien**
**Director of Academic Affairs**

*Erin K. Meinyer*
**Erin K. Meinyer**
**Executive Director**

CME Resource is accredited by the Accreditation Council for Continuing Medical Education to provide continuing medical education for physicians.

Florida CE Broker Provider #50-2405, Board of Medicine.

This activity is designed to comply with the requirements of California Assembly Bill 1195, Cultural and Linguistic Competency.



**CME
RESOURCE**
Continuing Medical Education
PO BOX 997571   SACRAMENTO, CALIFORNIA 95899-7571   1-800-232-4CEU

# *Certificate*
# *of Completion*

CME Resource certifies that
William P. Kyros  MD06880
has participated in the enduring material titled
#9456 Infection Control: The New York
Requirement
on February 7, 2013
and is awarded 5
AMA PRA Category 1 Credit(s)™.



*Freda S. O'Brien*
**Freda S. O'Brien**
**Director of Academic Affairs**

*Erin K. Meinyer*
**Erin K. Meinyer**
**Executive Director**

*CME Resource is accredited by the Accreditation Council for Continuing Medical Education to provide continuing medical education for physicians.*

*Florida CE Broker Provider #50-2405, Board of Medicine.*

*This course is approved by the New York State Department of Health to fulfill the requirement for 3 hours of Infection Control Training as mandated by Chapter 786 of the Laws of 1992. Provider #TP02047. This activity is designed to comply with the requirements of California Assembly Bill 1195, Cultural and Linguistic Competency.*

*This certificate is valid for a period of four (4) years from the above date of course completion. Be sure to maintain this document in your professional file.*



# CME
## RESOURCE
**Continuing Medical Education**
PO BOX 997571 ' SACRAMENTO, CALIFORNIA 95899-7571  1-800-232-4CEU



**NATIONAL PRACTITIONER DATA BANK**

# NPDB

P.O. Box 10832
Chantilly, VA 20153-0832

https://www.npdb.hrsa.gov

```
550000012258214
Process Date:  04/03/2017
Page: 1    of    1
```

**To:**   KYROS, WILLIAM PETER

15A RIVERVIEW AVE

MASHPEE, MA 02649-3090

**From:**   National Practitioner Data Bank
**Re:**    Response to Your Self-Query

The enclosed information is released by the National Practitioner Data Bank (NPDB) for restricted use under the provisions of Title IV of Public Law 99-660, the Health Care Quality Improvement Act of 1986, as amended; Section 1921 of the Social Security Act; and Section 1128E of the Social Security Act.

Title IV established the NPDB as an information clearinghouse to collect and release certain information related to malpractice payment history and professional competence or conduct of physicians, dentists, and other licensed health care practitioners.

Section 1921 of the Social Security Act expanded the scope of the NPDB. Section 1921 was enacted to protect program beneficiaries from unfit health care practitioners, and to improve the anti-fraud provisions of federal and state health care programs. Section 1921 authorizes the NPDB to collect certain adverse actions taken by state licensing and certification authorities, peer review organizations, and private accreditation organizations, as well as final adverse actions taken by state law or fraud enforcement agencies (including, but not limited to, state law enforcement agencies, state Medicaid Fraud Control Units, and state agencies administering or supervising the administration of a state health care program), against health care practitioners, health care entities, providers and suppliers.

Section 1128E of the Social Security Act was added by Section 221(a) of Public Law 104-191, the Health Insurance Portability and Accountability Act of 1996. The statute established a national data collection program (formerly known as the Healthcare Integrity and Protection Data Bank) to combat fraud and abuse in health care delivery and to improve the quality of patient care. Section 1128E information is now collected and disclosed by the NPDB as a result of amendments made by Section 6403 of the Affordable Care Act of 2010, Public Law 111-148. Section 1128E information includes certain final adverse actions taken by federal agencies and health plans against health care practitioners, providers, and suppliers.

Regulations governing the NPDB are codified at 45 CFR part 60. Responsibility for operating the NPDB resides with the Secretary of the U.S. Department of Health and Human Services (HHS), and HRSA, Division of Practitioner Data Banks.

Reports from the NPDB contain limited summary information and should be used in conjunction with information from other sources in granting privileges, or in making employment, affiliation, contracting or licensure decisions. NPDB responses may contain more than one report on a particular incident, if two or more actions were taken as a result of a single incident (e.g., an exclusion from a federal or state health care program and an adverse licensure action). The NPDB is a flagging system, and a report may be included for a variety of reasons that do not necessarily reflect adversely on the professional competence or conduct of the subject named in the report.

All information received from the NPDB is considered confidential and must be used solely for the purpose for which it was disclosed. Further, ANY PERSON WHO VIOLATES THE CONFIDENTIALITY PROVISIONS AS SPECIFIED IN TITLE IV OF PUBLIC LAW 99-660, AS AMENDED, IS SUBJECT TO A CIVIL MONEY PENALTY OF UP TO $11,000 FOR EACH VIOLATION. Subjects of reports who obtain information about themselves from the NPDB are permitted to share that information with anyone they choose.

If you require additional assistance, visit the NPDB web site (https://www.npdb.hrsa.gov) or contact the NPDB Customer Service Center at 1-800-767-6732 (TDD: 1-703-802-9395). Information Specialists are available to speak with you weekdays from 8:30 a.m. to 6:00 p.m. (5:30 p.m. on Fridays) Eastern Time. The NPDB Customer Service Center is closed on all Federal holidays.

**CONFIDENTIAL DOCUMENT - FOR AUTHORIZED USE ONLY**

**NATIONAL PRACTITIONER DATA BANK**

# NPDB

P.O. Box 10832
Chantilly, VA 20153-0832

https://www.npdb.hrsa.gov

---

5500000122582149
Process Date: 04/03/2017
Page: 1 of 2

---

## KYROS, WILLIAM PETER - SELF-QUERY RESPONSE

### A. SUBJECT IDENTIFICATION INFORMATION (Recipients should verify that subject identified is, in fact, the subject of interest)

| | | | |
|---|---|---|---|
| Practitioner Name: | KYROS, WILLIAM PETER | | |
| Date of Birth: | 01/01/1954 | Gender: | MALE |
| Delivery Address: | 15A RIVERVIEW AVE, MASHPEE, MA 02649-3090 | | |
| Social Security Number: | ***-**-7825 | DEA: | BK1351270 |
| License: | PHYSICIAN (MD), MD06880, RI, PSYCHIATRY | | |
| Professional School(s): | ST GEORGE'S UNIVERSITY, SCHOOL OF MEDICINE (1980) | | |

### B. PAYMENT INFORMATION

| | | | |
|---|---|---|---|
| Credit Card Information: | XXXXXXXXXXXX2985 (03/2018) | | |
| NPDB Charge: | $8.00* | NPDB Bill Reference Number: | N52193332 |
| * Each charge will appear separately on your credit card statement. | | | |
| Transaction Date: | 04/03/2017 | Additional Paper Copies Requested: 1 | |

### C. SUMMARY OF REPORTS ON FILE WITH THE DATA BANK AS OF 04/03/2017

The following report types have been searched:

| | | | |
|---|---|---|---|
| Medical Malpractice Payment Report(s): | No Reports | Health Plan Action(s): | **Yes, See Below** |
| State Licensure Action(s): | **Yes, See Below** | Professional Society Action(s): | No Reports |
| Exclusion or Debarment Action(s): | No Reports | DEA/Federal Licensure Action(s): | No Reports |
| Government Administrative Action(s): | No Reports | Judgment or Conviction Report(s): | No Reports |
| Clinical Privileges Action(s): | No Reports | Peer Review Organization Action(s): | No Reports |

Copies of these reports are enclosed for restricted/limited use as prescribed by statutes listed on the preceeding cover page.

---

**BCBSRI**
**HEALTH PLAN ACTION**
Basis for Action: - LICENSE REVOCATION, SUSPENSION OR OTHER DISCIPLINARY ACTION TAKEN BY A FEDERAL, STATE OR LOCAL LICENSING AUTHORITY

| | | | |
|---|---|---|---|
| Initial Action: | - CONTRACT TERMINATION | Date of Action: | 05/26/2010 |
| DCN: | 5500000061924725 | | |

---

**UNITED BEHAVIORAL HEALTH**
**HEALTH PLAN ACTION**
Basis for Action: - OTHER, SEE SECTION C. OF THE REPORT FOR DETAILS

| | | | |
|---|---|---|---|
| Initial Action: | - CONTRACT RESTRICTION | Date of Action: | 08/17/2009 |
| DCN: | 5500000058123382 | | |

---

**RHODE ISLAND DEPARTMENT OF HEALTH**
**STATE LICENSURE**
Basis for Action: - NON-SEXUAL DUAL RELATIONSHIP OR BOUNDARY VIOLATION

| | | | |
|---|---|---|---|
| Initial Action: | - SUSPENSION OF LICENSE | Date of Action: | 08/14/2009 |
| DCN: | 5500000060449447 | | |

---

**CONFIDENTIAL DOCUMENT - FOR AUTHORIZED USE ONLY**

**NATIONAL PRACTITIONER DATA BANK**

# NPDB

P.O. Box 10832
Chantilly, VA 20153-0832

https://www.npdb.hrsa.gov



```
5500000122582149
Process Date: 04/03/2017
Page: 2    of    2
```

---

## BD.MEDICAL LICENSURE AND DISCIPLINE

**STATE LICENSURE**

**Basis for Action:**   - SEXUAL MISCONDUCT

| | | | |
|---|---|---|---|
| **Initial Action:** | - OTHER LICENSURE ACTION, SEE SECTION C. OF THE REPORT FOR DETAILS | **Date of Action:** | 08/12/2009 |
| **DCN:** | 5500000079194093 | | |

---

-------------------------- **Unabridged Report(s) Follow** --------------------------

CONFIDENTIAL DOCUMENT - FOR AUTHORIZED USE ONLY



**NPDB**

P.O. Box 10832
Chantilly, VA 20153-0832

https://www.npdb.hrsa.gov

NATIONAL PRACTITIONER DATA BANK

DCN: 550000061924725
Process Date: 04/27/2010
Page: 1    of    3
KYROS, WILLIAM PETER

# KYROS, WILLIAM PETER

## BCBSRI

| HEALTH PLAN ACTION | Date of Action: 05/26/2010 |
|---|---|
| **Initial Action** | **Basis for Initial Action** |
| - CONTRACT TERMINATION | - LICENSE REVOCATION, SUSPENSION OR OTHER DISCIPLINARY ACTION TAKEN BY A FEDERAL, STATE OR LOCAL LICENSING AUTHORITY |

**A REPORTING ENTITY**

| | |
|---|---|
| Entity Name: | BCBSRI * |
| Address: | 15 LASALLE SQ. |
| City, State, Zip: | PROVIDENCE, RI 02903 |
| Country: | |
| Name or Office: | MARY BENNETT |
| Title or Department: | MANAGER, CREDENTIALING |
| Telephone: | (401) 459-5442 |
| Entity Internal Report Reference: | |
| Type of Report: | INITIAL |

*The reporting entity has changed its name or address on file with the NPDB. The following is the entity's most recent contact information reported to the NPDB on 11/29/2016:

| | |
|---|---|
| Entity Name: | BCBSRI |
| Address: | 500 EXCHANGE ST |
| City, State, Zip: | PROVIDENCE, RI 02903-2630 |
| Country: | |

**B SUBJECT IDENTIFICATION INFORMATION (INDIVIDUAL)**

| | |
|---|---|
| Subject Name: | KYROS, WILLIAM PETER |
| Other Name(s) Used: | |
| Gender: | MALE |
| Date of Birth: | 01/01/1954 |
| Organization Name: | WILLIAM P KYROS MD |
| Work Address: | 181 CENTERVILLE ROAD |
| City, State, ZIP: | WARWICK, RI 02806 |
| Organization Type: | MEDICAL GROUP/PRACTICE (365) |
| Home Address: | 1A BRADFORD DRIVE |
| City, State, ZIP: | BARRINGTON, RI 02806 |
| Deceased: | UNKNOWN |
| Federal Employer Identification Numbers (FEIN): | |
| Social Security Numbers (SSN): | ***-**-7825 |
| Individual Taxpayer Identification Numbers (ITIN): | (Not Provided) |
| National Provider Identifiers (NPI): | 1740390087 |
| Professional School(s) & Year(s) of Graduation: | ST GEORGE'S UNIVERSITY, SCHOOL OF MEDICINE (1980) |
| | NEW YORK MEDICAL COLLEGE (1987) |
| | METROPOLITAN HOSPITAL CENTER OF NEW YORK (1989) |
| Occupation/Field of Licensure (Code): | PHYSICIAN (MD) |
| State License Number, State of Licensure: | MD06880, RI |
| Specialty: | PSYCHIATRY |
| Drug Enforcement Administration (DEA) Numbers: | BK1351270 |

**CONFIDENTIAL DOCUMENT - FOR AUTHORIZED USE ONLY**



**NATIONAL PRACTITIONER DATA BANK**

# NPDB

P.O. Box 10632
Chantilly, VA 20153-0832

https://www.npdb.hrsa.gov

DCN: 5500000061924725
Process Date: 04/27/2010
Page: 2 of 3
KYROS, WILLIAM PETER

| | |
|---|---|
| Unique Physician Identification Numbers (UPIN): | B40351 |
| Name(s) of Health Care Entity (Entities) With Which Subject is Affiliated or Associated (Inclusion Does Not Imply Complicity in the Reported Action.): | |
| Business Address of Affiliate: | |
| City, State, ZIP: | |
| Nature of Relationship(s): | |

**C INFORMATION REPORTED**

| | |
|---|---|
| Type of Adverse Action: | HEALTH PLAN ACTION |
| Basis for Action: | LICENSE REVOCATION, SUSPENSION OR OTHER DISCIPLINARY ACTION TAKEN BY A FEDERAL, STATE OR LOCAL LICENSING AUTHORITY (39) |
| Name of Agency or Program That Took the Adverse Action Specified in This Report: | BLUE CROSS & BLUE SHIELD OF RHODE ISLAND |
| Adverse Action Classification Code(s): | CONTRACT TERMINATION (1920) |
| Date Action Was Taken: | 03/26/2010 |
| Date Action Became Effective: | 05/26/2010 |
| Length of Action: | INDEFINITE |
| Total Amount of Monetary Penalty, Assessment and/or Restitution: | |
| Is Subject Automatically Reinstated After Adverse Action Period is Completed?: | NO |
| Description of Subject's Act(s) or Omission(s) or Other Reasons for Action(s) Taken and Description of Action(s) Taken by Reporting Entity: | The contract was terminated due to action taken by DOH which is a condition of the Corporate Contract. |

☐ Subject Identified in Section B has appealed the reported adverse action.

**D SUBJECT STATEMENT**

If the subject identified in Section B of this report has submitted a statement, it appears in this section.

**E REPORT STATUS**

Unless a box below is checked, the subject of this report identified in Section B has not contested this report.

☐ This report has been disputed by the subject identified in Section B.

☐ At the request of the subject identified in Section B, this report is being reviewed by the Secretary of the U.S. Department of Health and Human Services to determine its accuracy and/or whether it complies with reporting requirements. No decision has been reached.

☐ At the request of the subject identified in Section B, this report was reviewed by the Secretary of the U.S. Department of Health and Human Services and a decision was reached. The subject has requested that the Secretary reconsider the original decision.

☐ At the request of the subject identified in Section B, this report was reviewed by the Secretary of the U.S. Department of Health and Human Services. The Secretary's decision is shown below:

**CONFIDENTIAL DOCUMENT - FOR AUTHORIZED USE ONLY**

**NATIONAL PRACTITIONER DATA BANK**

# NPDB

P.O. Box 10832
Chantilly, VA 20153-0832

https://www.npdb.hrsa.gov

DCN: 5500000061924725
Process Date: 04/27/2010
Page: 3    of    3
KYROS, WILLIAM PETER

| | |
|---|---|
| Date of Original Submission: | 04/27/2010 |
| Date of Most Recent Change: | 04/27/2010 |

**This report is maintained under the provisions of: Section 1128E**

The information contained in this report is maintained by the National Practitioner Data Bank for restricted use under the provisions of Section 1128E of the Social Security Act, and 45 CFR Part 60. All information is confidential and may be used only for the purpose for which it was disclosed. Disclosure or use of confidential information for other purposes is a violation of federal law. For additional information or clarification, contact the reporting entity identified in Section A.

———————————— **END OF REPORT** ————————————

**CONFIDENTIAL DOCUMENT - FOR AUTHORIZED USE ONLY**





NATIONAL PRACTITIONER DATA BANK
# NPDB
P.O. Box 10832
Chantilly, VA 20153-0832

https://www.npdb.hrsa.gov

DCN: 5500000058123362
Process Date: 08/26/2009
Page: 1   of   3
KYROS, WILLIAM P

## KYROS, WILLIAM P

### *UNITED BEHAVIORAL HEALTH/OPTUM HEALTH*

| HEALTH PLAN ACTION | Date of Action: 08/17/2009 |
|---|---|
| Initial Action | Basis for Initial Action |
| - CONTRACT RESTRICTION | - OTHER, SEE SECTION C. OF THE REPORT FOR DETAILS |

| A. REPORTING ENTITY | |
|---|---|
| Entity Name: | UNITED BEHAVIORAL HEALTH * |
| Address: | 4300 MARKETPOINT DR |
| | MN045-8500 |
| City, State, Zip: | BLOOMINGTON, MN 55435 |
| Country: | |
| Name or Office: | ADAIR TRITCHLER |
| Title or Department: | CREDENTIALING ADMINISTRATIVE ASSISTANT |
| Telephone: | (952) 205-2849 |
| Entity Internal Report Reference: | |
| Type of Report: | INITIAL |

*The reporting entity has changed its name or address on file with the NPDB. The following is the entity's most recent contact information reported to the NPDB on 05/19/2016:

| | |
|---|---|
| Entity Name: | UNITED BEHAVIORAL HEALTH/OPTUM HEALTH |
| Address: | 11000 OPTUM CIR |
| | MN103-0700 |
| City, State, Zip: | EDEN PRAIRIE, MN 55344-2503 |
| Country: | |

| B. SUBJECT IDENTIFICATION INFORMATION (INDIVIDUAL) | |
|---|---|
| Subject Name: | KYROS, WILLIAM P |
| Other Name(s) Used: | |
| Gender: | MALE |
| Date of Birth: | 01/01/1954 |
| Organization Name: | |
| Work Address: | 181 CENTERVILLE RD |
| City, State, ZIP: | WARWICK, RI 02886-4338 |
| Organization Type: | |
| Home Address: | |
| City, State, ZIP: | |
| Deceased: | NO |
| Federal Employer Identification Numbers (FEIN): | |
| Social Security Numbers (SSN): | ***-**-7825 |
| Individual Taxpayer Identification Numbers (ITIN): | |
| National Provider Identifiers (NPI): | 1740390087 |
| Professional School(s) & Year(s) of Graduation: | ST GEORGE'S UNIVERSITY SCHOOL OF MEDICIN (1980) |
| | NEW YORK MEDICAL COLLEGE (1987) |
| Occupation/Field of Licensure (Code): | PHYSICIAN (MD) |
| State License Number, State of Licensure: | MD06880, RI |
| Specialty: | PSYCHIATRY |
| Drug Enforcement Administration (DEA) Numbers: | BK1351270 |
| Unique Physician Identification Numbers (UPIN): | |

**CONFIDENTIAL DOCUMENT - FOR AUTHORIZED USE ONLY**

NATIONAL PRACTITIONER DATA BANK

# NPDB

P.O. Box 10832
Chantilly, VA 20153-0832

https://www.npdb.hrsa.gov

DCN: 5500000058123362
Process Date: 08/26/2009
Page: 2  of  3
KYROS, WILLIAM P

| | |
|---|---|
| Name(s) of Health Care Entity (Entities) With Which Subject is Affiliated or Associated (Inclusion Does Not Imply Complicity in the Reported Action.): | UNITED BEHAVIORAL HEALTH |
| Business Address of Affiliate: | 4300 MARKETPOINTE DR MN045-S500 |
| City, State, ZIP: | BLOOMINGTON, MN 55435 |
| Nature of Relationship(s): | SUBJECT IS MEMBER OF AFFILIATE OR ASSOCIATE'S NETWORK (300) |



| | |
|---|---|
| Type of Adverse Action: | HEALTH PLAN ACTION |
| Basis for Action: | OTHER UNPROFESSIONAL CONDUCT, SPECIFY (D8) |
| Other, as Specified: | ALLEGATIONS BY PATIENT OF BOUNDARY/ETHICAL VIOLATIONS |
| Name of Agency or Program That Took the Adverse Action Specified in This Report: | UNITED BEHAVIORAL HEALTH |
| Adverse Action Classification Code(s): | CONTRACT RESTRICTION (1931) |
| Date Action Was Taken: | 08/17/2009 |
| Date Action Became Effective: | 08/17/2009 |
| Length of Action: | INDEFINITE |
| Total Amount of Monetary Penalty, Assessment and/or Restitution: | |
| Is Subject Automatically Reinstated After Adverse Action Period is Completed?: | NO |
| Description of Subject's Act(s) or Omission(s) or Other Reasons for Action(s) Taken and Description of Action(s) Taken by Reporting Entity: | RESTRICTED STATUS DUE TO UNCONTESTED MISCONDUCT RELATED TO BOUNDARY AND ETHICAL VIOLATIONS. |

☐ Subject identified in Section B has appealed the reported adverse action.

**D. SUBJECT STATEMENT**

If the subject identified in Section B of this report has submitted a statement, it appears in this section.

**E. REPORT STATUS**

Unless a box below is checked, the subject of this report identified in Section B has not contested this report.

☐ This report has been disputed by the subject identified in Section B.

☐ At the request of the subject identified in Section B, this report is being reviewed by the Secretary of the U.S. Department of Health and Human Services to determine its accuracy and/or whether it complies with reporting requirements. No decision has been reached.

☐ At the request of the subject identified in Section B, this report was reviewed by the Secretary of the U.S. Department of Health and Human Services and a decision was reached. The subject has requested that the Secretary reconsider the original decision.

☐ At the request of the subject identified in Section B, this report was reviewed by the Secretary of the U.S. Department of Health and Human Services. The Secretary's decision is shown below:

**CONFIDENTIAL DOCUMENT - FOR AUTHORIZED USE ONLY**



**NATIONAL PRACTITIONER DATA BANK**

# NPDB

P.O. Box 10832
Chantilly, VA 20153-0832

https://www.npdb.hrsa.gov

DCN: 5500000058123362
Process Date: 08/26/2009
Page: 3  of  3
KYROS, WILLIAM P

| | |
|---|---|
| Date of Original Submission: | 08/26/2009 |
| Date of Most Recent Change: | 08/26/2009 |

**This report is maintained under the provisions of Section 1128E**

The information contained in this report is maintained by the National Practitioner Data Bank for restricted use under the provisions of Section 1128E of the Social Security Act, and 45 CFR Part 60. All information is confidential and may be used only for the purpose for which it was disclosed. Disclosure or use of confidential information for other purposes is a violation of federal law. For additional information or clarification, contact the reporting entity identified in Section A.

**END OF REPORT**

**CONFIDENTIAL DOCUMENT - FOR AUTHORIZED USE ONLY**



**NATIONAL PRACTITIONER DATA BANK**
# NPDB
P.O. Box 10832
Chantilly, VA 20153-0832

https://www.npdb.hrsa.gov

| |
|---|
| DCN: 5500000060449447 |
| Process Date: 01/29/2010 |
| Page: 1   of   3 |
| KYROS, WILLIAM |

## KYROS, WILLIAM

### BD MEDICAL LICENSURE AND DISCIPLINE

| STATE LICENSURE ACTION | Date of Action: 08/14/2009 |
|---|---|
| Initial Action | Basis for Initial Action |
| - SUSPENSION OF LICENSE | - NON-SEXUAL DUAL RELATIONSHIP OR BOUNDARY VIOLATION. |

**A REPORTING ENTITY**

| | |
|---|---|
| Entity Name: | RHODE ISLAND DEPARTMENT OF HEALTH * |
| Address: | 3 CAPITOL HILL, CANNON BUILDING |
| City, State, Zip: | PROVIDENCE, RI 02908-5097 |
| Country: | |
| Name or Office: | MARY E. SALERNO |
| Title or Department: | RI DEPARTMENT OF HEALTH |
| Telephone: | (401) 222-4747 |
| Entity Internal Report Reference: | 08-250, 09-252 |
| Type of Report: | INITIAL |

*The reporting entity is no longer an active registrant with the NPDB. The following entity is registered as its successor:

| | |
|---|---|
| Entity Name: | BD MEDICAL LICENSURE AND DISCIPLINE |
| Address: | 3 CAPITOL HL RM 401 |
| City, State, Zip: | PROVIDENCE, RI 02908-5034 |
| Country: | |
| Name or Office: | LAUREN LASSO |
| Title or Department: | ADMINISTRATIVE OFFICER |
| Telephone: | (401) 222-2268 |

**B SUBJECT IDENTIFICATION INFORMATION (INDIVIDUAL)**

| | |
|---|---|
| Subject Name: | KYROS, WILLIAM |
| Other Name(s) Used: | |
| Gender: | MALE |
| Date of Birth: | 01/01/1954 |
| Organization Name: | |
| Work Address: | |
| City, State, ZIP: | |
| Organization Type: | |
| Home Address: | 7 BRADFORD ST. #2 |
| City, State, ZIP: | BARRINGTON, RI 02806 |
| Deceased: | NO |
| Federal Employer Identification Numbers (FEIN): | |
| Social Security Numbers (SSN): | ***-**-7825 |
| Individual Taxpayer Identification Numbers (ITIN): | |
| National Provider Identifiers (NPI): | |
| Professional School(s) & Year(s) of Graduation: | ST. GEORGES UNIVERSITY SCHOOL OF MEDICINE, GRENADA (1980) |
| Occupation/Field of Licensure (Code): | PSYCHOLOGIST |
| State License Number, State of Licensure: | MD 06880, RI |
| Drug Enforcement Administration (DEA) Numbers: | |

**CONFIDENTIAL DOCUMENT - FOR AUTHORIZED USE ONLY**

**NATIONAL PRACTITIONER DATA BANK**

# NPDB

P.O. Box 10832
Chantilly, VA 20153-0832

https://www.npdb.hrsa.gov



DCN: 5500000060449447
Process Date: 01/29/2010
Page: 2  of  3
KYROS, WILLIAM

| | |
|---|---|
| Unique Physician Identification Numbers (UPIN): | |
| Name(s) of Health Care Entity (Entities) With Which Subject is Affiliated or Associated (Inclusion Does Not Imply Complicity in the Reported Action.): | |
| Business Address of Affiliate: | |
| City, State, ZIP: | |
| Nature of Relationship(s): | |

**C INFORMATION REPORTED**

| | |
|---|---|
| Type of Adverse Action: | STATE LICENSURE |
| Basis for Action: | NON-SEXUAL DUAL RELATIONSHIP OR BOUNDARY VIOLATION (D2) |
| Name of Agency or Program That Took the Adverse Action Specified in This Report: | BOARD OF MEDICAL LICENSURE & DISCIPLINE |
| Adverse Action Classification Code(s): | SUSPENSION OF LICENSE (1135) |
| Date Action Was Taken: | 08/14/2009 |
| Date Action Became Effective: | 08/14/2009 |
| Length of Action: | INDEFINITE |
| Total Amount of Monetary Penalty, Assessment and/or Restitution: | |
| Is Subject Automatically Reinstated After Adverse Action Period is Completed?: | NO |
| Description of Subject's Act(s) or Omission(s) or Other Reasons for Action(s) Taken and Description of Action(s) Taken by Reporting Entity: | The Board has received information regarding three boundary violations with women who were patients of this physician. The physician was also working in a mental health practice that lacked proper licensure. Pending further investigation, the physician has agreed to stop practicing any branch of medicine, and submit to an evaluation. |

☐ Subject Identified in Section B has appealed the reported adverse action.

**D SUBJECT STATEMENT**

If the subject identified in Section B of this report has submitted a statement, it appears in this section.

**E REPORT STATUS**

Unless a box below is checked, the subject of this report identified in Section B has not contested this report.

☐ This report has been disputed by the subject identified in Section B.

☐ At the request of the subject identified in Section B, this report is being reviewed by the Secretary of the U.S. Department of Health and Human Services to determine its accuracy and/or whether it complies with reporting requirements. No decision has been reached.

☐ At the request of the subject identified in Section B, this report was reviewed by the Secretary of the U.S. Department of Health and Human Services and a decision was reached. The subject has requested that the Secretary reconsider the original decision.

☐ At the request of the subject identified in Section B, this report was reviewed by the Secretary of the U.S. Department of Health and Human Services. The Secretary's decision is shown below:

**CONFIDENTIAL DOCUMENT - FOR AUTHORIZED USE ONLY**

NATIONAL PRACTITIONER DATA BANK

# NPDB

P.O. Box 10832
Chantilly, VA 20153-0832

https://www.npdb.hrsa.gov

DCN: 5500000060449447
Process Date: 01/29/2010
Page: 3    of    3
KYROS, WILLIAM

Date of Original Submission:    01/29/2010
Date of Most Recent Change:    01/29/2010

**This report is maintained under the provisions of: Section 1921**

The information contained in this report is maintained by the National Practitioner Data Bank for restricted use under the provisions of Section 1921 of the Social Security Act, and 45 CFR Part 60. All information is confidential and may be used only for the purpose for which it was disclosed. Disclosure or use of confidential information for other purposes is a violation of federal law. For additional information or clarification, contact the reporting entity identified in Section A.

**━━━━━━━━━━ END OF REPORT ━━━━━━━━━━**

**CONFIDENTIAL DOCUMENT - FOR AUTHORIZED USE ONLY**



**NATIONAL PRACTITIONER DATA BANK**
# NPDB
P.O. Box 10832
Chantilly, VA 20153-0832

https://www.npdb.hrsa.gov



DCN: 550000079194093
Process Date: 12/27/2012
Page: 1    of    3
KYROS, WILLIAM

## KYROS, WILLIAM

### BD MEDICAL LICENSURE AND DISCIPLINE

| STATE LICENSURE ACTION | Date of Action: 08/12/2009 |
|---|---|
| Initial Action | Basis for Initial Action |
| - OTHER LICENSURE ACTION, SEE SECTION C. OF THE REPORT FOR DETAILS | - SEXUAL MISCONDUCT |

**A. REPORTING ENTITY**

| | |
|---|---|
| Entity Name: | BD MEDICAL LICENSURE AND DISCIPLINE * |
| Address: | 3 CAPITOL HILL ROOM 205 |
| City, State, Zip: | PROVIDENCE, RI 02908-5097 |
| Country: | |
| Name or Office: | LAUREN LASSO |
| Title or Department: | ADMINISTRATIVE OFFICER |
| Telephone: | (401) 222-2268 |
| Entity Internal Report Reference: | |
| Type of Report: | INITIAL |

* The reporting entity has changed its name or address on file with the NPDB. The following is the entity's most recent contact information reported to the NPDB on 06/01/2016:

| | |
|---|---|
| Entity Name: | BD MEDICAL LICENSURE AND DISCIPLINE |
| Address: | 3 CAPITOL HL RM 401 |
| City, State, Zip: | PROVIDENCE, RI 02908-5034 |
| Country: | |

**B. SUBJECT IDENTIFICATION INFORMATION (INDIVIDUAL)**

| | |
|---|---|
| Subject Name: | KYROS, WILLIAM |
| Other Name(s) Used: | |
| Gender: | MALE |
| Date of Birth: | 01/01/1954 |
| Organization Name: | |
| Work Address: | |
| City, State, ZIP: | |
| Organization Type: | |
| Home Address: | 15A RIVERVIEW AVENUE |
| City, State, ZIP: | MASHPEE, MA 02649 |
| Deceased: | NO |
| Federal Employer Identification Numbers (FEIN): | |
| Social Security Numbers (SSN): | ***-**-7825 |
| Individual Taxpayer Identification Numbers (ITIN): | |
| National Provider Identifiers (NPI): | |
| Professional School(s) & Year(s) of Graduation: | ST. GEORGES UNIVERSITY SCHOOL OF MEDICINE, GRENADA (1980) |
| Occupation/Field of Licensure (Code): | PHYSICIAN (MD) |
| State License Number, State of Licensure: | MD06880, RI |
| Specialty: | PSYCHIATRY |
| Drug Enforcement Administration (DEA) Numbers: | |
| Unique Physician Identification Numbers (UPIN): | |
| Name(s) of Health Care Entity (Entities) With Which Subject Is Affiliated or Associated (Inclusion Does Not Imply Complicity In | |

CONFIDENTIAL DOCUMENT - FOR AUTHORIZED USE ONLY

**NATIONAL PRACTITIONER DATA BANK**

# NPDB

P.O. Box 10832
Chantilly, VA 20153-0832

https://www.npdb.hrsa.gov

DCN: 5500000079194093
Process Date: 12/27/2012
Page: 2   of   3
KYROS, WILLIAM

| | |
|---|---|
| the Reported Action.): | |
| Business Address of Affiliate: | |
| City, State, ZIP: | |
| Nature of Relationship(s): | |

**C. INFORMATION REPORTED**

| | |
|---|---|
| Type of Adverse Action: | STATE LICENSURE |
| Basis for Action: | SEXUAL MISCONDUCT (D1) |
| Name of Agency or Program That Took the Adverse Action Specified in This Report: | BOARD OF MEDICAL LICENSURE & DISCIPLINE |
| Adverse Action Classification Code(s): | OTHER LICENSURE ACTION - NOT CLASSIFIED, SPECIFY (1199) |
| Other, as Specified: | AGREEMENT TO CEASE PRACTICE |
| Date Action Was Taken: | 08/12/2009 |
| Date Action Became Effective: | 08/12/2009 |
| Length of Action: | INDEFINITE |
| Total Amount of Monetary Penalty, Assessment and/or Restitution: | |
| Is Subject Automatically Reinstated After Adverse Action Period Is Completed?: | NO |
| Description of Subject's Act(s) or Omission(s) or Other Reasons for Action(s) Taken and Description of Action(s) Taken by Reporting Entity: | IN ADDITION TO RI, THE RESPONDENT IS ALSO LICENSED IN THE FOLLOWING STATES NJ & NY. THE DEPARTMENT OF HEALTH RECEIVED INFORMATION CONCERNING THREE BOUNDARY VIOLATIONS WITH WOMEN WHO WERE HIS PATIENTS. THE RESPONDENT WAS WORKING AS AN EMPLOYEE IN A MENTAL HEALTH PRACTICE THAT LACKED PROPER LICENSURE AND ORGANIZATIONAL STRUCTURE. THE COMPLAINTS TO THE BOARD IMPLICATE THE PROVISIONS OF RIGL 5-37-5.1 (30) FOR SEXUAL CONTACT BETWEEN A DOCTOR AND A PATIENT. RESPONDENT AGREES TO CEASE PRACTICING ANY BRANCH OF MEDICINE. THE RESPONDENT AGREES TO GO FOR AN EVALUATION. |
| Is the Adverse Action Specified in This Report Based on the Subject's Professional Competence or Conduct, Which Adversely Affected, or Could Have Adversely Affected, the Health or Welfare of Patient(s)?: | YES |

☐ Subject Identified in Section B has appealed the reported adverse action.

**D. SUBJECT STATEMENT**

If the subject identified in Section B of this report has submitted a statement, it appears in this section.

**E. REPORT STATUS**

Unless a box below is checked, the subject of this report identified in Section B has not contested this report.

☐ This report has been disputed by the subject identified in Section B.

☐ At the request of the subject identified in Section B, this report is being reviewed by the Secretary of the U.S. Department of Health and Human Services to determine its accuracy and/or whether it complies with reporting requirements. No decision has been reached.

**CONFIDENTIAL DOCUMENT - FOR AUTHORIZED USE ONLY**



**NPDB**

NATIONAL PRACTITIONER DATA BANK

P.O. Box 10832
Chantilly, VA 20153-0832

https://www.npdb.hrsa.gov

DCN: 5500000079194093
Process Date: 12/27/2012
Page: 3   of   3
KYROS, WILLIAM

☐ At the request of the subject identified in Section B, this report was reviewed by the Secretary of the U.S. Department of Health and Human Services and a decision was reached. The subject has requested that the Secretary reconsider the original decision.

☐ At the request of the subject identified in Section B, this report was reviewed by the Secretary of the U.S. Department of Health and Human Services. The Secretary's decision is shown below:

Date of Original Submission:     12/27/2012
Date of Most Recent Change:     12/27/2012

**This report is maintained under the provisions of: Title IV; Section 1921**

The information contained in this report is maintained by the National Practitioner Data Bank for restricted use under the provisions of Title IV of Public Law 99-660, as amended, Section 1921 of the Social Security Act, and 45 CFR Part 60. All information is confidential and may be used only for the purpose for which it was disclosed. Disclosure or use of confidential information for other purposes is a violation of federal law. For additional information or clarification, contact the reporting entity identified in Section A.

──────────── **END OF REPORT** ────────────

**CONFIDENTIAL DOCUMENT - FOR AUTHORIZED USE ONLY**

# EXHIBIT T



**KELLY & MANCINI PC**
**ATTORNEYS AT LAW**

*Attorneys and Counselors at Law*

April 25, 2017

**VIA FIRST-CLASS MAIL**
Board of Medical Licensure & Discipline
Department of Health
Three Capitol Hill
Providence, RI 02908

      Re:   *Dr. William Kyros - File #: C08-250 & C09-252*

Dear Members of the Board:

      Enclosed herein please find copies of Dr. Kyros' Certificates of Completion for Continuing Medical Education classes taken on April 6, 2017 to supplement those which were previously submitted to the Board on April 13, 2017.

      Should you have any questions, please do not hesitate to contact our office.

Sincerely,

Jackson C. Parmenter

Enclosures

cc:   Steven Morris, Esq. (via e-mail)
      James McDonald (via e-mail)

**William P. Kyros, M.D. (MD06880) Continuing Medical Education Credits (2013-Present)**

| Date | Title | Credits Received | Certificate of Completion? |
|---|---|---|---|
| February 7, 2013 | Infection Control | 5 | Yes |
| April 5, 2014 | Type 2 Diabetes | 5 | Yes |
| April 5, 2014 | Pressure Ulcers | 10 | Yes |
| April 5, 2014 | Chronic Pain | 15 | Yes |
| May 5, 2014 | Palliative Care | 15 | Yes |
| March 27, 2015 | Hypertension | 5 | Yes |
| March 27, 2015 | Cancer Screening | 10 | Yes |
| March 27, 2015 | Prescription Opioids | 15 | Yes |
| November 19, 2015 | Medical Marijuana | 5 | Yes |
| November 19, 2015 | Ischemic Stroke | 10 | Yes |
| November 19, 2015 | PTSD | 15 | Yes |
| March 7, 2016 | Medical Ethics | 5 | Yes |
| April 6, 2017 | Burnout in Physicians | 5 | Yes |
| April 6, 2017 | Parkinson's Disease | 10 | Yes |
| April 6, 2017 | Low Back Pain | 15 | Yes |
|  |  |  |  |
|  |  | **Total: 145** |  |
|  |  |  |  |
|  |  |  |  |

# Certificate of Completion

NetCE certifies that

William P. Kyros  MD06880

has participated in the enduring material titled
#41030 Burnout in Physicians
on April 6, 2017
and is awarded 5

AMA PRA Category 1 Credit(s)™.

Freda S. O'Brien
Director of Academic Affairs

Erin K. Meinyer
Executive Director

NetCE is accredited by the Accreditation Council for Continuing Medical Education to provide continuing medical education for physicians.

Florida CE Broker Provider #50-2405, Board of Medicine.

This activity is designed to comply with the requirements of California Assembly Bill 1195, Cultural and Linguistic Competency.

**NetCE**
Continuing Education

PO BOX 997571   SACRAMENTO, CALIFORNIA 95899-7571   1-800-232-4CEU



# Certificate of Completion

NetCE certifies that

William P. Kyros  MD06880

has participated in the enduring material titled

#98770 Parkinson Disease

on April 6, 2017

and is awarded 10

AMA PRA Category 1 Credit(s)™.

*Freda S. O'Brien*
**Freda S. O'Brien**
*Director of Academic Affairs*

*Erin K. Meinyer*
**Erin K. Meinyer**
*Executive Director*

NetCE is accredited by the Accreditation Council for Continuing Medical Education to provide continuing medical education for physicians.

Florida CE Broker Provider #50-2405, Board of Medicine.

This activity is designed to comply with the requirements of California Assembly Bill 1195, Cultural and Linguistic Competency.



**NetCE**
Continuing Education

PO BOX 997571    SACRAMENTO, CALIFORNIA 95899-7571    1-800-232-4CEU

# Certificate of Completion

NetCE certifies that

William P. Kyros  MD06880

has participated in the enduring material titled

#94100 Low Back Pain

on April 6, 2017

and is awarded 15

AMA PRA Category 1 Credit(s)™.

*Freda S. O'Brien*
**Freda S. O'Brien**
**Director of Academic Affairs**

*Erin K. Meinyer*
**Erin K. Meinyer**
**Executive Director**

NetCE is accredited by the Accreditation Council for Continuing Medical Education to provide continuing medical education for physicians.

Florida CE Broker Provider #50-2405, Board of Medicine.

This activity is designed to comply with the requirements of California Assembly Bill 1195, Cultural and Linguistic Competency.



**NetCE**
**Continuing Education**

PO BOX 997571   SACRAMENTO, CALIFORNIA 95899-7571   1-800-232-4CEU

# EXHIBIT U



Department of Health

Three Capitol Hill
Providence, RI 02908-5097

TTY: 711

www.health.ri.gov

William Kyros M.D.

15 A Riverview Ave

Mashpee, MA 02649


Encl: Agreement Cease to Practice 8/14/2009

9/11/2017


Dr. Kyros,


The Rhode Island Board of Medical Licensure & Discipline Licensing Committee appreciates your visit to the committee on August 3rd, 2017. Given the complexity of your application from the previous adverse action of August 14th, 2009, the committee tabled the matter that day and considered this matter again on September 7th, 2017.

At the September 7th Licensing Committee meeting, the committee voted to have you attend the Sante Center for a re-evaluation since so much time has elapsed since the original evaluation. The committee also requires you to attend the Center for Personalized Education for Physicians (CPEP) to assess your clinical competency to practice psychiatry.

Once both of these evaluations are completed, the committee will reassess your application for a license as a physician.


Kind Regards,

James V. McDonald M.D., M.P.H.

Chief Administrative Officer, BMLD

3 Capitol Hill

Providence, Rhode Island 02908-5097

Cc: Jackson Parmetier Esq.

# EXHIBIT V



**KELLY & MANCINI PC**
**ATTORNEYS AT LAW**

*Attorneys and Counselors at Law*

September 18, 2017

**VIA CERTIFIED MAIL RETURN RECEIPT REQUESTED**

Dr. James V. McDonald, M.D., M.P.H
Department of Health
Three Capitol Hill
Providence, RI 02908
*James.McDonald@health.ri.gov*

> **RE:   *Dr. William Kyros - File #: C08-250 & C09-252***
> ***DEMAND FOR FORMAL HEARING***

Dear Dr. McDonald and Members of the Board:

      Pursuant to Rule 6.2 of the Rules and Regulations Pertaining to Practices and Procedures Before the Rhode Island Department of Health (the "Rules"), demand is hereby made, on behalf of Dr. William Kyros ("Dr. Kyros"), for a formal hearing. Specifically, Dr. Kyros demands a formal hearing relative to the Board of Medical Licensure and Discipline Committee's ("Board") decision dated September 11, 2017, attached hereto as <u>Exhibit A</u>, as well as Dr. Kyros' fitness to return to the practice of medicine as contemplated in the Consent Order attached hereto as <u>Exhibit B</u>. Specifically, this demand is made in the wake of the Board's unfounded determination that Dr. Kyros must <u>again</u> attend the Sante Center for a re-evaluation and attend the Center for Personalized Education for Physicians. Since 2009, Dr. Kyros has complied with each and every demand made by the Board relative to treatment and evaluation – all of which have indicated that Dr. Kyros is fit to return to practice. There is no reason that Dr. Kyros should have to endure any more treatment and evaluation before having his license reinstated. A brief overview of the relevant facts is highly instructive here.

      In August, 2009, following complaints of unprofessional conduct, Dr. Kyros entered into a Consent order with the Board to cease practice. *See* <u>Exhibit B</u>, attached hereto for a copy of Agreement to Cease Practice (the "Agreement"). Subsequent to executing that Agreement, several steps were taken to professionally evaluate Dr. Kyros and to enhance and maintain his academic credentials with the anticipation that he would return to the practice of medicine once cleared. In compliance with the Agreement, and the recommendation of the Board, Dr. Kyros submitted himself for a professional evaluation at the Sante Center for Health in the state of Texas in August of 2009. Despite a lengthy assessment, the Sante Center did not reach a definitive conclusion. Without conclusive results, the Sante Center nonetheless recommended a course in professional conduct and lengthy psychotherapeutic supervision, personal therapy and monitored practice. Importantly, it did not recommend that Dr. Kyros cease practice.

Page 2
Dr. James V. McDonald, M.D., M.P.H.
September 18, 2017

Also in 2009, Dr. Kyros was treated by a Board Certified Psychiatrist. Specifically, he was treated for trauma symptoms engendered by the personal stress caused by the complaints asserted against him. Dr. Kyros remained in treatment with this psychiatrist for four (4) years. In 2013, the treating psychiatrist reported the following: "After working with Dr. Kyros these past 3.5 years, I saw no evidence of any characterological traits or patterns consistent with or evidencing a propensity or likelihood of Dr. Kyros exhibiting boundary issues." See Exhibit C, attached hereto for the Evaluation by Dr. Gene Jacob dated May 13, 2013. Moreover, it was – and is – the opinion of that treating psychiatrist that Dr. Kyros was able, as of May 13, 2013, to resume clinical practice. Interestingly, there was no mention of the need for probation or supervision of clinical practice in that report. See Exhibit C.

Additionally, Dr. Kyros was evaluated by another psychiatrist from October 2009 through late 2010. This psychiatrist, while admittedly influenced by the reservations expressed in the Sante Center evaluation as to Dr. Kyros's truthfulness, ultimately stated: "I can say that over the months of talking to him, I have had no reason to doubt his sincerity or truthfulness." See Exhibit D, attached hereto for Dr. Edward Brown's summary dated August 2, 2010.

Furthermore, at the recommendation of the Physicians Health Committee, Dr. Kyros was evaluated by a Forensic Psychiatrist, Dr. Harrop, in August of 2013. This evaluation specifically addressed Dr. Kyros' "fitness for duty," or work readiness as a physician. See Exhibit E, attached hereto for a copy of Dr. Daniel Harrop's evaluation. Dr. Harrop noted that after conducting extensive examinations that Dr. Kyros' mental status was entirely within normal limits. Dr. Harrop noted that Dr. Kyros had never had any other legal problems: no arrests, no civil judgments, and no malpractice suits. See Exhibit E. Dr. Harrop found no evidence of psychiatric disorder and concluded Dr. Kryos was "fit-for-duty," should have his license returned unrestricted and be able to resume his practice. See Exhibit E.

Thereafter, the Physicians Health Committee reviewed Dr. Harrop's evaluation and stated the psychiatric symptoms that lead to Dr. Kryos seeking treatment (the trauma and depression resulting from his fear of losing his livelihood and reputation permanently) have abated. See Exhibit F, attached hereto. The Physicians Health Committee noted Dr. Jacob's and Dr. Harrop's findings that Dr. Kyros is no longer impaired medically or psychologically and concluded that "we have no reason to doubt this conclusion." See Exhibit F.

Despite multiple clearances, the Board requested further evaluation. Accordingly, in November of 2015, Dr. Kyros was again evaluated by Dr. Harrop. Dr. Harrop confirmed his previous evaluation regarding Dr. Kyros' fitness to practice and indicated that Dr. Kyros was "fit for duty to have his medical license returned unrestricted…" See Exhibit G, attached hereto.

Dr. Kyros was also evaluated by the Physicians Health Program ("PHP") in 2010 and 2013. Although PHP, as a matter of policy, does not make recommendations on reentry when physicians have been referred for possible boundary violations, the PHP reviewed the documentation and recommendations from treating and evaluating behavioral health care providers and had no reason to believe Dr. Kyros was impaired medically or psychologically.

Page 3
Dr. James V. McDonald, M.D., M.P.H.
September 18, 2017

Additionally, Dr. Kyros has taken steps to further his education. He successfully completed a 20.5 credit category 1 CME course entitled: Intensive Course in Medical Ethics, Boundaries and Professionalism at Case Western Reserve University School of Medicine in Cleveland, Ohio in September of 2010. Importantly, Dr. Kyros has provided evidence of meeting the requirement for Continuing Medical Education for the timeframe of 2010-present.

On November 17, 2016, Dr. Kyros requested a meeting with the Board to discuss reinstatement of his license to practice. *See* Exhibit H, attached hereto, for a copy of the November 17, 2016 correspondence from Dr. Kyros' counsel to the Board. Finally, in February of 2017, the Board sent Dr. Kyros a reinstatement application so that the Board could "further consider Dr. Kyros' request for reinstatement." *See* Exhibit I, attached hereto, for a copy of that February 2, 2017 correspondence from the Board. Thereafter, on March 16, 2017, a formal demand for hearing was made upon the Board. *See* Exhibit J, attached hereto, for a copy of the March 16, 2017 Demand for Formal Hearing correspondence. Ignoring the demand for hearing, the Board sent a letter dated May 5, 2017 which requested Dr. Kyros' appearance before the Licencing & Policy Committee on August 3, 2017. *See* Exhibit K, attached hereto. Dr. Kyros attended that August 3, 2017 meeting with the Board and demonstrated his ability to return to practice and his compliance with each and every recommendation of the Board. In the wake of that meeting, the Board now wants Dr. Kyros to, again, at more costs to Dr. Kyros, go through the same evaluation he did previously – a demand that is without basis in law or fact. *See* Exhibit A, attached hereto, for a copy of the Board's September 11, 2017 correspondence demanding that Dr. Kyros go for re-evaluation and treatment.

Notwithstanding the fact that Dr. Kyros has complied with each and every recommendation of the Board, and despite the clinical evaluations cited herein which indicate that Dr. Kyros should be permitted to return to practice on an unrestricted basis, the Board has refused to reinstate his license and continuously dodged Dr. Kyros' reinstatement requests. The instant demands being levied upon Dr. Kyros by the Board are no exception, and necessitate a hearing to demonstrate that Dr. Kyros has complied with all the demands of the Board in accordance with the Consent Order attached hereto as Exhibit B, is fit to return to practice and should have his license returned unrestricted.

With that said, Dr. Kyros hereby renews his demand a formal hearing before the Department in accordance with the Agreement attached hereto as Exhibit B. Exhibit B makes clear that the Department is required to give Dr. Kyros this opportunity. In the event we do not hear from the Department regarding this request for a formal hearing within ten (10) days from the date hereof, Dr. Kyros will exercise any and all rights and/or privileges available to him at law or in equity. This will include an action initiated in Providence Superior Court for the Board's willful violation of his right to due process and a cause of action for attorneys' fees and costs under the Rhode Island Equal Access to Justice Act. This cause of action will be exceedingly strong should the Board continue to refuse Dr. Kyros' reinstatement.

**Page 4**
**Dr. James V. McDonald, M.D., M.P.H.**
**September 18, 2017**

I look forward to hearing from you within ten (10) business days of this correspondence. Should you have any questions please do not hesitate to contact us at our office.

Respectfully,

Jackson C. Parmenter

Enclosures

# EXHIBIT W



Department of Health

Three Capitol Hill
Providence, RI 02908-5097

TTY: 711

www.health.ri.gov

September 26, 2017

William Kyros M.D.
15 A Riverview Ave
Mashpee, MA 02649

Dr. Kyros,

This is confirming receipt of your letter titled "DEMAND FOR FORMAL HEARING", received
September 21, 2017.  I will forward this letter to The Rhode Island Board of Medical Licensure
& Discipline Licensing Committee for their next meeting, October 5th, 2017.  You are welcome
to appear before the committee at 9:30 am to discuss your response in person.

At present your application for a physician license has not been approved or denied. If you are
not willing to attend the Sante Cente and CPEP as the Committee requested, you can
communicate that to the committee at that time.

Kind Regards,

James V. McDonald M.D., M.P.H.
Chief Administrative Officer, BMLD
Rhode Island Department of Health
3 Capitol Hill
Providence, Rhode Island 02908-5097

Cc:    Jackson Parmetier Esq.
       128 Dorrance Street, Suite 300
       Providence, Rhode Island 02903

# EXHIBIT X



**KELLY & MANCINI PC**
**ATTORNEYS AT LAW**

*Attorneys and Counselors at Law*

October 3, 2017

**VIA FIRST-CLASS MAIL AND VIA E-MAIL**
Dr. James V. McDonald, M.D., M.P.H
Department of Health
Three Capitol Hill
Providence, RI 02908
*James.McDonald@health.ri.gov*

      *Re:    Dr. William Kyros – File Nos. C08-250 and C09-252*

Dear Dr. McDonald:

      This correspondence is in response to your letter dated September 26, 2017. In your September 26, 2017 correspondence, you indicated that we are welcome to appear before the Medical Licensure and Discipline Committee on October 5, 2017 to discuss our September 18, 2017 request for a formal hearing in person. While we appreciate the offer, we believe that the September 18, 2017 correspondence was sufficiently detailed for the Committee to make a decision regarding the hearing request.

      Moreover, please be advised that in no way did our letter state that Dr. Kyros was unwilling to attend the Sante Center and CPEP as requested by the Committee. Rather, we feel that neither the Sante Center nor the CPEP is necessary for the reasons outlined in our September 18, 2017 correspondence. Accordingly, Dr. Kyros is requesting a formal hearing to determine whether attending the Sante Center or the CPEP is even necessary given that he has already gone through for treatment, or if his license to practice should be immediately reinstated without conditions or restrictions. If after a formal hearing, a decision is issued requiring Dr. Kyros to attend the Sante Center and CPEP, we will evaluate Dr. Kyro's options at that time. In the interim, we respectfully request an opportunity to have a formal hearing to demonstrate that Dr. Kyros does not need to attend the Sante Center or CPEP as requested by the Committee, and should be able to return to practice immediately, unrestricted.

      Should you have any questions, please do not hesitate to contact me at the office.

Sincerely,

Jackson C. Parmenter

cc:    Steven Morris, Esq. (via e-mail)

# EXHIBIT Y



Department of Health

Three Capitol Hill
Providence, RI 02908-5097

TTY: 711
www.health.ri.gov

October 10, 2017

William Kyros M.D.
15 A Riverview Ave
Mashpee, MA 02649

RE: APPLICATION FOR MEDICAL LICENSURE IN RHODE ISLAND

Dr Kyros:

The Licensing Committee of the Rhode Island Board of Medical Licensure and Discipline (BMLD) has reviewed your application for licensure in detail. The committee appreciates your appearance in person to discuss your application as well as your supplemental correspondence.

The committee has recommended denial of your application. You are entitled to a formal hearing by which you may appeal this decision. Your request for formal hearing must be made to my office within 30 days from the above date of this letter.

If you elect not to request a formal hearing within 30 days of the date of this letter, this decision will be considered final and must be reported to the National Practitioner Data Bank.

Sincerely,

James V. McDonald, M.D. MPH
Chief Administrative Officer

# EXHIBIT Z



KELLY & MANCINI PC
ATTORNEYS AT LAW

*Attorneys and Counselors at Law*

October 12, 2017

**VIA FIRST-CLASS MAIL AND VIA E-MAIL**
Dr. James V. McDonald, M.D., M.P.H
Department of Health
Three Capitol Hill
Providence, RI 02908
*James.McDonald@health.ri.gov*

   **Re:**  *Dr. William Kyros* – **_Formal Hearing Request_**

Dear Dr. McDonald:

   This correspondence is in response to your letter dated October 10, 2017 denying Dr. William Kyros' Reinstatement Application. This correspondence shall constitute Dr. Kyros' formal hearing request relative to the Department's decision contained in your October 10, 2017 correspondence. I look forward to hearing from you regarding hearing dates so we can move this matter forward.

Sincerely,

Jackson C. Parmenter

cc:  Steven Morris, Esq. (via e-mail)

# EXHIBIT AA

**STATE OF RHODE ISLAND DEPARTMENT OF HEALTH**
**BOARD OF MEDICAL LICENSURE AND DISCIPLINE**





November 3, 2017

IN THE MATTER OF:

William Kyros, M.D.
**LICENSE APPLICATION**

## <u>NOTICE AND TIME OF HEARING</u>

Dear Dr. Kyros:

Your request for a formal hearing regarding the recommendation from the Licensing Committee of the Rhode Island Board of Medical Licensure and Discipline (BMLD) is granted.

Pursuant to the provisions for a hearing in Rhode Island General Laws §§ 5-37-5.3 and 5.4 (1956) as amended, you are hereby given notice that the Rhode Island Board of Medical Licensure and Discipline will hold a hearing to receive and act upon evidence that you may have violated certain laws and regulations as set forth in the previously delivered Specification of the Charges. The hearing will be conducted on the question of whether your license as a physician in Rhode Island should be revoked, suspended and/or otherwise disciplined.

You have been scheduled to appear for the hearing on **December 7, 2017 at 2:00 PM** at the offices of the Department of Health, Board of Medical Licensure and Discipline, Room 205, Cannon Building, Three Capitol Hill, Providence, Rhode Island.

The hearing will be conducted in accordance with the *Rules and Regulations Pertaining to Practices and Procedures Before the Rhone Island Department of Health* (Regulations). Once the hearing commences, you will have the opportunity to appear personally and to have counsel present, with the right to produce witnesses and evidence on your own behalf, to cross examine witnesses testifying against you, to examine documentary evidence as may be produced against you, to have subpoenas issued by the Board, and to exercise all other rights set forth in the Regulations.

If you wish to request subpoenas, such requests must be received prior to the date of your hearing. If you plan to introduce materials at this hearing, please have five (5) copies available for distribution to the hearing panel and counsel.

**STATE OF RHODE ISLAND DEPARTMENT OF HEALTH**
**BOARD OF MEDICAL LICENSURE AND DISCIPLINE**

If you fail to appear at the hearing once it is scheduled and you are made aware of the scheduled hearing date, the Board of Medical Licensure and Discipline will hear evidence regarding the alleged unprofessional conduct and will then render a decision based thereon, including sanctions such as license revocation and an administrative fee of up to $10,000.00. Although you would have a right to appeal the decision to the Superior Court, should you fail to appear, the decision would still become a public document.

A stenographic record of the hearing will be kept.

FOR THE BOARD,

Stephen Morris, Esq
Deputy Chief Legal Counsel
Office of Health and Human Services
Rhode Island Department of Health

2                                    Board of Medical Licensure & Discipline
                                           William Kyros M.D.

# EXHIBIT AB

**STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS**
**DEPARTMENT OF HEALTH**
**BOARD OF MEDICAL LICENSURE AND DISCIPLINE**
**THREE CAPITOL HILL**
**PROVIDENCE, RHODE ISLAND 02908**

| | | |
|---|---|---|
| IN THE MATTER OF: | : | |
| | : | |
| William Kyros, M.D. | : | **BMLD** |
| | : | **License application** |
| Respondent. | : | |
| | : | |

## DECISION

### I.    INTRODUCTION

The above-entitled matter came before a hearing committee[1] of the Board of Medical Licensure and Discipline ("Board") pursuant to a Time and Notice of Hearing and a Specification of Charges[2] issued to William Kyros, M.D. ("Respondent"). The Respondent applied for re-licensing ("License") as a physician pursuant to R.I. Gen. Laws § 5-37-1 *et seq.* A hearing was held on December 7, 2017, January 31 and May 17, 2018 with both parties represented by counsel. The Respondent filed a brief and both parties made oral arguments on August 8, 2018.

### II.    JURISDICTION

The Board has jurisdiction over this matter pursuant to R.I. Gen. Laws § 5-37-1 *et seq.*, R.I. Gen. Laws § 42-35-1 *et seq.*, 216-RICR-40-05-1, *Licensure and Discipline of Physicians* Regulation, and 216-RICR-10-05-4 *Practices and Procedures Before the Rhode Island Department of Health* Regulation.

---

[1] The Committee members were Sandra Coletta, Joseph Dowling, M.D., and Leonard Green. See R.I. Gen. Laws § 5-37-5.2.
[2] See Department's Exhibits One (1) and Two (2) (Notice and Time of Hearing and Specification of Charges both dated November 3, 2017).

### III.     ISSUE

Whether the Respondent should be re-licensed pursuant to his 2009 Agreement to Cease

Practice ("Agreement").  See Department's Exhibit Three (3).[3]

### IV.     MATERIAL FACTS AND TESTIMONY

It is undisputed that in 2009, the Respondent signed the Agreement.   The Agreement

recited the facts that the Respondent is Board Certified in General Psychiatry and that during the

Board's investigation of an April, 2009 boundary violation complaint against the Respondent, the

Board received information concerning three (3) other boundary violations by the Respondent with

women who were his patients.  The Agreement found that the boundary violations dated back to

the early 1990's and more recently that year.  By signing the Agreement, the Respondent waived

his right to a hearing and agreed to cease practicing any branch of medicine and agreed to go for

an evaluation at the Sante Center for Healing, Argyle, Texas ("Sante Center").   The Agreement

provided that the Board would make a final determination on final sanctions after it reviewed and

considered the evaluation report from the Sante Center.

---

[3] R.I. Gen. Laws § 5-37-4 speaks of the refusal by the Board to grant an original license after application. However, since
this matter arose out of the Agreement, the Specification of Charges alleged that the Respondent violated R.I. Gen.
Laws § 5-37-5.1(24).  It then further requested that a Hearing Committee make findings of fact and conclusions of
law and if the charges are sustained, said Committee determine the discipline to be imposed on the Respondent. R.I.
Gen. Laws § 5-37-5.1 defines "unprofessional conduct" to include as follows:

> Unprofessional conduct. – The term "unprofessional conduct" as used in this chapter includes,
> but is not limited to, the following items or any combination of these items and may be further defined
> by regulations established by the board with the prior approval of the director:
> ***
> (24) Violating any provision or provisions of this chapter or the rules and regulations of the
> board or any rules or regulations promulgated by the director or of an action, stipulation, or agreement
> of the board

The issue before the Board is whether the Respondent should be allowed to be re-licensed as a physician.
This is not an issue of whether the Respondent engaged in unprofessional conduct by violating a Board order and if
so, what discipline should be imposed, but rather the issue is whether because of previous complaints of unprofessional
conduct that resulted in the Agreement should the Respondent be allowed to be re-licensed in light of the requirements
in the Agreement.  The way the Agreement was written is that any decision by the Board is a final determination of
sanctions.  The determination by the Committee is a determination of sanctions pursuant to the Agreement.

It is undisputed that the Respondent went to the Sante Center for an evaluation. The report by the Sante Center ("Report") deferred the issue of competency to the Board and found that the Respondent had not been fully truthful or was in denial about his actions. The Report found that his underlying issues required exploration in psychodynamic oriented psychotherapeutic supervision, personal therapy, and monitored practice. The Report recommended that if the Respondent returned to practice that he be monitored. See Department's Exhibit Four (4).

The Respondent[4] testified that he signed the Agreement in August, 2009 and as part of that Agreement, he went to the Sante Center. The Respondent testified that he did not commit the allegations referenced in the Agreement and disputed that there were violations from the 1990's. He testified that the complaint in 1991 was retaliatory by a ringleader with a very checkered past and that he was exonerated in 1991 as well as from the 1999 complaint. He testified that the Board did not hear about either incidence in 1991 or 1999. The Respondent testified that the 2008 complaint was a false complaint from a patient who complained that he said inappropriate things to her because her husband found out she was flashing her chest to truckers and "shacking" up with them.[5] He testified that the 2009 complaint was from an addicted patient. He testified that his attorney told him to sign the Agreement, but he disagreed with it.

The Respondent testified that he believed he has complied with the Report except for the return to practice because the Board would not let him. He testified that he has completed all required continuing medication education ("CME") credits since 2009. He testified that on August 27, 2009 which was seven (7) days after his treatment at the Sante Center, his attorney wrote to the Board and again on September 30, 2009 regarding what his next steps should be. See

---

[4] The Respondent was initially called by the Department as a Department witness so that this summary of testimony is from his direct by both parties and cross-examination.

[5] The patient involved in this complaint testified on behalf of the Department. Her testimony as to what occurred that day was very different from the Respondent's testimony.

Respondent's Exhibits Three (3) and Four (4) (said letters). He testified that he does not remember receiving a response from the Board regarding the September 30, 2009 letter. He testified that he received an evaluation on August 22, 2010 from a psychiatrist, Dr. Edward Brown. He testified that he saw Dr. Brown in 1991 and 1992 after the 1991 complaint so contacted him again in 2009 on advice from his attorney since they had not heard from the Board. He testified that he saw Dr. Brown from 2009 to 2011. See Respondent's Exhibit Five (5) (August 2, 2010 letter to the Board from Dr. Edward M. Brown). He testified that he thinks Dr. Brown's report satisfies the Report since he engaged in psychodynamic and psychotherapeutic personal therapy with him.

The Respondent testified that he was also treated by Dr. Gene Jacobs for three-and-a-half years and started with him after starting with Dr. Brown. He testified that he engaged in psychodynamic and psychotherapeutic personal therapy with Dr. Jacobs. He testified that his attorney suggested that since more time had passed that he contact the Board and provide another psychiatric report so that he provided Dr. Jacobs' report in 2013. See Respondent's Exhibit Six (6) (Dr. Jacobs' letter of May 13, 2013 detailing his treatment of the Respondent for the last three-and-a-half years). He testified that in 2013, his attorney wrote to the Board and they met with Dr. James McDonald, the Board administrator. He testified that he received a forensic psychiatry report from Dr. Daniel Harrop after seeing him for an extensive evaluation and submitted that report to the Board. See Respondent's Exhibit Eight (8) (August 19, 2013 letter from Dr. Harrop indicating that he has consulted with Dr. Brown and Dr. Jacobs on this matter and performed a forensic evaluation of Respondent on his fitness for duty finding he is not medically or psychiatrically impaired). He testified that his License application was denied in 2013 and he did not have the money to challenge that decision.

4

The Respondent testified that he hired a new attorney in 2014 and in 2015, they met with Dr. McDonald regarding being re-licensed. He testified that after the meeting, the Board requested that he return to the Sante Center for evaluation and go to the Center for Personalized Education for Physicians ("CPEP"). He testified that his clinical competence has never been under issue until this came up and he disagreed with it. See Respondent's Exhibits 13, 14, 15 (letters from Respondent's attorney to the Board in 2016 regarding application for License); 18 and 20 (Respondent's March 23 and April 13, 2017 reinstatement application); 12 (November 5, 2015 letter from Dr. Harrop to Board updating his 2013 report); 22 (September 11, 2017 letter from Board to Respondent finding he should return to the Sante Center for evaluation and to CPEP because of the lapse in time); 26 (October 3, 2017 letter from Board to Respondent denying his reinstatement application); and 27 (Respondent's October 12, 2017 request for hearing).

The Respondent testified that under the Agreement he agreed to abide by the recommendations of the Sante Center and feels that he has and that he did not receive guidance from the Board. He testified that the Board is to make the final decision after it considers the Report, but he does not agree with the Agreement and only signed it because his attorney told him to. He testified that the last time he saw a patient was in 2009.

Dr. James McDonald ("McDonald"), Chief Administrative Officer of the Board testified on behalf of the Department. He testified that he reviews complaints and the statute authorizes recouping costs for proceedings against physicians not to exceed $10,000 and he has kept track of the staff time and stenographic invoices. See Department's Exhibits 8 (staff time for himself and the attorneys, stenographic invoices) and 8A (copies of some stenographic invoices).[6]

---

[6] After hearing, the spreadsheet was updated to include the costs of all hearings for a total cost of $4,858.41. See Department's email of September 26, 2018 to Respondent's attorney and the Hearing Committee's hearing officer and made part of Department's Exhibit Eight (8) (spreadsheet of Department's costs of administrative hearing).

McDonald testified that he has read the Agreement[7] and reviewed the Report in detail. He testified that he is sure the Board committees considered the psychiatrists' reports submitted by the Respondent, but presumably the licensing committee did not find them compelling or convincing and he himself did not either. He testified that the Respondent has been out of practice for a long time and the reports do not prove that he is competent to practice medicine. He testified that CPEP is a physician reentry program with mock patients, mock history, and mock physical findings so it is a formal structure to assess someone's practice and is tailored to the specialty of the physician. He testified that there is no report showing the Respondent was clinically competent to practice medicine. He testified that Dr. Jacobs did not assess clinical competency, but rather addressed any psychiatric conditions that would be a barrier to practice. He testified that physicians go to CPEP when they have a large gap in practicing medicine such as time off to raise a family. He testified that the Respondent went in front of several committees and no one voted to grant him a License and they were most worried about his character and his competency.

## V.    **DISCUSSION**

### A.    **Arguments**

The Respondent argued that he has complied with the Report in every possible way except those (e.g. practicing) that he could not accomplish. The Respondent argued that his reports from Doctors Brown, Jacobs, and Harrop meet the Report's requirements for further treatment. The Respondent argued that he should be allowed to regain his License without any further restrictions.

The Department argued that under the Agreement, the Board is to determine the appropriate sanctions upon review of the Report and since the Respondent has not been seeing

---

[7] This is a summary of his direct and cross-examination as well as questioning from the Hearing Committee.

6

patients, his competency needs to be evaluated so that the Board wants the Respondent to return to the Sante Center for evaluation and complete CPEP to determine competency.

**B.      Standard of Review for an Administrative Hearing**

It is well settled that in formal or informal adjudications modeled on the Federal Administrative Procedures Act, the initial burdens of production and persuasion rest with the moving party. 2 Richard J. Pierce, Administrative Law Treatise § 10.7 (2002). Unless otherwise specified, a preponderance of the evidence is generally required in order to prevail. *Id.* See *Lyons v. Rhode Island Pub. Employees Council 94*, 559 A.2d 130, 134 (R.I. 1989) (preponderance standard is the "normal" standard in civil cases). This means that for each element to be proven, the fact-finder must believe that the facts asserted by the proponent are more probably true than false. *Id.* When there is no direct evidence on a particular issue, a fair preponderance of the evidence may be supported by circumstantial evidence. *Narragansett Electric Co. v. Carbone*, 898 A.2d 87 (R.I. 2006).

**C.      The Agreement**

The Agreement provided as follows:

> Respondent agrees to cease practicing any branch of medicine. The Respondent agrees to go for an evaluation at the Sante Center for Healing, Argyle, TX. The evaluation report must be sent directly to the Board of Medical Licensure and Discipline. The Board will make a determination on final sanctions after it reviews and considers the evaluation report from Sante Center for Healing.

**D.      Whether Respondent Should be Licensed**

The Respondent denied the allegations referenced in the Agreement and spent a long time testifying as to why he could not have committed the various alleged boundary violations. However, the issue before the Committee is the Respondent's application for re-licensing and what sanctions should be imposed on the Respondent as provided for in the Agreement. Based on the

7

Agreement, the Board is to take into consideration the Sante Center's Report when determining any licensing and discipline issues.

The Report deferred to the Board the issue of competency to practice medicine. Competency is not just an issue of whether there are medical or psychiatric barriers to being able to practice medicine, but also whether someone is able to actually able to perform the job of practicing medicine. E.g. clinical competence.   The Respondent has not treated a patient since 2009.

Pursuant to the Agreement and based upon the foregoing, the Committee unanimously found that in order to be re-licensed, the Respondent shall ensure competency by satisfactorily completing the fitness for duty and clinical competency assessment at CPEP and by following all recommendations from CPEP.   The Respondent shall keep the Board informed of his progress at CPEP on an ongoing basis. Additionally, the Respondent shall satisfy all statutory requirements for licensing (e.g. CME's, application, fees).

E.     **Administrative Fees**

The Department sought the imposition of administrative fees pursuant to R.I. Gen. Laws § 5-37-6.3.[8]   The Board voted unanimously to impose an administrative fee of $2,000 for the cost of this hearing as the Respondent was found to have violated R.I. Gen. Laws § 5-37-5.1.[9]

---

[8] R.I. Gen. Laws § 5-37-6.3 provides in part as follows:

> Sanctions. – If the accused is found guilty of unprofessional conduct as described in § 5-37-6.2, the director, at the direction of the board, shall impose one or more of the following conditions:
> ***
> (8) Assess against the physician the administrative costs of the proceedings instituted against the physician under this chapter; provided, that this assessment does not exceed ten thousand dollars ($10,000).

[9] While this matter was concerned with the denial of a licensing application, the basis for that refusal was the Agreement and the determination of what was to be the final sanction. See footnote three (3).

## VI.    <u>FINDING OF FACTS</u>

1.      Pursuant to R.I. Gen. Laws § 5-37-1 *et seq*., the Respondent applied on March 23 and April 14, 2017 to be re-licensed as a physician in the State of Rhode Island and his application was denied by letter dated October 10, 2017.

2.      On November 3, 2017, a Notice and Time of Hearing and a corresponding Specification of Charges was issued to the Respondent by the Board.

3.      A full hearing on this matter was held on December 7, 2017 and January 31 and May 17, 2018.  The Respondent's brief was timely filed and oral argument was made on August 8, 2018.

4.      The facts contained in Section IV and V are reincorporated by reference herein.[10]

## VII.    <u>ORDER</u>

Pursuant to the Agreement, the Committee found that in order to be re-licensed, the Respondent shall ensure competency by satisfactorily completing the fitness for duty and clinical competency assessment at CPEP and by following all recommendations from CPEP.[11]  The Respondent shall keep the Board informed of his progress at CPEP on an ongoing basis. Additionally, the Respondent shall satisfy all statutory requirements for licensing (e.g. CME's, application, fees).

---

[10] The Respondent submitted in his brief an extensive list of "proposed finding of facts."  The Committee reviewed all the evidence and made determinations regarding the pertinent facts as set forth above.  These are the finding of facts.

[11] Note that this is not the Reentry to Clinical Program at CPEP.  Those seeking to reenter practice after discipline are directed to CPEP's clinical competence assessment program. Along with clinical competency, the Respondent shall complete the fitness for duty evaluation.  The method for completing these programs is determined by CPEP.

Entered this __14th__ day of November, 2018.

Sandra Coletta
Board Member

Joseph Dowling, M.D.
Board Member

Leonard Green
Board Member

Ratified and approved by the Director of the Department of Health:

Nicole Alexander-Scott, M.D.

Sandra Coletta, hereby represents that she read the transcript for the hearing, reviewed the evidence in the administrative record, and adopts the summary of testimony, findings of facts, and Conclusions of Law as her own.

Joseph Dowling, M.D., hereby represents that he read the transcript for the hearing, reviewed the evidence in the administrative record, and adopts the summary of testimony, findings of facts, and Conclusions of Law as his own.

Leonard Green hereby represents that he read the transcript for the hearing, reviewed the evidence in the administrative record, and adopts the summary of testimony, findings of facts, and Conclusions of Law as his own.

10

Entered this _14th_ day of November, 2018.

Sandra Coletta
Board Member

Joseph Dowling, M.D.
Board Member

Leonard Green
Board Member

Ratified and approved by the Director of the Department of Health:

Nicole Alexander-Scott, M.D.

    Sandra Coletta, hereby represents that she read the transcript for the hearing, reviewed the evidence in the administrative record, and adopts the summary of testimony, findings of facts, and Conclusions of Law as her own.

    Joseph Dowling, M.D., hereby represents that he read the transcript for the hearing, reviewed the evidence in the administrative record, and adopts the summary of testimony, findings of facts, and Conclusions of Law as his own.

    Leonard Green hereby represents that he read the transcript for the hearing, reviewed the evidence in the administrative record, and adopts the summary of testimony, findings of facts, and Conclusions of Law as his own.

10

## NOTICE OF APPELATE RIGHTS

PURSUANT TO R.I. GEN LAWS § 5-37-7, THIS DECISION MAY BE APPEALED TO THE SUPERIOR COURT WITHIN THIRTY (30) DAYS AFTER THE DECISION OF THE DIRECTOR BY SERVING THE DIRECTOR WITH NOTICE OF APPEAL AND FILING SUCH NOTICE IN SUPERIOR COURT. APPEALS ARE GOVERNED BY THE ADMINISTRATIVE PROCEDURES ACT, R.I. GEN LAWS § 42-35-1 *et seq.*

## CERTIFICATION

I hereby certify on the 14th of November 2018 that a copy of the within Decision and Notice of Appellate Rights was sent by email to Jackson Parmenter, Esq. as follows:

JParmenter@ksrplaw.com

# EXHIBIT AC

STATE OF RHODE ISLAND                                SUPERIOR COURT
PROVIDENCE, SC.
_____

DR. WILLIAM KYROS,                        :
        *Plaintiff*,                       :
                                          :
v.                                        :
                                          :
RHODE ISLAND DEPARTMENT OF                :    C.A. No.: _____
HEALTH and NICOLE ALEXANDER-              :
SCOTT, MD, MPH, in her capacity as        :
the Director of Health of the Rhode       :
Island Department of Health.              :
        *Defendants*.
_____

## COMPLAINT

    **NOW COMES** the Plaintiff, Dr. William Kyros (*hereinafter*, "Dr. Kyros"), who

pursuant to Rhode Island General Laws § 5-37-7 and § 42-35-15, hereby appeals the decision of

the Rhode Island Board of Medical Licensure and Discipline of the Department of Health dated

November 14, 2018. A copy of that Decision is attached hereto as **Exhibit 1**.

## PARTIES

    1.    The Appellant, Dr. Kyros, is an individual residing in the State of Rhode Island

whose license to practice medicine in the state of Rhode Island has been suspended since August

2009 by the Department.

    2.    Appellee, Nicole Alexander-Scott, M.D., M.P.H., is the Director of the State of

Rhode Island Department of Health (*hereinafter*, "Director") and is being sued in her capacity as

such pursuant to R.I.G.L. § 5-37-7.

    3.    Appellee, the Board of Medical Licensure and Discipline is a board of the

Department of Health (*hereinafter*, "BMLD" and/or "Board") created pursuant to R.I.G.L. § 5-

37-1.1.

4.    Appellee, State of Rhode Island Department of Health (*hereinafter*, "DOH") is a department of the State of Rhode Island.

## JURISDICTION

5.    This Court has jurisdiction over the subject matter herein, pursuant to R.I. Gen. Laws § 42-35-15 and 5-37-7.

## GENERAL ALLEGATIONS

6.    Dr. Kyros and the BMLD entered into an "Agreement to Cease Practice" in August 2009. *See* **Exhibit 2**.

7.    In pertinent part, Dr. Kyros "agree[d] to cease practicing any branch of medicine." **Ex. 2**. He also "agree[d] to go for an evaluation at the Santé Center for Healing, Argyle, [Texas]. The evaluation report must be sent directly to the Board of Medical Licensure and Discipline. The Board will make a determination on final sanctions after it reviews and considers the evaluation report from Santé Center for Healing." *Id.*

8.    Dr. Kyros attended the Santé Center for Healing in Argyle, Texas from August 17, 2009 to August 20, 2009. *See* **Exhibit 3**.

9.    The Santé Center issued recommendations regarding Dr. Kyros. *See* **Ex. 3**.

10.    The Santé Center evaluation report was sent directly to the BMLD.

11.    The BMLD did not take official action on the Santé Center recommendations until September 2017, when the Licensure Committee provided additional requirements for Dr. Kyros to meet. *See* **Exhibit 4**.

12.    Dr. Kyros was not required by the terms of the "Agreement to Cease Practice" to complete the recommendations. *See* **Ex. 2**.

2

13.     Dr. Kyros reached out to the BMLD for guidance as to his next steps, but finding none, set out on his own to meet the Santé Center's recommendations.

14.     Dr. Kyros sought and received treatment from Edward M. Brown, M.D. (*hereinafter*, "Dr. Brown") once every two weeks starting in October 2009 for about a year. *See* **Exhibit 5** at 123:1-7; *see also,* **Exhibit 6**.

15.     Dr. Brown noted that "[s]ince Dr. Kyros has had eighteen years practicing without complaint, it seems that there are some practice settings, less challenging than the one where his recent difficulties arose, where he should be able to practice successfully." **Ex. 6**.

16.     Dr. Kyros also sought and received treatment from Gene Jacobs, D.O. (*hereinafter*, "Dr. Jacobs") for treatment for three and a half years. **Ex. 5** at 135:9-14; 136:17-137:1.

17.     Dr. Jacobs noted Dr. Jacobs noted "[a]fter working with Dr. Kyros these past 3.5 years I saw no evidence of any characterological traits or patterns consistent with or evidencing a propensity or likelihood of Dr. Kyros exhibiting boundary issues." **Exhibit 7**.

18.     Dr. Kyros was evaluated, at the recommendation of the Physicians Health Committee, Dr. Kyros was evaluated by a Forensic Psychiatrist, Daniel S. Harrop, M.D. (*hereinafter*, Dr. Harrop), in August 2013.  This evaluation specifically addressed Dr. Kyros' "fitness for duty," or work readiness as a physician. **Exhibit 8**.  Dr. Harrop noted that after conducting extensive examinations that Dr. Kyros' mental status was entirely within normal limits.  Dr. Harrop noted that Dr. Kyros had never had any other legal problems: no arrests, no civil judgments, and no malpractice suits. *Id.*  Dr. Harrop found no evidence of psychiatric disorder and concluded Dr. Kyros was "fit-for-duty," and should have his license returned unrestricted and be able to resume his practice. *Id.*

3

19.    Dr. Harrop's conclusions regarding Dr. Kyros was submitted to the Department by request of the BMLD or Dr. McDonald.

20.    The Physicians Health Committee reviewed Dr. Harrop's evaluation and stated the psychiatric symptoms that lead to Dr. Kyros seeking treatment (the trauma and depression resulting from the fear of losing his livelihood and reputation permanently) had abated.  See **Exhibit 9**.  The Physicians Health Committee noted Dr. Jacob's and Dr. Harrop's findings that Dr. Kyros is no longer impaired medically or psychologically and concluded that "we have no reason to doubt this conclusion."  *Id.*

21.    On December 4, 2013, The BMLD Chief Administrative Officer James V. McDonald M.D., MPH (*hereinafter*, "Dr. McDonald") and Attorney Thomas J. Corrigan, Jr., the BMLD's counsel at that time, sent a letter to Dr. Kyros notifying him that the BMLD "ha[d] made a finding of 'Unprofessional Conduct' on your part relating to your role" in the case at hand.  *See* **Exhibit 10**.

22.    In January 2014, a meeting took place between Dr. Kyros and Dr. McDonald, among others.  Dr. Kyros described the meeting as:

> a discussion of where we go from here, whether to go to a hearing or to accept a consent that I was uncomfortable accepting, which would have required supervision and probation, and I did not feel I needed that . . . so there was no agreement at that meeting.

**Ex. 5** at 159:10-17.

23.    As of early 2014, Dr. Kyros could no longer afford his legal costs with Attorney Michael Sarli, and after a time engaged the services of Attorney Ronald Resmini.  **Ex. 5** at 160:21-24.

4

24.    Upon Dr. Kyros' engagement of Attorney Resmini's services, Attorney Resmini "requested documents. It took four months to get my file from the Board to Mr. Resmini." **Ex. 5** at 160:25-161:2.

25.    From 2014 to 2015, Attorney Resmini, Dr. Kyros, Dr. McDonald, and several BMLD attorneys met occasionally "to discuss potential consents to put the matter to rest. As time went along, Dr. McDonald requested an update from one of the previous physicians, and I got an update from Dr. Harrop in November of 2015." **Ex. 5** at 163:9-17.

26.    On November 5, 2015, Dr. Harrop wrote a letter to Dr. McDonald. *See* **Exhibit 11**. In his letter, Dr. Harrop wrote:

> As such, my opinion remains much as it did in August 2013: After an extensive review of the psychiatric records, the complaints as forwarded, and recognizing at the current time that [Dr. Kyros] has no psychiatric diagnosis, having fully recovered from post-traumatic stress disorder and major depressive disorder, and that he is not in any other way impaired medically or psychiatrically, I find that he would be "fit for duty" to have his medical license returned unrestricted at the present time to be able to resume his medical practice.

*Id.*

27.    After the November 5 letter from Dr. Harrop, "there were just the ongoing back-and-forth of consent proposals, Mr. Resmini to the Board, and back-and-forth, I mean, they would happen every six to eight weeks." **Ex. 5** at 165:24-166:2.

28.    Dr. Kyros was unable to agree to the proposed consent decrees "[b]ecause of the ongoing requests that I participate in supervision, probation, and I believe it came to me having

to reapply for licensure, and I had had my license since the late 1980s. There was just no agreement." **Ex. 5** at 166:8-12.

29.     On September 8, 2016, Dr. Kyros through his current counsel, notified the Board that he had retained new counsel. *See* **Exhibit 12**. The letter suggested a new proposed Consent Order, which would allow Dr. Kyros to practice his chosen profession after seven years of not practicing. *Id.*

30.     On October 13, 2016, Dr. Kyros' counsel, Attorney Michael A. Kelly, sent a follow up letter to Dr. McDonald. *See* **Exhibit 13**. The letter indicated that no response to the September 8, 2016 letter had been received and as that the BMLD consider the proposed Consent Order. *Id.*

31.     Dr. McDonald and the BMLD responded to the October 13, 2016 letter on November 11, 2016, stated that the September 8, 2016 letter "did not evidence the requisite insight for the Board to seriously consider this request." *See* **Exhibit 14**.

32.     In a letter from Lauren Lasso, the Administrative Officer for the BMLD wrote "[a] letter and Reinstatement Application was sent to Dr. Kyros.  In order for the Committee to further consider Dr. Kyros' request for reinstatement of licensure, we need a completed application and the required supporting documents." **Exhibit 15**.

33.     On March 16, 2017, Dr. Kyros' attorneys sent a letter demanding a formal hearing before the BMLD or hearing officer "regarding his fitness to return to the practice of medicine as contemplated in the Consent Order." **Exhibit 16**.

34.     On March 23, 2017, Dr. Kyros, through his attorneys, filed a Reinstatement Application and the required fees. **Exhibit 17**.

35.     Six days later, Angela Phengsavatdy wrote back saying that Dr. Kyros had submitted an incomplete fee and application. **Exhibit 18**.

36.     Two weeks later, Dr. Kyros submitted the requested documents to complete his application. **Exhibit 19**.  Supplemental information was provided on April 25, 2017.  **Exhibit 20**.

37.     The BMLD's licensure committee met on August 3, 2017 to consider Dr. Kyros' application, but "[g]iven the complexity of your application from the previous adverse action of August 14th, 2009, the committee tabled the matter that day and considered this matter again on September 7th, 2017." **Exhibit 21**.

38.     Dr. McDonald wrote a letter on September 11, 2017, which stated "[a]t the September 7th Licensing Committee meeting, the committee voted to have you attend the Santé Center for a re-evaluation since so much time has elapsed since the original evaluation.  The committee also requires you to attend the Center for Personalized Education for Physicians ("CPEP") to assess your clinical competency to practice psychiatry." **Ex. 21**.  "Once both of these evaluations are completed, the committee will reassess your application for a license as a physician." *Id.*

39.     Dr. Kyros, though counsel, timely demanded "a formal hearing relative to the Board of Medical Licensure and Discipline Committee's . . . decision dated September 11, 2017." **Exhibit 22**; **Exhibit 23**.

40.     Dr. McDonald confirmed that Dr. Kyros' demand for a formal hearing had been received on September 21, 2017. **Exhibit 24**; **Exhibit 25**.  He further noted:

At present your application for a physician license has not been approved or denied.
If you are not willing to attend the Santé Cente[r] and CPEP as the Committee
requested, you can communicate that to the committee at that time.

*Id.*

41. In a letter dated October 3, 2017, Dr. Kyros, through counsel, stated:

Moreover, please be advised that in no way did our letter state that Dr. Kyros was
unwilling to attend the Santé Center and CPEP as requested by the Committee.
Rather, we feel that neither the Santé Center nor the CPEP is necessary for the
reasons outlined in our September 18, 2017 correspondence.   Accordingly, Dr.
Kyros is requesting a formal hearing to determine whether attending the Santé
Center or the CPEP is even necessary given that he has already gone through for
treatment, or if his license to practice should be immediately reinstated without
conditions or restrictions. If after a formal hearing, a decision is issued requiring
Dr. Kyros to attend the Santé Center and CPEP, we will evaluate Dr. Kyro's options
at that time.

**Exhibit 26**.

42.     In an October 10, 2017 letter, the BMLD Licensure Committee notified Dr. Kyros
of its decision to "recommended denial" of his application for license reinstatement. **Exhibit 27**;
**Exhibit 28**.

43.     Dr. Kyros requested a formal hearing two days later.  **Exhibit 29**.

44.     On November 3, 2017, a Specification of Charges was sent to Dr. Kyros, via his
attorney, accusing him of violating R.I.G.L. § 5-37-5.1(24).  *See* **Exhibit 30**.   Notice of his
hearing date was also provided.

8

45.     The hearing was held in three parts, taking place on December 7, 2017, January 31, 2018, and May 17, 2018. *See generally,* **Ex. 5**.

46.     Dr. Brown and Dr. Jacobs' treatment of Dr. Kyros showed that Dr. Kyros had been truthful about his own actions.

47.     Dr. Brown and Dr. Jacobs' treatment had helped Dr. Kyros to not be in denial of his "contributions to the situations that led to his past and current complaints." **Ex. 31** [Department's Ex. 4].

48.     Dr. Brown and Dr. Jacobs' treatment of Dr. Kyros was "exploration in supervision, psychodynamically oriented psychotherapeutic supervision, personal therapy and monitored practice." **Ex. 3**.

49.     Dr. Kyros was not required to undergo an additional polygraph test, as Santé Center said it was only one way to prove that he had made "satisfactory progress." **Ex. 3**.

50.     Dr. Kyros' polygraph results should not have been used as or considered as evidence in this administrative adjudication by the BMLD. Dr. Kyros was unable to work in a supervised environment, as suggested by the Santé Center.

51.     Dr. Kyros is not at fault for being unable to work in a supervised environment, as suggested by the Santé Center, because the BMLD and Department never reinstated the license in any capacity.

52.     Dr. Kyros underwent a course equivalent to "[t]he Maintaining Proper Boundaries Course through UT Southwestern Medical Center, Vanderbilt, or an equivalent accredited course." **Ex. 3**.

53.     Dr. Kyros did not refuse to attend the Santé Center or CPEP, as required by the BMLD Licensure Committee.

9

54.    Dr. Kyros requested a formal hearing regarding the BMLD Licensure's Committee's requirement that he reattend the Santé Center and attend CPEP.

55.    Dr. Kyros' formal hearing request regarding the additional requirements set forth by the BMLD Licensure Committee does not show that Dr. Kyros violated R.I.G.L. § 5-37-5.1(24).

56.    The BMLD Licensure Committee's decision to deny Dr. Kyros' application for a medical license was made before his requested hearing relating to the additional requirements imposed by that committee.

57.    Dr. Kyros' numerous Continuing Medical Education credits evidence his clinical competency.

58.    The negotiation of Consent Orders did not relieve the BMLD of it's agreed upon duty to timely "make a determination on final sanctions after it reviews and considers the evaluation report from Santé Center for Healing." *See* **Ex. 1**.

59.    The BMLD's eight year delay in assessing the Santé Center's report was prejudicial to Dr. Kyros.

60.    The BMLD's eight year delay amounts to "appreciable delay." *Barry v. Barchi*, 443 U.S. 55, 66 (1979).

61.    The BMLD's eight year delay was a violation of Dr. Kyros' procedural due process rights.

62.    The BMLD provided no explanation as to why Dr. Kyros was required to reapply for his Medical License.

63.    The BMLD Licensure Committee gained jurisdiction over Dr. Kyros because of this application.

64.     The BMLD did not have probable cause to initiate an action for "unprofessional conduct" against Dr. Kyros, specifically for "[v]iolating any provision or provisions of this chapter or the rules and regulations of the board or any rules or regulations promulgated by the director or of an action, stipulation, or agreement of the board."

65.     Despite this, the Board held three hearings on December 7, 2017, January 31, 2018 and May 17, 2018. *See generally*, **Ex. 5**.

66.     The Board promulgated a decision on November 14, 2018, requiring Dr. Kyros participate in CPEP evaluation, which would likely cost him more than $17,000. *See* **Ex. 1**. The Decision does not require that Dr. Kyros attend the Santé Center as previously required by the Licensing Committee in response to Dr. Kyros' License Application.

## COUNT I

### *(Appeal of the Director's Final Decision)*

67.     The Plaintiff realleges and reasserts each and every one of the proceeding paragraphs of this Complaint as if set forth fully herein.

68.     The Board's Decision is:

a.  In violation of constitutional, statutory, or ordinance provisions;

b.  In excess of the authority granted to the DOH and Board by statute or ordinance;

c.  Made upon unlawful procedure;

d.  Affected by other error of law;

e.  Clearly erroneous in view of the reliable, probative, and substantial evidence of the whole record; and

f.  Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

**WHEREFORE**, Appellant respectfully requests that this Honorable Court reverse the Decision, including the sanctions imposed in the Decision, hear this matter on an expedited basis pursuant and award Appellant its attorney's fees and costs as provided by R.I.G.L. § 42-92-2, and such other and further relief as may be fair and just in the within matter.

Respectfully Submitted,

**WILLIAM KYROS, M.D.**

By and through his attorneys,

*/s/ Jackson C. Parmenter*
Michael A. Kelly, Esq. (#2116)
Jackson C. Parmenter, Esq. (#8396)
Kelly, Souza, Rocha & Parmenter, PC
128 Dorrance Street, Suite 300
Providence, RI 02903
Tel#:   (401) 490-7334
Fax#:   (401) 490-7874
mkelly@ksrplaw.com
jparmenter@ksrplaw.com
www.ksrplaw.com

Dated: December 12, 2018

12

# EXHIBIT AD

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

PROVIDENCE, SC.                                    SUPERIOR COURT

(FILED: December 13, 2019)

| | | |
|---|---|---|
| DR. WILLIAM KYROS, | : | |
| | : | |
| *Plaintiff,* | : | |
| | : | |
| v. | : | C.A. NO. PC-2018-8998 |
| | : | |
| RHODE ISLAND DEPARTMENT OF | : | |
| HEALTH and NICOLE ALEXANDER- | : | |
| SCOTT, MD, MPH, IN HER CAPACITY: | | |
| AS THE DIRECTOR OF HEALTH OF | : | |
| THE RHODE ISLAND DEPARTMENT | : | |
| OF HEALTH | : | |
| | : | |
| *Defendants.* | : | |

## DECISION

**LANPHEAR, J.**  Before this Court is the appeal of Dr. William Kyros (Dr. Kyros) from a decision of the Rhode Island Department of Health denying his request to be relicensed. Jurisdiction is pursuant to G.L. 1956 § 42-35-15. For the reasons set forth herein, this Court reverses the Rhode Island Department of Health's final decision.

I

### Facts and Travel

The Court first chronicles the extensive, decade-long journey Dr. Kyros has endured at the hands of the Rhode Island Department of Health (RIDOH) and the Board of Medical Licensure and Discipline (the Board). That journey has landed the parties here, with Dr. Kyros appealing the Board's denial of his relicensure application.

Dr. Kyros became a licensed physician in Rhode Island in June 1986. Dr. Kyros's practice of medicine halted in August 2009 pursuant to an "Agreement to Cease Practice" (the Agreement) with RIDOH.[1] Compl. Ex. 16A. Pursuant to the Agreement, Dr. Kyros also agreed to go for an evaluation at the Sante Center for Healing (Sante Center) and have the evaluation report sent to the Board. *Id.* The Board was to review the report and then "make a determination on final sanctions." *Id.*

Dr. Kyros then went to the Sante Center for an evaluation, completing his treatment on August 20, 2009. Appellant Mem. Supp. Appeal Ex. A 3 (Board Decision). The Sante Center recommendation stated that Dr. Kyros may not have been truthful in his evaluations and that he should be monitored when he returns to practice. *Id.* On August 27 and September 30, 2009, Dr. Kyros's attorney wrote to the Board asking what Dr. Kyros's next steps should be. *Id.* at 3-4; Appellant Mem. Supp. Appeal Ex. D, E. There is no evidence that Dr. Kyros ever received a response from the Board. Appellant Mem. Supp. Appeal Ex. A 4 and Ex. F 11 (Hr'g Tr. 156).

Dr. Kyros, on his own accord, began treatment with psychiatrists Dr. Edward M. Brown and Dr. Gene Jacobs for several years. Appellant Mem. Supp. Appeal Ex. A 4. Dr. Brown treated Dr. Kyros in 1991 and 1992 after the first complaint had been made against Dr. Kyros and then again from 2009 to 2011.[2] *Id.* Dr. Jacobs also treated Dr. Kyros for three-and-one-half years. *Id.* In 2013, a psychiatric report written by Dr. Jacobs was submitted to the Board. *Id.*; Appellant Mem. Supp. Appeal Ex. I. He was also evaluated by forensic psychiatrist Dr. Daniel Harrop in August 2013, and Dr. Kyros received a forensic psychiatry report from him. Appellant Mem.

---

[1] Dr. Kyros has had four complaints of boundary violations with female patients. The first two occurred in the 1990s, and the most recent two occurred in 2008 and 2009, which began the issue at hand.

[2] Dr. Kyros also received an evaluation from Dr. Brown on August 22, 2010.

2

Supp. Appeal Ex. A 4. All of these doctors have since stated that Dr. Kyros is fit to return to work. Dr. Kyros and his attorney then met with the Board Administrator, Dr. James McDonald. *Id.* Dr. Kyros submitted a license application in 2013, which was subsequently denied.[3] *Id.*

On December 4, 2013, the Board sent Dr. Kyros a letter notifying him that the investigating committee had made a finding of "Unprofessional Conduct" against Dr. Kyros. Compl. Ex. 10. There is no evidence that the Board ever ratified this finding.[4] The Board did not take any official action against Dr. Kyros for some time, and Dr. Kyros's third attorney continued to contact the Board in an effort to resolve the issues at hand. Appellant Mem. Supp. Appeal Ex. M. On September 8, 2016, Dr. Kyros's attorney proposed a consent order that would allow Dr. Kyros to return to practice, to which he never received a response. *Id.* On October 13, 2016, Dr. Kyros's attorney sent another letter to the Board noting its lack of response. Appellant Mem. Supp. Appeal Ex. N. His attorney also requested a response regarding the proposed consent order. *Id.* Nearly a month later, the Board finally responded to Dr. Kyros's attorney stating that the previous letter "did not evidence the requisite insight for the Board to seriously consider [the] request." Appellant

---

[3] Dr. Kyros continued to receive his updated license after the Agreement was signed until June 30, 2014. Appeal Hr'g Tr. 12-13, Sept. 18, 2019 (when Dr. Kyros had his last license "[h]e never got notice that he was going to be put on inactive status and it would say that he had received a notice of violation from professional conduct"). No hearing was ever held regarding the suspension of Dr. Kyros's license; it appears the Board simply stopped sending updated licenses to Dr. Kyros. *Id.* at 18 (Dr. Kyros's license was taken away "[w]ithout a hearing . . . his license was just taken away after, I imagine 6/30/2014 when this expired, when his license expired here. For whatever reason. No notice. No hearing.").

[4] The Board admits in its decision that the issue here is not whether Dr. Kyros "engaged in unprofessional conduct by violating a Board order and if so, what discipline should be imposed" but only "whether because of previous complaints of unprofessional conduct that resulted in the Agreement should [Dr. Kyros] be allowed to be re-licensed in light of the requirements in the Agreement." Appellant Mem. Supp. Appeal Ex. A (Board Decision n.3). The Board did not discuss this letter whatsoever in its decision. At a hearing in front of this Court, the parties appeared to agree that there has never been a finding by the Board of unprofessional conduct relative to this matter.

Mem. Supp. Appeal Ex. O.  Within a week, Dr. Kyros's attorney responded, again requesting approval of the consent order and outlining all of the steps Dr. Kyros had completed since signing the Agreement.  *Id.*

On March 23, 2017, Dr. Kyros applied to the Board for reinstatement.  Appellant Mem. Supp. Appeal Ex. Q.  The Board found that application to be incomplete, and Dr. Kyros resubmitted the application on April 13, 2017.  Appellant Mem. Supp. Appeal Ex. R, S.  That application included evidence that Dr. Kyros had completed all continuing medical education (CME) credits since the Agreement was signed in 2009.  Appellant Mem. Supp. Appeal Ex. A (Board Decision 3); Appellant Mem. Supp. Appeal Ex. S, T.

In response to Dr. Kyros's application, the Board held a Licensing Committee Meeting on September 7, 2017 and subsequently sent a letter to Dr. Kyros stating that the committee voted to have him attend the Sante Center for re-evaluation and to attend the Center for Personalized Education for Physicians (CPEP) to assess his clinical competency to practice psychiatry.  Appellant Mem. Supp. Appeal Ex. U.  The Board informed him they would reconsider his application once he completed these evaluations.  Compl. Ex. 4.  Dr. Kyros then sent a demand for a formal hearing on September 18, 2017.  Compl. Ex. 22.  The Board responded to Dr. Kyros, informing him that he could come to the next licensing committee meeting and that his application for reinstatement had not yet been approved or denied.  Compl. Ex. 24.  Dr. Kyros, through his attorney, responded that he did not believe he needed to come in for any further discussion and would like for the Board to review his application.  Compl. Ex. 26.

On October 10, 2017, the Board denied Dr. Kyros's application.  Compl. Ex. 27.  Upon receiving this denial, Dr. Kyros again requested a formal hearing.  Compl. Ex. 29.  After a hearing, the Board issued its decision regarding Dr. Kyros on November 14, 2018.  The Board's Decision

4

required Dr. Kyros to complete a clinical competency assessment at CPEP[5] and follow all of CPEP's recommendations before Dr. Kyros can be relicensed.[6]  Appellant Mem. Supp. Appeal Ex. A 9 (Board Decision).  Dr. Kyros was also required to keep the Board informed of his progress at CPEP and satisfy all other statutory requirements for licensing.  *Id.*  Lastly, the Board required Dr. Kyros to pay a $2000 administrative fee for the cost of the hearing.  *Id.*

## II

### Standard of Review

This Court has jurisdiction over appeals from the Board's decisions pursuant to the Administrative Procedures Act (APA).  Section 42-35-15.  "Any person . . . who has exhausted all administrative remedies available to him or her within the agency, and who is aggrieved by a final order in a contested case is entitled to judicial review. . . ."  Section 42-35-15(a). When reviewing an agency decision, this Court has the authority to

> "[A]ffirm the decision of the agency or remand the case for further proceedings, or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
>
> "(1) In violation of constitutional or statutory provisions;
>
> "(2) In excess of the statutory authority of the agency;
>
> "(3) Made upon unlawful procedure;
>
> "(4) Affected by other error of law;
>
> "(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

---

[5] Compliance with this requirement would cost Dr. Kyros approximately $28,016.  Appellant Mem. Supp. Appeal Ex. AB.

[6] The Board relied solely on Dr. Kyros's nine-year gap in practicing medicine to justify the need to evaluate Dr. Kyros's clinical competence.  Appellee Mem. Opp'n Appeal 13 ("Appellant's lapse of more than nine years speaks for itself relative to the question of clinical competence. . . .").

"(6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion."

Section 42-35-15(g). "The trial justice must not 'substitute [his or her] judgment for that of the agency as to the weight of the evidence on questions of fact.'" *Endoscopy Associates, Inc. v. Rhode Island Department of Health*, 183 A.3d 528, 532 (R.I. 2018) (quoting *Interstate Navigation Co. v. Division of Public Utilities and Carriers*, 824 A.2d 1282, 1286 (R.I. 2003)) (alteration in original). This Court must defer to the agency's factual determinations made in an administrative proceeding when there is legally competent evidence to support such findings. *Arnold v. Rhode Island Department of Labor & Training Board of Review*, 822 A.2d 164, 167 (R.I. 2003). "Legally competent evidence is 'relevant evidence that a reasonable mind might accept as adequate to support a conclusion, and means an amount more than a scintilla but less than a preponderance.'" *Id.* (quoting *Rhode Island Temps, Inc. v. Department of Labor & Training, Board of Review*, 749 A.2d 1121, 1125 (R.I. 2000)). It is not within this Court's discretion to determine if an agency chose the appropriate sanction; it only decides whether the agency's findings are supported by legally competent evidence. *Rocha v. State Public Utilities Commission*, 694 A.2d 722, 726 (R.I. 1997). However, "'an administrative decision can be vacated if it is clearly erroneous in view of the reliable, probative, and substantial evidence contained in the whole record.'" *Auto Body Association of Rhode Island v. State Department of Business Regulation*, 996 A.2d 91, 95 (R.I. 2010) (quoting *Costa v. Registrar of Motor Vehicles*, 543 A.2d 1307, 1309 (R.I. 1988)).

## III

### Issues on Appeal

Dr. Kyros believes that the Board's Decision regarding his "fitness for duty" determination was arbitrary and capricious and an abuse of discretion. He argues that requiring him to attend

6

CPEP is disproportionately harsh as compared to sanctions imposed on other similarly situated physicians and that it is unsupported by factual findings in the Board's Decision. Dr. Kyros is currently required to complete both a "clinical competency" and "fitness for duty" assessment at CPEP—located only in North Carolina and Colorado—and then complete all recommendations from CPEP. Dr. Kyros alleges this course will cost him approximately $20,000. Dr. Kyros also argues that the administrative fee imposed here was inappropriate because the Board did not find him guilty of unprofessional conduct.

RIDOH argues that Dr. Kyros has not presented any evidence that he is clinically competent to return to the practice of medicine and his nine-year gap in practicing medicine speaks for itself. The Board believes Dr. Kyros also has not taken the same steps as the physicians he claims were similarly situated to him, and therefore, the disproportionate treatment is merely reflective of the differences in these situations. The Board also believes that the requirement for CPEP classes is warranted to ensure that Dr. Kyros is ready to reenter practice after a significant gap. The Board Decision states that under the Agreement, the final sanction was to be determined by the Board. Thus, RIDOH contends that the imposition of administrative fees is warranted under the Agreement.

## IV

### Analysis

#### A

#### CPEP Classes

Although this Court "cannot substitute its judgment on the evidence even though it might be inclined to view that evidence differently" than the administrative agency, it can determine that the agency's decision was devoid of competent evidence. *See Rhode Island Public*

7

*Telecommunications Authority v. Rhode Island State Labor Relations Board*, 650 A.2d 479, 485 (R.I. 1994); *see Bunch v. Board of Review, Rhode Island Department of Employment & Training*, 690 A.2d 335, 337 (R.I. 1997); *Barrington School Committee v. Rhode Island State Labor Relations Board*, 608 A.2d 1126, 1138-39 (R.I. 1992) (affirming the Superior Court's finding that there was no competent evidence to support the agency's decision and was therefore clearly erroneous). An administrative decision that lacks findings of fact "cannot be upheld." *Sakonnet Rogers, Inc. v. Coastal Resources Management Council*, 536 A.2d 893, 896-97 (R.I. 1988).

Here, the Board relies solely on Dr. Kyros's nine-year gap in practicing medicine—a gap that the Board is largely responsible for—to justify requiring clinical competency courses. The Board arbitrarily believes this gap speaks for itself. Appellee Mem. Opp'n Appeal 13. Although the Court is principally concerned for the safety and welfare of patients, it also acknowledges Dr. Kyros's "concern for continued employment." *Costa*, 543 A.2d at 1311 (finding insufficient findings of fact by the administrative agency when it did not find some competent, substantial evidence of the existence of a tangible disease or defect that would adversely affect the appellant's capacity to work without harming the public); *compare Guarino v. Department of Social Welfare*, 122 R.I. 583, 588, 410 A.2d 425, 428 (1980) (finding evidence that appellant had not performed professional duties sufficiently and determining that discharge was therefore appropriate).

The record here is devoid of nearly any evidence that Dr. Kyros is not clinically competent. *Compare Rocha*, 694 A.2d at 726 (finding that competent evidence existed and the Superior Court "merely disagreed with the sanction decided upon by the [agency] and reversed the [agency]'s decision"). On the other hand, the only doctors who spoke of Dr. Kyros's clinical competence—Dr. Brown, Dr. Jacobs, and Dr. Harrop—determined that he was able to return to his profession in some capacity. *See Bulwer v. Mount Auburn Hospital*, 46 N.E.3d 24, 35 (Mass. 2016) (the high

8

court of Massachusetts considering conflicting evidence from various doctors regarding the
clinical competence of another doctor). Dr. Kyros also stayed up-to-date with his CME courses—
including courses on medical ethics, burnout in physicians, chronic pain, prescription opioids,
medical marijuana, Parkinson's Disease, and several others—completing them throughout this
nearly-ten-year period when he was unable to practice.

Further, the Court is very concerned about the extensive license deprivation here: the Board
created a situation where Dr. Kyros was unable to understand and fulfill what it wanted for over
nine years. Dr. Kyros repeatedly attempted to follow the recommendations of the Sante Center
and various doctors to appease the Board, with little response from the Board. The Board's odd
statute regarding refusal of licensure, G.L. 1956 § 5-37-4, allows the Board to "refuse" a license
after notice and opportunity to be heard.[7]  Instead, the Board refused Dr. Kyros for over nine years.

In a footnote, the Board's Decision attempts to justify the circuitous and extensive travel
of this case.[8]  From this footnote, it is clear that the issue the Board addressed was whether Dr.
Kyros should be relicensed.  However, according to the Agreement, Dr. Kyros was never
unlicensed. *See* Compl. Ex. 2. Dr. Kyros's license was never taken from him; rather, back in
2009, he agreed not to practice and did not practice for over nine years. Dr. Kyros was only forced
to apply for relicensure to get the Board to come to a conclusion when it repeatedly remained silent
regarding Dr. Kyros's efforts to return to practice.  Appellant Mem. Supp. Appeal Ex. A 4 and F
11 (Hr'g Tr. 156).

---

[7] Counsel did not question the constitutionality of this license deprivation and the High Court
disfavors such *sua sponte* challenges. *State v. Beaudoin*, 137 A.3d 717, 726 (R.I. 2016) ("The trial
justice was without authority to raise and decide, *sua sponte*, a constitutional issue that was not
squarely placed before him by the parties.").
[8] That footnote details the applicable Rhode Island statutes and the lack of a finding of
unprofessional conduct here.  The Board also attempts to justify its reasoning in deciding at that
juncture whether Dr. Kyros should be relicensed.  Board Decision n.3.

Focusing *only* on the Agreement, it is clear that Dr. Kyros did not surrender his license but merely agreed to cease practice; the Board was to make a determination when it received the Sante Center report in September 2009, which it never did. The physicians' committee found Dr. Kyros fit for duty in 2013, and the Board only addressed Dr. Kyros after his third attorney repeatedly asked for a consent agreement four years later. Both parties have attempted to compare this case to that of another Superior Court case, *Jake and Ella's, Inc. v. Department of Business Regulation*, to determine whether the Board's sanctions were arbitrary and capricious; however, neither party has addressed the central differentiating fact of that case. No. NC01-461, 2002 WL 977812 at *6 (R.I. Super. Apr. 22, 2002). There, the Superior Court found wrongful conduct on the part of the appellant, whereas, here no such conduct has even been found. *Id.* Here, there has been no finding by the Board of unprofessional conduct. Dr. Kyros's license was never given up or revoked.

This Court finds that there was no competent evidence to support a finding requiring Dr. Kyros to attend CPEP classes to address his clinical competency. Therefore, the imposition of that penalty was arbitrary and capricious. *See id.* Accordingly, the Court reverses the decision of the Board requiring Dr. Kyros to attend CPEP classes.

**B**

**Administrative Fees**

The Board imposed an administrative fee of $2000 on Dr. Kyros pursuant to § 5-37-6.3(8). Section 5-37-6.3 provides that "[i]f the accused is *found guilty of unprofessional conduct* as described in § 5-37-6.2, the director, at the direction of the board, shall impose one or more of the following conditions . . . (8) [a]ssess against the physician the administrative costs of the proceedings instituted against the physician under this chapter" (emphasis added). Under § 5-37-

10

6.2, "[i]n no case shall a person be found guilty of unprofessional conduct unless a majority of the hearing committee votes in favor of finding the person guilty."

As noted previously, the Board specifically stated in its decision that it was not making a finding of unprofessional conduct at this juncture but merely determining whether Dr. Kyros should be relicensed. Compl. Ex. 1; Board Dec. n.3. Nowhere in its decision does the Board suggest that there has been a finding of unprofessional conduct against Dr. Kyros by the Board. There is no evidence that the Board ever ratified the investigating committee's finding of unprofessional conduct in 2013. *Compare Danzer v. Rhode Island Board of Medical Licensure & Discipline*, 745 A.2d 733, 734 (R.I. 2000) (After the investigating committee made a finding of unprofessional conduct, *the board ratified that finding*, and a consent order agreement was proposed that included payment of an administrative fee.). Although the Agreement allows the Board to "make a determination on final sanctions," administrative fees must still be imposed in accordance with the statute. *See* § 5-37-6.3.

The administrative fee was clearly imposed "[i]n violation of constitutional or statutory provisions," namely § 5-37-6.3(8). *See* § 42-35-15(g)(1). With the record devoid of a Board determination regarding unprofessional conduct on the part of Dr. Kyros, administrative fees cannot be statutorily imposed under this section. *See Town of Richmond v. Rhode Island Department of Environmental Management*, 941 A.2d 151, 155 (R.I. 2008) (considering whether an agency acted unconstitutionally or in excess of its statutory authority). Therefore, this Court finds that the imposition of an administrative fee was in excess of RIDOH's statutory authority and would prejudice Dr. Kyros's substantial rights. Accordingly, this Court reverses the Board's Decision as to the imposition of an administrative fee.

11

**V**

**Conclusion**

For the foregoing reasons, this Court finds that Dr. Kyros never lost his license, and therefore, the imposition of an administrative fee was in excess of the Board's statutory authority and would prejudice Dr. Kyros's substantial rights. Further, this Court removes the requirement that Dr. Kyros participate in the new, expensive CPEP course as (1) there were no factual findings on Dr. Kyros's lack of competence; (2) the Board never found CPEP competence courses appropriate; (3) the Sante Center never found Dr. Kyros's skill or competence in dispute; (4) the Board relied on new, inapplicable 2018 regulations to justify its decision; and (5) the Board made few, insufficient findings of fact. Although the Court would typically be inclined to remand this case to RIDOH for further proceedings—with respect to inadequate findings of fact—here, the Court finds that doing so would only cause more harm and opportunity for delay after a nearly decade-long saga, and moreover, the Board Decision was not supported by competent evidence. *See Sakonnet Rogers, Inc.*, 536 A.2d at 897 ("To delay the administrative process further by remanding the case to [the agency] for additional consideration of a petition filed seven years ago would prejudice the right of the petitioner to a final adjudication of his petition within a reasonable period."). Accordingly, the Board's Decision is reversed and it is directed to act in accordance with this Court's holding. Counsel for petitioner shall submit the appropriate judgment for entry.



**RHODE ISLAND SUPERIOR COURT**

*Decision Addendum Sheet*

---

TITLE OF CASE:               **Dr. William Kyros v. Rhode Island Department of
                              Health, et al.**


CASE NO:                     **PC-2018-8998**


COURT:                       **Providence County Superior Court**


DATE DECISION FILED:         **December 13, 2019**


JUSTICE/MAGISTRATE:          **Lanphear, J.**


ATTORNEYS:

    For Plaintiff:          **Jackson C. Parmenter, Esq.
                              Andrew Blais, Esq.**

    For Defendant:          **Lisa F. Bortolotti, Esq.
                              Joseph K. Alston, Esq.
                              Morgan A. Goulet, Esq.**

# EXHIBIT AE

June 30, 2021

**Supreme Court**

No. 2020-104-M.P.
(PC 18-8998)
(Dissent begins on Page 19)

Dr. William Kyros                    :

v.                                   :

Rhode Island Department of           :
Health et al.

> NOTICE:    This opinion is subject to formal revision
> before publication in the Rhode Island Reporter. Readers
> are requested to notify the Opinion Analyst, Supreme
> Court of Rhode Island, 250 Benefit Street, Providence,
> Rhode Island 02903, at Telephone (401) 222-3258 or
> Email:    opinionanalyst@courts.ri.gov,    of    any
> typographical or other formal errors in order that
> corrections may be made before the opinion is published

**Supreme Court**

No. 2020-104-M.P.
(PC 18-8998)
(Dissent begins on Page 19)

Dr. William Kyros                    :

          v.                                    :

Rhode Island Department of    :
    Health et al.

Present: Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ.

## OPINION

**Justice Goldberg, for the Court.** This case came before the Supreme
Court on May 18, 2021, pursuant to a writ of certiorari issued following a petition
for review filed by the defendants, the Rhode Island Department of Health (DOH)
and Nicole Alexander-Scott, M.D., in her capacity as Director of the DOH
(collectively defendants). The defendants seek review of an order and a judgment
of the Superior Court reversing a decision and order of the DOH Board of Medical
Licensure and Discipline (the Board) that required the plaintiff, William Kyros,
M.D. (Dr. Kyros or plaintiff)—who sought to return to the practice of medicine
after signing an agreement to cease practice in 2009—to complete a competence
assessment program and fitness for duty evaluation for physicians seeking to
reenter practice after discipline. The defendants argue that the trial justice erred:

- 1 -

(1) in reversing the Board's decision because, they contend, competent evidence in the record supported the Board's decision and the sanction imposed was not arbitrary or capricious; and (2) in declining to remand the case to the Board for further proceedings. For the reasons set forth in this opinion, we affirm the judgment and the order of the Superior Court.

## Facts and Travel

The plaintiff has been licensed as a physician in Rhode Island since June 1986. In August 2009 plaintiff and the Board entered into an Agreement to Cease Practice (the Agreement). Apparently, the Board had "received notice that [Dr. Kyros] engaged in unprofessional conduct by engaging in serious professional boundary violations with patients."[1] Based on its investigation, the Board found probable cause to discipline Dr. Kyros. It did not do so, however.

The parties entered into an agreement whereby Dr. Kyros waived his right to a hearing and further procedural steps and agreed that failure to comply with the Agreement would subject him to further disciplinary action. The Agreement provided that Dr. Kyros would

> "cease practicing any branch of medicine[,] * * * go for an evaluation at the Sante Center for Healing, * * * [t]he evaluation report must be sent directly to the Board[, and

---

[1] The record reveals that, while investigating a complaint of a boundary violation with a female patient that occurred in April 2009, the Board uncovered two additional instances of alleged boundary violations with female patients "dat[ing] back to the early 1990s[.]"

> that t]he Board will make a determination on final
> sanctions after it reviews and considers the evaluation
> report from [the] Sante Center for Healing."

Doctor Kyros attended the Santé Center in Argyle, Texas, from August 17
through 20, 2009. A fifty-four-page comprehensive report was compiled by the
Santé Center and received by the Board on September 25, 2009 (the report). The
report detailed plaintiff's personal history, evaluations by several health-care
professionals, the results of two polygraph examinations, and a preliminary
recommendation. The Santé Center recommended that "Dr. Kyros should not
return to the unrestricted practice of medicine through direct psychiatric patient
care" and that, at the appropriate time, he should return to supervised practice. The
report also recommended that Dr. Kyros successfully complete an education course
about maintaining proper boundaries. Significantly, the issue of Dr. Kyros' "skill
and competence in the practice of medicine" was explicitly not addressed by the
Santé Center because it was beyond the scope of the assessment and within the
province of the Board and DOH.

Doctor Kyros was willing to do everything he reasonably could in order to
comply with the recommendations of the Santé Center and address the concerns
raised in the report. The record supports this contention. He promptly contacted
the Board, asking for guidance on what should be his next steps. Doctor Kyros
received no response. In November 2009, Dr. Kyros, proactively and of his own

- 3 -

accord, began treating with Edward Brown, M.D., and Gene Jacobs, O.D., both of whom are psychiatrists. In accordance with the recommendation in the report, Dr. Kyros completed a course in Medical Ethics, Boundaries & Professionalism in September 2010. Time passed.

On June 10, 2013, Dr. Kyros contacted the Board "to discuss his future." Enclosed was a report from Dr. Jacobs, which detailed his treatment and diagnosis of Dr. Kyros. Doctor Jacobs stated, "After working with Dr. Kyros these past 3.5 years I saw no evidence of any characterological traits or patterns consistent with or evidencing a propensity or likelihood of Dr. Kyros exhibiting boundary issues." Doctor Jacobs concluded that there was no further need for Dr. Kyros to engage in psychiatric follow-up care, and he saw "no reason as to why Dr. Kyros cannot restart clinical practice."

Doctor Kyros met with the chief administrative officer of the Board, James McDonald, M.D., and was directed to engage with the chairperson of the Physicians Health Committee of the Rhode Island Medical Society, an agency not affiliated with DOH. Doctor Kyros complied; in August 2013, he was told by Chairperson Herbert Rakatansky, M.D., that he must undergo a forensic psychiatric evaluation. He did so. On August 19, 2013, Daniel Harrop, M.D., submitted a report of his forensic evaluation of Dr. Kyros to Chairperson Rakatansky. Doctor Harrop concluded that Dr. Kyros was fit for duty to have his

- 4 -

license returned unrestricted. Chairperson Rakatansky contacted Dr. McDonald on
September 9, 2013, notifying him that Dr. Kyros had met with him, provided
supporting documents, and submitted to a forensic psychiatric evaluation.
Chairperson Rakatansky noted that he had "no reason to doubt" the favorable
conclusions reached by Dr. Jacobs and Dr. Harrop "that Dr. Kyros is no longer
impaired medically or psychologically[.]"

Three months later, on December 4, 2013, Dr. Kyros was formally issued a
preliminary finding of "Unprofessional Conduct" by an investigating committee of
the Board. Doctor Kyros met informally with Dr. McDonald in January 2014 to
discuss a potential resolution to the charge of unprofessional conduct. The parties
were unable to reach an agreement because Dr. Kyros was opposed to supervision
and probation. Doctor Kyros testified that he was unable to pursue a formal
hearing in 2014 due to financial circumstances. For nearly two years thereafter,
Dr. Kyros retained new counsel and engaged in discovery to prepare for what he
believed would be an eventual hearing before the Board. The parties continued to
meet several times to discuss settlement but were again stonewalled by the issue of
supervision and probation. Doctor Harrop submitted an updated report to the
Board in November 2015 and affirmed his earlier conclusion—that Dr. Kyros was
fit for duty, that an unrestricted license could be reinstated, and that Dr. Kyros
could resume practice.

Negotiations over a consent order continued through Fall 2016. To no avail.
Finally, in March 2017, Dr. Kyros demanded a formal hearing before the Board
"regarding his fitness to return to the practice of medicine as contemplated in the"
Agreement. Doctor Kyros also submitted a "Reinstatement Application" to the
Board. The Board found his application to be incomplete, and Dr. Kyros
resubmitted the application in April 2017 and included proof that he had completed
four years of continuing medical education credits, from 2013 through 2017.

Doctor Kyros met with the licensing committee of the Board on August 3,
2017; due to "the complexity of [his] application[,]" the matter was tabled until
September 7, 2017, when the committee voted to require Dr. Kyros to "attend the
Sant[é] Center for a re-evaluation since so much time has elapsed since the original
evaluation." The licensing committee also required him "to attend the Center for
Personalized Education for Physicians (CPEP) to assess [his] clinical competency
to practice psychiatry." The committee indicated that once both evaluations were
complete, they would again reassess the application.

Yet another demand for a formal hearing was made by Dr. Kyros on
September 18, 2017. Doctor McDonald confirmed receipt of the demand letter and
invited Dr. Kyros to again appear before the licensing committee. Doctor Kyros
declined to re-appear and indicated his reluctance to attend the Santé Center and
CPEP because he felt it was unnecessary given the extensive treatment he had

undergone. The committee denied Dr. Kyros' application for licensure on October 10, 2017, and Dr. Kyros timely demanded a formal hearing.

The specification of charges by the Board is the focal point of our analysis and determinative of our holding. A one-count specification of charges was issued against Dr. Kyros in November 2017, alleging that he engaged in unprofessional conduct—in violation of G.L. 1956 § 5-37-5.1—by violating provisions of chapter 37 of title 5 of the general laws, or the rules and regulations of the Board or the director, or the provisions of an agreement of the Board. A hearing committee of the Board conducted an evidentiary hearing on December 7, 2017, and January 31 and May 17, 2018, including the presentation of documentary and testimonial evidence. The Board issued a ten-page written decision and order dated November 14, 2018, which made four findings of fact. There was no finding that Dr. Kyros engaged in "unprofessional conduct." Doctor Kyros was ordered to complete a competence assessment program and fitness for duty evaluation at CPEP for physicians seeking to re-enter practice *after discipline*, to follow all recommendations from CPEP, and satisfy all statutory requirements for licensing.[2] The director adopted the decision and order of the Board, and Dr. Kyros filed a timely notice of appeal to the Superior Court.

---

[2] Doctor Kyros was also required to pay for certain costs and expenses arising out of the administrative proceedings. Before the Superior Court, defendants conceded that the imposition of administrative fees was improper. That issue is not before the Court.

- 7 -

Before the Superior Court, Dr. Kyros alleged the usual grounds for an administrative appeal: He argued that the decision was (1) in violation of constitutional, statutory, or ordinance provisions; (2) in excess of the Board's and DOH's authority; (3) made upon unlawful procedure; (4) affected by other error of law; (5) clearly erroneous; and (6) arbitrary or capricious or characterized by abuse of discretion. Specifically, Dr. Kyros asserted in support of his administrative appeal that the Board's order that Dr. Kyros attend CPEP was "disproportionately harsh when compared to the sanctions propounded upon other similarly situated physicians[,]" and "unsupported by factual findings in the Board's [d]ecision." Doctor Kyros also argued that the length of time it took for the Board to determine final sanctions and a path forward was arbitrary and capricious.

The defendants argued that the Board's decision to require Dr. Kyros to complete CPEP should be upheld because Dr. Kyros "has not proffered any proof of his clinical competence to practice medicine[,]" and has "not seen a patient since 2009[.]" The Board also maintained that any delay in Dr. Kyros' return to the practice of medicine was of his own accord because he refused multiple opportunities to return to practice with supervision and probation.

The trial justice entertained argument on September 18, 2019; on December 13, 2019, he issued a written decision granting the appeal and reversing the Board's decision. The trial justice found that "the Board relie[d] solely on Dr.

- 8 -

Kyros' nine-year gap in practicing medicine—a gap that the Board is largely responsible for—to justify requiring clinical competency courses." Referencing the Board's Superior Court filing in opposition to Dr. Kyros' administrative appeal, the trial justice noted that "[t]he Board arbitrarily believes this gap speaks for itself" but that, in actuality, the record was "devoid of nearly any evidence that Dr. Kyros is not clinically competent." The trial justice recognized that the only evidence of Dr. Kyros' clinical competence was from Drs. Brown, Jacobs, and Harrop, all of whom determined that Dr. Kyros was fit to return to the practice of medicine, and the undisputed fact that Dr. Kyros had completed all continuing medical education credits.

The trial justice expressed his concern "about the extensive license deprivation" created by the Board "where Dr. Kyros was unable to understand and fulfill what [the Board] wanted for over nine years." The trial justice found that Dr. Kyros *never* surrendered his medical license, but rather agreed to cease practice pursuant to the Agreement; the doctor "was only forced to apply for relicensure to get the Board to come to a conclusion when it repeatedly remained silent regarding Dr. Kyros's efforts to return to practice." The trial justice correctly concluded that "there has been no finding by the Board of unprofessional conduct[,] * * * there was no competent evidence to support a finding requiring

- 9 -

Dr. Kyros to attend CPEP classes to address his clinical competency[,] * * * [and]

the imposition of that penalty was arbitrary and capricious."

Accordingly, the Superior Court reversed the decision of the Board and

stated that

> "[a]lthough the [c]ourt would typically be inclined to
> remand this case to RIDOH for further proceedings—
> with respect to inadequate findings of fact—here, the
> [c]ourt finds that doing so would only cause more harm
> and opportunity for delay after a nearly decade-long saga,
> and moreover, the Board [d]ecision was not supported by
> competent evidence."

Final judgment entered in favor of plaintiff. This Court granted defendants'

petition for writ of certiorari on April 24, 2020, and a writ issued on April 29,

2020.[3]

## Standard of Review

The Superior Court's review of an administrative decision is governed by

the Administrative Procedures Act, G.L. 1956 chapter 35 of title 42.[4] "[T]he

---

[3] We also granted defendants' emergency motion to stay enforcement of the trial justice's decision pending our consideration of the writ of certiorari.

[4] General Laws 1956 § 42-35-15(g) provides:

> "The court shall not substitute its judgment for that of the
> agency as to the weight of the evidence on questions of
> fact. The court may affirm the decision of the agency or
> remand the case for further proceedings, or it may
> reverse or modify the decision if substantial rights of the
> appellant have been prejudiced because the

- 10 -

Superior Court must uphold the agency's decision if it is supported by legally

competent evidence." *Endoscopy Associates, Inc. v. Rhode Island Department of

Health*, 183 A.3d 528, 532 (R.I. 2018). "When this Court reviews the Superior

Court's decision on certiorari, we apply the 'some' or 'any' evidence test and

review the record to determine whether legally competent evidence exists to

support the findings.'" *Id.* (brackets omitted) (quoting *Sartor v. Coastal Resources

Management Council*, 542 A.2d 1077, 1083 (R.I. 1988)). This Court will "not

weigh the evidence, but rather determine whether the trial justice was legally

justified in modifying or reversing the agency's order." *Id.* (quoting *Interstate

Navigation Co. v. Division of Public Utilities and Carriers*, 824 A.2d 1282, 1286

(R.I. 2003)). We also examine the record for any errors of law. *Id.*

---

> administrative findings, inferences, conclusions, or
> decisions are:
>> "(1) In violation of constitutional or statutory
>> provisions;
>> "(2) In excess of the statutory authority of the
>> agency;
>> "(3) Made upon unlawful procedure;
>> "(4) Affected by other error of law;
>> "(5) Clearly erroneous in view of the reliable,
>> probative, and substantial evidence on the whole
>> record; or
>> "(6) Arbitrary or capricious or characterized by
>> abuse of discretion or clearly unwarranted exercise
>> of discretion."

- 11 -

Case 1:24-cv-00074-MSM-LDA   Document 1-1   Filed 02/21/24   Page 254 of 270 PageID
#: 273

## Analysis

Before this Court, defendants assert two claims of error. The defendants first argue that the trial justice erred in finding that the Board's decision was arbitrary, capricious, and not supported by competence evidence. Specifically, defendants contend that the CPEP requirement was made pursuant to the Agreement—which authorized the Board to take into consideration the Santé Center Report and make a final determination on sanctions—and the Board's decision noted that Dr. Kyros had not seen a patient since 2009, thereby supporting this sanction. The defendants are mistaken.

The specification of charges issued against Dr. Kyros is the controlling document in this case, and it alleges that Dr. Kyros violated § 5-37-5.1. This section of our general laws is entitled "Unprofessional conduct" and enumerates thirty-one items that may constitute unprofessional physician conduct. The Board specifically charged Dr. Kyros with violating § 5-37-5.1(24), which qualifies unprofessional conduct as "[v]iolating any provision * * * of this chapter or the rules and regulations of the board or any rules or regulations promulgated by the director or of an action, stipulation, or agreement of the board[.]" This charge was not sustained. Doctor Kyros was not found to have engaged in unprofessional conduct, and no disciplinary sanction was imposed. The Board did not address it.

- 12 -

The Board's decision overlooked, and indeed ignored, the specification of
charges and declared that the issue before it was *not* whether Dr. Kyros "engaged
in unprofessional conduct by violating a Board order and if so, what discipline
should be imposed, *but rather* * * * whether because of previous complaints of
unprofessional conduct that resulted in the Agreement should [Dr. Kyros] be
allowed to be re-licensed in light of the requirements in the Agreement."
(Emphasis added.) This was a marked departure from the specification of charges
and was made upon unlawful procedure.    The trial justice was correct in
concluding that the Board never made a finding that Dr. Kyros was guilty of
unprofessional conduct.

    The Board made no finding that Dr. Kyros violated the terms of the
Agreement and, importantly, the record is devoid of any evidence that he did so.
Both sides were bound by the terms of the Agreement. It is not a flexible concept.
The record before us establishes that Dr. Kyros attempted to fulfill all of his
obligations under the Agreement, including attending the Santé Center, complying
with the recommendations in the report, treating with psychiatrists, and completing
a course in proper boundaries and professionalism. He sought guidance from the
Board on numerous occasions as to his next steps; and, if he received a response
from the Board, he followed through with their instructions, including engaging
with the Physicians Health Committee of the Rhode Island Medical Society and

- 13 -

submitting to a forensic psychiatric evaluation, all at his expense. He also completed all continuing medical education credits from 2013 through 2017. Despite Dr. Kyros' unflagging efforts to comply with the terms of the Agreement and satisfy all requests made by defendants, the Board—for nine years—neglected *its* obligation under the Agreement to "make a determination on final sanctions" and ultimately imposed none. The Board made no findings about Dr. Kyros' clinical competency and there is no credible evidence to support its order for a competence assessment program and fitness for duty evaluation for practitioners seeking to reenter practice after discipline.

The trial justice found that the record was devoid of any evidence that Dr. Kyros was not clinically competent to practice medicine. In the face of this finding, a remand would be futile. Although the Board acknowledged in its decision that pursuant to "the Agreement, the Board is to take into consideration the Sant[é] Center's Report when determining any licensing and discipline issues[,]" it overlooked and misconceived the provision in the report that "[t]he issue of skill and competence in the practice of medicine is beyond the scope of this assessment and will not be addressed here." Accordingly, any reliance by defendants on the report to uphold the Board's decision is misplaced and was

- 14 -

properly rejected by the trial justice.[5]  The issue of skill and competence was

textually committed to the DOH, and DOH failed to present any evidence and

made no findings.

The only competent evidence in the record of Dr. Kyros' fitness for clinical

practice is the positive reports from three respected medical practitioners, Drs.

Brown, Jacobs, and Harrop, as well as the evidence that he completed all

continuing medical education credits.  In their reports, the physicians each reached

the same conclusion: Doctor Kyros was fit to have his license reinstated and return

to clinical practice.  The Board erroneously concluded:

> "Pursuant to the Agreement * * * the Committee
> unanimously found that in order to be re-licensed, [Dr.
> Kyros] shall ensure competency by satisfactorily
> completing the fitness for duty and clinical competency
> assessment at CPEP and by following all
> recommendations from CPEP. [Doctor Kyros] shall keep

---

[5] Notwithstanding the lack of relevance of the report to the issue of Dr. Kyros'
clinical competency, we note our concern about the fact that two polygraph
examinations were employed to support the conclusion that Dr. Kyros should not
return to the unrestricted practice of medicine because he was not "fully truthful
[or] is in denial about his own actions or contributions to the situations that led to
his past and current complaints." This Court has "conclud[ed] that the 'test results
of polygraph examinations have not been established as scientifically reliable.'"
*State v. Werner*, 851 A.2d 1093, 1103 (R.I. 2004) (quoting *State v. Dery*, 545 A.2d
1014, 1017 (R.I. 1988)). We have "determined that polygraph examinations are
unreliable and that no evidence exist[s] tying deceit and lying to the physiological
reactions measured by a polygraph examination." *Id.* Accordingly, polygraph
evidence is categorically excluded under our jurisprudence. *Id.* Because a
polygraph examination is not an accepted investigatory tool, its inclusion in the
report is unsettling.

> the Board informed of his progress at CPEP on an
> ongoing basis."

The Board's reliance on the Agreement to support these findings is clearly erroneous. The Agreement is silent on the question of clinical competency. The Board failed to make a single finding that Dr. Kyros was, in fact, not clinically competent, and wholly overlooked the substantial evidence in the record that plaintiff was fit for clinical practice.

Although the Board argued to the trial justice that Dr. Kyros' "lapse of more than nine years speaks for itself relative to the question of clinical competence," this blanket assertion is of no moment to the issue before us and ignores the reliable and probative evidence in the record. Furthermore, this argument is belied by the fact that the Board specifically limited Dr. Kyros to the programs for physicians who have been disciplined.[6]

Pursuant to § 5-37-6.2, the Board is required to "prepare written findings of fact and law" to support its conclusions and decision. If the Board fails to adequately do so, then the Superior Court may, pursuant to § 42-35-15(g), find the decision erroneous and unsupported by evidence, or arbitrary or capricious. *See*

---

[6] The Board's decision specifically directed Dr. Kyros to complete CPEP's clinical competency assessment. The Board acknowledged that this program is reserved for "[t]hose seeking to reenter practice after discipline[,]" and the decision stated that Dr. Kyros was *not* to complete the reentry to clinical program at CPEP. Thus, the sanction imposed by the Board was clearly a disciplinary sanction. A necessary predicate to discipline was a finding by the Board that he was guilty of unprofessional conduct. There is no such finding.

- 16 -

*Sakonnet Rogers, Inc. v. Coastal Resources Management Council*, 536 A.2d 893,
896 (R.I. 1988) ("An administrative decision that fails to include findings of fact
required by statute cannot be upheld."). In this case, the Board wholly failed to
make findings of fact that supported its conclusion that Dr. Kyros needed to attend
postdiscipline CPEP programs to assess his clinical competency. Instead, the
Board attempted to support the CPEP requirement—which apparently could cost
approximately $28,000—by arguing that the necessity of the program spoke for
itself. The Superior Court properly recognized these deficiencies and reversed the
decision.

The defendants also submit that the trial justice erred in declining to remand
the case to the Board for further proceedings because the protection of the health
and safety of the public "outweigh[s] concern for prejudice of [Dr. Kyros'] right to
a final adjudication within a reasonable period." We disagree with this contention.
Parties who are subject to administrative proceedings have the right to an
expeditious agency decision and judicial decision. Only the trial justice complied
with this mandate; the DOH did not. Indeed, this Court has "acknowledge[d] that
there are instances in which a remand to an administrative agency may not be the
most appropriate remedy[,]" including those cases in which a remand would not
"'further the interests of justice * * * [or] provide decisive new information.'"
*Champlin's Realty Associates v. Tikoian*, 989 A.2d 427, 449 (R.I. 2010) (quoting

- 17 -

*Easton's Point Association, Inc. v. Coastal Resources Management Council*, 559
A.2d 633, 636 (R.I. 1989)).

Doctor Kyros voluntarily ceased practicing medicine for more than nine
years. It is striking that defendants would now claim that this matter should be
further delayed in order to afford them an opportunity to attempt to correct the
deficiency of the Board's decision which did not comply with the specification of
charges. Allowing defendants to continue to stonewall Dr. Kyros' return to the
practice of medicine will not further the interests of justice.[7]

Moreover, remanding the matter to the Board would not produce new
information that could cure the deficiency of the Board's decision. As we have
already concluded, there is no evidentiary support in the record that Dr. Kyros is
not clinically competent. The passage of time does not speak to anything in light
of all that Dr. Kyros has done in furtherance of the Agreement. It is not for us to
hold otherwise. Accordingly, we discern no error with the trial justice's decision
reversing the Board's decision and declining to remand for further proceedings.

---

[7] We acknowledge that, at times, delay in the resolution of this matter may have
been caused by Dr. Kyros' financial situation, his desire to retain new counsel,
and/or tactical decisions made by counsel. However, Dr. Kyros' actions in no way
relieved the Board of its responsibilities pursuant to the Agreement to determine
final sanctions.

## Conclusion

The judgment of the Superior Court is affirmed. The papers may be
remanded to the Superior Court with our decision endorsed thereon.

**Justice Robinson, dissenting.** I respectfully but vigorously dissent from the
majority's opinion in this important and vexing case. I never lightly dissent, but I
am unequivocally convinced that I must do so forcefully in this case. In my
opinion, the hearing justice erred when he reversed the decision of the Rhode
Island Department of Health's Board of Medical Licensure and Discipline (the
Board), which had required that, in order to be re-licensed, William Kyros, M.D.,
must "satisfactorily complet[e] the fitness for duty and clinical competency
assessment at [the Center for Personalized Education for Physicians (CPEP)]
and * * * follow[ ] all recommendations from CPEP."

I acknowledge at the outset, as I must, that our standard of review in the
context of a case which comes to this Court by way of a writ of certiorari is
deferential: we do not weigh the evidence but rather review "the record as a whole
to determine whether any legally competent evidence[1] exists therein to support

---

[1]    "Legally competent evidence (sometimes referred to as 'substantial
evidence') has been defined as relevant evidence that a reasonable mind might
accept as adequate to support a conclusion[; it] means an amount more than a
scintilla but less than a preponderance." *Town of Burrillville v. Rhode Island State*

- 19 -

the trial court's decision or whether the trial court committed [an] error of law in reaching its decision." *Banki v. Fine*, 224 A.3d 88, 94 (R.I. 2020) (internal quotation marks omitted); *see also Preservation Society of Newport County v. City Council of City of Newport*, 155 A.3d 688, 692 (R.I. 2017) ("If legally competent evidence exists to support [the] determination [at issue], [this Court] will affirm it unless one or more errors of law have so infected the validity of the proceedings as to warrant reversal.") (internal quotation marks omitted). It is my position that the hearing justice in this case clearly committed errors of law in reversing the decision of the Board.

The basis of my disagreement with the majority is twofold. First, I am of the opinion that the hearing justice clearly erred as a matter of law in this case in failing to recognize that the "Agreement to Cease Practice" (the Agreement), which Dr. Kyros and the Director of Health (on behalf of the Department of Health) signed in 2009, controls this case. Second, in my judgment, the hearing justice also erred in failing to recognize the Board's explicit statutory authority to see to it that the public is properly protected when the Board is dealing with a doctor who, as of the time of the Board's decision, had not practiced medicine in approximately nine years.

---

*Labor Relations Board*, 921 A.2d 113, 118 (R.I. 2007) (internal quotation marks omitted).

This dispute began when the Board received "notice that [Dr. Kyros]
engaged in unprofessional conduct by engaging in serious professional boundary
violations with patients." An Investigating Committee of the Board then "found
probable cause for discipline." In response to that finding, Dr. Kyros and the
Board entered into the Agreement "for settlement purposes * * *." The Agreement
explicitly set forth the following pertinent facts: (1) the Board had "received
information concerning three boundary violations with women who were [Dr.
Kyros's] patients" dating from the early 1990s to 2009; and (2) "[t]he complaints
to the Board implicate[d] the provisions of R.I.G.L.5-37-5.1 (30) for sexual contact
between a doctor and a patient."

The Agreement further provided that Dr. Kyros was waiving a number of
rights, including his right to appear personally or by counsel (or both) before the
Board; his right to further procedural steps (except for those specifically contained
in the Agreement); and "[a]ny and all" of his rights to appeal the Agreement.[2] The
Agreement reflected Dr. Kyros's explicit assent to complying with the following
requirements: (1) cease practicing; and (2) attend the Santé Center for Healing for

---

[2]    In my opinion, Dr. Kyros's waiver of these rights in the Agreement, which
expressly stated that it was entered into "for settlement purposes," is the reason the
allegations against him did not progress to a determination by the Board as to
whether or not he had engaged in unprofessional conduct. Doctor Kyros chose to
settle as opposed to availing himself of the further procedural steps before the
Board (and an appeal to Superior Court), to which he would otherwise have been
entitled.

an evaluation. It further provided that the Board would "make a determination on final sanctions after it reviews and considers the evaluation report from [the] Sante Center for Healing." It is significant that Dr. Kyros's signature appears at the end of the Agreement.[3]

A contract, like the Agreement at issue in this case, is binding on the signatories to the contract. *See Lamoureux v. Burrillville Racing Association*, 91 R.I. 94, 98, 161 A.2d 213, 215 (1960) ("A contract is an agreement which creates an obligation.") (quoting 17 C.J.S. *Contracts* § 1 at 310); 17A Am. Jur. 2d *Contracts* § 1 (May 2021 Update) ("A 'contract' is an agreement between two or more parties that creates obligations that are legally enforceable by the contracting parties."); *see also Manchester v. Pereira*, 926 A.2d 1005, 1012 (R.I. 2007) ("[I]t has long been a settled principle that a party who signs an instrument manifests his assent to it and cannot later complain that he did not read the instrument or that he did not understand its contents.") (internal quotation marks omitted). Thus, Dr. Kyros is bound by his agreement to allow the Board to make a determination of final sanctions after it reviewed the Santé Center evaluation. After carefully poring over the record, it is my opinion that that is what the Board has actually done in this case. The Board has surely not acted with maximal celerity and clarity, but it has nonetheless done what it contractually bound itself to do when the critically

---

[3]   I further note that it is clear from the record that Dr. Kyros was represented by counsel at the time he entered into the Agreement.

- 22 -

important Agreement was signed by both parties in the wake of the Board's having "received information concerning three boundary violations with women * * *."

I readily acknowledge that the Board's ultimate decision was issued years after the signing of the Agreement. At the same time, however, it is noteworthy that the Agreement did not contain any timeline provision. Additionally, I would note that, while the Board is not blameless with respect to the delay in this case, it is clear from the record that a meaningful portion of the delay was the result of negotiations between the Board and Dr. Kyros with respect to his possible return to practice and the conditions that might be attached thereto. The record reflects that those negotiations were unsuccessful at least in part due to Dr. Kyros's resistance to supervised practice. Because, in my judgment, the Agreement which Dr. Kyros opted to enter into allows for the Board to determine final sanctions, as it has now done, it was error on the part of the hearing justice to reverse the Board's decision.[4] Doctor Kyros voluntarily chose to settle by entering into a contractual agreement with the Board. It is my unblinking view that he must now live with the binding legal effect of that choice.

---

[4]    I would note that the Board's decision in this case specifically stated that the issue before it was whether Dr. Kyros should be relicensed "in light of the requirements in the Agreement." The fact that the specification of charges (on which the majority so heavily relies) stated something different does not alter my conclusion about the authority that the Board had to act as it did under the Agreement.

- 23 -

That being said, it is separately my opinion that the Board had competent evidence to support its decision given the fact that Dr. Kyros has, as of now, not practiced medicine for *approximately twelve years*. The Department of Health is specifically charged, by statute, with taking "cognizance of the interests of life and health among the peoples of the state * * *." General Laws 1956 § 23-1-1. The Board, and in turn both the Superior Court and this Court, owe a solemn duty to the public to ensure that medical professionals who are licensed to practice medicine in this state are at least minimally competent. Twelve years away from any profession would in all likelihood affect one's competency and skill. In the field of medicine particularly, twelve years might well be the metaphorical equivalent of an eternity when one considers the rate of medical advancements in the modern world. The Board was well within its authority with respect to its role in licensing physicians and its duty to the public when it required Dr. Kyros to attend CPEP so that there might be assurances of his clinical competency after what was then an approximately nine-year hiatus from practice. In my view (which is contrary to that of the hearing justice), that fact alone serves to show that the Board's decision was not arbitrary and capricious; I submit that the hearing justice erred in finding it to be so.[5]

---

[5]    I note that, in my opinion, it is relevant that the report from the Santé Center explicitly deferred the issue of competency to the Board. Moreover, I would note that my view in this case is not altered by the fact that the CPEP programs which

- 24 -

In addition, I wish to direct attention to the following language from the

Rhode Island Code of Regulations pertaining to the Department of Health:

> "Granting of licensure after a lapse for non-disciplinary
> reasons. If a physician has not engaged in the active
> practice of medicine for two (2) years or more the Board
> shall establish clinical competency of the applicant prior
> to reactivation or reinstatement. The Board may establish
> clinical competency based on any or all of the following:
>
> "* * *
>
> "3. An evaluation of clinical competency by a
> Board approved organization, such as the Center
> for Personalized Education for Physicians (CPEP).
> The applicant is responsible to report the results of
> an evaluation from a Board approved organization
> and follow the recommendations for ongoing
> competence * * *." 216 RICR 40-05-1.5(E).

Although I acknowledge that, because of its date of enactment, this regulation as

such is not applicable to this case, it is at least evidence of the fact that, even in

cases where an absence from practice was for non-disciplinary reasons and has

lasted only two years (as opposed to the approximately twelve years at issue in this

case), the Board may now require that the physician attend CPEP, just as it has

done here.

I am convinced that the Board, in requiring Dr. Kyros to attend CPEP, was

well within its authority and, frankly, was acting in a laudably responsible manner,

---

the Board directed Dr. Kyros to complete were apparently programs to be
completed after discipline; what matters is that the Board was seeking to assure
itself of Dr. Kyros's *present* competence to serve as a medical doctor in this state.

- 25 -

acting pursuant to its statutory duty to protect the public.[6] It seems to me that all responsible citizens should be very concerned about the potentially harmful effect on unwitting members of the public of the ministrations of a doctor who has not practiced medicine in approximately twelve years and who, as a result of the decision of the majority, will not be required to do *anything* to prove that he remains competent to practice.[7] To me, the potential threat to the "life and health

---

[6]    The appropriateness of the Board's action vis-à-vis Dr. Kyros in this case is in my view one whose necessity is self-evident. To my mind, the Board acted in a manner that was entirely consistent with common sense. *See Peak v. United States*, 353 U.S. 43, 46 (1957) ("That seems to us to be the common sense of the matter; and common sense often makes good law.").

[7]    The majority relies on the positive reports of Edward M. Brown, M.D., Gene Jacobs, D.O., and Daniel S. Harrop, M.D., and the fact that Dr. Kyros completed all of his continuing medical education credits as evidence of clinical competency. I strongly disagree that those reports and credits are genuinely instructive as to the issue of clinical competency.

I note initially that Dr. Brown's report (which is surely not entirely positive) dates back to 2010, and both Dr. Jacobs's report and Dr. Harrop's initial report date back to 2013, thus *eight* years and *five* years respectively before the Board's decision at issue in this case. Indeed, Dr. Harrop's updated report was from 2015, some *three* years prior to the Board's decision at issue in this case. But, more importantly, after reading these reports, it is clear to me that they reflect a focus on Dr. Kyros's mental health and whether his mental health was such that it would permit him to responsibly practice in view of the complaints about him stemming from allegations concerning "sexual contact between the doctor and a patient" that gave rise to this case.     Those reports *do not* discuss Dr. Kyros's clinical competency. Additionally, I do not believe that continuing medical education credits are indicative of clinical competency in this particular case, given the lengthy period of time during which Dr. Kyros has been away from the practice of medicine.

- 26 -

[of] the peoples of the state" should trump any other consideration. Section 23-1-1.

Accordingly, for the reasons set forth herein, I respectfully assign error to the hearing justice because, in my judgment, he erred as a matter of contract law and also with respect to the import of the Board's statutory charge to protect the public when licensing physicians.

I do not question the sincerity of the disapprobation of the regrettable lassitude of the Board in dealing with the case of Dr. Kyros that has resulted in the position taken by the majority—although I hasten to add that Dr. Kyros too lives in a glass house with respect to the enormous delays that are reflected in the record. In the end, however, bearing in mind the crucial role of the Department of Health vis-à-vis the citizenry, I very respectfully question whether the decision of the majority comports with what real justice requires in this so very troubling case. In the same tone of respectfulness, but also with ardent conviction, I conclude by remarking that I have never forgotten the observation of the late Justice Thomas Kelleher to the effect that "the attainment of justice * * * is the true purpose of a court's existence." *Wilkinson v. Harrington*, 104 R.I. 224, 230, 243 A.2d 745, 749 (1968).[8]

---

[8]    I certainly do not for a moment mean to imply that my respected colleagues ever fail to pursue justice. However, I am profoundly aware that what is "just" can be the subject of good-faith debate. It is my humble opinion that the Court's

- 27 -

Therefore, I record my respectful but wholehearted dissent in this case.

opinion in this case does not attain justice, but I do not question the sincerity of those who view the issue differently.